UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
RUOSHUI SUN, Individually and on Behalf of : Civil Action No.  1:22-cv-01015
All Others Similarly Situated,                 :
                                               : CLASS ACTION
                              Plaintiff,        :
                                               :
            vs.                                 : COMPLAINT FOR VIOLATIONS OF THE
                                               : FEDERAL SECURITIES LAWS
TAL EDUCATION GROUP, BANGXIN               :
ZHANG, RONG LUO and LINDA HE,              :
                                               :
                              Defendants.        :
                                               :
———————————————————— x DEMAND FOR JURY TRIAL

Plaintiff Ruoshui Sun ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of TAL Education Group ("TAL" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased TAL American Depository Shares ("ADSs") between April 26, 2018 and July 22, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1934 (the "1934 Act") against TAL and certain of the Company's senior officers and directors.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act.  TAL ADSs trade on the New York Stock Exchange ("NYSE"), located within this District, and defendants disseminated the statements alleged herein to be materially false and misleading into this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

5.      Plaintiff Ruoshui Sun, as set forth in the certification attached hereto and incorporated by reference herein, purchased TAL ADSs during the Class Period and suffered damages as a result.

6.      Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in the People's Republic of China ("China" or the "PRC"). TAL ADSs trade on the NYSE under the ticker symbol "TAL." Each ADS represents one third of one share of TAL common stock.

7.      Defendant Bangxin Zhang ("Zhang") co-founded TAL. He was the Chief Executive Officer ("CEO") and a director of TAL during the Class Period and, until January 2020, the Chairman of the Board of Directors. Defendant Zhang is also the controlling shareholder of the Company and, largely through his ownership of TAL shares, was reportedly one of the richest individuals in China.

8.      Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period. He resigned from the Company effective October 29, 2021.

9.      Defendant Linda He ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019.

10.      The defendants referenced above in ¶¶7-9 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with TAL, are referred to herein as "defendants."

11.      Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary

information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is

responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

14.     TAL provides K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese.  Tutoring services are primarily offered through small classes, personalized premium services and online course offerings.  Although headquartered in Beijing, China, the Company is organized as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities, including Beijing Xueersi Education Technology Co., Ltd.

15.     TAL provides tutoring services under the brands Xueersi Peiyou, Firstleap, Mobby and Izhikang, as well as overseas study consulting services and test preparation courses for major overseas exams in China.  Xueersi Peiyou is TAL's leading brand that offers small-class offline tutoring services.

16.     TAL's primary sources of revenue are: (i) small class tutoring services that focus on offline education; and (ii) online education services provided through www.xueersi.com.  For the fiscal year ended February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively.  As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform.

17.     In February 2018, the Chinese government released a set of regulations aimed at reining in excessive tutoring fees and limiting the perceived societal harm resulting from the ubiquity of for-profit tutoring programs in China such as those offered by TAL.  Among other

changes, the regulations prohibited after-school tutoring institutions from providing courses more advanced than the syllabus and curricula applicable to the respective primary and secondary school students, providing courses designed to enhance exam-taking skills, and linking school enrollment with tutoring results.  On the whole, the regulations were aimed at reducing disparities in school performance between relatively affluent students able to afford after-school tutoring and those that could not.

18.     On August 22, 2018, the Chinese State Counsel issued an opinion on Supervising After-School Tutoring Institutions, known as "Circular 80," which provided further regulations targeting after-school tutoring institutions.  In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than three months' worth of fees.

19.     Because TAL operated in a highly regulated industry within China, the impact of new laws and regulations impacting the Chinese tutoring industry and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance to investors.  In fact, TAL acknowledged the material importance of maintaining strict compliance with Chinese laws, regulations and government prerogatives.  For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations."

20.     Despite defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations and proscriptions of the Chinese government, during the Class Period the Company routinely engaged in illicit business practices designed to artificially inflate the Company's financial results.  Among its many transgressions, TAL reportedly: (i)

engaged in deceptive advertising and promoted fake product pricing, designed to induce student enrollment; (ii) fabricated favorable course reviews, including by purported consumers who did not in fact exist; (iii) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (iv) offered courses that gave students unfair advantages in contravention of Chinese government policies; (vi) misrepresented teacher qualifications and course qualities; (vii) mishandled user data; and (viii) rigged promotional events to defraud consumers.  As one Chinese language source observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]."  Instead, the Company continued to engage in "over-standard and advanced tutoring, illegal charges, false publicity, tricking consumer into transactions, [the use of] vulgar videos, illegal recruiting and financial fraud."  Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."[1]

21.    As a result of its wide-ranging misconduct, TAL was exposed to an extreme undisclosed risk of adverse governmental action, as well as immense legal, regulatory and reputational fallout if TAL's illicit business practices were ever publicly revealed.  Defendants engaged in a fraudulent scheme to conceal the Company's true business practices and, later, an impending government crackdown on the industry, falsely claiming that TAL maintained industry-leading compliance with applicable rules and regulations governing the Chinese for-profit tutoring industry and that the Company in fact would ***benefit*** from the regulations.  As a result of defendants' scheme to defraud investors and issue materially false and misleading statements during the Class Period, the price of TAL ADSs traded at artificially inflated prices as detailed herein.

---

[1]    The Chinese-language sources cited herein have been translated into English by translators hired by plaintiff's counsel.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS ISSUED DURING THE CLASS PERIOD

22.     The Class Period begins on April 26, 2018.  On that date, TAL issued a release which announced the Company's financial results for the fourth quarter and fiscal year 2018 ended February 28, 2018.[2]  The release stated that the Company had achieved total net revenue for the quarter of $504.1 million, a 59.4% year-over-year increase.  The release also stated that during the quarter total student enrollment had increased 95.7% year-over-year, to approximately 2.6 million students.  For the fiscal year, the release stated that the Company had achieved total net revenue of $1.7 billion, a 64.4% year-over-year increase.  In the release, defendant Luo attributed TAL's favorable results to "'rapid enrollment growth and all-around structural improvement in our business.'"  Defendant Luo added that "'[l]ooking ahead, we believe we are well positioned to maintain healthy growth.'"

23.     On June 26, 2018, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year ended February 28, 2018, which was signed by defendant Zhang and included signed certifications attesting to its accuracy by defendants Zhang and Luo (the "2018 Form 20-F").  The 2018 Form 20-F included the Company's annual financial results detailed above. In addition, the 2018 Form 20-F described TAL's marketing and recruitment strategies which includes word-of-mouth referrals, adding that "[o]ur reputation and brand have also greatly facilitated our student recruitment."  Further, the 2018 Form 20-F stated that TAL was "in the process of adapting our operations" and "taking corrective measures" to ensure compliance with the February 2018 regulations.

24.     On July 26, 2018, TAL issued a release which announced the Company's financial results for the first quarter of 2019 ended May 31, 2018.  The release stated that the Company had

---

[2]     TAL's fiscal year ends February 28th or 29th of the calendar year.

achieved total net revenue for the quarter of $550.6 million, a 71.1% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 88.7% year-over-year, to approximately two million students. In the release, defendant Luo stated that "'the first quarter's financial and operational results reflect the steady growth of our offline and online business revenue and enrollments.'" Defendant Luo added that "'we remain committed to a healthy and sustainable overall business development.'"

25.    That same day, TAL held an earnings call with analysts and investors hosted by defendant Luo. During the call, defendant Luo acknowledged the policies that the government has released relating to the tutoring market and stated that the policies are aimed at further improving the overall standards of the industry and TAL is "***fully cooperating with the government directions***, and where needed, [will] make adjustments to our business operations accordingly." Defendant Luo also stated that the reform policy will "***be very positive*** for the quality and diversity of off-line school tutoring services."

26.    On October 25, 2018, TAL issued a release which announced the Company's financial results for the second fiscal quarter of 2019 ended August 31, 2018. The release stated that the Company had achieved total net revenue for the quarter of $699.8 million, a 53.5% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 120.2% year-over-year, to approximately 4.9 million students. In the release, defendant Luo stated that "'revenue and enrollments grew steadily'" due to "'stable online and offline business performance.'" Defendant Luo added that "'[l]ooking ahead, we will continue to enhance product quality and customer satisfaction, and further our contribution to the healthy and sustainable development of the education sector.'"

27.     That same day, TAL held an earnings call with analysts and investors hosted by defendant Luo.  During the call, defendant Luo stated that the 120.2% year-over-year student enrollment growth was "mostly driven by the growth in online enrollments as well as Xueersi Peiyou small class."   Further, defendant Luo asserted that TAL was "***definitely to comply with the government policies***."

28.     On January 24, 2019, TAL issued a release which announced the Company's financial results for the third fiscal quarter of 2019 ended November 30, 2018.  The release stated that the Company had achieved total net revenue for the quarter of $586 million, a 35.3% year-over-year increase.  The release also stated that during the quarter total student enrollment had increased by 68.4% year-over-year, to approximately 2.6 million students.  In the release, defendant Luo stated that "'[o]ur third quarter revenue performance was based on healthy growth of small class business and the continued scaling of our online courses.'"  Defendant Luo added that "our overall financial and business performance have further improved due to our ongoing efforts to upgrade operational utilization and efficiency."

29.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated, in regard to recently imposed government regulations, that "[a]ll these policies are aimed at further improving overall standards and the ecosystem of the entire industry.  ***We are following government directions***, and where needed, we will continue to make adjustments into our business operations accordingly."  Defendant Luo later added that the government policies had been good for TAL's business, as they had "***greatly improved the service standard of the whole industry***."  He continued: "***[W]e fully agree with all the policies and try to execute the policies in our operations as much as we can***."  Defendant Luo also asserted that "***we try our best to be compliant with all the government kind of policies***" as they

would be "***beneficial***" in the long run to companies like TAL.  Defendant Luo added that "***we welcome all the regulations, policies in online environments***."  Defendant Luo further reassured investors that "***[i]f any new policy [comes] out, we definitely will become the first compan[y] who will go and implement all the policies in place***."

30.    On April 25, 2019, TAL issued a release which announced the Company's financial results for the fourth fiscal quarter and fiscal year ended February 28, 2019.  The release stated that the Company had achieved total net revenue for the quarter of $726.6 million, a 44.1% year-over-year increase.  The release also stated that during the quarter total student enrollment had increased by 71.2% year-over-year, to approximately 4.5 million students.  For the fiscal year, the release stated that the Company had achieved total net revenue of $2.6 billion, a 49.4% year-over-year increase.  In the release, defendant Luo stated that "'[o]ur overall education program is proceeding as planned with a healthily paced growth in online business and measured capacity expansion in our learning center and geographic network.'"

31.    That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated that the robust student enrollment growth was "mostly driven by the growth in online enrollments of Xueersi Peiyou small class." Further, in regard to the education regulations, defendant Luo stated that "***[w]e have followed the government directions***, and where needed, we'll continue to adjust our business operations accordingly."  Defendant Luo spoke favorably of the government regulations, stating that "[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry."

32.    During the earnings call, defendant Luo also described TAL's use of branding channels as a beneficial way that the Company gains customers while keeping customer acquisition costs down.  Defendant Luo explained that costs are very low for utilizing branding channels, where

parents "trust our brand" which encourages "parents' referrals."  Defendant Luo added that this had

allowed TAL "to leverage our word-of-mouth marketing" to attract more students.

33.     During the same earnings call defendant He attributed "[t]he rapid scaling of online

courses" to TAL's effective sales tactics, including its "marketing online customer acquisition

efforts."

34.     On May 16, 2019, TAL filed with the SEC on Form 20-F the Company's financial

results for the fiscal year ended February 28, 2019, which was signed by defendant Zhang and

included signed certifications attesting to its accuracy by defendants Zhang and Luo (the "2019

Form 20-F").  The 2019 Form 20-F included the Company's annual financial results detailed above.

The 2019 Form 20-F also stated that "[w]e are a leading K-12 after-school tutoring services provider

in China."  The 2019 Form 20-F described TAL's marketing and recruitment strategies, stating that

the Company's "reputation and brand have also greatly facilitated our student recruitment."  Further,

the 2019 Form 20-F stated that TAL had successfully "adapted our operations" to comply with the

February 2018 regulations.

35.     On July 25, 2019, TAL issued a release which announced the Company's financial

results for the first fiscal quarter of 2020 ended May 31, 2019.  The release stated that the Company

had achieved total net revenue of $702.8 million for the quarter, a 27.6% year-over-year increase.

The release also stated that during the quarter total student enrollments of normal priced long-term

courses had increased by 40.6% year-over-year, to approximately 1.7 million students.  In the

release, defendant Luo stated that the favorable results "'reflected the success of our consistent

growth strategy.'"  Defendant Luo also stated that "'[l]ooking ahead, our long-term development

strategy remains unchanged . . . [while at the same time TAL] will continuously invest in new

technology and other initiatives to accelerate our online business development and realize the promising potential of online education.'"

36.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo asserted that TAL "*will follow the government . . . directions in education reforms, standardizations and regulation . . . [and] will adjust our business operations accordingly*."  Defendant Luo further noted that "these policies are aimed at elevating the standards and improving the entire education – the whole industry, *which is the long-term benefit of peer customers and shareholders alike*."  Defendant Luo further claimed that TAL's success was primarily attributable to the quality of its teachers and products, stating: "If you don't pay attention to the real teaching quality, if you don't make students satisfied, if you don't persuade the parents to say you have very good products, that's nothing[,] . . . whether they will stay, depend[s] on the teaching quality you can deliver."

37.     On October 24, 2019, TAL issued a release which announced the Company's financial results for the second fiscal quarter of 2020 ended August 31, 2019.  The release stated that the Company had achieved total net revenue of $936.6 million for the quarter, a 33.8% year-over-year increase.  The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 54.5% year-over-year, to approximately 3.4 million students.  In the release, defendant Luo stated that the results were "'based on the healthy and broadly distributed growth of our overall small class business across the cities we currently cover and the continued scaling of our online courses.'"

38.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated that TAL's second quarter revenue performance "was based on the robust and healthy growth of our overall small class business in the

cities we currently cover and the continuous scaling of our online courses."  In regard to the government policies and regulations, defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made "[t]he pressure of being compliant . . . bigger than before."  Yet, defendant Luo asserted that "*the policies were a good timing for us to review our business models and be more cautious*," so TAL "*can be more compliant than before*."

39.     Also during the earnings call, defendant He referred to a document released in September 2019 by the China Ministry of Education, along with ten other related departments, regarding general guidance relating to the online education industry in China.  Defendant He stated that "*we are very happy to see and even welcome the online education regulations* . . . and . . . will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services."  Defendant He went on to add that "we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students."  Defendant He further stated that "*we welcome and fully support all these regulations and policies, which will have improved the standards and services of the industry and further strengthen the overall industry environment*."

40.     On January 21, 2020, TAL issued a release which announced the Company's financial results for the third fiscal quarter of 2020 ended November 30, 2019.  The release stated that the Company had achieved total net revenue of $862.4 million for the quarter, a 47.2% year-over-year increase.  The release also stated that, during the quarter, total student enrollment of normal priced long-term courses had increased by 66% year-over-year, to approximately 2.3 million students.  In the release, defendant Luo stated that the results "'reflect the progress in our efforts to

build a healthy and sustainable business model.'"  Defendant Luo also stated that "'[w]e expect growth momentum of our overall business to continue.'"

41.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated that "[t]he growth dynamic of our business and our operational efficiency efforts have made positive contributions and will continue to do so to help balance our growth and profitability as well."  Defendant Luo added that TAL "can further leverage our off-line and online advantages . . . [to enable TAL] to build an education services model which is demand-driven and sustainable for the long term."  During the call, defendant He similarly represented that "[a]longside any expansion effort, we invest in new technology and online business to improve overall operational efficiency and ***abide by the standards and regulations***."

42.     On April 28, 2020, TAL issued a release which announced the Company's financial results for the fourth quarter and fiscal year ended February 29, 2020.  The release stated that the Company had achieved total net revenue for the quarter of $857.7 million, an 18% year-over-year increase.  The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 56.6% year-over-year, to approximately 4.6 million students.  For the fiscal year, the release stated that the Company had achieved total net revenue of $3.3 billion, a 27.7% year-over-year increase.

43.     On June 30, 2020, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year ended February 29, 2020, which was signed by defendant Zhang and included signed certifications attesting to its accuracy by defendants Zhang and Luo (the "2020 Form 20-F").  The 2020 Form 20-F included the Company's annual financial results detailed above. The 2020 Form 20-F also stated that "[w]e are a leading K-12 after-school tutoring services provider

in China."  The 2020 Form 20-F added that the "K-12 after-school tutoring market in China [has] grow[n] in recent years," and, barring any unforeseen economic changes, "the demand for K-12 after-school tutoring services will continue to grow."  The 2020 Form 20-F described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's "reputation and brand have also greatly facilitated our student recruitment."  Further, the 2020 Form 20-F stated that TAL had "adapted our operations" to comply with existing governmental regulations and "been making efforts to ensure compliance with these regulations and implementation rules."

44.     On July 30, 2020, TAL issued a release which announced the Company's financial results for the first fiscal quarter of 2021 ended May 31, 2020.  The release stated that the Company had achieved total net revenue of $910.7 million for the quarter, a 35.2% year-over-year increase. The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 72.1% year-over-year, to approximately 2.96 million students.  In the release, defendant Luo stated that "'[t]he first fiscal quarter revenue results were driven by solid performance of online courses and the healthy growth of Xueersi Peiyou business.'"

45.     On October 22, 2020, TAL issued a release which announced the Company's financial results for the second fiscal quarter of 2021 ended August 31, 2020.  The release stated that the Company had achieved total net revenue of $1.1 billion for the quarter, a 20.8% year-over-year increase.  The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 65% year-over-year, to approximately 5.6 million students.

46.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated that TAL's online and offline strategy "remains on track."  Defendant Luo also stated that TAL would continue to enlarge its online market share "by continued investment in technology, teacher supply chain and marketing and consistent

hard work of building all-around online services with superior customer experiences."  Later in the earnings call, defendant Luo stated that in order to maintain its leading position in the online sector, TAL will "keep our investment in technology, in teacher supply chain . . . as well as marketing."  During the same earnings call, defendant He similarly stated that "[t]he growth in online business was supported by . . . [a number of factors including] sales and marketing efforts."

47.     On January 21, 2021, TAL issued a release which announced the Company's financial results for the third fiscal quarter of 2021 ended November 30, 2020.  The release stated that the Company had achieved total net revenue of $1.1 billion for the quarter, a 35% year-over-year increase.  The release also stated that during the quarter total student enrollment of normal priced long-term courses increased by 46.5% year-over-year, to approximately 3.4 million students.

48.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo asserted that TAL "***[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations***, including those that regard national public health."  Defendant Luo further committed to "investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences."

49.     Defendants' statements referenced in ¶¶22-48 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about TAL's business, operations and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that TAL's revenue and operational growth was the result of deceptive marketing tactics and illicit business practices that flouted Chinese laws, regulations and policies,

and exposed the Company to an extreme risk that more draconian measures would be imposed on the Company;

(b)     that TAL had engaged in misleading and fraudulent advertising practices, including the provision of false and misleading discount information designed to obfuscate the true cost of the Company's programs to its customers, the creation of fake customer reviews designed to fraudulently lure new customers to TAL programs, the misrepresentation of teacher qualifications and course qualities, and the marketing of rigged promotional events;

(c)     that TAL had defied Chinese policies designed to alleviate the burden imposed by tutoring services on students and their families, including by imposing hefty advances and recurring debt payments on course enrollees, by offering courses designed to give affluent students unfair advantages, by holding courses outside of allowable tutoring hours, and by linking for-profit courses to government-mandated schooling;

(d)     that, as a result of the foregoing, TAL was subject to an extreme undisclosed risk of adverse enforcement actions, regulatory fines and penalties, and the imposition of new rules and regulations adverse to the Company's business and financial interests; and

(e)     that, as a result of the foregoing, TAL's historical growth was not sustainable or the result of legitimate business tactics as represented, and defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable factual basis.

50.     Additionally, as defendants knew or recklessly disregarded, TAL's annual reports on Form 20-F misleadingly failed to include information required by SEC rules and regulations to be stated therein.  Specifically, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which*

- 17 -

*are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*"   (Emphasis in original.)   Furthermore, Item 5(D), entitled "Trend information," provides:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year.  ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

51.     The scope of the information required to be disclosed under this paragraph is coextensive with that required under Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Furthermore, the SEC has recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

52.     The Form 20-F annual reports filed by TAL during the Class Period violated Item 303 by failing to disclose the adverse facts alleged in ¶49 above concerning the Company's wide-ranging misconduct and efforts to artificially inflate TAL's financial results through the illicit business tactics detailed herein.   These adverse facts and events created known trends and uncertainties that were reasonably likely to (and ultimately did) have a material adverse impact on the Company's financial condition and results of operations, and, accordingly, appropriate disclosure in the Form 20-F annual reports was required.

53.     Additionally, TAL's Form 20-F annual reports failed to disclose certain of the most material risks facing the Company at the time of filing, in violation of Item 105 of SEC Regulation

S-K, 17 C.F.R. §229.105.  Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  Specifically, Item 105 requires a company to "[e]xplain how each risk affects the registrant or the securities being offered" and "each risk factor should be set forth under a subcaption that adequately describes the risk."  Likewise, Item 3 of Part I of Form 20-F requires a foreign private issuer, such as TAL, to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."

54.  TAL's Form 20-F annual reports filed during the Class Period failed these reporting obligations because, as defendants knew or recklessly disregarded, the reports failed to disclose the true risks arising from the adverse facts alleged in ¶49 above concerning the Company's wide-ranging misconduct and efforts to artificially inflate TAL's financial results through the illicit business tactics detailed herein.  The specific and extreme risks of adverse regulatory action, as well as legal, reputational and financial risks arising from these adverse facts, were not disclosed in the annual reports even though they were some of the most material factors that made an investment in TAL ADSs speculative or risky.

55.  Moreover, the purported "risk disclosures" contained in TAL's Form 20-F annual reports were themselves materially misleading.  For example, while the reports stated that TAL "*may*" be subject to adverse regulatory actions if the government found the Company was not in compliance with the existing regulatory regime, nowhere did the reports disclose that TAL was *already* and *knowingly* engaged in the wide-ranging misconduct and illicit business tactics detailed herein.  The Form 20-F annual reports also qualified their discussion of purported regulatory risks by claiming that TAL was taking actions to ensure compliance with the laws, regulations and policies applicable to its business, for example by stating that TAL was "making efforts to ensure

compliance," had "adapted [its] operations" to comply with the law, and had taken various steps to "comply with PRC laws and regulations." The failure to disclose the Company's actual business practices and TAL's efforts to knowingly flout Chinese rules, regulations and policies rendered the discussion of purported "risks" relating to TAL's business contained in the annual reports themselves materially misleading.

56.    From March 4, 2021 through March 11, 2021, China held its annual "Two Sessions" parliamentary meetings, where the two main political bodies of China meet, discuss, and reveal plans for China's policies involving the economy, military, trade, diplomacy, the environment and more.

57.    Media reports stated that attendees of the ongoing Two Sessions conference had proposed "stricter regulations" to rein in the online education industry, such as regulations aimed at enhancing teacher quality, limiting fee scams, reducing market "abuse" by large players like TAL, and reducing the stress that for-profit tutoring companies had placed on students in the Chinese educational system. For example, on March 8, 2021, the *China Daily* published an article titled "Political advisers discuss regulations for online education," which stated in pertinent part as follows:

> Political advisers have proposed stricter regulations for the extracurricular online education industry in China during the ongoing annual session of the Chinese People's Political Consultative Conference National Committee.
>
> These regulations are aimed at enhancing teaching quality and avoid hidden risks faced by customers.
>
> *    *    *
>
> "However, the rapid surge in such short time has created several hidden risks," said Ma Jin, a member of the National Committee of the CPPCC and deputy chairman of the Shanghai municipal committee of China Zhi Gong Party.
>
> "***To seize the opportunity in the emerging market, a few huge companies have abused their dominant position in the sector, whereas small and medium-sized firms are lacking time and finances to grow***," he said.

*In addition, many online education platforms require advance payment, which leads to risks of advance fee scams and customers encountering difficulties in getting refunds, he said*.

\*       \*       \*

To tackle these problems, Ma said the government should formulate regulations for extracurricular online education, including standards for the establishment of education institutions, teaching environment and content.

"Online education platforms should display their teachers' qualifications to the public," he said.

With regard to financial risks, Ma suggested that around 30 percent of the company's reserve fund should be supervised by the government.  Once financial risks emerge, the use of these funds should be restricted.

Furthermore, online education platform institutions should not charge more than three months' worth of tuition fees at a time, and the fee should be used for only teaching related activities, instead of investment.  A third-party payment platform could be used to supervise customer advance payments.

This sentiment was echoed by another political adviser Sima Hong, who is also the chairman of the Beijing Municipal Committee of the Democratic National Construction Association.

Sima advised education authorities to cooperate with banks to establish a supervision system for online education platforms to address the issue of potential misappropriation of advance payments.

"*Any legal person and major shareholders of institutions which illegally charge tuition fees before they disappear should be seriously punished*," she added.

Li Xin, chairman of the Guangdong Provincial Committee, associated the negative impact of substandard online education with children's eye health.

Data from the National Health Commission shows that 53.6 percent of children in China suffered from myopia in 2018.

"Services from some substandard online education platforms have increased students' burden of schoolwork these years," she said.

In her proposal, Li suggested online education institutions be prohibited from cooperation with schools or classes.

"*Schools and teachers should not recommend extracurricular online education platforms and products to parents and students or force students to take e-learning lessons*," she said.

- 21 -

"The length for a web-based course in senior high school should not exceed 30 minutes, while for junior high school students, it should be within 25 minutes, and within for 20 minutes primary school students, to ensure children's eye health," Li said.

"Efforts should also be made by local authorities to limit the students' e-learning time on extracurricular education platforms," she added.

58.     Similarly, on March 11, 2021, the *South China Morning Post* published an article titled "China two sessions: tightened regulation of 'chaotic' K-12 off-campus education market may spoil Big Tech's expansion plans."  The article described how an impending "regulatory storm" presented a headwind for after-school tutoring businesses in China such as TAL, although the article stated that these businesses were likely to be able to navigate the regulatory environment to continue their expansion plans, stating in pertinent part as follows:

China's US$110 billion K-12 off-campus education market, which has struggled during the coronavirus pandemic, is now bracing for a regulatory storm amid comments expressed by the country's leaders, lawmakers and advisers in the "two sessions", the country's biggest annual political gathering.

President Xi Jinping described the domestic market for K-12 – referring to kindergarten to 12th grade – after-school training services as a "social problem" in a meeting last week of the Chinese People's Political Consultative Conference (CPPCC).

"It can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it," Xi said in comments published by official media.

While it remains unclear exactly how regulations are going to be rolled out, the message from the National People's Congress (NPC), China's top legislature, indicated that off-campus training services are "chaotic" and create problems for the country's education sector.  Typically, primary school pupils take extracurricular tutoring on top of their studies on campus to perform well in examinations.

***The prospects of tightened regulation could bring uncertainty to the market and the plans of Chinese Big Tech companies to expand operations in the education sector***.  Tech unicorn ByteDance, owner of short video-sharing apps TikTok and Douyin, recently announced its intention to recruit some 13,000 new employees for its growing Dali education business.

Big Tech's vast resources are expected to help them continue their expansion into education. "The internet giants won't give up their education initiatives," said Claudia Wang, a partner at management consulting firm Oliver Wyman, said on Thursday.

"Most of them have businesses in the education sector that are aligned with government initiatives to improve access to quality education via different channels. They are also equipped with strong capital to be compliant with government regulation."

**A number of big players in the market, including TAL Education Group and New Oriental Education & Technology Group, have become listed companies on the back of domestic demand.**

\*     \*     \*

Dozens of NPC and CPPCC delegates have been vocal about the need to strengthen spot inspections of K-12 off-campus education providers and punish those found guilty of false advertising. Zhu Yongxin, a CPPCC member, suggested that advertising by these providers should be curbed, while fellow delegate Chen Zhongyi suggested a permanent ban on all off-campus tutoring services.

59.     Then, on March 31, 2021, China's Ministry of Education announced that education departments should limit the times at which primary and secondary school students take part in online learning to ensure they are getting enough sleep.

60.     As news of the government's focus on the after-school tutoring industry spread, the price of TAL ADSs began to drop from $76.04 when the market closed on March 5, 2021, to $56.31 by April 1, 2021, a 26% decline. However, the price of TAL ADSs remained artificially inflated because TAL's illicit business practices and the true nature of the Two Sessions parliamentary meetings and the draconian measures that would soon be announced adversely impacting the for-profit tutoring industry were not revealed to the market. In addition, defendants continued to make materially false and misleading statements regarding TAL's business and operations and the impending impact of new governmental regulations on the for-profit tutoring industry following the Two Sessions meetings.

61.     For example, on April 22, 2021, TAL issued a release which announced the Company's financial results for the fourth quarter and fiscal year ended February 28, 2021.  The release stated that the Company had achieved total net revenue for the quarter of $1.4 billion, a 58.9% year-over-year increase.  The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 44% year-over-year, to approximately 6.7 million students.  For the fiscal year, the release stated that the Company had achieved total net revenue of $4.5 billion, a 37.3% year-over-year increase.  The release further stated that TAL was on track to achieve revenues of "between [$1.30] million and [$1.32] million, representing an increase of 43% to 45% on a year-over-year basis," during the first fiscal quarter of 2022.  In the release, defendant Luo attributed TAL's strong annual revenue growth to "'[o]ur strength in both offline and online education capabilities.'"  Defendant Luo added that, "'[l]ooking ahead, we will keep investing in the quality of our products, service and technology *as well as in sustainable marketing efforts*.'"

62.     That same day, TAL held an earnings call with analysts and investors hosted by defendants Luo and He.  During the call, defendant Luo stated that TAL's "tutoring business, both online and off-line, as well as our capacity expansion in all cities developed as planned" in the quarter.  Defendant Luo added that TAL "*will continuously follow up with the government guidelines for the industry . . . as well as keep investing in the quality of our products, services, teachers' training and technologies, supported by sustainable marketing efforts*."  Later in the call, defendant Luo reiterated that "*we as a company, we will follow the government guidelines*" and that "*if the policy is clear, we will definitely comply with the policies to make necessary adjustments*."  When specifically asked about guidelines around marketing, defendant Luo claimed "*very clearly, we comply with the guidelines*."

63. Defendants' statements referenced in ¶¶61-62 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about TAL's business, operations and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a) that TAL's revenue and operational growth was the result of deceptive marketing tactics and illicit business practices that flouted Chinese laws, regulations and policies, and exposed the Company to an extreme risk that more draconian measures would be imposed on the Company;

(b) that TAL had engaged in misleading and fraudulent advertising practices, including the provision of false and misleading discount information designed to obfuscate the true cost of the Company's programs to its customers, the creation of fake customer reviews designed to fraudulently lure new customers to TAL programs, the misrepresentation of teacher qualifications and course qualities, and the marketing of rigged promotional events;

(c) that TAL had defied Chinese policies designed to alleviate the burden imposed by tutoring services on students and their families, including by imposing hefty advances and recurring debt payments on course enrollees, by offering courses designed to give affluent students unfair advantages, by holding courses outside of allowable tutoring hours, and by linking for-profit courses to government-mandated schooling;

(d) that, as a result of the foregoing, TAL was subject to an extreme undisclosed risk of adverse enforcement actions, regulatory fines and penalties, and the imposition of new rules and regulations adverse to the Company's business and financial interests;

(e) that the new rules, regulations and policies to be implemented by the Chinese government following the Two Sessions parliamentary meetings were far more severe than

represented to investors by defendants and in fact posed an existential threat to the Company and its business; and

(f)     that, as a result of the foregoing, TAL's historical growth was not sustainable or the result of legitimate business tactics as represented, and defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable factual basis.

64.     On April 25, 2021, a mere three days after defendant Luo's assertions that TAL had "very clearly" complied with government guidelines around advertising, media reports revealed that the city of Beijing had fined four online education agencies, including TAL, the maximum fine of 500,000 yuan (approximately $80,000) each for misleading customers with false advertising. Specifically, regulators found that TAL's VIE, Beijing Xueersi Education Technology Co., Ltd., had been misrepresenting the un-discounted costs of enrollment in its courses to consumers, thereby deceiving customers into paying full price for courses that they believed they were receiving at a discount. For example, TAL promoted online courses as being offered at a 97% discount from the purported regular price when in fact no Company courses had in fact ever been sold at this purported regular price. In one instance, TAL had inflated the price of an online course by nearly *4,000%*. Beijing authorities stated that they were acting on serious concerns that had been raised by the general public regarding the Company's business practices.

65.     Then, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, the provision of tutoring services during weekend hours, and the imposition of industry-wide fee limitations. For example, a *Reuters* article titled "China

planning new crackdown on private tutoring sector," stated that regulators had taken adverse actions

against for-profit tutoring companies, including ordering TAL advertising to be pulled in April 2021,

and otherwise summarized the impending regulatory changes in pertinent part as follows:

> **China is framing tough new rules to clamp down on a booming private tutoring industry**, aiming both to ease pressure on school children and boost the country's birth rate by lowering family living costs, sources told Reuters.

> The clampdown will also have the effect of cooling China's cutthroat tutoring market for kindergarten through to the 12th grade, or K-12 pupils, that has grown exponentially in recent years to around $120 billion.

> \*       \*       \*

> The changes being drafted by the Ministry of Education and other authorities target before- and after-school K-12 tutoring, three people with knowledge of the matter told Reuters.

> One source said the draft rules could be unveiled as early as by end-June.  All three sources requested anonymity as they were not authorised [sic] to speak publicly.

> **Under the planned rules, on-campus academic tutoring classes will be banned, as will both on and off-campus tutoring during weekends, two of the people said.  Regulators will also clamp down on off-campus tutoring, in particular for English and math, they added, restricting class times on weekdays**.

> \*       \*       \*

> **The new rules would seek to limit fees charged by companies for tutoring, one of the sources told Reuters**.

> \*       \*       \*

> The planned rules would add to restrictions imposed in March, including a ban on live-streamed classes for minors after 9 p.m., a crackdown on advertising, and a ban on academic tutoring course offerings for pre-school kids.

> \*       \*       \*

> **A source told Reuters that a large state broadcaster was told by regulators last month to remove TV commercials from two players, New Oriental Education & Technology Group and TAL Education Group that they had placed earlier**.

66.     As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period.  However, TAL ADSs continued to trade at artificially inflated prices because investors and the market still did not know the full truth about TAL's illicit business practices nor the severity of the impending regulatory crackdown arising from these practices.

67.     On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud.  Among the violations by the 15 offenders were reportedly fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews.  The regulators gave examples of how TAL's subsidiary, Xueersi, had advertised false parent user reviews in Beijing and Shanghai, such as one purportedly from a mother stating: "'[T]he most powerful thing about Xueersi is that parents are allowed to listen, get refund fees and transfer classes at any time.  Parents are at ease.'"  Another, from a father claimed: "The hardware development of Xueer Si Peiyou is very scientific and really great!"  However, the governmental investigation concluded that the parents attributed to these reviews and comments did not exist.  The offending companies, including TAL, were hit with maximum penalties for their illegal business practices, totaling a combined 36.5 million yuan ($5.73 million).  At a governmental conference announcing the fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including *155,000* complaints and reports for education and training services received by authorities in 2020 alone and over *47,000* similar complaints and reports received by authorities in the first quarter of 2021.

68.     In addition to the issues outlined above, TAL was reportedly found to have: (i) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (ii) offered courses that gave students unfair advantages in contravention of Chinese government policies; (iii) engaged in illegal bait-and-switch tactics; (iv) misrepresented teacher qualifications and course qualities; (v) mishandled user data; and (vi) rigged promotional events to defraud consumers.   As one Chinese language source observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]."   Instead, the Company continued to engage in "[o]ver-standard and advanced tutoring, illegal charge, false publicity, tricking consumers into transaction, [the use of] vulgar videos, illegal recruit[ing] and financial fraud."  Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."[3]

69.     As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

70.     Finally, on July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public.  This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China.  A *Reuters* report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL.

---

[3]     The Chinese-language sources cited in this paragraph have been translated into English by translators hired by plaintiff's counsel.

71.     As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline.  This represented a ***greater than 95% decline*** in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

72.     On July 30, 2021, TAL canceled its scheduled earnings release and earnings call.

73.     On November 12, 2021, TAL issued a release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021.  The Company stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods."  Revenues deriving from such services have historically formed a substantial majority of the Company's total revenues.

74.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL ADSs, plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased TAL ADSs during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TAL ADSs were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in

the proposed Class.  Record owners and other members of the Class may be identified from records maintained by TAL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

77.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

78.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

79.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants' statements or omissions during the Class Period were materially false and misleading;

(b)    whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

81.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding TAL, and their control over and/or receipt and/or modification of TAL's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

82.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

83.     The Individual Defendants, because of their positions with TAL, controlled the contents of TAL's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for

the accuracy of TAL's corporate statements and is, therefore, responsible and liable for the representations contained therein.

## LOSS CAUSATION

84.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TAL ADSs and operated as a fraud or deceit on Class Period purchasers of TAL shares by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TAL ADSs declined significantly as the prior artificial inflation came out of the price of the ADSs.

85.     As a result of their purchases of TAL ADSs during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused TAL ADSs to trade at artificially inflated levels throughout the Class Period, trading as high as $90.15 per share on February 19, 2021.

86.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of TAL's business, risks and future financial prospects.  When the truth about the Company was revealed to the market, the price of TAL ADSs fell significantly, dropping to just $4.40 per share by July 26, 2021, removing the inflation therefrom and causing economic loss to investors who had purchased TAL ADSs during the Class Period.

87.     The decline in the price of TAL ADSs after the corrective disclosures came to light was a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in TAL ADSs negates any inference that the losses suffered by plaintiff and the other Class members were caused

by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.

88.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of TAL ADSs and the subsequent significant declines in the value of TAL ADSs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET**

89.     At all relevant times, the market for TAL ADSs was an efficient market for the following reasons, among others:

(a)     TAL ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, TAL filed periodic public reports with the SEC;

(c)     TAL regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     TAL was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

90.     As a result of the foregoing, the market for TAL ADSs promptly digested current information regarding TAL from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of TAL ADSs during the Class Period

suffered similar injury through their purchases of TAL ADSs at artificially inflated prices and a presumption of reliance applies.

91.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

92.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of TAL who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

93.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TAL ADSs during the Class Period.

96.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TAL ADSs.  Plaintiff and the Class would not have purchased TAL ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

97.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of TAL ADSs during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

98.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of TAL within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of TAL shares, the Individual Defendants had the power and authority to cause TAL to engage in the wrongful conduct complained of herein.  TAL controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 4, 2022

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
VICKI MULTER DIAMOND


*s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vdiamond@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ADEMI LLP
GURI ADEMI
3620 East Layton Avenue
Cudahy, WI  53110
Telephone:  414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Ruoshui Sun ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this <u>3rd</u> day of February, 2022.

孙 若水

_____
Ruoshui Sun

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**ADR**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/03/2021 | 20 | $76.25 |
| 03/10/2021 | 1 | $67.40 |
| 03/10/2021 | 2 | $67.50 |
| 03/10/2021 | 4 | $67.40 |
| 03/10/2021 | 12 | $67.34 |
| 03/17/2021 | 5 | $67.41 |
| 03/26/2021 | 20 | $53.99 |
| 03/29/2021 | 2 | $52.99 |
| 03/29/2021 | 3 | $52.66 |
| 03/29/2021 | 7 | $52.61 |
| 03/31/2021 | 8 | $53.85 |
| 04/01/2021 | 7 | $56.60 |
| 04/05/2021 | 3 | $54.40 |
| 05/05/2021 | 8 | $54.60 |
| 05/12/2021 | 15 | $52.70 |
| 05/14/2021 | 4 | $48.65 |
| 05/21/2021 | 2 | $43.23 |
| 05/21/2021 | 10 | $43.15 |
| 05/24/2021 | 4 | $36.08 |
| 05/24/2021 | 15 | $36.06 |
| 05/24/2021 | 20 | $36.07 |
| 06/03/2021 | 4 | $33.13 |
| 06/03/2021 | 16 | $33.36 |
| 06/04/2021 | 25 | $30.08 |
| 06/04/2021 | 32 | $29.99 |
| 06/04/2021 | 55 | $30.10 |
| 06/07/2021 | 20 | $27.95 |
| 06/16/2021 | 25 | $24.21 |
| 06/16/2021 | 25 | $26.05 |
| 06/17/2021 | 20 | $20.45 |
| 06/17/2021 | 25 | $20.43 |
| 06/17/2021 | 30 | $20.44 |
| 06/17/2021 | 35 | $20.44 |
| 06/17/2021 | 50 | $20.48 |
| 07/01/2021 | 25 | $23.57 |
| 07/02/2021 | 18 | $21.21 |
| 07/02/2021 | 33 | $21.21 |
| 07/07/2021 | 20 | $19.47 |
| 07/12/2021 | 20 | $20.30 |
| 07/16/2021 | 10 | $19.63 |
| 07/16/2021 | 15 | $19.62 |
| 07/19/2021 | 4 | $18.68 |
| 07/19/2021 | 10 | $18.68 |
| 07/20/2021 | 30 | $19.37 |

Prices listed are rounded to two decimal places.