UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW MEXICO STATE INVESTMENT COUNCIL and PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:22-cv-01015 (ALC) (KHP) |
| | The Honorable Andrew L. Carter Jr. |
| Plaintiff, | The Honorable Katharine H. Parker |
| vs. | CLASS ACTION |
| TAL EDUCATION GROUP, BANGXIN ZHANG, RONG LUO, and LINDA HE, | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Defendants. | JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION AND OVERVIEW ............................................................. 4

II.   JURISDICTION AND VENUE ................................................................................... 11

III.  PARTIES .................................................................................................................. 11

  A.   Lead Plaintiff ....................................................................................................... 11

  B.   Defendants ........................................................................................................... 13

  C.   Confidential Witness ............................................................................................ 15

IV.   FACTS .................................................................................................................... 15

  A.   Overview of TAL .................................................................................................. 15

  B.   For Years, China's Private Tutoring Industry Had Been Lucrative Because of the Country's Fierce Academic Competition ............................................................................................. 18

  C.   The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry ................................................................................................................. 21

  D.   Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws ..................................................................................................................... 28

    1.   **Advanced Tuition Charges** ............................................................................. 29

    2.   **Illegal Tutoring** ............................................................................................. 30

    3.   **TAL's Teachers' Qualification Were Repeatedly Falsified or Noncompliant** ........ 31

    4.   **TAL Regularly Engaged in Unlawful Pricing Practices and Price Fraud** .............. 32

    5.   **TAL Repeatedly Disseminated Unauthorized or Illegal Publications to Promote Its Tutoring Business** ................................................................................................................. 34

    6.   **TAL Regularly Engaged in False Advertising of Its Services in Violation of Applicable Regulations** ................................................................................................................. 35

    7.   **Other Integrity and Compliance Issues** ........................................................... 39

  E.   TAL Is at Risk of Having Its ADRs Delisted ......................................................... 43

  F.   Other SEC Investigations ..................................................................................... 44

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS  AND OMISSIONS ISSUED DURING THE CLASS PERIOD ....................................................................................... 45

  A.   Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry .......................................... 46

    1.   **Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Advertising Regulations** .......................................................................................... 57

    2.   **Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations** .............................................................................................. 59

    3.   **Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations** ................................................................................. 59

    4.   **Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations** ........................................................................... 62

B.    Materially False and Misleading Statements Regarding the Drivers Behind TAL's "Healthy" and "Stable" Student Enrollment Growth.................................................................................................. 64

    1.    **Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2018**.................................................................................... 65

    2.    **Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2019**.................................................................................... 67

    3.    **Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2020**.................................................................................... 74

    4.    **Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2021**.................................................................................... 82

C.    Materially False and Misleading Statements and Omissions Regarding the Government's Heightened Regulations Governing the Private Tutoring Industry................................................................................ 86

D.    Materially False and Misleading Sarbanes-Oxley Certifications........................................................ 97

E.    Defendants Omitted Material Facts in Violation of Item 5(D) and Item 105 of Regulation S-K....... 98

    1.    **Overview of TAL's Item 5 Disclosure Requirements** ................................................................. 98

    2.    **Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct and Regulatory Violations**................................................................................................ 101

    3.    **Defendants Failed to Disclose Material Facts in Violation of Item 105 of Regulation S-K**.. 104

VI.    POST CLASS PERIOD DISCLOSURES....................................................................................... 105

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................................... 106

A.    Motive and Opportunity................................................................................................................... 107

    1.    **TAL Insiders Realized $458 Million in Proceeds from Their Class Period Stock Sales**....... 107

    2.    **The Individual Defendants' Bonuses**.......................................................................................... 112

    3.    **The Individual Defendants' High-Level Positions and Experience**........................................ 113

B.    The Sarbanes-Oxley Certifications ................................................................................................... 117

C.    The SEC Is Threatening to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations ............................................................................................................................................... 117

D.    Executive Resignations .................................................................................................................... 117

VIII.    LOSS CAUSATION ...................................................................................................................... 117

IX.    CLASS ACTION ALLEGATIONS .............................................................................................. 122

X.    NO SAFE HARBOR ...................................................................................................................... 123

XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET 123

XII.    CLAIMS FOR RELIEF ................................................................................................................. 125

XIII.    PRAYER FOR RELIEF................................................................................................................. 126

XIV.    JURY DEMAND............................................................................................................................ 127

New Mexico State Investment Council ("NMSIC") and Public Employees' Retirement System of Mississippi ("MSPERS," and, together with NMSIC, "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation which includes without limitation: (a) review and analysis of regulatory filings made by TAL Education Group ("TAL" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by TAL; (c) review of other publicly available information concerning TAL; (d) review of regulatory filings with the People's Republic of China; and (e) interviews with confidential witnesses.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    Lead Plaintiff brings this securities class action on behalf of all persons or entities who purchased TAL American Depository Shares ("ADSs") between April 26, 2018 and July 22, 2021, both dates inclusive (the "Class Period"). Lead Plaintiff pursues claims against TAL and certain of the Company's senior officers and directors (the "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Incorporated in the Cayman Islands and headquartered in Beijing, China, TAL ("Tomorrow Advancing Life") is an academic company that offers private educational and tutoring services to students in the People's Republic of China ("China" or the "PRC"). For decades, academic competition has been fierce in China.  From the time children are toddlers in preschool, social pressure to excel academically *and* perfect multiple extracurricular sports or music activities weighs

heavily on Chinese parents. The daunting Gaokao – China's very difficult college entrance exam – also looms on the horizon.

3. Ambitious parents of Chinese children set rigorous academic goals for their children. Parents, concerned that other children will outperform their own, began enrolling their children in expensive tutoring courses to supplement their already intense public school education. Supplemental after-school tutoring became the norm and any child not enrolled in such a program would, in their parents' eyes, quickly fall behind. An advertisement that went viral on Chinese social media in 2020 graphically illustrates the heightened anxiety that parents were experiencing: "Come, and we'll tutor your child. Don't come, and we'll tutor your child's rival."

4. As social and academic pressure grew, Chinese parents were willing to spend significant sums of money – tens of thousands of dollars each year – for after-school tutoring services. In fact, estimates indicate that some Chinese parents spent between *25% and nearly 50%* of their annual income on after-school tutoring. These parents and societal attitudes have fueled the success of TAL and its competitors in China like VIPKid and New Oriental.

5. The Chinese government disfavored the private tutoring trend and the inordinate resources poured into these after-school tutoring courses, resulting in huge profits for TAL and the tutoring companies. For example, in March 2021, China's leader, Xi Jinping said: "On the one hand, parents want their children to be healthy and have a happy childhood; on the other hand, they are afraid their children will lose right from the starting line in the competition for marks." Chinese President Xi Jinping characterized the tutoring industry as "a stubborn malady" and vowed to address the problem in a March 6, 2021 meeting with medical and health education committee members attending the Two Sessions, China's annual legislative and political meetings.

6. In or around 2018, China began to restrict the private tutoring industry by implementing more stringent rules and regulations. For instance, in February 2018, the Ministry of

Education, along with two other governmental agencies, issued the Circular on Alleviating After-school Burdens on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions. Later that year, in August 2018, the Chinese State Counsel issued Circular 80 which limited curriculum content, imposed additional certification requirements for after-school tutoring institutions, banned homework, imposed early class stopping times and forbade tutoring companies from collecting more than three months' worth of fees.

7.      The following year, in March 2019, China held its Two Sessions annual political meeting of the 13th Chinese People's Political Consultative Conference ("CPPCC") National Committee. During the Two Sessions, the government published a notice titled: "The Urgency of Regulating Out-of-School Tutoring Market." In July 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education."

8.      Over the next few years, the Chinese government enacted progressively more stringent policies governing the for-profit tutoring industry and enforced regulations more strictly. Meanwhile, TAL continued to evade those same policies to fuel its growth, while claiming that it was compliant with them.

9.      TAL was the dominant company operating in a hostile regulatory environment in which it persistently engaged in flagrant violations of Chinese rules, regulations and proscriptions governing the Chinese tutoring industry to fuel its meteoric growth in student enrollments, thereby inflating its financial results and ADS price.  TAL was aware of the progressively strict government regulations and claimed that it complied with them, but intentionally failed to comply with these new regulations in order to fuel its rapid growth. TAL's continuing violations of Chinese laws and policies governing the for-profit after-school tutoring industry included, without limitation: holding tutoring courses past 8:30 pm; using deceptive low-price promotions to lure parents and students in; and

6

advertising and offering courses beyond the scope of the teaching syllabus. Because TAL operated in a highly regulated industry within China, the impact of new laws and regulations governing the Chinese tutoring industry and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance to investors – and TAL acknowledged that material importance.

10.    Prior to July 2021, when the Chinese government effectively put TAL out of business, Chinese regulators had caught just a few dozen of TAL's violations (many of which did not even relate to the Company's core business, such as infractions regarding trash and décor, to name a few examples). In response, in all but a handful of instances, the Chinese government imposed *de minimis* fines ranging from the equivalent of a few hundred to a few thousand dollars. By contrast, at its height during the Class Period, TAL's market cap exceeded $55 billion. Because TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and only *one* in the United States during the Class Period, the few dozen publicly reported infractions relating to its tutoring business obscured the actual magnitude of TAL's unreported violations and its egregious non-compliance, as announced by the Chinese government at the end of the Class Period. Thus, TAL engaged in *many* more violations of the applicable rules, regulations and proscriptions during the Class Period than those for which it had been caught and fined, which violations were either unavailable, inaccessible or otherwise unknown to the investing public during the Class Period. It was not until the end of the Class Period that it was reported by Chinese government media sources that during the Class Period, TAL and its entities violated numerous laws such as the Private Education Law and the Implementation Rules for Private Education Law and their related regulations. TAL's ongoing pattern of flagrant violations of the Chinese government's rules, regulations and proscriptions was a significant basis on which the Chinese government ultimately shut down TAL and the tutoring industry in China. Against that backdrop, Defendants took advantage of the *de minimis* reported fines during the Class

Period and falsely represented to the investing public that TAL was in near perfect compliance with Chinese rules, regulations and proscriptions. All the while, however, TAL was engaged in a persistent pattern of flagrant violations of the very rules, regulations and proscriptions it purported to comply with, in order to grow its student enrollments.

11.    The Individual Defendants and the rest of TAL's management were in a race against time to cash out their TAL stock at artificially inflated prices and receive proceeds of over \$450 million before the government's regulations became so overbearing that it restricted TAL's ability to continue earning profits.

12.    Defendants knew or recklessly disregarded during the Class Period that the longstanding regulations of the tutoring industry were becoming progressively harsher and more restrictive, making compliance increasingly difficult, as evidenced by the fines and sanctions repeatedly imposed on TAL and compounded by the Company's willingness to violate such regulations to grow its business. These regulatory violations and fines gave ammunition to the government and fueled its justification for ultimately shutting down the entire tutoring industry. Defendants knew of the restrictive regulations and cited them repeatedly in SEC filings, even claiming that more regulation would be a benefit to its business and to the tutoring industry as a whole. Yet, Defendants claimed that TAL was "fully cooperating with the government directions, and where needed, [would] make adjustments to [its] business operations accordingly."  They thus expressed unrelenting confidence about the health, stability and sustainability of the tutoring business, its "long term" prospects, that it was operating in a "healthy," "stable" and "sustainable" environment, and even claimed that the reforms were "very positive" and would make the tutoring industry "more healthy."

13.    Nothing was further from the truth. The foundation for TAL's growth was based on its consistent violations of regulations; knowing this, Defendants sold their shares of TAL stock at

artificially inflated prices during the Class Period, reaping hundreds of hundreds of millions of dollars in proceeds for themselves, while at the same time deceiving investors into believing that TAL was compliant with the regulations and believed them to be "beneficial" for TAL's business and that long-term prospects were good. Defendants' representations were unfounded because they knew or recklessly disregarded throughout the Class Period that TAL's persistent violations would provide justification for a government crackdown.

14.     On May 12, 2021, news of the severity and magnitude of the impending government crackdown on the for-profit tutoring industry began to surface. As a result, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, representing a 13% decline.

15.     On June 1, 2021, 15 off-campus tutoring organizations, including TAL, were fined for illegal activities including false advertising and fraud. As the news hit the market, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, representing an 18% decline over the two-day period.

16.     Then, on July 23, 2021, the Chinese government released its "Double Reduction" policies, which were primarily intended to reduce: (1) the amount of time students spend on homework; and (2) after-school tutoring hours. This sweeping overhaul of its education sector banned companies that teach the school curriculum from making profits, raising capital or going public, effectively ending any potential growth in the for-profit tutoring sector in China.

17.     As part of the Chinese government's announcement of the Double Reduction policies, it also announced that various tutoring companies were engaged in serious violations of the rules, regulations and proscriptions governing the tutoring industry. TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which drove student

enrollments. TAL's previously undisclosed misconduct was reported to have also included widespread practices of:

> (a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law;
>
> (b) offering courses that gave students unfair advantages in contravention of Chinese government policies;
>
> (c) engaging in illegal bait-and-switch tactics;
>
> (d) misrepresenting teacher qualifications and course qualities;
>
> (e) mishandling user data; and
>
> (f) rigging promotional events to defraud consumers.

18.    Once the market learned of TAL's previously undisclosed repeated violations and that its core business became effectively outlawed by the July 2021 regulations, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

19.    On July 30, 2021, TAL cancelled its scheduled earnings release and earnings call as a result of the news.

20.    On November 12, 2021, TAL announced that it would no longer offer academic subjects to students in K-9 in mainland China and that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year end February 28, 2022 and subsequent periods" because the revenues derived from those services for its previous fiscal year had "accounted for a substantial majority of the Company's total revenues in the year."

21.    The *New Yorker* later reported on May 16, 2022, that "TAL Education Group, renowned for its Math Olympiad-style courses, transitioned to a 'quality education' program that teaches calligraphy instead of calculus." It further reported that TAL's competitor, New Oriental, let

go 60,000 staff members, VIPKid shut down many of its services, and Yuanfudao, another Chinese education company, began posting job openings for fashion designers.

## II.    JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

24.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act. TAL ADSs trade on the New York Stock Exchange ("NYSE"), located within this District, and Defendants disseminated the statements alleged herein to be materially false and misleading into this District.

25.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Lead Plaintiff

26.    MSPERS and NMSIC purchased TAL American Depository Shares ("ADSs") during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein.

27.    NMSIC is a sovereign wealth fund that manages the investments for New Mexico's four permanent funds: (i) the Land Grant Permanent Fund; (ii) the Severance Tax Permanent Fund; (iii) the Tobacco Settlement Permanent Fund; and (iv) the Water Trust Fund. As of 2021, NMSIC manages assets valued at $34 billion including the investment of 23 New Mexico government related clients which, at

present, have a combined value of approximately $1.5 billion. According to NMSIC's website, it is "focused on optimizing the earnings of New Mexico's permanent funds – funds that contribute to the state's overall operating budget – while preserving and growing the real value of the funds for future generations of New Mexicans."

28.     MSPERS was established in 1952 as the retirement system for Mississippi state agencies, as well as counties, cities, and other participating political subdivisions. It provides retirement benefits for employees of the state of Mississippi who work in government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services. These retirement benefits help retain a strong public workforce in the state of Mississippi. The 10-member MSPERS Board of Trustees includes the State Treasurer, a gubernatorial appointee who is a member of MSPERS, two retirees, two state employees, and one representative each of public schools and community colleges, institutions of higher learning, counties, and municipalities. With the exception of the State Treasurer and the gubernatorial appointee, members are elected to staggered six-year terms. The Board is responsible for designating the System's executive director and for establishing the policies for administration of the trust. The Board also works to carry out the intent and purposes of the state Legislature by establishing rules and regulations for the administration of MSPERS and the transaction of its business. The Government Finance Officers Association of the United States and Canada awarded a Certificate of Achievement for Excellence in Financial Reporting to MSPERS for its comprehensive annual financial report for the fiscal year end June 30, 2020. MSPERS received the Public Pension Coordinating Council's Public Pension Standards 2021 Award in recognition of meeting professional standards for plan design and administration. As set forth in its Certification, ECF 18-1, MSPERS acquired TAL ADSs during the Class Period at prices that were artificially inflated as a result of Defendants' fraud.

**B.    Defendants**

29.    Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in China. TAL ADSs trade on the NYSE under the ticker symbol "TAL."  Each ADS represents one third of one share of TAL common stock.

30.    Defendant Bangxin Zhang ("Zhang") co-founded TAL.  He was the Chief Executive Officer ("CEO") and a director of TAL during the Class Period and, until January 2020, the Chairman of the Board of Directors. Defendant Zhang is also the controlling shareholder of the Company. Zhang is also the sole shareholder and sole director of Bright Unison Limited, a company incorporated in the British Virgin Islands. During the Class Period, Defendant Zhang issued materially false and misleading statements, and failed to disclose material facts to investors, as further alleged herein. During the Class Period, Defendant Zhang sold *5,509,553 shares* of TAL stock through his company Bright Unison Ltd., realizing proceeds of approximately *$215.2 million*.

31.    Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period.  Luo resigned from the Company effective October 29, 2021. During the Class Period Defendant Luo made materially false and misleading statements and failed to disclose material facts to investors as alleged herein. During the Class Period, Defendant Luo sold *457,380 shares* of TAL stock at artificially inflated prices, realizing approximately *$24.7 million in proceeds.*

32.    Defendant Linda He[1] ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019. Defendant He made materially false and misleading statements and failed to disclose material facts to investors during the Class Period, as further alleged herein.

---

[1] Defendant Linda He's name is often spelled "Linda Huo" on public filings.

33.    Defendants Zhang, Luo, and He (the "Individual Defendants," and together with TAL, the "Defendants"), were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

34.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded ADSs would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, Defendants Luo and He participated in conference calls with investors during which false and misleading statements were made, and/or each Individual Defendant had the ability and/or opportunity to prevent the issuance of such documents and statements or cause them to be

14

corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### C.   Confidential Witness

36.   CW1 worked at TAL's Nanjing branch from July 2012 to September 2021. There, CW1 served as a deputy head and deputy general manager, responsible for government relations. CW1 disclosed that at least as early as January 2021 – months before rumors emerged in March 2021 during China's Two Sessions and the Chinese government formally issued regulations in July 2021 – TAL's senior executives had been aware that stringent regulations were forthcoming.

## IV.   FACTS

### A.   Overview of TAL

37.   TAL was founded in China in 2003 by Defendant and CEO Bangxin Zhang who began working as a part-time tutor in 2002 while completing his PhD program at Peking University. When Zhang originally launched TAL, the Company primarily offered mathematics tutoring courses, but later expanded to other subject areas as well. During the Class Period, TAL provided K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese. Tutoring services are primarily offered through small classes, personalized premium services and online course offerings, which the Company began offering in 2010.

38.   Soon after its formation, TAL began experiencing success and a growing student base. In 2007, Defendant Zhang dropped out of his PhD program at Peking University to focus entirely on the Company.

39.   On January 10, 2008, TAL Education Group became incorporated in the Cayman Islands as the "holding company for a group of companies engaged in the provision of high quality after-school tutoring programs." Although headquartered in Beijing, China, the Company is organized

as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities ("VIEs"), including Beijing Xueersi Education. In or around October 2010, TAL listed its ADSs on the NYSE under the ticker "XRS." In the subsequent years after its IPO, the price of TAL ADSs grew by approximately ***200%***. Thus, by 2016, Defendant Zhang was worth ***$1.5 billion at just 36 years old***. From 2015 to 2019, TAL ranked in the Top 100 Most Valuable Chinese Brands for five consecutive years. By February 2021, TAL was valued at ***$55 billion*** and Defendant Zhang's wealth grew to ***over $15 billion***.

40.     TAL's primary sources of revenue are: (i) small class tutoring services that focus on offline education; and (ii) online education services provided through www.xueersi.com.  For the fiscal year end February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively. Further, throughout the Class Period, TAL's gross profits increased exponentially as it experienced robust growth due to its deceptive pricing and advertising strategies. For instance, TAL's fiscal year 2019 gross profits were $1.4 million; fiscal year 2020 profits were $1.8 million; and fiscal year 2021 profits were $2.4 million.

41.     As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform.  According to TAL's Form 20-F for its fiscal year end February 29, 2020, the net revenue obtained from TAL's VIEs and subsidiaries and schools accounted for 93.4% of TAL's total net revenue.

42.     During the Class Period TAL had 10 subsidiaries and consolidated affiliated entities. TAL's subsidiaries are: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

43.     TAL's VIEs are: (1) Beijing Xueersi Education Technology Co., Ltd. ("Beijing Xueersi Education"); (2) Beijing Xueersi Network Technology Co., Ltd. ("Beijing Xueersi Network"); (3) Xinxin Xiangrong Education Technology (Beijing) Co., Ltd. ("Xinxin Xiangrong").

44.     TAL's Affiliated Entities ("AEs") are: (1) Shidai TAL Education Technology (Beijing) Co., Ltd.; (2) TAL Education Technology (Jiangsu) Co., Ltd.; and (3) TAL Training School (Shanghai) Co., Ltd.

45.     In addition to TAL's 10 subsidiaries and consolidated affiliated entities named above, TAL has an additional operating entity called Shenzhen Xueersi Training Center ("Shenzhen School"), which was incorporated in November 2013 in Shenzhen, China.

46.     According to Forms 20-F filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL owned a 100% legal ownership interest in the following entities: (1) TAL Holding Limited ("TAL Hong Kong"), an intermediate holding company; (2) Beijing Century TAL Education Technology Co., Ltd. ("TAL Beijing"), a software sales and consulting service; (3) Beijing Huanqiu Zhikang Shidai Education Consulting Co., Ltd. ("Huanqiu Zhikang"), an education and management consulting service; (4) Yidu Huida Education Technology (Beijing) Co., Ltd. ("Yidu Huida"), a software sales and consulting service; (5) Beijing Xintang Sichuang Education Technology Co., Ltd. ("Beijing Xintang Sichuang"), a software and network development, sales, and consulting service; (6) Zhixuesi Education Consulting (Beijing) Co., Ltd. ("Zhixuesi Beijing"), a software and network development, sales, and consulting service; (7) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. ("Pengxin TAL"), an investment management and consulting service; (8), Firstleap Education ("Firstleap"), an intermediate holding company; (9) Firstleap Education (HK) Limited ("Firstleap Hong Kong"), an intermediate holding company; (10) Beijing Lebai Information Consulting Co., Ltd. ("Lebai Information"), an education and management consulting service; and (11) Beijing

Yizhen Xuesi Education Technology Co., Ltd. ("Yizhen Xuesi"), a software and network development, sales, and consulting service.

47.     For fiscal year end February 28, 2022 ("FY 2022"), TAL's 100% legal ownership over other entities dropped significantly. TAL reported in its Form 20-F for FY 2022 that the "Company decided in November 2021 to cease offering services relating to academic subjects from kindergarten through grade nine in the mainland of China by the end of December 2021" and further, that "[t]he Company also has taken actions to restructure its business and operations . . .." Thus, as of February 28, 2022, TAL only had a 100% legal interest in: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; and (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

48.     As of the date of this filing, TAL operates four major tutoring brands including: (1) Xueersi, which is further divided into Xueersi Peiyou, which provides small-class learning services, and Xueersi.com, which provides online education services; (2) Zhikang, which provides after-school one-on-one learning services; (3) First Leap, which provides English education; and (4) Mobby, its science, technology, engineering, arts and math ("STEAM") education brand.

49.     TAL also provides overseas study consulting services and test preparation courses for major overseas exams. Xueersi Online School is TAL's leading brand. It provides online live lessons to students ages 3-16 and is the longest-running online education brand under TAL. Mobby is TAL's preschool education program which was first launched in 2011.

## B.     For Years, China's Private Tutoring Industry Had Been Lucrative Because of the Country's Fierce Academic Competition

50.     Private after-school tutoring in China has been popular for decades.  Chinese students begin facing rigorous courses and examinations as early as primary school.  Preschool students attend

elementary school-level English and math tutoring courses which cost anywhere from $80 to $150 an hour.

51.     Chinese parents are willing to spend significant amounts of money on after-school tutoring to help ensure that their students keep pace with other children. For instance, in 1990, 20% of graduates from local primary schools in Shanghai received at-home tutoring. By 2004, the Urban Household Education and Employment Survey of 4,772 households reported that 73.8% of primary school students had taken tutoring lessons. By 2016, the value of China's private tutoring sector for primary and secondary education grew to 800 billion RMB (USD $120.3 billion).

52.     The advent of Zoom and other technologies which could transcend geographical limitations that once prevented students in rural or otherwise inaccessible areas to undergo tutoring further contributed to the growth of China's for-profit tutoring industry. In fact, the COVID-19 pandemic caused a surge in China's ed tech market with the "number of online education users in China reaching 342 million by 2020, accounting for 34.6 percent of the Internet population," as stated in a Beijing Review article.  The article further stated that from "January to October 2020, 82,000 new online education firms sprang up."

53.     According to a 2015 survey conducted by the China Youth and Children Research Centre, Chinese students would spend an average of 50 minutes each weekday and two hours on the weekend in after-school courses.  And as one article published in the South China Morning Post on December 4, 2018 stated: "tutoring classes have risen [in popularity] against conventional schooling" and "parents send their kids to six hours of extra tutoring per week."

54.     Parents, feeling increased social and academic pressure to spend significant amounts of money to help their children excel and ultimately pass the Gaokao – China's college-entrance examination – spent a minimum of $7,000 USD per year, an average of $17,000 USD per year on their children's after-school tutoring classes, and as much as $43,500 USD per year on extracurricular

tutoring. An article by NPR issued on September 6, 2021, reported that Chinese families can spend, on average, between 25% and nearly 50% of their incomes on "supplemental education activities." According to analyst group JL Warren, it was estimated that Chinese parents spent more than $100 billion USD or 695 billion RMB on after-school tutoring courses in 2018 alone, which was up 19% year-over-year.

55.     These students that are, as Reuters put it, "pumped with extracurricular classes and energy-boosting 'chicken blood' by anxious parents" are referred to as "*Jiwa*" which means "chicken baby."  Insider.com, NPR, and Psychology Today have also reported on this newfound parenting style, noting that it has taken the spotlight and replaced "Tiger Moms." For instance:

> Jiwa parenting culture, a relatively new phenomenon, is now in the crosshairs of Chinese authorities. At a time when the government wants to see families having more children and raising more future workers, it fears that hypercompetitive parenting pressures – combined with the meteoric growth of China's private education sector, now worth billions of dollars – are deepening inequality and discouraging couples for having larger families…

56.     It has been estimated that in Beijing and Shanghai alone, about 70% of primary school aged students receive extracurricular tutoring.  Further, more than 60% of primary school students are tutored outside the classroom, and in 2021 it was estimated that the ***number of entities operating in China's private tutoring industry was almost equal to the number of public schools in China.***

57.     The confluence of these factors presented a lucrative opportunity for private tutoring companies such as TAL. Eventually, China's private tutoring industry became a massive cash cow with the industry valued anywhere from $120 to $150 billion, and at one point, as much as ***$310 billion USD***.

58.     TAL enjoyed a major piece of this market share; it soon became one of the top five tutoring companies in China, and by February 2021, it was valued at over ***$55 billion USD***, up ***323%*** from its $13 billion valuation in October 2018 and became increasingly profitable over time.

59.    Yet as it grew in popularity and size, China's private tutoring industry increasingly became a target of governmental regulation.  By no later than March 2021, the government conveyed its view that the country's private tutoring industry had become a burden on parents and students and generally reduced the quality of education as well as the health of Chinese students. Leading up to and during the Class Period, the Chinese government began to implement a series of regulations and laws intended to govern the for-profit tutoring industry. As Defendants acknowledged, failure to comply with these regulations could result in severe consequences for China's private tutoring companies such as TAL.

60.    TAL, as one of China's largest tutoring companies, faced significant risks if it failed to comply with China's new and increasing regulation of the industry. But in the midst of exponential year-over-year growth, TAL had no intention of limiting its operations. Rather than constrain its growth and concomitant profits by complying with the applicable rules, regulations and proscriptions, TAL persistently evaded the Chinese government's new regulations and laws by, among other things: (i) releasing deceptive advertisements and promoting fake product pricing in order to induce student enrollment; (ii) creating fake course reviews; (iii) forcing students to pay advances and take on recurring debt; and (iv) offering students courses that gave them unfair advantages in contravention of Chinese policies.

**C.    The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry**

61.    The National People's Congress is China's highest legislative body. The State Council is the highest authority of the executive branch of the PRC central government. There are several ministries and agencies under the authority of the State Council including the Ministry of Education, the General Administration of Press and Publication, the MIIT, the SAIC, and the Ministry of Civil Affairs.

62.     As stated in TAL's Forms 20-F filed with the SEC for fiscal years 2018 through 2022, "The principal laws and regulations governing private education in China consist of the PRC Education Law, the Private Education Law and Implementation Rules, and the Regulations on PRC-Foreign Cooperation in Operating School."

63.     In the 1990s, the Chinese government began to take concrete measures to make education in China more equitable and less burdensome on parents and students. For instance, in 1995, the Chinese government enacted Regulations on the Qualifications of Teachers as a supplement to the Teachers Law of the People's Republic of China.[2] The 1995 supplementary regulation provided further details regarding the acceptable forms of teaching qualifications, prerequisites, examinations, as well as teaching credentials. Thus, in the past several decades, the Chinese government began taking actual steps to regulate the burgeoning private education industry, particularly by enacting various laws and regulations.

64.     Then, in 2010, the Department of Development and Planning (within the Ministry of Education, "MOE"), which is responsible for national educational development, proposed the National Long-Term Education Reform and Development Plan (2010-2020) ("Long-Term Education Reform"), a strategic plan for reforming and developing education of all levels throughout China between the years of 2010-2020.  The Long-Term Education Reform was, for a while, the most salient guidance in Chinese education.

65.     In 2018, the Chinese government began enacting a series of rules and regulations referred to as "Circulars" and "State Council Opinions" under the regime of the Law on the Promotion of Private Education of China. For instance, in February 2018, the Chinese government promulgated the "Circular on Special Enforcement Campaign Concerning After-school Training Institutions to Alleviate

---

[2] According to a report issued on oecd.org, at times, the Chinese government supplements education *laws* with *regulations. See* https://www.oecd.org/china/Education-in-China-a-snapshot.pdf.

Extracurricular Burden on Students of Elementary Schools and Middle School," or Circular 3, which was aimed at reining in excessive tutoring fees and limiting the perceived societal harm resulting from the for-profit tutoring programs in China. Among other restrictions, the regulations prohibited after-school tutoring institutions from providing courses more advanced than the government-approved syllabus and curricula applicable to the respective primary and secondary school students; providing courses designed to enhance exam-taking skills; and linking school enrollment with tutoring results. On the whole, the regulations purported to reduce disparities in school performance between relatively affluent students able to afford after-school tutoring and those that could not. In particular, Circular 3 prohibits private training organizations from organizing academic competitions or tests for students in elementary or middle school and further prohibits elementary and middle schools from considering the results from private training organizations in the enrollment process. As stated in TAL's Form 20-F for fiscal year 2018 ("FY 2018"), under Circular 3, Chinese "government authorities will carry out a special enforcement campaign to alleviate extracurricular burden on students of elementary schools and middle schools and regulate operations of after-school training institutions."

66.    On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the State Administration for Market Regulation ("SAMR") jointly issued a Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, under which government authorities would carry out a series of inspections on after-school training institutions.

67.    On August 22, 2018, the Chinese State Council issued an opinion on Supervising After-School Tutoring Institutions, known as "Circular 80," or "State Council Opinions 80," which provided additional regulations targeting after-school tutoring institutions. In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than

three months' worth of fees.  Circular 80 also set forth requirements pertaining to the Permit for Operating a Private School, including: the size of the classroom; the teacher's qualifications, insurance, fire safety, environmental protection, as well as health and food safety.

68.     That same month, the State Counsel issued the "Opinion on regulating the Tutoring Industry" which set forth the following: (1) course information must be filed with the local education authorities and made publicly available; (2) contents of tutorial courses should not surpass the national guideline (i.e., students should not be placed in courses that match their grade levels); (3) course schedule should not conflict with regular school time; (4) tutorial centers should not offer tutoring courses past 8:30 pm and instructors should not assign homework for students; (5) no examination, competition, or any related rankings can be conducted for courses of primary school and secondary school subjects; (6) tutorial centers cannot receive students' tuition payments for more than 3 months in advance; (7) instructors who teach Chinese, math, foreign language, physics, and chemistry, among others, in the compulsory education system must obtain teaching qualifications; (8) the average floor space per student during one tutoring session cannot be less than three square meters; and (9) public school teachers cannot be employed by after-school tutoring institutions.

69.     On August 31, 2018, the General Office of the MOE promulgated the Circular called "Implementation of Special Measures and Rectification Work on the Private Education Institutions," which pronounced specific requirements for local education departments to enforce State Council Opinions 80.

70.     On November 20, 2018, the General Office of the MOE along with the General Office of the SAMR of the PRC and the General Office of the Ministry of Emergency Management of the PRC jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," better known as "Circular 10." Circular 10 provides express

requirements for local governments regarding the implementation of State Council Opinions 80, which was issued earlier that year in February.

71. Approximately one year later, on March 5, 2019, during China's "Two Sessions" of the 13th CPPCC National Committee (annual political meeting of China's top political advisory body held in Beijing), a notice entitled, "The Urgency of Regulating Out-of-School Tutoring market" was published on the Ministry of Education website by LI Hongpin, the Deputy to the National People's Congress ("NPC").

72. In China, living close to a school is often a prerequisite to a child's enrollment. As a result, home prices rose significantly in neighborhoods near the best schools. On January 1, 2019, Beijing implemented price controls on houses in certain school districts. Houses purchased after that date no longer guarantee enrollment of owners' children in certain schools. Beijing housing authorities also suspended and fined two real estate brokers as part of a sweeping inspection of more than 100 brokerages to determine whether they continue advertising school district houses to mislead buyers. On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education" marking China's first document centered on reforming education and teaching in compulsory education.

73. Parallel to the July 8, 2019 regulation was the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), promulgated by the MOE and other PRC government bodies such as the Cyberspace Administration of China, on July 12, 2019. These opinions were intended to regulate academic after-school training that involved internet technology and specifically initiated the supervision of online and offline after-school training.

74. On April 21, 2020, the Ministry of Human Resources and Social Welfare promulgated the Notice of Implementing the Phased Measures of "Taking Certificate after Starting Career."

75.     Because TAL operated in a highly regulated industry within China, the impact of new laws and regulations governing the Chinese tutoring industry and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance to investors. TAL acknowledged the material importance of maintaining strict compliance with Chinese laws, regulations and government prerogatives governing the tutoring industry. For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations."

76.     On April 7, 2021, China's State Council promulgated the Amended Regulations on the Implementation of the Law for Promoting Private Education of the PRC, or the Amended Implementation Regulations of Private Education Law, which became effective on September 1, 2021.  The Amended Implementation Regulations of Private Education Law together with State Council Circular 80 "require the learning centers of after-school tutoring institutions to make filings with the relevant education authorities," as reported in TAL's Form 20-F for fiscal year 2022.

77.     Then, on July 23, 2021, China *effectively outlawed the entire private academic tutoring industry.* In particular, the General Office of the Central Committee of China's Communist Party and the General Office of the State Council jointly released the Opinions on Further Reducing the Burden of Homework and Off-Campus Training for Compulsory Education Statements (the "Opinions") which contain a reference to a "Double Reduction" – that is, a reduction in the total amount of time and commitment consumed by school homework as well as a reduction in the burden presented by after-school training or off-campus programs. This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China. A *Reuters* report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL.

78.     The July 23 rules require, among other things, that all education companies register as nonprofits; and further state that "no new licenses will be issued to tutoring agencies catering to elementary and middle school students."

79.     The media's reaction to the new policies reflected their severity, for instance, *Sixth Tone*, a Chinese "online publication that produces informed and insightful content on contemporary China, referred to the "double reductions," as a "a massive campaign to take the heat out of the country's educational rat race." *Reuters* reported that the new restrictions barring for-profit tutoring are an effort by China to "boost the country's birth rate by lowering family living costs."

80.     Further, a *JD Supra* article stated:

Double Reduction policy is intended to improve the overall health of students, relieve the burdens and anxiety of parents, reduce social inequity, further regulate and standardize off-campus training (including both online and offline training), and strictly implement the Compulsory Education Law, the Protection of Minors Law and other laws and regulations governing the education industry.

81.     Today, the primary regulations that govern the private education sector in China include: The Private Education Law ("Private Education Law") and the Implementation Rules for Private Education Law ("Implementation Rules").

82.     As the Chinese government enacted these laws, TAL turned a blind eye to the new laws and regulations and elected to continue to operate as it had long since – evading and violating the regulatory framework while assuring investors that it was in compliance or actively seeking to comply while acknowledging the risks if it did not – despite the serious financial and reputational consequences that would likely arise. Despite the increased regulation, China's Gaokao remained a college entry requirement and general expectations of academic excellence had not diminished; thus, TAL continued to experience heightened demand for its tutoring services and wanted to continue to capitalize on the demand. As further detailed below, TAL consciously defied the new laws and instead moved its business operations underground.

**D.** **Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws**

83.     Despite Defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations and proscriptions of the Chinese government, during the Class Period, the Company regularly violated those same rules, regulations and proscriptions designed to artificially inflate the Company's financial results. These violations were caught by Chinese regulators, who imposed fines ranging from the equivalent of a few hundred to a few thousand dollars. As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States. Lead Plaintiff's investigation uncovered at least 60 infractions; however, TAL engaged in many additional violations which led the Chinese government to finally, effectively, shut down the Company's operations.  Indeed, at a governmental conference announcing the industry-wide fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including *155,000* complaints and reports for education and training services received by authorities in 2020 alone and over *47,000* similar complaints and reports received by authorities in the first quarter of 2021.  Given the concentration in the industry among TAL and a handful of its competitors, it stands to reason that TAL engaged in *many* more regulatory infractions which are either unavailable or inaccessible to the public than the 60 referenced above.  Further, in May 2021, SAMR fined 15 TAL after-school tutoring institutions with financial penalties amounting to CNY 36.50 million ($5.13 million USD). In particular, an affiliate of TAL's leading brand Xueersi, Hangzhou Yidu Training School Co. Ltd., was fined CNY 2.5 million ($351,321 USD) for engaging in false advertising and price fraud. Senecaesg.com reported that the tutoring companies were accused of "false publicity, such as fabricating teacher qualifications, exaggerating tutoring effects, fabricating user reviews, and so on."

84.     Among the transgressions for which TAL was sanctioned by Chinese regulators, TAL reportedly: (i) engaged in deceptive advertising and promoted fake product pricing, designed to induce student enrollment; (ii) fabricated favorable course reviews, including by purported consumers who did not in fact exist; (iii) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (iv) offered courses that gave students unfair advantages in contravention of Chinese government policies; (vi) misrepresented teacher qualifications and course qualities; (vii) mishandled user data; and (viii) rigged promotional events to defraud consumers.

85.     TAL was an unrepentant serial violator of the Chinese government's rules, regulations and proscriptions engaged in a continuing game of cat and mouse with regulators. As one Chinese language source[3] observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]." Instead, the Company continued to engage in "over-standard and advanced tutoring, illegal charges, false publicity, tricking consumer into transactions, [the use of] vulgar videos, illegal recruiting and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

### 1.     Advanced Tuition Charges

86.     As alleged above, Circular 80, enacted in 2018, forbade tutoring companies from charging tuition for a period greater than three months, yet TAL flouted this regulation. For example, Xueersi, TAL's leading brand, violated the regulation by maintaining a practice of charging students advance tuition for more than three months of courses, typically in Xueersi.com's Summer and Autumn Course Package, which, according to a report by the Economic Observer, often lasted more

---

[3] The Chinese-language sources cited herein have been translated into English by translators hired by Lead Plaintiff's counsel.

than three months, and required prepayment in full. Therefore, students were paying tuition in advance of course programs.

### 2. Illegal Tutoring

87.     TAL repeatedly engaged in illegal tutoring practices by, among other things, offering course programs that violated state regulations, tutoring beyond the scope of the syllabus, and operating a school without approval. Below is a small sample size of the infractions that TAL incurred during the Class Period; upon information and belief, TAL likely incurred hundreds, if not thousands, of regulations and laws governing the for-profit tutoring industry throughout the Class Period.

88.     A TAL tutoring institution based in Yingzhou District, Fuyang City of the Anhui province organized primary school students to take a junior high school entrance examination, which was allegedly designed to send overachieving candidates to the better junior high schools. The local Yingzhou District Education Bureau issued a public notice that the TAL institution was involved in unauthorized illegal tutoring and ordered the institution to suspend operations in June 2021.

89.     TAL's Hangzhou branch, Hangzhou Xueersi, violated the new senior high school entrance examination policy by using terms like "top achievers' class "target class," and "competition class" during student enrollment promotions;

90.     TAL's Xinxin Zhixue Education Technology (Beijing) Co Ltd., a wholly owned subsidiary of Xinxin Xiangrong, enrolled students in May 2021 and offered Xueersi Peiyou training services at its Guangzhou campus from July to August 2021 in direct violation of state regulations which forbade unauthorized private tutoring services. As a result, the state ordered it to suspend its operations on January 11, 2022. (Penalty Decision No. 326.)

91.     TAL's Chongqing Jiulongpo District Xueersi Yizhi Technology training Co., Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, engaged in illicit practices such as advanced tutoring,

tutoring beyond the scope of the syllabus, and charging tuition for periods longer than the allowable three-month period. As a result, the company was blacklisted by the Education Commission of Jiulongpo District, Chongqing in May 2021. The company later changed its name on May 18, 2022, to Chongqing Jiulongpo District Zhikang Education Training Co. Ltd.

92.     On April 16, 2021, Kunshan Yizhen Education Technology Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong was fined for operating a school without approval. (Penalty Decision No. 010002.)

### 3.     TAL's Teachers' Qualification Were Repeatedly Falsified or Noncompliant

93.     China also imposed stringent regulations concerning teachers' qualifications, and closely watched for infractions.  However, once again, TAL ignored or skirted these rules.  For example, many Xueersi.com teachers lacked the requisite teaching qualifications. According to one report dated May 2, 2020, only 27 out of 58 teachers that taught Chinese, Math, and English in Grade 1 via Xueersi.com provided their teaching certificate numbers. Worse, of those that did purport to provide their teachers' qualifications, such "qualifications" did not comply with prevailing regulations.

94.     Another report dated April 25, 2021 reported that some teachers on Xueersi.com taught students in grades that were more advanced than their teaching qualifications permitted. For instance, a teacher with the surname "Qi" had a teaching certificate that indicated that she was qualified to teach primary school subjects, however, she was actually teaching junior high school subjects on Xueersi.com.

95.     On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd., on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming to be a high school teacher with six years of teaching experience

recommended Xueersi.com online courses. Beijing Xueersi Education spent CNY 2,622.58 on the video advertisement. (Penalty Decision No. 323.)

96.     On May 30, 2021, Hangzhou Yidu Training School Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined CNY 2.5 million (USD $351,321) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

## 4.     TAL Regularly Engaged in Unlawful Pricing Practices and Price Fraud

97.     TAL's subsidiaries also flagrantly disregarded Chinese law governing pricing. For instance, on August 21, 2019, Shanghai Xueersi Education Training Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for illegal pricing after an inspection revealed that an IZhikang store located in Shanghai did not provide a public notice of its tutoring courses' prices and promotional details, which constitutes failure of clear price marking. (Penalty Decision No. 122019007925.)

98.     Thereafter, on April 25, 2021, the Beijing Municipal government issued a warning and imposed a fine on Beijing Xueersi Education for offering discounted prices for several of its courses in violation of pricing laws as well as selling courses more than three months in advance and holdings courses past 9 pm. (Penalty Decision No. 58.) Specifically, regulators found that TAL's VIE, Beijing Xueersi Education Technology Co., Ltd., had been misrepresenting the un-discounted costs of enrollment in its courses to consumers, thereby deceiving customers into paying full price for courses that they believed they were receiving at a discount. For example, TAL promoted online courses as being offered at a 97% discount from the purported regular price when in fact no Company

courses had ever been sold at this purported regular price. On one occasion, TAL marked up the price of an online course by nearly 4,000% despite offering a substantially lower price initially.

99.    Beijing authorities stated that they were acting on serious concerns that had been raised by the general public regarding the Company's business practices. In its May 7, 2021 20-F filing, TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." For example, the PRC Pricing Law provides that an operator is prohibited from using false or confusing pricing methods to induce consumers or other operators into trading with it.

100.    On July 23, 2021, Xi'an Yanta District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., a wholly-owned subsidiary of TAL's Beijing Xueersi Education, was fined CNY 1.3 million (USD $200,577) for violating the: (1)  Anti Unfair Competition Law by setting unclear terms while offering a prize-attached sale; (2) the Advertising Law by explicitly or implicitly promising training effects; (3) Advertising Law by providing false or misleading contents in its advertisements; and (4) the Price Law by using false or misleading pricing measures to induce customers or other operators into transactions. (Penalty Decision No. 0168.)

101.    Even after the Class Period, TAL continued to flagrantly disregard Chinese pricing laws. For instance, on November 16, 2021, Wenzhou Xueersi Culture Communication Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., ordered to rectify its illegal practice of marketing eight tutoring courses for RMB 1 each, where the market price was more than 30 times higher between July 2021 and September 2021.

102.    On September 13, 2021, Hangzhou Xiashan Money School Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined for failing to display its pricing standards to the public. (Penalty Decision No. 45.)

## 5. TAL Repeatedly Disseminated Unauthorized or Illegal Publications to Promote Its Tutoring Business

103.     China strictly regulates the publication and dissemination of information, regardless of the medium of expression.  The Administrative Regulations on Publications, or No. 343 Order of the State Council of the PRC, was first adopted on December 12, 2001, and later amended on February 6, 2016. It applies to activities such as: publishing, printing, copying, importing or distributing publications, including books, newspapers, periodicals, audio and video products. Under the Administrative Regulations on Publications, any entity engaged in these aforementioned activities must obtain a permit to do so.  Despite these rules, TAL regularly disseminated materials without the requisite permits.

104.     During the Class Period, Defendants were fined for engaging in unauthorized or illegal publications. In particular, Beijing Xueersi Education Technology Co., Ltd., was fined on June 21, 2022 for publishing and disseminating an online publication between December 12, 2016 and April 6, 2022 that contained illicit content. (Penalty Decision No. 400076.)

105.     Additionally, Qingdao Xueersi Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined on July 27, 2021, for offering unauthorized version of electronic textbooks available for free public download via its WeChat Public Account named "Qingdao Kindergarten to Primary School Information" between May and June 2021. (Penalty Decision No. F-000020.)

106.     On May 17, 2021, Nantong Yizhen Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for unauthorized publication and had one of its computers and 173 sets of a publication confiscated. (Penalty Decision No. 46.)

107.    On February 24, 2021, Nanjing Xintang Sichuang Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for the unauthorized publication of 556 sets of two booklets. (Penalty Decision No. 6.)

108.    On January 13, 2021, Beijing Xueersi Education was fined because it failed to obtain review and approval procedures for a map which was uploaded and published by a website operated by the company, in violation of Regulation on Map Management. (Penalty Decision No. 2.)

109.    On September 29, 2020, Shanghai YY Information Technology Co. Ltd., which is 81.1% owned by Beijing Xueersi Educaiton Technology Co. Ltd., was fined for the provision of an online publication without the relevant license or prior approval by authorities. (Penalty Decision No. 20200220.)

110.    On September 6, 2021, Suzhou Industrial Park Xueersi Culture Training Center Co. Ltd. and Suzhou Wujiang District Xueersi Training Center Co. Ltd., both wholly owned subsidiaries of Suzhou Yizhen Education Technology Co. Ltd., which in turn is wholly owned by Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., were fined for illegal publications. (Penalty Decision Nos. 21 and 72).

111.    On August 27, 2018, Beijing Xueersi Education was fined for publishing and disseminating an online publication containing forbidden content. (Penalty Decision No. 40764.) Beijing Xueersi Education was also fined on June 10, 2015, for an illegal online publication. (Penalty Decision No. 40194.)

### 6.    TAL Regularly Engaged in False Advertising of Its Services in Violation of Applicable Regulations

112.    According to TAL's Form 20-F for fiscal year end February 28, 2019, the principal regulations governing the advertising businesses in China include: the PRC Advertising Law, which went into effect in September 2015, and was recently amended in October 2018, and the Advertising

Administrative Regulations promulgated by the State Council. These laws require companies that advertise their services to obtain a business license that permits advertising in that particular scope from either the SAIC or its local branches.

113.    Before, during, and after the Class Period, TAL and many of its subsidiaries flagrantly disregarded the PRC's advertising rules and regulations thereby incurring repeated sanctions. In particular, leading up to the Class Period, TAL demonstrated that it had little regard for PRC's regulations given that it incurred a number of regulatory sanctions including: one on June 21, 2017 after one of its subsidiaries launched a project for a teaching campus without proper authorization; one on August 25, 2017 after one of its entities failed to properly register for fire engineering completion; one on April 25, 2018, after one of TAL's subsidiaries provided false statistics; and others.

114.    Moreover, during the Class Period, TAL and many of its subsidiaries continued to receive financial penalties for engaging in an array of false promotional and advertising schemes. For example, on June 27, 2018, Beijing Bangxue Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for publishing training advertisements that explicitly or implicitly stated that examination institution personnel or exam preparation staff participated in the preparation of education or tutoring contents. (Penalty Decision No. 1045.) Previously, another administrative penalty had been issued to Beijing Bangxue on June 15, 2018, in connection with the company using the name or image of a scientific research institute, academic institution, education institution, industry association, specialized professional, or beneficiary person to recommend or substantiate education or tutoring advertisements, but no penalty was imposed at that time.

115.    On September 10, 2018, Beijing Xueersi Education was fined after the company unlawfully used the name or image of a scientific research institute, academic institution, education institution, industry association, specialized professional, or beneficiary person, to recommend or substantiate education or tutoring advertisements. (Penalty Decision No. 27.)

116.    On November 13, 2020, Hangzhou Xuesi Training School Co. Ltd, a wholly owned subsidiary of Xinxin Xiangrong, was fined for illegally publishing an education and training advertisement on August 14, 2020. (Penalty Decision No. 091.)

117.    On December 11, 2020, Nanchang Xueersi After-School Service Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined for displaying a large outdoor advertisement board without approval. (Penalty Decision Nos. 0406013, 0406014.)

118.    On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd. on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming to be a high school teacher with six years of teaching experience recommended Xueersi.com online courses. Beijing Xueersi Education spent CNY 2,622.58 on the video advertisement. (Penalty Decision No. 323.)

119.    Further, on May 30, 2021, Hangzhou Yidu Training School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined CNY 2.5 million (USD $351,321) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

120.    Changzhou Xuesi Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined on June 30, 2021, for publishing a false advertisement. (Penalty Decision No. 179.)

121.    TAL and its subsidiaries were sanctioned after the Class Period for false advertising schemes employed during the Class Period. For instance, Xueersi Education Training Co. Ltd., which is 80% owned by Beijing Xueersi Education, was fined on August 31, 2021, for violating China's Anti Unfair Competition Law – a law initially enacted in 1993 and later amended in 2017 and 2019 which contains 33 articles concerning the types of unfair competition and the procedures by which to investigate the unfair competition and the legal liabilities for such acts. In particular, Xueersi Education

violated the "false prize-attached sales" provision of the Anti Unfair Competition Law which "refers to the act of the operator who conducts the sales promotion with prizes in a fraudulent way, or with a top prize of the lottery sale exceeding CNY 50,000."

122.    On September 13, 2021, Chongqing Shapingba District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., ("Chongqing Shapingba") a wholly-owned subsidiary of Beijing Xueersi Education, was fined for releasing a promotional video on its WeChat[4] public account that contained statements by two students of the Xueersi Peiyou courses recommending Xueersi Peiyou's tutoring service, in violation of the Advertising Law of the People's Republic of China. The video further stated that a teacher was teaching more than 90% of the students that participated in competitions, which was not true. (Penalty Decision No. 226.)

123.    On November 4, 2021, Tianjin Xueersi Education Information Consulting Co. Ltd, a wholly owned subsidiary of Beijing Xueersi Education was fined for illegal advertising.

124.    On January 10, 2022, Beijing Shunshun Bida Information Consulting Co. Ltd., which is 80% owned by Beijing Xueersi Education was fined for falsely overstating that its overseas study enrollment rate of students tutored by Beijing Dongfang reached 98% whereas the actual rate was 87%. (Penalty Decision No. 9.)

125.    TAL falsely claimed that the Company maintained industry-leading compliance with applicable rules and regulations governing the Chinese for-profit tutoring industry when, in fact, it repeatedly violated those rules and regulations while claiming that the Company would benefit from the very regulations it was violating. As a result of Defendants' scheme to defraud investors and issue materially false and misleading statements during the Class Period, the price of TAL ADSs traded at artificially inflated prices as detailed herein.

---

[4] WeChat is a marketing and social messaging app with more than 1.1 billion registered accounts and 846 million monthly active users.

### 7.     Other Integrity and Compliance Issues

126.    Lead Plaintiff's investigation uncovered an additional 24 incidents for which TAL was sanctioned, involving matters not directly related to its tutoring operations further minimizing the potential importance of the violations detailed above among the total mix of violations for which the Company was fined during the Class Period.

127.    For instance, on June 21, 2017, Guangzhou TAL Network Technology Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Network Technology Co. Ltd., was fined for launching an interior decoration project for its classrooms at a teaching campus without a construction license. (Penalty Decision No. 1800003.)

128.    Xueersi Future Education Technology (Beijing) Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined on June 10, 2019 for organizing 10 people to distribute 300 flyers containing characters of "Xueersi International" in the street on May 12, 2019, without authorization.

129.    On August 25, 2017, Hangzhou Qinmin Information Consulting Co. Ltd., which is 90% owned by Beijing Xueersi Education, was for its failure to register for fire engineering completion. (Penalty Decision No. 12000273.)

130.    Just one day before the Class Period began, on April 25, 2018, Yidu Huida Education Technology (Beijing) Co. Ltd., a wholly owned by TAL Holding Limited, was fined for providing false statistics materials.[5] (Penalty Decision No. 0005.) Yidu Huida was also fined on November 19, 2018 for providing online visual and audio program services without authorization. (Penalty Decision No. 41171.)

---

[5] "Statistics materials" refers to company information such as the operational address, financial data, employee headcount, and main business scope, that the Statistics Bureau collects from enterprises to get a clearer understanding of the economy.

131.    Sixteen of the 24 sanctions that TAL and its affiliates received were during the Class Period.

132.    On August 16, 2019, Beijing Banxin Network Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined on August 16, 2019, for failing to declare individual income tax since July 2017.

133.    On January 8, 2020, Changsha Tianxin District Xueersi Education Training School Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., was fined for the unauthorized construction on two teaching campus renovation projects. (Penalty Decision Nos. G-1, G-2.)

134.    On April 1, 2020, Hangzhou Xiaoshan Money School Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for failing to report an employees' information to the local public security bureau. (Penalty Decision No. 01692.)

135.    On May 12, 2020 Beijing Bangxue Education Technology Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined by the Haidian District Bureau of Culture and Tourism, Beijing, for an undisclosed irregularity. (Penalty Decision No. 3-058.)

136.    On May, 20, 2020, Jiaxing Sichuang Technology Training Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined for an unauthorized design and engineering project after the subsidiary engaged a provider to complete the interior decoration of one of its sites including the wall, ceiling, and electrical design/installation. (Penalty Decision No. 05-0026.)

137.    On July 17, 2020, Beijing Xueersi Education was fined for an undisclosed irregularity. (Penalty Decision No. 100081.)

138.    On August 27, 2020, Beijing Xueersi Education was warned for violating the fourth point of Article No. 11 of *Measures for Supervision and Handling of Contract-related Violations*, which stipulates that a consumer's right to the interpretation of terms may not be overlooked. In

particular, Beijing Xueersi had a promotion where students who referred new students to the tutoring course were entitled to a tuition refund; however, those students that falsely introduced new students in order to get the tuition refund would be disqualified. Thus, Beijing Xueersi received this penalty becuase Beijing Xueersi had the exclusive right to interpret the legal terms for this promotional activity, and the students were not given the ability to interpret its terms, in violation of Article No. 11. (Penalty Decision No. 370.)

139.   On September 1, 2020, Xi'an Yanta District Xueersi Peiyou Extra-Curriculum Training School Co. Ltd., a wholly-owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined for violating the Law on Managing Vaccine after the company's practicing doctor failed to: (i) participate in a vaccination-related training; (ii) pass pertinent tests; and (iii) fill in vaccination records in accordance with the rules. (Penalty Decision No. 42.)

140.   On January 11, 2021, Changsha Yuhua District Xueersi Training School Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined for the unauthorized construction of three teaching campus renovation projects. (Penalty Decision No. 1, 2, and 16, respectively.)

141.   On March 24, 2021, TAL Training School (Shanghai) Co. Ltd., was fined for operating a tutoring business in the name of "Zhangyang Road Branch" from July 2020 to January 2021 without having obtained the relevant branch registration. (Penalty Decision No. 152020001595.)

142.   On April 30, 2021, Changsha Yuelu District Xueersi School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined for unauthorized construction. (Penalty Decision No. G-13.)

143.   On May 7, 2021, Hangzhou Yidu Training School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined for violations relating to its distribution of printed

advertisements (flyers of A4 paper size) in a public space on April 8, 2021. (Penalty Decision No. 05-0109.)

144.    Even after the Class Period, TAL continued to flout regulations and laws. For example, on August 6, 2021, Beijing Xueersi Education was fined for its failure to fulfill fire security obligations and rectify them within the prescribed time frame. (Penalty Decision No. 200129.)

145.    On August 9, 2021, Beijing Xueersi Peiyou Training Mentougou School Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for its failure to provide security education and training to its staff. (Penalty Decision No. 2-18.)

146.    On October 18, 2021, Zibo Ledu Lekao Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined for its failure to declare stamp tax and pay the individual income tax on behalf of its employees. (Penalty Decision No. 13.)

147.    On November 11, 2021, Jinan Lixia District Xueersi Training School Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined for utilizing its facilities without proper construction project review. (Penalty Decision No. 458.)

148.    On December 29, 2021, Beijing Xueersi Education was fined for fabricating a false tax basis. (Penalty Decision No. 255.)

149.    Further, in May 2022, Chongqing Liangjiang New District Xueersi Yixue Technology Training Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was investigated by the local Education Bureau ("Bureau") of Liangjiang New District, Chongqing. The Bureau identified three major issues involving the company, including: (1) its failure to publicize complete information about the institution and its teachers' qualifications; (2) failure to cooperate with the experts for an effective assessment on whether course programs are academic tutoring in nature; and (3) failure to implement the three-month tuition policy into its business practices.

### E.    TAL Is at Risk of Having Its ADRs Delisted

150.    TAL's auditor - Deloitte Touche Tohmatsu Certified Public Accountants LLP - operates in Beijing, PRC. In December 2021, the PCAOB reported that it is "unable to inspect or investigate completely registered public accounting firms headquartered in Mainland China and Hong Kong." TAL's auditor, Deloitte, was identified as one such auditor.

151.    China has stringent privacy laws hamper the PCAOB's ability to monitor accounting firms in China.

152.    Enacted in December 2020, the Holding Foreign Companies Accountable Act ("HFCAA") is a law that requires the SEC to "identify public companies that have retained a registered public accounting firm to issue an audit report where the firm has a branch or office that: (1) is located in a foreign jurisdiction, and (2) the Public Company Accounting Oversight Board ('PCAOB') has determined that it is unable to inspect or investigate completely because of a position taken by an authority in the foreign jurisdiction. Under the HFCAA, if the issuer remains a "Commission-Identified Issuer" for three consecutive years – that is, the PCAOB is unable to inspect the issuer's auditor for three consecutive years – the SEC will prohibit the issuer from trading its securities on U.S. stock exchanges. For instance: "[a]fter a company has been a Commission-identified issuer for three consecutive years, the SEC will issue an order prohibiting trading of the company's securities on any national securities exchange or in the over-the-counter market in the United States."

153.    On June 24, 2022, TAL was provisionally identified as a "Commission-Identified Issuer" – i.e., a company subject to the HFCAA and on July 19, 2022, the SEC conclusively identified TAL Education as an issuer under the HFCAA. TAL disclosed this in its Form 20-F filed with the SEC on June 14, 2022.

154.    On June 14, 2022, TAL filed its annual report on Form 20-F for its fiscal year-ended

February 28, 2022. The annual report stated, in relevant part:

> Our ADSs will be delisted and our ADSs and shares will be prohibited from trading
> in the over-the-counter market in 2024 under the Holding Foreign Companies
> Accountable Act, or the HFCAA, if the PCAOB is unable to inspect or fully
> investigate auditors located in China, or in 2023 if proposed changes to the law are
> enacted. **The PCAOB has been unable, and is currently unable, to inspect our
> auditor in relation to their audit work performed for our financial statements.**
> On December 16, 2021, the PCAOB issued a report to notify the SEC of its
> determination that the PCAOB is unable to inspect or investigate completely
> registered public accounting firms headquartered in Mainland China and Hong Kong**.
> The PCAOB identified our auditor, Deloitte Touche Tohmatsu Certified Public
> Accountants LLP, as one of the registered public accounting firms that the
> PCAOB is unable to inspect or investigate completely.** Under the current law,
> delisting and prohibition from over-the-counter trading in the United States could take
> place in 2024. The delisting of our ADSs, or the threat of their being delisted, may
> materially and adversely affect the value of your investment. In addition, the proposed
> changes to the law would decrease the number of non-inspection years from three
> years to two, thus reducing the time period before our ADSs may be prohibited from
> over-the-counter trading or delisted. If the proposed provision is enacted, **our ADS
> could be delisted from the exchange and prohibited from over-the-counter
> trading in the United States in 2023.**

155.    On June 28, 2022, TAL filed a Form 6-K with the SEC disclosing that it was updating

its status under the HFCAA to "Commission-Identified Issuer." TAL further disclosed that the SEC

identified TAL as a "Commission-Identified Issuer" because "the Company used an auditor

[Deloitte] whose working paper cannot be inspected or investigated" by the PCAOB to issue the

audit opinion for its financial statements for the fiscal year end February 28, 2022.

156.    TAL had until July 18, 2022, to submit evidence disputing the SEC's identification of

it as a "Commission-Identified Issuer" under the HFCAA.

157.    TAL is at risk of having its ADRs delisted from the NYSE as soon as 2023 or 2024.

**F.    Other SEC Investigations**

158.    On July 30, 2019, the SEC began investigating TAL.  According to the Probes Report,

based on its investigation, FOIA requests to the SEC and appeals of those FOIA requests, "the timing

of SEC responses to us suggests that *TAL education Group management may have known about an SEC probe since at least Jul-2019."*

159. On June 30, 2020, the Probes Reporter issued an update on an SEC probe entitled "SEC Investigation Update" which included the following timeline of the SEC's investigation into TAL:

| 20-Aug-2018 | FOIA Response | No SEC investigative records found. |
|---|---|---|
| 30-Jul-2019 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 19-Sep-2019 | Appeal Response | Existence of on-going SEC enforcement proceedings officially confirmed on appeal; Access to records remains blocked. |
| 27-Mar-2020 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 4-Jun-2020 | Appeal Response | **Existence of on-going SEC enforcement proceedings officially confirmed on appeal**; Access to records remains blocked. |

160. The update stated that "an undisclosed SEC investigation is again confirmed" and that "TAL Education Group remains on our Watch list of companies with confirmed, undisclosed SEC investigations."

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

161. Throughout the Class Period, Defendants issued materially false and misleading statements and omissions, including those regarding: (a) TAL's adherence to Chinese regulations governing the after-school tutoring industry; (b) the ability of TAL to comply with Chinese regulations; (c) the causes for TAL's increasing student enrollment and financial success; and (d) the "beneficial" nature of the regulations which would purportedly make the industry "more healthy."

162. Analysts were focused on the number of student enrollments TAL was reporting; they viewed this metric as most indicative of the Company's future success. For instance, DBS Group wrote in a January 2019 report: "The top-line growth driver is enrolment [sic] growth." Further, on July 31, 2020, Credit Suisse AR reported: "We remain confident about the recovery of student enrollment in the autumn semester . . ." And on January 22, 2021, Deutsche Bank AR reported:

"Operating data continues to deliver good performance with total student enrollments up by 47% yoy to 3.4mn."

A.  **Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry**

163.   During the Class Period, Defendants misled investors about TAL's continued failure to comply with Chinese regulations overseeing the private, for-profit tutoring industry—failed to disclose the repeated fines and sanctions imposed on TAL, and that TAL's repeated reckless regulatory violations would fuel that Chinese government's increasingly harsh regulation of the industry and risked and or provoked a complete shut-down of the industry and, with it, TAL's profitable private tutoring business.

164.   In their Forms 20-F and 6-K filed with the SEC; earnings calls; press releases; and interviews with analysts, Defendants consistently reassured the public that the Company was complying with the government's evolving regulations pertaining to the tutoring industry and in fact, that the government's rules and regulations would benefit the industry. In actuality, however, Defendants' core business operations were severely impacted by the regulations which ultimately contributed to the demise of the entire tutoring industry, but Defendants continued to reassure the public that all was well while selling hundreds of millions of dollars of TAL stock for their personal enrichment.

165.   The 2018 Form 20-F explained the 2018 regulations, including, Circular 3, or the Circular on Special Enforcement Campaign concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle Schools, which the MOE had promulgated earlier in the year on February 13, 2018. The Form 20-F further provided that (emphases added):

In March 2018, two of our training institutions providing K-12 tutoring services received notice under Circular 3 from the local government authority and *we are taking corrective measures in accordance with Circular 3.* For example, *we have reduced our course hours and schedule for certain of our offline tutoring courses to end before 8:30 pm and reduced the coursework assigned to our students*, etc. However, *we cannot assure you that we will fully comply with the above mentioned regulations timely or at all, and will not be fined or otherwise penalized by government authorities for offering such classes, in which case our business and operations could be materially and adversely affected . . . .*

*if we fail to comply with the applicable legal requirements* concerning obtaining and maintaining applicable licenses and permits and fulfilling applicable registration and filing requirements to operate our after-school tutoring business, including any failure to cure non compliances in a timely manner, we may be subject to fines, confiscation of the gains derived from our noncompliant operations or the suspension of our noncompliant operations, which may materially and adversely affect our business and results of operations.

166.    This statement and the risk warnings were false and misleading when made and omitted material facts because, as described in ¶¶83-125, contrary to its assurances that the Company was taking corrective measures to reduce its course hours, end tutoring courses by 8:30 pm, and reduce the coursework assigned to students, TAL was actually violating these very laws and incurring significant sanctions as a result.

167.    One month later, on July 26, 2018, TAL held an earnings call with analysts and investors hosted by Defendant Luo. During the call, Defendant Luo acknowledged the policies that the government had released relating to the tutoring market and stated that the policies were aimed at further improving the overall standards of the industry. In particular, Defendant Luo stated: TAL is "*fully cooperating with the government directions*, and *where needed, [will] make adjustments to our business operations accordingly."* Defendant Luo also stated that the reform policy will "*be very positive* for the quality and diversity of off-line school tutoring services," "*the direction is -- the regulations will help the online education to be more healthy*" and *"we proactively follow the government regulations and do the adjustments ourselves."* Defendant Luo further stated: "[T]he regulations will help the online education to be more healthy . . . So we, as a company, is just follow

their – and we are going to follow the government regulation requirements if they have in the future. And even before that, we, as a company, also we are operating our own business in a very disciplined way."

168.    The statements that TAL was "fully cooperating" with and "proactively following" the government's regulations governing the for-profit tutoring industry were materially false and misleading when made because the Company was actually engaging in a variety of illegal measures designed to induce student enrollment and drive up its quarterly revenues. As such, TAL was *not* adjusting its "business accordingly" but rather, intentionally flouting Chinese rules and regulations governing the tutoring industry.

169.    On January 24, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo again claimed that TAL was following Chinese law regarding the tutoring industry and adjusting its business practices accordingly:

> As you know, the education industry, including after-school tutoring market is currently in the midst of ongoing education reforms, standardizations and regulations. All these policies are aimed at further improving overall standards and the ecosystem of the entire industry. ***We are following government directions***, ***and where needed, we will continue to make adjustments into our business operations accordingly***.

170.    Later in the call, Thomas Chong, an analyst with Credit Suisse AG, asked: "Can management give us some update about the off-line and online regulations…." Defendant Luo responded that the government policies were good for TAL's business, as they had "***greatly improved the service standard of the whole industry***." Defendant Luo further added: "***[W]e fully agree with all the policies and try to execute the policies in our operations as much as we can***." Defendant Luo then stated:

> ***[W]e try our best to be compliant with all the government kind of policies***. And ***we believe all of these policies, at the end, their purpose is not to try to kill the industry,*** their purpose is try to protect the rights of parents and give more right of choices back to the parents, which also can protect the whole industry and will be beneficial to all the compliant companies in the long run. ***And besides what you have seen, off-line***

*regulation policies, and we have disclosed and make you very open to all of you guys in the past earning calls.*

171.    The statements set forth above were materially false and misleading because Defendants did not genuinely believe that the Chinese government's stringent policies "greatly improved" the for-profit tutoring industry, did not genuinely believe that "*their purpose is not to try to kill the industry,"* and further, TAL was not following the government's directions by adjusting its business practices to be compliant with the new policies. Instead, TAL was engaging in a wide range of illegal conduct in violation of these policies, as further alleged in Section IV.D. Indeed, Defendants' sale of vast amounts of their personal holdings in TAL at the same time reveal that they did not believe their statements to the market regarding the beneficial impact the new regulations would have on TAL's business or TAL's ability to comply with said regulations which merely served to jack up the stock while they cashed out on their insider sales.

172.    Defendant Luo added during the January 24 earnings call that "*we welcome all the regulations, policies in online environments*." Defendant Luo further reassured investors that "*[i]f any new policy [comes] out, we definitely will become the first compan[y] who will go and implement all the policies in place*." During the same call, Defendant He stated: "*we are pacing our off-line capacity growth as we continue to invest in new technology and online business to ensure we are following the new standards and regulations that are currently being implemented."* Finally, Defendant Luo stated: "And we will continue to follow all of government policies and regulations to make sure the new learning centers we enter is compliant with the government requirements."

173.    These statements were false and misleading when made because despite Defendants' assurances that TAL was "following the new standards" and would become the "first company" to "implement all the policies," TAL was disregarding the new policies by continuing to design

marketing and pricing campaigns designed to lure in new students, among other illegal acts. These statements were materially misleading because, in reality, TAL was repeatedly violating the new policies and regulations governing the for-profit tutoring industry. Defendants' insider sales further reveal that they did not genuinely hold the belief that TAL was complying with governmental regulations and that their reassurances to the market that they were in compliance were merely to artificially inflate the stock price while they cashed out on their insider sales.

174.     On April 25, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo stated that the robust student enrollment growth was "mostly driven by the growth in online enrollments of Xueersi Peiyou small class." Further, in regard to the education regulations, defendant Luo stated that *"we continue to invest in new technology and online business to keep improving our overall operational efficiency and ensure we are following the new standards and regulations that are currently being implemented*" and "*[w]e have followed the government directions*, *and where needed, we'll continue to adjust our business operations accordingly."* Defendant Luo spoke favorably of the government regulations, stating that *"[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry."*

175.     This statement was materially false and misleading when made because TAL was not, in fact, following "the government directions" or "adjust[ing] [its] business operations accordingly." Rather, TAL was disregarding the government's rules and regulations and continuing to operate its business in a way that violated existing and new laws governing the after-school tutoring industry.

176.     Luo's confidence in the above statements was unfounded because he knew that increasingly harsh and restrictive government regulations would make the operation of TAL's tutoring business virtually impossible in an environment where the Chinese government was progressively moving toward curtailing the tutoring industry entirely. Further, Luo did not genuinely

believe that "[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry," as evidenced by his sales of stock contemporaneous with this statement.

177.    On July 25, 2019, TAL held an earnings call for its first fiscal quarter of 2020. During the call, Defendant Luo continued to assure investors and analysts: "***We will follow the government [] directions in education reforms, standardizations and regulation. Where needed, we will adjust our business operations accordingly***. All these policies are aimed at elevating the standards and improving the entire education – the whole industry, *which is the long-term benefit of peer customers and shareholders alike*."

178.    This statement was materially false and misleading because contrary to Defendant Luo's assurances that TAL would heed the government's directions on education reforms and regulation and "adjust [its] business operations accordingly," in actuality, TAL was purposely flouting those very laws its promised to heed by: employing deceptive pricing measures to lure in new students, creating false or misleading advertisements to attract new clientele, falsifying teaching certifications which it posted on its website, and various other illegal measures designed to increase its student base and thereby increase revenues.

179.    On October 24, 2019, during an earnings call, in regard to the government policies and regulations, Defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made *"[t]he pressure of being compliant . . . bigger than before."* Yet, Defendant Luo asserted that "*the policies were a good timing for us to review our business models and be more cautious*," so TAL "*can be more compliant than before*." With respect to off-line centers, he stated: "*we will still be very cautious with the approval policy as first priority to make sure all off-line centers can be more compliant."*

180.    This statement was materially false and misleading because, contrary to Defendant Luo's assurances that the policies came at a good time for TAL, the opposite was true. In reality,

51

Defendants knew that the new policies made it increasingly difficult for TAL to operate and continue to expand its student base and thereby increase its revenues. The statement that TAL could be "more compliant than before" is also materially misleading because it wrongly insinuates that TAL had already been complying with the regulations and that it would continue to become even more compliant. Further, Defendant Luo recognized the pressure that the new regulations had on TAL's business but nevertheless continued to reassure investors and analysts that the regulations were beneficial to the success of its business. Additionally, that these statements are materially false and misleading is further evidenced by the fact that Defendant Luo had already sold more than $5 million worth of his stock at that point and just five days after he issued the above statements, he proceeded to sell another $5 million worth of stock.

181.    Also during the October 24, 2019 earnings call, Sheng Zhong, an analyst with Morgan Stanley's research division asked Defendant Luo for an update on how the government's regulations would impact off-line and online segments of TAL's business. With respect to off-line regulations, Defendant Luo stated: "compared to 1 or 2 years ago, we're making better than before." Defendant He answered the analyst's question as it pertained to the online regulations:

> As one of the leading online education pioneers, *we are very happy to see and even welcome the online education regulations as always, and we will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services.* And we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students, especially the kids who are based in lower-tier geographic areas.
>
> And finally, *I'd like to emphasize again that we welcome and fully support all these regulations and policies*, which will have improved the standards and services of the industry and further strengthen the overall industry environment.

Defendant He later stated: "we invest in new technology and online business to further improve our operational efficiency and *closely follow all the standards and regulations*." She also referred to a document released in September 2019 by the China Ministry of Education, along with ten other

related departments, regarding general guidance relating to the online education industry in China. Defendant He stated that "*we are very happy to see and even welcome the online education regulations* . . . and . . . will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services." Defendant He added: "*we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students"* and "*we welcome and fully support all these regulations and policies, which will have improved the standards and services of the industry and further strengthen the overall industry environment*."

182.    The statements above were false and misleading when made because Defendant He knew that the government was intent upon increasingly harsh regulation of the tutoring industry which, in turn, made compliance by TAL more difficult, thus rendering He's statement about the beneficial effect of the regulations and the future of the tutoring industry unfounded. Further, that Defendant Luo had already sold $5 million worth of his stock in TAL during the Class Period by the time he made this statement, and that he then sold another $5 million worth of stock just *five days* after assuring the public that TAL was in better shape in terms of compliance than it had been before further demonstrates that his statement that TAL was "making better than before" when "compared to 1 or 2 years ago" was materially false and misleading.

183.    On June 30, 2020, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year end February 29, 2020, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo ("2020 Form 20-F"). In the Form 20-F, Defendants Zhang and Luo certified pursuant to the SOX that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Both

Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

184.    This statement was materially false and misleading because although Defendants Zhang and Luo certified that TAL's annual report was true and did not omit material facts, behind the scenes TAL was engaging in an array of illegal behaviors for employing deceptive pricing measures to lure in new students, creating false or misleading advertisements to attract new clientele, falsifying teaching certifications which it posted on its website, and incurring dozens, if not hundreds or even thousands, of sanctions as a result. Additionally, at the time Defendants made these statements, Defendant Luo had already disposed of 279,768 shares of TAL common stock for proceeds of $10.4 million, and Defendant Zhang had sold 5.5 million shares of common stock for proceeds of **$215.2 million** via his holding company for which he is the sole shareholder, Bright Unison Limited. The sheer magnitude of these insider sales evidences that these Defendants did not genuinely believe in the veracity of these statements at the time they were made.

185.    The 2020 Form 20-F included the Company's annual financial results, and described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's "reputation and brand have also greatly facilitated our student recruitment" and that TAL *"adapted our operations" to comply with existing governmental regulations and "been making efforts to ensure compliance with these regulations and implementation rules."* TAL also explained how on February 13. 2018, the MOE and three other government authorities made changes to academic competitions which may impact the demand for their after-school tutoring business and personalized premium service and stated: "*We have adapted our operations which may be construed as competitions or ranking activities to these regulations.*"

186.    These statements were false and misleading when made because at the time these statements were issued, TAL had not adapted its operations to adhere to existing governmental regulations and was in fact engaging in the serious violations that precipitated the July 21 crackdown that signaled the end of the private for-profit tutoring industry.

187.    The 2020 Form 20-F further explained that under the regime of the Law on the Promotion of Private Education of China, the PRC government authorities had promulgated a number of regulations and implementation rules in 2018 governing the education industry and the after-school tutoring service market, including the Circular 3, the State Council Opinions 80, as well as Circular 10. TAL stated that these new regulations and implementation rules provide a series of requirements in the operation of after-school tutoring business and that TAL has "***been making efforts to ensure compliance with these regulations and implementation rules.***"

188.    Further, the 2020 Form 20-F explained that the MOE, jointly with certain other PRC government authorities, promulgated the Implementation Opinions on Regulating Online After-School Tutoring, or the Online After-School Tutoring Opinions, effective on July 12, 2019.  The Online After-School Tutoring Opinions also imposed a series of new regulatory requirements which TAL stated: ***"We are making efforts to comply with***…."

189.    That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, defendant Luo asserted that TAL ***"[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations, including those that regard national public health."*** Defendant Luo further committed to ***"investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences.***" He further stated: "we will consistently pursue our long-term strategy regardless of what kind of the ***short-term challenges we are facing***. To the end, we will keep investing in technology, teachers and marketing and make every effort to build all-around online

services with ***top-quality content and customer experiences***. We firmly believe that as an education player, education is education. Our long-term accomplishment is defined only by the quality of our products, services and technology instead of purely marketing." These statements were false because the challenges were not short term, but instead were part of an increasingly harsh campaign by the Chinese government to regulate the tutoring industry, which regulations TAL had a long history of flouting and was continuing to flout in order to support its growth and dominance of the industry.

190.    On April 21, 2021, TAL held its fourth quarter fiscal year 2021 ("FY 2021") earnings call with investors and analysts, during which Defendant Luo claimed: "Our view is very clear, is we will comply with government guidelines and follow their requirements to do the off-line learning centers." He further added: "***And looking forward, when the new policy is out, and we'll definitely follow the policies to make the necessary adjustments cause in view of the known. Based on what we see today, we are pretty much on track.***"

191.    This statement was false and misleading when made because TAL had no intention of following the existing or new policies that the Chinese government was promulgating and further, it was not "pretty much on track," because by April 2021, TAL had already incurred dozens – and likely even hundreds or thousands – of regulatory penalties as a result of its flagrant disregard for the laws governing the for-profit tutoring industry and was committing serious violations, as first revealed by the Chinese government at the end of the Class Period. Defendant Luo's $25 million in proceeds from his insider sales at this point in time further demonstrates that he did not genuinely hold the belief that TAL was "on track" to adhere to the government's increasingly stringent violations and knew that the impending government crackdown of the tutoring industry was on the horizon.

192.    On April 22, 2021, TAL held its fourth quarter FY 2021 earnings call during which Defendant He stated: "[W]e have conditionally rented some Peiyou small class learning centers and

expect to add a few more and close down some learning centers based on standard operations. ***We will closely follow up with government guidelines*** . . ."

193.    This statement was false and misleading because Defendant He knew about China's annual "Two Sessions" parliamentary meetings from March 4, 2021 through March 11, 2021, the purpose of which was to enact "stricter regulations" to rein in the online education industry, thus potentially putting at risk the legality of certain of TAL's business operations considering the then-existing political climate.

### 1.    Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Advertising Regulations

194.    On October 25, 2018, TAL held an earnings call for its second quarter results for fiscal year 2019 ("FY 2019") during which Defendant Luo provided an update on TAL's promotional and marketing efforts for the second quarter:

> You probably have seen in Q2, our sales and marketing has been more than $150 million. Compared to the previous year's, it grew by more than $100 million. Most of that actually was spending on online marketing. And as a result, the online marketing in Q2, we have – especially in online-Xueersi online school-we have 2.4 million enrollments. And let me give some split of this 2.4 million enrollments. The 2.4 million enrollments, including almost 0.5 million that is regular class, with normal price and normal terms. Last year, this number is lower than 160,000, ***so they grow more than 200%.***

195.    The statement above was materially false and misleading when made because it omitted to disclose that TAL's promotional efforts to drive student enrollments violated the PRC's advertising and pricing laws and therefore, that TAL's enrollments had grown more than 200% not due to organic or healthy growth, but rather, due to its illegal practices designed to lure in new students. At the time Defendant Luo made this statement, TAL and its subsidiaries were routinely using illicit advertising and promotional schemes and promoting fake product pricing designed to induce student enrollment in order to get more market share

196. On January 21, 2021, TAL held an earnings call for the Company's third quarter FY 2021 financial results with investors and analysts. During the call, Defendant Luo stated: "[W]e always put the managing healthy growth and students and the parents in first priority instead of purely marketing."

197. This statement was materially false and misleading when made because despite Defendant Luo's bold statement that TAL always prioritized "managing healthy growth" and the "students and the parents" instead of "purely marketing," TAL was doing just the opposite; it was prioritizing its illicit marketing campaigns in order to induce student enrollments and drive revenues as described above in ¶¶112-125. Additionally, Defendant Luo had already liquidated 457,380 shares of TAL common stock for proceeds of nearly $25 million at the time he issued this statement, which further evidences that he did not genuinely believe that TAL prioritized healthy growth over "purely marketing."

198. On April 22, 2021, during TAL's fourth quarter FY 2021 earnings call, D.S. Kim, an analyst with JP Morgan Chase & Co. asked Defendants about TAL's compliance with marketing regulations. Defendant Luo claimed, "*very clearly, we comply with the guidelines. We made necessary adjustments.*"

199. This statement was materially false and misleading when made because at the time it was made, TAL was not complying with the government's marketing guidelines and regulations or making the "necessary adjustments." Rather, TAL was repeatedly employing deceptive marketing techniques to induce students and parents to sign up for its tutoring classes and incurred many regulatory fines for doing so, as described above in ¶¶112-125. Further, Defendant Luo knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Additionally, at the time Defendant Luo issued the above statement, he had already realized proceeds of nearly *$25 million*

from unloading his TAL stock, further evidencing that he could not have genuinely believed that TAL complied with the Chinese government's guidelines or was making the "necessary adjustments."

### 2. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations

200.     On April 28, 2020, during an earnings call, Defendant Luo stated: "So the pricing strategy of online will serve our purpose to getting more market share, to serve more people and to make people more satisfy." Defendant Luo further stated: "I think on one side, we tailored price a little bit up, but on the other side, we also give promotions in the coupons and kind of an incentive for the parents and students if they can finish the work."

201.     This statement was materially false and misleading and omitted material facts because, as described above in ¶¶112-125, TAL was violating the Chinese government's regulations and rules regarding pricing for tutoring classes throughout the Class Period. Thus, Defendant Luo's statement regarding TAL's pricing strategy, for instance, using promotions and coupons to incentivize parents and students, is misleading because it omits TAL's deceptive pricing practice of offering substantial discounts on tutoring courses and later, requiring parents to pay substantially more for the course.  For instance, on one occasion, TAL marked up a course by *4,000%* and on another occasion, TAL marketed eight tutoring courses for just 1 RMB each where the market price was actually much higher. This statement is also materially false and misleading because at the time that Defendant Luo made this statement to the public, he had already dumped approximately 280,000 shares of TAL common stock for $10.4 million in proceeds.

### 3. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations

202.    Throughout the Class Period, Defendants also repeatedly assured the public that the

Company was complying with China's regulations regarding advanced tuition payments. For

instance, on October 25, 2018, during TAL's second quarter earnings call for fiscal year 2019, Mark

Li, an analyst with Citigroup Inc., Research Division, asked Defendant Luo about the advanced

tuition payment regulation, stating: "I want to know about the regulation of no more than 3 months

of getting the fees." Defendant Luo replied:

> I think we as the top players in this industry, ***we are definitely to comply with the
> government policies. We're in the process to implement the 3-month policies across
> our business units.*** For example, the Xueersi Peiyou small class. Their retention
> period will start from late October, maybe this week and next week, to early
> December. So we will change our system to fit in the 3-months policy, with no doubt.
> We will follow the government policy to do this.

> And for the Xueersi one-on-on – for Zhikang one-one-one [sic], ***yes we will also adopt
> this one-on-one policy – this 3-month policies.*** But because for the one-on-one,
> actually, most of their students, actually, coming up from our small class. ***So we don't
> foresee a material impact on maybe difference or change to my business due to the
> change of the 3-month policy. We don't see any material impact on them . . . .***

> But again, I think the 3-month policy is very good policy because it gives more right
> back to the parents. . . .

> ***So we are also quite confident to this 3-month policy to give more rights back to the
> parents. And we believe that's the right way and that's the right policy to help
> improve the quality of the whole industry.***

203.    These statements were materially false and misleading because, Luo knew or

recklessly disregarded that the regulations were designed to constrain the tutoring industry and make

compliance with increasingly restrictive regulations increasingly difficult and, as described above in

¶149, TAL was not complying with the three-month tuition policy required by Circular 80 and could

not possibly have thought the three-month policy was a "very good policy" given that it continuously

disregarded such policy. Rather, throughout 2018 and thereafter, TAL's leading brand Xueersi was

in the practice of charging advance tuition for ***more than three months***, for instance, in its summer

and autumn course packages. Further, TAL's subsidiary, Chongqing was violating the tuition

payment regulations and in fact, was blacklisted by the Education Commission in May 2021. Further, that Defendant Luo dumped 5,001 shares of his TAL stock just five days after issuing these statements for proceeds of $139,527 and had earlier that year unloaded nearly 20,000 shares for proceeds of $724,125 further evidence that these statements were materially false and misleading when made.

204.    On January 24, 2019, TAL held its earnings call for its third fiscal quarter of 2019. During the call, Yuzhong Gao, an analyst with CICC asked Defendants: "how much of your deferred revenue has been impacted by the new tuition collection policy?" Defendant He replied:

> And for your question, yes, according to the regulations issued last year in August, parents cannot be billed for more than 3 months. It does have impact on our deferred revenue and cash flow. ***Since the policy has been issued, we have followed the government's requirement to make necessary adjustment of our tuition fee charging policies if needed.*** This particular policy actually gives a right of choice back to the parents, ***which we believe is a right and good practice to protect the parents' rights and interest*** and, as I just mentioned, helps to improve the overall industry environment. . . .
>
> And in terms of the pro forma, we charge tuition fee based on the spring, summer, autumn and winter semesters.

205.    Defendant He then reemphasized: "in the long run, ***we still believe with all the regulations in place, which aim to protect the parents' rights and which aim to improve the service level or service quality of the whole industry, we -- the compliant companies in the long run will be beneficial"*** and ***"[w]e need to follow the new rule, new policies within this environment.***

206.    These statements were materially false and misleading when made because Defendant He knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult and contrary, to Defendant He's assurances that TAL had been following the government's regulations by adjusting its tuition fee policies and that TAL believed that the policies were a "right and good practice to protect the parents' rights and interest," in actuality, TAL was charging tuition for periods

greater than three months in direct violation of the PRC's 2018 regulation, Circular 80. For instance,

TAL's leading brand, Xueersi.com, was violating this law with respect to tuition payments for its

summer and autumn course packages.

### 4. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations

207.    During the Class Period, TAL continuously represented that it was complying with

regulations regarding teacher qualifications. For instance, on October 25, 2018, TAL held its second

quarter earnings call for fiscal year 2019. During the call, Yue Wu, an analyst with China

International Capital Corporation Limited, asked Defendant Luo about teachers' licenses and in

particular, whether the teacher licensing exam affects TAL's next quarter guidance and expansion.

Defendant Luo replied:

> I think because *we have put the teacher license as a very high priority in the past few years, so in this industry*, the percentage of our teachers who have license is higher than the industry average. And based on the government's policy, this year, most of – almost all, but most of our teachers who don't have license, they have registered exams in November, which will happen after 1 or 2 weeks. *So we will continue to follow company's – government's policy to make sure all of our teachers can be compliant.* And we don't see a material impact from teaching license in the short term, especially for the next quarter.

208.    This statement was false and misleading and omitted material facts because, despite

Defendant Luo's assurances to the public that TAL had put teacher licenses as a "very high priority"

and would comply with the "government's policy to make sure all of our teachers can be compliant,"

in actuality, TAL was misrepresenting its teachers' qualifications by displaying incomplete teaching

credentials or no teaching credentials at all on its website, allowing teachers to teach grades more

advanced than their teaching qualifications permitted, and even altogether falsifying teacher

qualifications by fabricating teacher qualifications and posting them on their website. Therefore, the

statements above falsely misrepresented that TAL was following the government's teaching requirement regulations.

209. On January 24, 2019, TAL held an earnings call for its third fiscal quarter of 2019. During the call, Thomas Chong, an analyst with Credit Suisse AG's research division, asked Defendant Luo for an update regarding teachers' passing rates on exams. Defendant Luo responded: "[W]e will continue to encourage our teachers, who don't have license, to go and apply for the new teacher exams and try to get teacher license by the end of the exams. We continue to encourage all of them to do so."

210. This statement was materially false and misleading and omitted material facts because Defendants were not encouraging teachers to get licenses or take the teaching exams to get their licenses. Rather, as described above in ¶¶93-96, TAL falsified its teachers' qualifications or at the very least, misrepresenting their qualifications by displaying incomplete teaching credentials or entirely omitting teaching credentials from its website and allowing teachers to teach grades more advanced than their teaching qualifications permitted. Additionally, by the time that Defendant Luo made this statement, he had already sold $863,652 worth of TAL common stock, not to mention, just one month later, on February 22, 2019, he sold an additional 99,000 shares of common stock for proceeds of $3,264,930. These substantial insider sales indicate that Defendant Luo could not have genuinely believed that TAL was encouraging its teachers to obtain the necessary qualifications or that it was complying generally with the heightening regulations concerning teaching credentials.

211. On April 28, 2020, TAL held an earnings call for its fourth quarter fiscal year 2020 ("FY 2020") financial results. During the call, Defendant Luo stated: "***The teaching quality is always the key and the first priority, no matters for off-line business or online business.***"

212. This statement was materially false and misleading when made. Teaching quality was not Defendant's "first priority" as evidenced by the fact that TAL was fabricating teacher's

qualifications and allowing its teachers to tutor students even though they lacked the requisite credentials. Rather, Defendants' "first priority" was increasing the Company's revenues in order to maximize their performance bonuses and sell their stock at artificially inflated prices. Further, that Defendant Luo did not genuinely hold the belief that TAL prioritized complying with the teaching qualification regulations is further evidenced by the fact that at the time that Defendant Luo issued the above statements he had already sold $10.4 million worth of TAL common stock and would proceed to sell an additional $14.2 million worth of stock.

213.    On June 30, 2020, during an earnings call, Defendant He added: "*For the people-intensive products, the service is very important. So we need to make sure we do right training to the teachers and teacher assistants.* We give them good compensation to make sure *we also encourage all of teacher and teacher assistants to serve the students better. I think the necessary investments in the teacher and the teacher assistants are very necessary*."

214.    This statement was materially false and misleading and omitted material facts because TAL did not make sure to "do right training to the teacher and teacher assistants" and did not "encourage all of the teacher and teacher assistants to serve the students better." Rather, as described above in ¶¶93-96, Defendants were misrepresenting teachers' credentials by posting incomplete qualifications or entirely omitting teachers' qualifications from TAL's website or allowing teachers to teach grades more advanced than their teaching qualifications allowed. In some cases, Defendants were falsifying teacher's qualifications altogether by fabricating their credentials

### B.    Materially False and Misleading Statements Regarding the Drivers Behind TAL's "Healthy" and "Stable" Student Enrollment Growth

215.    During the Class Period, Defendants also consistently misled or outright lied to investors regarding the reasons for TAL's financial success and operational growth. TAL repeatedly ascribed its growing student-base and increasing revenues to "healthy" and "stable" growth when in

reality, TAL was violating Chinese government rules and regulations by fabricating customer reviews, engaging in illegal pricing measures, and falsifying teacher's qualifications in order to benefit its business. Meanwhile, TAL repeatedly represented that it did, in fact, comply with Chinese government regulations and rules concerning its business and would comply with any new regulations and that "[a]s always [TAL] will conduct [its] business in line with all relevant" regulations.

216.    TAL even repeatedly claimed that the new regulations would be beneficial to its business and that it thought the policies were "good" and "necessary" when in fact it knew that the new and developing regulations would have a materially negative impact on its business, particularly because TAL was not in compliance. Meanwhile, Defendants knew or recklessly disregarded that the increasingly stricter regulations – and TAL's continuing failure to comply with them -- would hinder and eventually likely stop TAL's growth, which was not "healthy and stable", but instead depended on surviving within the regulatory framework as long as possible. While issuing the below statements concerning the drivers for its increasing student enrollments (and thus revenues) throughout the Class Period, Defendants were unloading hundreds of thousands of shares of TAL common stock realizing millions of dollars in proceeds which suggests that they could not have plausibly believed the veracity of the statements they were issuing.

### 1.  Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2018

217.    On April 26, 2018, the first day of the Class Period, TAL issued a release attached to a Form 6-K filed with the SEC, signed by Defendant Luo, which announced the Company's financial results for the fourth quarter and fiscal year 2018 ended February 28, 2018.[6] The release stated that

---

[6] TAL's fiscal year ends February 28th or 29th of the calendar year.

the Company had achieved total net revenue for the quarter of $504.1 million, a 59.4% year-over-year increase.  The release also stated that during the quarter total student enrollment had increased 95.7% year-over-year, to approximately 2.6 million students.  For the fiscal year, the release stated that the Company had achieved total net revenue of $1.7 billion, a 64.4% year-over-year increase.  In the release, Defendant Luo attributed TAL's favorable results to "***rapid enrollment growth and all-around structural improvement in our business***."

218.    That same day, TAL held an earnings call with analysts and investors. During the call, Defendant Luo echoed what was said in TAL's press release filed earlier that day: "Our fourth quarter revenue growth was driven by stable demand in all cities and a rapid growth of our online courses. Revenue growth in the fourth quarter was 59.4% in U.S. dollars [] to $504.1 million. Student enrollments increased by 95.7% year-over-year, mostly driven by the growth in online enrollments." During the same call, Defendant Luo continued: "Our revenue growth in the full fiscal year 2018 was ***supported by higher-than-average enrollments, and supported by the well-paced expansion of small classroom capacity in our spreading geography network***."

219.    The statements above in ¶¶112-125 were materially false and misleading and omitted to disclose material facts because TAL's favorable results for the fourth quarter of fiscal year end 2018 were not attributed to "structural improvement[s]," but rather, to TAL's deceptive advertising campaigns, fabrication of teacher's credentials, and illicit pricing measures used to induce prospective customers into using TAL's tutoring services, all of which violated Chinese laws governing the for-profit tutoring industry.

220.    On June 26, 2018, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year end February 28, 2018, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo (the "2018 Form 20-F"). The 2018 Form 20-F included the Company's annual financial results detailed above. In addition,

the 2018 Form 20-F described TAL's marketing and recruitment strategies which includes word-of-mouth referrals, adding that *"[o]ur reputation and brand have also greatly facilitated our student recruitment."* Further, the 2018 Form 20-F stated that TAL was "*in the process of adapting [its] operations" and "taking corrective measures*" to ensure compliance with the February 2018 regulations.

221.    The statements that TAL's "reputation and brand" were facilitating its student recruitment and that TAL was "adapting [its] operations" and "taking corrective measures" to comply with the new regulations were materially false and misleading when made. In particular, these statements misleadingly and falsely attributed the facilitation of TAL's student recruitment to the Company's "reputation and brand," but entirely omitted to disclose that the recruitment was a result of illicit marketing and pricing tactics, among other things, which were designed to induce student enrollments. Defendants' assurance that TAL was "taking corrective measures" to adhere to the new regulations overseeing the after-school tutoring industry was also false and misleading because Defendants were flouting those very laws and even incurring substantial penalties as a result, as alleged above in ¶¶112-125.

## 2.    Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2019

222.    On July 26, 2018, TAL issued a release announcing the Company's financial results for the first quarter of fiscal year 2019 ended May 31, 2018. The release stated that the Company had achieved total net revenue for the quarter of $550.6 million, a 71.1% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 88.7% year-over-year, to approximately two million students. In the release, Defendant Luo stated that "the first quarter's financial and operational results reflect the steady growth of our offline and online business revenue

and enrollments." Defendant Luo added that *"we remain committed to a healthy and sustainable overall business development."*

223.    That same day, TAL held an earnings call discussing its first quarter results for fiscal year 2019 during which Defendant Luo stated: "Our first quarter revenue growth was driven by a *stable demand* in the cities we currently cover and a contribution from our online courses. Revenue growth in the first quarter was 71.1% in U.S. dollars and to USD 550.6 million and 57.1 in RMB terms. Student enrollment increased by 88.7% year-over-year, mostly driven by the growth in the online enrollments as well as Peiyou small class." Later in the call, Defendant Luo added: "We continue to pursue a *healthy growth* in Peiyou small class and other off-line tutoring services . . ."

224.    The statements set forth above in ¶¶112-125 were materially false and misleading when made. TAL's growth in the first fiscal quarter of 2019 was neither driven by "stable demand" nor was it "healthy." Rather, TAL's revenue growth was due to its deceptive and illegal marketing and pricing practices which it employed to induce student enrollments. The falsity of Defendant Luo's statements is further supported by the fact that he had sold $724,125 worth of TAL common stock just two months before issuing this statement and would continue to sell hundreds of thousands of shares of TAL common stock throughout the remainder of the Class Period for total proceeds of nearly $25 million.

225.    On October 25, 2018, TAL issued a release which announced the Company's financial results for the second fiscal quarter of 2019 ended August 31, 2018. The release stated that the Company had achieved total net revenue for the quarter of $699.8 million, a 53.5% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 120.2% year-over-year, to approximately 4.9 million students. In the release, Defendant Luo stated that "revenue and enrollments grew steadily" due to "*stable online and offline business performance*." Defendant Luo added: "Looking ahead, *we will continue to enhance product quality and customer*

*satisfaction, and further our contribution to the healthy and sustainable development of the education sector*."

226.    Also on October 25, 2018, TAL held an earnings call with analysts and investors during which it reported its second quarter results for fiscal year 2019. Defendant Luo hosted the call and began by stating: "Our second quarter revenue growth was *based on stable demand in the cities we currently cover and a contribution from our online courses*." Defendant Luo further stated that the 120.2% year-over-year student enrollment growth was "*mostly driven by the growth in online enrollments as well as Xueersi Peiyou small class.*" Defendant Luo further stated: "We continue to pursue a healthy growth in Peiyou small class and other off-line tutoring services and further expand our learning center networks at pace."

227.    The statements set forth above in ¶¶83-125 suggesting that TAL's revenue and student enrollment growth in the second quarter of fiscal year 2019 were due to "stable demand" and "product quality and customer satisfaction" and were materially false and misleading because they omit the true reasons for TAL's business and revenue growth for that quarter. In reality, TAL's revenues for this quarter had increased because of its deceptive pricing promotions wherein it aggressively discounted its tutoring classes only to later charge parents the full amount for the course, if not more; touting fabricated positive customer reviews on its website; falsifying teachers' credentials; and deceptive marketing campaigns which gave the Company an unfair advantage such as posting fake promotional videos on certain of its social media channels.

228.    On January 24, 2019, TAL issued a release which announced the Company's financial results for the third fiscal quarter of 2019 ended November 30, 2018. The release stated that the Company had achieved total net revenue for the quarter of $586 million, a 35.3% year-over-year increase. The release also stated that during the quarter total student enrollment had increased by 68.4% year-over-year, to approximately 2.6 million students. In the release, Defendant Luo stated:

"Our third quarter revenue performance was based on ***healthy growth*** of small class business and the continued scaling of our online courses." Defendant Luo added that "our overall financial and business performance have further improved ***due to our ongoing efforts to upgrade operational utilization and efficiency***."

229.    That same day, TAL held an earnings call discussing its third quarter results for FY 2019. Defendant Luo reiterated that TAL's "third quarter revenue performance was based on ***healthy growth*** of small class business in the cities we currently cover and scaling of our online courses." Defendant He then made the following statements regarding TAL's business growth:

- "Student enrollments increased by 68.4% year-over-year, mostly driven by the growth in the online enrollments as well as Xueersi Peiyou small class."

- "The ***healthy pace*** of fiscal third quarter revenue growth was driven by the demand for the various education services in the cities we currently cover."

- "Net revenue from Xueersi Peiyou small class was up by 23% in U.S. dollar terms and 29% in RMB terms, while enrollment increased by 29% year-over-year***. This growth rate reflects stable growth*** in both Peiyou off-line and online class."

- "***This growth momentum is supported by broad market demand*** across all cities and ***incremental ramp-up of enrollments*** from our earlier classroom expansion. We make ongoing efforts to expand our course offerings. Chinese and English courses continue to grow at a solid pace. Furthermore, during the quarter, we opened 4 new Mobby centers to reach a total of 16 Mobby centers. ***The healthy expansion of Mobby reflects the young parents' keen interest in early childhood activities that combine fun learning with competency building***."

230.    Finally, during the same call, Defendant Luo stated: "Most of our revenue still is contributed by our ***organic growth*** . . .  We strong believe most growth – ***we need to drive most growth through our organic drivers, not from the other company***."

231.    The statements above in ¶¶228-29 that TAL's revenue and business growth was "***healthy***" and "***stable***" and "***organic***;" that it was due to "demand for education services;" that it reflected the Company's "ongoing efforts to upgrade [its] operational utilization and efficiency;" and that the expansion of certain of its learning centers was due to "parents' keen interest in early

childhood activities" were materially false and misleading when made. In particular, TAL's increasing revenues and student enrollments for the third fiscal quarter of 2019 were a direct result of TAL's illicit marketing and pricing measures designed to induce student enrollment and increase its revenues and thus was not healthy, stable, or organic. Finally, these statements were issued shortly after Defendant Luo had already sold $863,652 worth of TAL common stock and just less than one month before he sold an additional $3.3 million worth of stock; thus, Defendant Luo did not genuinely believe that TAL's business growth was "healthy," "stable," or "organic."

232.    During the same January 24, 2019 earnings call, Defendants also discussed the positive impact the Company's marketing efforts had on student enrollment. In particular, Yuzhong Gao, an analyst with CICC, asked about TAL's online promotion plan for the summer of 2019. Defendant Luo stated: "This year, we run the marketing promotions. We use RMB 50 classes and some more classes to do that, and we're investing in online marketing channel, including WeChat channels, Baidu channels, Toutiao channels and other channels to attract new students."

233.    This statement was materially misleading when made because it failed to disclose the real nature of TAL's marketing efforts on these social media channels which it used to drive student enrollments as described above in ¶¶120-23. For instance, while it is true that TAL was "investing in online marketing channel[s]" such as "WeChat channels, Baidu channels, Toutiao channels" to "attract new students," this statement omitted to disclose that TAL was using these channels in illegal ways to induce student enrollment, for example, by releasing promotional videos containing misleading student statements regarding tutoring courses in violation of China's Advertising Law causing TAL to incur penalties.

234.    On April 25, 2019, TAL issued a release which announced the Company's financial results for the fourth fiscal quarter and fiscal year end February 28, 2019. The release stated that the Company had achieved total net revenue for the quarter of $726.6 million, a 44.1% year-over-year

increase. The release also stated that during the quarter total student enrollment had increased by

71.2% year-over-year, to approximately 4.5 million students. For the fiscal year, the release stated

that the Company had achieved total net revenue of $2.6 billion, a 49.4% year-over-year increase. In

the release, Defendant Luo stated: "Our overall education program is proceeding as planned with *a*

*healthily paced growth* in online business and measured capacity expansion in our learning center

and geographic network."

235.    That same day, TAL held an earnings call with investors and analysts. Defendant Luo

began the call by highlighting TAL's growing revenues for that quarter:

> Our fourth quarter revenue performance was based on ***healthy growth*** of small class
> business in the cities we currently cover and the scaling of our online courses. Net
> revenue growth in the fourth quarter was 44.1% year over year in U.S. dollar term to
> USD $726.6 million and 52.2% in RMB terms. Student enrollment increased by
> 71.2% year over year, mostly driven by the growth in online enrollments of Xueersi
> Peiyou small class.

236.    Defendant He elaborated on the reasons for TAL's growing revenues, stating the

following:

- "Fiscal fourth quarter revenue was based on ***steady growth momentum*** in the various
  education services of our tutoring business."

- "Net revenue from Xueersi Peiyou small class was up by 29% in U.S. dollar terms and 37%
  in RMB terms, while enrollment increased by 45% year over year. ***This growth rate reflects
  the stable growth in both Peiyou offline/online class***."

- "the Peiyou offline small class revenue increased by 25% in U.S. dollar terms and 32% in
  RMB terms, while enrollments increased by 18% year over year."

- "Peiyou offline normal priced courses revenue increased by 33% in RMB terms, while
  enrollments increased by 21% year over year."

- "Revenue generated from cities other than the top 5 grew by 34% in U.S. dollar terms, and
  the other cities accounted for the remaining 42% of the Xueersi Peiyou small class business*.
  **This growth momentum is supported by broad market demand across all cities,
  incremental ramp-up of enrollment from our earlier classroom expansion, as well as our
  ongoing operational efficiency improvement."***

- Fourth quarter revenue from xueersi.com grew by 187% in U.S. dollar terms year over year and 204% in RMB terms, while enrollments grew by 146% year over year to over 1.7 million . . . . The rapid scaling of online courses was ***mainly driven by sales and the marketing online customer acquisition efforts for the winter term promotion, retentions of the previous quarters as well as the ongoing momentum in demand for online education***."

237.    Later in the call, Echo Yan, TAL's Head of Investment Relations, continued to discuss the Company's various business successes. Defendant Luo followed with: "These business results reflect ***solid online business growth, healthy development*** of our offline business, as well as the ongoing efforts we have made in the ***transition for only running one business model to multiple-pronged education service model,*** including online and other ***diversified education programs and the projects during the fiscal year 2019***."

238.    During the same call, Goldman Sachs analyst Christine Cho asked Defendants how low user acquisition costs were achieved and whether such low costs would be sustainable. Defendant Luo explained that TAL uses branding channels as a beneficial way for the Company to gain customers while keeping customer acquisition costs down, stating: "The parents know us and know our name and trust our brand, so ***they come to our Xueersi online school automatically***. So ***we don't have to pay that much in the branding channels***. And we also doubly encourage the parents' referrals. So our current – so ***we try to leverage our word-of-mouth marketing and the branding and the reputations to make sure we can attract more students from branding channels***.

239.    The statements made above in ¶¶234-38 including that TAL had "healthy growth;" "steady momentum;" that parents come to TAL's tutoring services "automatically;" and that TAL leveraged "word-of-mouth marketing" to attract student enrollments were materially false and misleading when made because these statements failed to disclose that TAL was actually devising false and deceptive marketing promotions, employing pricing tactics such as offering substantial discounts on tutoring packages only to later charge parents the full amount of the course, if not more, fabricating teacher's reviews and qualifications; and creating fake customer reviews, all of which

were used to induce student enrollment and drive its revenues, as described above in ¶¶93-96. In addition, TAL was one of the subjects of a deluge of complaints against bad industry actors, including *155,000* complaints and reports for education and training services received by authorities in 2020 alone and over *47,000* similar complaints and reports received by authorities in the first quarter of 2021.

240.    On May 16, 2019, TAL filed its annual report for fiscal year end February 28, 2019 on Form 20-F, which was signed by Defendant Zhang and included the Company's annual financial results. The 2019 Form 20-F described TAL's marketing and recruitment strategies, stating that the Company's *"reputation and brand have also greatly facilitated our student recruitment."* Further, the 2019 Form 20-F stated that TAL had successfully "*adapted [its] operations" to comply with the February 2018 regulations,"* but that *"[it] cannot assure you whether relevant governmental authorities will find [its] operations in violation of such regulations."* The Form 20-F assured investors that *"[w]e have been making efforts to ensure compliance with these regulations and implementation rules but there is no assurance that our operations comply with all applicable regulations in a timely manner due to various factors beyond our control*."

241.    These statements were materially false and misleading when made because they misleadingly suggest that TAL's "reputation and brand" were the main facilitators of its growing student recruitment and further, that TAL had "adapted [its] operations" to comply with the PRC's regulations overseeing the for-profit tutoring industry. However, in actuality, TAL was doing just the opposite – engaging in various illicit measures such as employing deceptive pricing and advertising tactics designed to increase student enrollment and thereby drive its revenues even higher.

> **3.    Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2020**

242.    On July 25, 2019, TAL issued a release which announced the Company's financial results for its first fiscal quarter of 2020 ended May 31, 2019. The release stated that the Company had achieved total net revenue of $702.8 million for the quarter, a 27.6% year-over-year increase and that during the quarter total student enrollments of normal priced long-term courses had increased by 40.6% year-over-year, to approximately 1.7 million students. In the release, Defendant Luo stated that the favorable results "'reflected the success of our consistent growth strategy" and that "'[l]ooking ahead, our long-term development strategy remains unchanged . . . [while at the same time TAL] will continuously *invest in new technology and other initiatives to accelerate our online business development* and realize the promising potential of online education.'"

243.    That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo asserted that TAL's "first quarter revenue performance was based on *healthy growth* of small class business in the cities we currently cover and the *scaling of our online courses*." Defendant He echoed this, stating: "Fiscal quarter revenue was based on *steady growth momentum* in the various education services of our tutoring business." Defendant He further stated: "This growth rate reflects the *stable growth* in both Xueeri Peiyou offline/online class" and "[t]his *growth momentum is supported by broad market demand* across all cities. Incremental ramp-up of enrollments from our earlier classroom expansion as well as our ongoing efforts to improve operational efficiency."

244.    Defendant He then discussed Zhikang, TAL's one-on-one business, noting: "As always, we pursue well-paced offline capacity growth, and at the same time, *investment in new technology and online business* to continue to improve overall operational efficiency and closely follow all the standards and regulations." Defendant He then discussed TAL's online business operations, stating: "First quarter revenue from xueersi.com grew by 108% in U.S. dollar terms year-over-year" and this "*rapid growth in online business was supported by a dedicated sales and*

*marketing efforts, retention of the previous quarters, as well as the rising demand for online education*."

245.    The statements above in ¶¶242-44 were materially false and misleading when made because they falsely attributed the Company's financial and enrollment growth to "investment in new technology," "broad market demand," and "steady growth momentum," however, in actuality, TAL's financials and student enrollments were growing because Defendants were employing an array of illicit pricing and advertising measures designed to deceive parents and students into enrolling for the Company's tutoring courses. Further, the statement that TAL's growth was attributed to "dedicated sales and marketing efforts" was materially misleading because it failed to disclose the true illegal nature of TAL's sales and marketing efforts.

246.    On October 24, 2019, TAL issued a release, attached as an exhibit to the Form 6-K, which announced the Company's financial results for the second fiscal quarter of 2020 ended August 31, 2019. The release stated that the Company had achieved total net revenue of $936.6 million for the quarter, a 33.8% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 54.5% year-over-year, to approximately 3.4 million students. In the release, Defendant Luo stated that the results were "'based on the *healthy and broadly distributed growth o*f our overall small class business across the cities we currently cover and the continued scaling of our online courses.'"

247.    That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo stated that TAL's second quarter revenue performance "*was based on the robust and healthy growth of our overall small class business in the cities we currently cover and the continuous scaling of our online courses*." Defendant He elaborated on TAL's business and revenue growth making the following statements:

- "The drivers of this widely spread growth are solid market demand across all cities, incremental ramp-up of enrollments from our earlier classroom expansion as well as our ongoing efforts to improve operational efficiency."

- "The rapid growth in online business was supported by dedicated sales and marketing efforts, retentions of the previous quarters as well as the growing demand for online education."

248.   Later in the call, Defendant Luo issued the following false statements regarding

TAL's growing business:

- "As an education product and service provider, we will never just go after a high-revenue growth base only, but more importantly, the fast growth rate should be achieved in a healthy and sustainable way . . .. We will continuously invest to innovate our products and operational efficiency with *full attention to the necessary details.*"

- "More importantly, the growth rate must be achieved in a *healthy and sustainable way, healthy and sustainable way*."

- "[W]e'll continue to leverage the online offer to attract more students, get more market share, have more enrollment. And at the same time, we'll continue to [improve] the product quality and the product experiences and the satisfaction from students and the parents as the key for everything, especially in education sectors."

- "So we will make sure both online and off-line growth can be in a *healthy and sustainable way. That's our key priority*."

- "But again, we don't think promotion, marketing money is the only way to grow a business. *The key of growing our business is still go back to the product, go back to operational efficiency*, go back to do a lot of detail in your dirty works."

249.   The statements above in ¶¶246-48 were false and misleading when made because despite Defendant Luo's assurances that TAL paid "full attention to the necessary details" and prioritized "healthy and sustainable growth" in reality, the Company was doing just the opposite. In fact, Defendants were utilizing deceptive marketing and advertising campaigns, touting extremely low pricing only to later increase the prices by, in some instances, as much as 4,000% of the original course price, and engaging in an array of other questionable and illicit behaviors designed to drive student enrollments, all of which were the antithesis of "healthy" or sustainable" growth. Further, at

the time that Defendant Luo issued these statements, he had already sold $5 million worth of TAL common stock, and would continue to sell an additional $3.3 million worth of stock just *five days* after making these reassurances to the public. The magnitude and timing of these insider sales further evidence that Defendant Luo did not sincerely believe that TAL's growing business was attributed to healthy or sustainable growth or "operational efficienc[ies]."

250. On January 21, 2020, TAL issued a release which announced the Company's financial results for the third fiscal quarter of 2020 ended November 30, 2019. The release stated that the Company had achieved total net revenue of $862.4 million for the quarter, a 47.2% year-over-year increase. The release also stated that, during the quarter, total student enrollment of normal priced long-term courses had increased by 66% year-over-year, to approximately 2.3 million students. In the release, Defendant Luo stated that the results "'reflect the progress in our efforts to build *a healthy and sustainable business model*.'" Defendant Luo also stated that "'[w]e expect growth momentum of our overall business to continue.'"

251. That same day, TAL held an earnings call during which Defendants Luo and He discussed TAL's third quarter results for FY 2020. During the call, Defendant Luo made the following false and misleading statements regarding TAL's growing revenues and student enrollments:

- "Our third quarter revenue performance was *based on solid growth momentum of both our overall small class business in the cities we currently cover and the continued scaling of our online courses*."

- "This quarter's results *reflect the progress in our efforts to build a healthy and sustainable business model based on our product development, technology, customer satisfaction and operational efficiencies*."

- "This outspread growth is *based on solid market demand across our cities, incremental ramp-up of enrollments from our earlier classroom expansion, faster growth of Peiyou online courses as well as our ongoing efforts to improve operational efficiency*."

- "The rapid growth in online business was *supported by seasonality-driven sales and marketing efforts, retentions of the previous quarters as well as the secular demand for online education*."

- "The growth dynamic of our business and our operational efficiency efforts have made positive contributions and will continue to do so to help balance our growth and profitability as well."

- TAL "can further leverage our off-line and online advantages . . . [to enable TAL] to build *an education services model which is demand-driven and sustainable for the long term*."

252. Later in the call, Zhangxiang Liu, an analyst with China Renaissance Securities (US) Inc. asked Defendants: "What are the major drivers for [Peiyou's] notable off-line enrollments acceleration?" Defendant Luo responded: "[W]e're adding more classrooms," "we improved a little bit in our key operational KPIs, including the refund rate, retention rate and the seats fulfillment rate," and "we try to manage and improve our operational efficiencies in the Peiyou small class every day." Liu then asked: "What's the sort of the growth strategy we are seeing in the lower tier cities in the coming fiscal year?" Defendant Luo responded that "*this kind of accelerations is because we leveraged the power of dual-teacher model and the power of technology*."

253. This statement was materially false and misleading when made because it attributed the accelerated student enrollments to the "dual-teacher model" and the "power of technology" when in fact, TAL was utilizing illegal pricing and promotional measures in order to induce students and parents to sign up for its tutoring courses, which was the real reason for TAL's increased enrollments for that quarter.

254. During the same earnings call, Defendant He made the following materially false and misleading statements regarding TAL's third quarter FY 2020 increased revenues and growing business:

- "Fiscal third quarter revenue was based on *solid growth momentum in the various education services of our tutoring business*."

- Alongside any expansion effort, we invest in new technology and online business to improve overall operational efficiency and *abide by the standards and regulations*."

- "*We do not pursue growth for growth's sake*."

- "The new customer acquisitions or some kind of the marketing channels, promotions, that's not the most important features which we are different from the other one. *We care more of teaching quality and the students*."

255. These statements in ¶254 were materially false and misleading when made because, contrary to Defendants' statements that TAL did "not pursue growth for growth's sake," the Company was doing exactly that as evidenced by its illegal advertising and pricing strategies employed to inflate its revenues quarter after quarter. Further, Defendants' statement that TAL cared more about its "teaching quality and the students" rather than "new customer acquisitions" and its "marketing channels, promotions," was materially false because had this been true, TAL would not have: (1) allowed teachers with no qualifications, incomplete qualifications, or entirely fabricated qualifications to tutor students; (2) let teachers tutor grades more advanced than their qualifications allowed; (3) deceive students and parents by touting fake customer reviews promising certain results; and (4) mark up the prices of tutoring courses to inordinate amounts such as 4,000% more than the original price of a course despite originally offering substantial promotional pricing and discounts for that very course.

256. On April 28, 2020, TAL issued a release which announced the Company's financial results for the fourth quarter and fiscal year end February 29, 2020. The release stated that the Company had achieved total net revenue for the quarter of $857.7 million, an 18% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 56.6% year-over-year, to approximately 4.6 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $3.3 billion, a 27.7% year-over-year increase. Finally, TAL continued to make misrepresentations when attesting

that: "[o]ther than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 29, 2020 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions."

257. That same day, TAL held an earnings call with investors and analysts during which Defendant Luo discussed an instance of wrongdoing on the part of one of TAL's employees which the Company announced in a Form 6-K filing on April 7, 2020. As a result of the employee's wrongdoing, TAL's financial metrics were artificially inflated; in particular, its revenue for the first three quarters of fiscal year 2020 was inflated by $86.1 million USD. In discussing this incident, Defendant Luo assured investors and analysts: "I would like to reiterate that *we will always follow the highest standards of corporate governance and always have 0 tolerance for any illegal conduct.*"

258. This statement that TAL "will always follow the highest standards of corporate governance" and has "0 tolerance for any illegal conduct" was materially false and misleading when made because throughout the Class Period, Defendants consistently engaged in illegal conduct such as employing illicit marketing and promotional advertisements designed to induce student enrollment, using improper pricing techniques, fabricating course reviews, and charging tuition for more than three month periods, among other things, as detailed above in Sections IV.D.1 – IV.D.6.

259. During the same call, Zhangxiang Liu, an analyst with China Renaissance Securities (US) Inc., asked about Xueersi.com's market position and whether TAL considered it important to be the first player in the online education market. Defendant Luo replied: "[W]e don't have any kind of intention to say, we need to maintain #1 in this market. Because #1, when you say #1 means the size, the volume. But what *we care more is the quality* . . . being bigger is not our priority*, being*

***stronger and being more competitive and being better to the students and the parents, that's our key priority*.**"

260.    This statement was materially false and misleading when made because throughout the Class Period, TAL employed nearly every measure possible, regardless of its legality, to ensure that the Company's student enrollments and revenue continued to skyrocket. Thus, these assurances that TAL cared more about "quality" and that the parents and students were its "key priority" were materially false and misleading; in actuality, TAL cared more about increasing student enrollments and its management cared more about selling stock at artificially inflated prices.

261.    During the same earnings call, Defendant He elaborated on TAL's financial results for the fourth quarter of FY 2020, noting that: "Net revenue from Xueersi Peiyou small class was up by 6% in U.S. dollar terms and 8% in RMB terms while our normal priced long-term course enrollment increased by 37% year-over-year." Defendant He further stated: "The rapid growth in online business was ***supported by the current circumstances driving the secular demand for online education as well as sales and marketing efforts and retentions of the previous quarters*.**"

262.    Defendant He's statement that TAL's rapid growth for its fourth fiscal quarter of 2020 was driven by "secular demand" and TAL's "sales and marketing efforts" was materially false and misleading when made because these statements failed to disclose the true drivers for TAL's increased revenues and student enrollments. Specifically, these statements incorrectly suggest that demand for TAL's tutoring courses was organic when, in fact, TAL was employing an array of illegal marketing and pricing tactics, among other things, to deceive students and parents and thereby induce student enrollment and inflate revenues.

### 4.    Materially False and Misleading Statements and Omissions Regarding the Drivers of TAL's Student Enrollments for Fiscal Year End 2021

263. On July 30, 2020, TAL issued a release which announced the Company's financial results for its first fiscal quarter of 2021 ended May 31, 2020. The release stated that the Company had achieved total net revenue of $910.7 million for the quarter, a 35.2% year-over-year increase. The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 72.1% year-over-year, to approximately 2.96 million students. In the release, Defendant Luo stated that "'[t]he first fiscal quarter revenue results were driven by solid performance of online courses and the ***healthy growth*** of Xueersi Peiyou business.'"

264. That same day, TAL held an earnings call hosted by Defendants He and Luo. During the call, Defendants continued to tout the Company's growing revenues with Defendant Luo stating: "Net revenue growth in the first quarter was 35.2% year-over-year." Defendant He later added: "Our first quarter performance reflected stable growth of small class business across our cities."

265. These statements made on July 30, 2020 were false and misleading when made because they omitted the real reasons for TAL's increased student enrollments and therefore, growing revenues, which were: TAL's illegal pricing tactics, deceptive advertising practices, fabricated course reviews, false or incomplete teachers' qualifications posted on its website, as described in Sections IV.D.1 – IV.D.6, above.

266. On October 22, 2020, TAL issued a release which announced the Company's financial results for the second fiscal quarter of 2021 ended August 31, 2020. The release stated that the Company had achieved total net revenue of $1.1 billion for the quarter, a 20.8% year-over-year increase. The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 65% year-over-year, to approximately 5.6 million students.

267. That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant He stated: "In line with our longstanding approach, ***we will continue to pursue healthy and sustainable learning center network expansion***

*by following government guidelines and market demand."* Defendant Luo stated that TAL would continue to enlarge its online market share "*by continued investment in technology, teacher supply chain and marketing and consistent hard work of building all-around online services with superior customer experiences*."

268.    Later in the earnings call, Defendant Luo stated that in order to maintain its leading position in the online sector, TAL will "keep our investment in technology, in teacher supply chain . . . as well as marketing." During the same earnings call, Defendant He similarly stated that "[t]he growth in online business was supported by . . . [a number of factors including] sales and marketing efforts." Defendant Luo explained: "*Education, in the end, is now a simple game of marketing. That is a game -- that is -- the key to playing education is we need to focus to providing the high-quality service to students. We need to put students in the first priority.* We need to not only taking care of the efficiency of the marketing, but also taking care of effectiveness of the students."

269.    The statements in ¶¶266-68 above were materially false and misleading when made because they omitted the real reasons for TAL's increased student enrollments and growing revenues which were: TAL's illegal pricing tactics, deceptive advertising practices, fabricated course reviews, and false or incomplete teachers' qualifications, among other things. Additionally, the statement that Defendants "put students in the first priority" was materially misleading because in actuality, Defendants were prioritizing growing the Company's student enrollments and revenues.

270.    On January 21, 2021, TAL released its third quarter FY 2021 earnings in a Form 6-K filed with the SEC. The release stated that "Net revenues increased by 35.0% year-over-year to US $1,119.1 million from US $829.0 million in the same period of the prior year." The release further stated that "total student enrollments of normal priced long-term course increased by 46.5% year-over-year to approximately 3.4 million students."

271.    That same day, TAL held an earnings call hosted by Defendants Luo and He. During the call, Defendant He discussed TAL's developing business and increased enrollments, stating: "we reaccelerated the widening of our learning center network in the third quarter, based on a *healthy and sustainable approach*, and by *following government guidelines and market demand*."

272.    The statements above that TAL had experienced increased revenues and student enrollments for the third fiscal quarter of 2021 by implementing a "healthy and sustainable approach" which adhered to "government guidelines and market demand" were materially false and misleading when made. In particular, these statements failed to disclose that Defendants were actually employing an *unsustainable* approach wherein they utilized illegal marketing campaigns and pricing tactics to drive student enrollment and thereby inflate revenues, as further described above in ¶¶112-125. In addition, TAL was one of the subjects of a deluge of complaints against bad industry actors, including *155,000* complaints and reports for education and training services received by authorities in 2020 alone and over *47,000* similar complaints and reports received by authorities in the first quarter of 2021.

273.    On April 22, 2021, TAL held its fourth quarter earnings call for FY 2021. During the call, D.S. Kim, an analyst with JPMorgan Chase & Co., asked Defendants: "But in an unlikely scenario of government limiting advertisements significantly, what do you think will be the sustainable growth rate for xueersi.com or online tutoring industry as a whole in a less-advertisement or no-advertisement environment?" Defendant Luo responded: "*We prefer we teach the students well and we make people satisfied and we drive our growth through our high-quality services. That's the typical way we drive up growth*." Defendant He further stated: "The growth in online business was *supported by increasing demand of online education as well as sales and marketing efforts and retentions of the previous quarters*." Defendant He later stated that TAL's fourth quarter revenues for FY 2021 were "supported by increasing demand for online education as well as sales

and marketing efforts and retentions of the previous quarters." Further, Defendant Luo stated that TAL's online business performed better than expected in part, because they "spent a fair amount of the marketing dollars to drive the growth."

274.    These statements were materially false and misleading or omitted to disclose material information when made because TAL was not driving growth by satisfying its clientele by providing high-quality services, but rather, was continuously employing illicit marketing and advertising practices designed to induce student enrollment such as posting videos with falsified content and offering promotional pricing in violation of China's pricing laws, as further detailed above in ¶¶112-125.

## C.    Materially False and Misleading Statements and Omissions Regarding the Government's Heightened Regulations Governing the Private Tutoring Industry

275.    Long before the Chinese government effectively outlawed the private, for-profit tutoring industry in July 2021, Defendants knew or recklessly disregarded that the government was on a concerted campaign to shut down the profitable private tutoring industry, as corroborated by CW1. This information was material non-public information which Defendants knew and failed to disclose to the investing public. Despite having knowledge of this MNPI which substantially impacted the nature of TAL's business and ability to continue operating as it had been, Defendants continued to issue false and misleading statements regarding the government's regulatory impacts on its business.

276.    From March 4, 2021 through March 11, 2021, China held its annual "Two Sessions" parliamentary meetings, where the two main political bodies of China meet, discuss, and reveal plans for China's policies involving the economy, military, trade, diplomacy, the environment and more.

277.    Media reports stated that attendees of the ongoing Two Sessions conference had proposed "stricter regulations" to rein in the online education industry, such as regulations aimed at

enhancing teacher quality, limiting fee scams, reducing market "abuse" by large players like TAL, and reducing the stress that for-profit tutoring companies had placed on students in the Chinese educational system.

278.    For example, on March 8, 2021, the *China Daily* published an article titled "Political advisers discuss regulations for online education," which stated in pertinent part:

> Political advisers have proposed stricter regulations for the extracurricular online education industry in China during the ongoing annual session of the Chinese People's Political Consultative Conference National Committee.
>
> These regulations are aimed at enhancing teaching quality and avoid hidden risks faced by customers.
>
> * * *
>
> "However, the rapid surge in such short time has created several hidden risks," said Ma Jin, a member of the National Committee of the CPPCC and deputy chairman of the Shanghai municipal committee of China Zhi Gong Party.
>
> "*To seize the opportunity in the emerging market, a few huge companies have abused their dominant position in the sector, whereas small and medium-sized firms are lacking time and finances to grow,*" he said.
>
> *In addition, many online education platforms require advance payment, which leads to risks of advance fee scams and customers encountering difficulties in getting refunds, he said*.
>
> * * *
>
> To tackle these problems, Ma said the government should formulate regulations for extracurricular online education, including standards for the establishment of education institutions, teaching environment and content.
>
> "Online education platforms should display their teachers' qualifications to the public," he said.
>
> With regard to financial risks, Ma suggested that around 30 percent of the company's reserve fund should be supervised by the government. Once financial risks emerge, the use of these funds should be restricted.
>
> Furthermore, online education platform institutions should not charge more than three months' worth of tuition fees at a time, and the fee should be used for only teaching

related activities, instead of investment. A third-party payment platform could be used to supervise customer advance payments.

This sentiment was echoed by another political adviser Sima Hong, who is also the chairman of the Beijing Municipal Committee of the Democratic National Construction Association.

Sima advised education authorities to cooperate with banks to establish a supervision system for online education platforms to address the issue of potential misappropriation of advance payments.

"***Any legal person and major shareholders of institutions which illegally charge tuition fees before they disappear should be seriously punished***," she added.

Li Xin, chairman of the Guangdong Provincial Committee, associated the negative impact of substandard online education with children's eye health.

Data from the National Health Commission shows that 53.6 percent of children in China suffered from myopia in 2018.

"Services from some substandard online education platforms have increased students' burden of schoolwork these years," she said.

In her proposal, Li suggested online education institutions be prohibited from cooperation with schools or classes.

"***Schools and teachers should not recommend extracurricular online education platforms and products to parents and students or force students to take e-learning lessons***," she said.

"The length for a web-based course in senior high school should not exceed 30 minutes, while for junior high school students, it should be within 25 minutes, and within for 20 minutes primary school students, to ensure children's eye health," Li said.

"Efforts should also be made by local authorities to limit the students' e-learning time on extracurricular education platforms," she added.

279.    Similarly, on March 11, 2021, the *South China Morning Post* published an article titled "China two sessions: tightened regulation of 'chaotic' K-12 off-campus education market may spoil Big Tech's expansion plans." The article described how an impending "regulatory storm" presented a headwind for after-school tutoring businesses in China such as TAL, although the article

stated that these businesses were likely to be able to navigate the regulatory environment to continue their expansion plans, stating in pertinent part:

China's US$110 billion K-12 off-campus education market, which has struggled during the coronavirus pandemic, is now bracing for a regulatory storm amid comments expressed by the country's leaders, lawmakers and advisers in the "two sessions", the country's biggest annual political gathering.

President Xi Jinping described the domestic market for K-12 – referring to kindergarten to 12th grade – after-school training services as a "social problem" in a meeting last week of the Chinese People's Political Consultative Conference (CPPCC).

"It can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it," Xi said in comments published by official media.

While it remains unclear exactly how regulations are going to be rolled out, the message from the National People's Congress (NPC), China's top legislature, indicated that off-campus training services are "chaotic" and create problems for the country's education sector. Typically, primary school pupils take extracurricular tutoring on top of their studies on campus to perform well in examinations.

***The prospects of tightened regulation could bring uncertainty to the market and the plans of Chinese Big Tech companies to expand operations in the education sector***. Tech unicorn ByteDance, owner of short video-sharing apps TikTok and Douyin, recently announced its intention to recruit some 13,000 new employees for its growing Dali education business.

Big Tech's vast resources are expected to help them continue their expansion into education. "The internet giants won't give up their education initiatives," said Claudia Wang, a partner at management consulting firm Oliver Wyman, said on Thursday.

"Most of them have businesses in the education sector that are aligned with government initiatives to improve access to quality education via different channels. They are also equipped with strong capital to be compliant with government regulation."

***A number of big players in the market, including TAL Education Group and New Oriental Education & Technology Group, have become listed companies on the back of domestic demand***.

* * *

Dozens of NPC and CPPCC delegates have been vocal about the need to strengthen spot inspections of K-12 off-campus education providers and punish those found

guilty of false advertising. Zhu Yongxin, a CPPCC member, suggested that advertising by these providers should be curbed, while fellow delegate Chen Zhongyi suggested a permanent ban on all off-campus tutoring services.

280.    Then, on March 31, 2021, China's MOE announced that education departments should limit the times at which primary and secondary school students take part in online learning to ensure they are getting enough sleep.

281.    Although Defendants knew or recklessly disregarded the government's campaign to eliminate the profitable private tutoring industry throughout the Class Period, unsuspecting investors first became aware of it after the news emerged and the price of TAL ADSs began to drop from $76.04 when the market closed on March 5, 2021, to $56.31 by April 1, 2021, a 26% decline. However, the price of TAL ADSs remained artificially inflated because Defendants continued to make materially false and misleading statements regarding TAL's business prospects and operations and the impending impact of new governmental regulations on the for-profit tutoring industry following the Two Sessions meetings.

282.    For example, on April 22, 2021, TAL issued a release which announced the Company's financial results for the fourth quarter of FY 2021. The release stated that the Company had achieved total net revenue for the quarter of $1.4 billion, a 58.9% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 44% year-over-year, to approximately 6.7 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $4.5 billion, a 37.3% year-over-year increase. The release further stated that TAL was on track to achieve revenues of "between [$1.30] million and [$1.32] million, representing an increase of 43% to 45% on a year-over-year basis," during the first fiscal quarter of 2022. In the release, Defendant Luo attributed TAL's strong annual revenue growth to TAL's "'strength in both offline and online education capabilities.'"

Defendant Luo added: '*"Looking ahead, we will keep investing in the quality of our products, service and technology as well as in sustainable marketing efforts*."'

283.    That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo stated that TAL's "tutoring business, both online and off-line, as well as [its] capacity expansion in all cities developed as planned" in the quarter. Defendant Luo added that TAL "*will continuously follow up with the government guidelines for the industry . . . as well as keep investing in the quality of [its] products, services, teachers' training and technologies, supported by sustainable marketing efforts*." Later in the call, Defendant Luo reiterated that "*we as a company, we will follow the government guidelines*" and that "*if the policy is clear, we will definitely comply with the policies to make necessary adjustments*."

284.    These statements that Defendants would "follow up with the government guidelines for the industry" and continue "investing in the quality of our products, services, teachers' training and technologies" and "definitely comply with the policies" were materially false and misleading because they failed to disclose adverse facts about TAL's business, operations and prospects, specifically. As such, Defendant Luo could not have genuinely believed that his statements were true, as further evidenced by the fact that he had already sold 457,380 shares of TAL common stock for proceeds of nearly *$25 million* at the time he issued these statements.

285.    In their May 7, 2021 Form 20-F filing, TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations."  For example, the PRC Pricing Law provides that an operator is prohibited from using false or misunderstanding pricing methods to induce consumers or other operators into trading with it. In the filing TAL referenced several of the same regulations and

policies referenced in their prior June 30, 2021 filing including the regulations and policies which focus on the efforts to de-emphasize scholastic competition achievements in college and high school admissions or the efforts to forbid academic competitions referred to as Circular 3. TAL stated: ***"We have adapted our operations which may be construed as competitions or ranking activities to these regulations. We cannot assure you whether relevant governmental authorities will find our operations in violation of such regulations.***" TAL also referenced the State Council Opinion 80 and Circular 10 that provide a series of requirements in the operation of after-school tutoring business and that they "***have been making efforts to ensure compliance with these regulations and implementation rules.***"

286. TAL specifically mentioned how the "market price for [its] ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as…" and then listed several factors, **none of which** included information on TAL's longstanding history of regulatory violations, including for releasing misleading advertisements.

287. TAL claimed as part of its filing that "[it] [was] not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 28, 2021 that are reasonably likely to have a material adverse effect on [its] net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions."

288. On May 11, 2021, *China Daily* reported that in April 2021 the Beijing municipal administration for market regulation handed out fines of 500,000 CNY to four online education companies for misleading customers with false advertising, including TAL's subsidiary Xueersi for labeling their online courses with misleading prices.

289. Then, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching

than previously publicly known. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, the provision of tutoring services during weekend hours, and the imposition of industry-wide fee limitations. For example, a *Reuters* article titled "China planning new crackdown on private tutoring sector," stated that regulators had taken adverse actions against for-profit tutoring companies, including ordering TAL advertising to be pulled in April 2021, and otherwise summarized the impending regulatory changes in pertinent part as follows:

> ***China is framing tough new rules to clamp down on a booming private tutoring industry***, aiming both to ease pressure on school children and boost the country's birth rate by lowering family living costs, sources told Reuters.

> The clampdown will also have the effect of cooling China's cutthroat tutoring market for kindergarten through to the 12th grade, or K-12 pupils, that has grown exponentially in recent years to around \$120 billion.

> \* \* \*

> The changes being drafted by the Ministry of Education and other authorities target before- and after-school K-12 tutoring, three people with knowledge of the matter told Reuters.

> One source said the draft rules could be unveiled as early as by end-June. All three sources requested anonymity as they were not authorised [sic] to speak publicly.

> ***Under the planned rules, on-campus academic tutoring classes will be banned, as will both on and off-campus tutoring during weekends, two of the people said. Regulators will also clamp down on off-campus tutoring, in particular for English and math, they added, restricting class times on weekdays***.

> \* \* \*

> ***The new rules would seek to limit fees charged by companies for tutoring, one of the sources told Reuters***.

> \* \* \*

> The planned rules would add to restrictions imposed in March, including a ban on live-streamed classes for minors after 9 p.m., a crackdown on advertising, and a ban on academic tutoring course offerings for pre-school kids.

> \* \* \*

*A source told Reuters that a large state broadcaster was told by regulators last month to remove TV commercials from two players, New Oriental Education & Technology Group and TAL Education Group that they had placed earlier*.

290.    As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a *13% decline over the two-day period*. However, TAL ADSs continued to trade at artificially inflated prices because investors and the market still did not know the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

291.    On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were reportedly fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews.

292.    TAL's previously undisclosed misconduct was reported to have included widespread practices of:

(a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law;

(b) offering courses that gave students unfair advantages in contravention of Chinese government policies;

(c) engaging in illegal bait-and-switch tactics;

(d) misrepresenting teacher qualifications and course qualities;

(e) mishandling user data; and

(f) rigging promotional events to defraud consumers.

293.    TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which would drive enrollments. The regulators explained that Xueersi, had advertised false parent user reviews in Beijing and Shanghai, such as one purportedly from a mother stating: "'[T]he most powerful thing about Xueersi is that parents are allowed to listen, get refund

fees and transfer classes at any time. Parents are at ease."' Another, from a father claimed: "The hardware development of Xueer Si Peiyou is very scientific and really great!" However, the governmental investigation concluded that the parents attributed to these reviews and comments did not exist. The offending companies, including TAL, were hit with maximum penalties for their illegal business practices, totaling a combined 36.5 million CNY ($5.73 million USD). At a governmental conference announcing the fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including *155,000* complaints and reports for education and training services received by authorities in 2020 alone and over *47,000* similar complaints and reports received by authorities in the first quarter of 2021.

294.   As one Chinese language source observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]." Instead, despite its assurances that it complied with the Chinese government's rules, regulations and proscriptions, TAL continued to engage in "[o]ver-standard and advanced tutoring, illegal charge, false publicity, tricking consumers into transaction, [the use of] vulgar videos, illegal recruit[ing] and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

295.   As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

296.   Finally, on July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public. In response, TAL issued a press release attached to a Form 6-K filed with the SEC on July

26, 2021, that same day stating "that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system," but then misleadingly told the public that TAL "**ha[d] not received official notification of the regulations**."

297.    As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly *79% decline*. This represented a *greater than 95% decline* in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs, as follows:



298.    The statements set forth above were materially false and misleading because, according to CW1, Defendants knew that the Double Reduction policies were going to be

implemented and affect its business ***at least six months before*** they were actually issued and further, Defendants knew the severe consequences that the Double Reduction policies posed on its business operations.

### D.    Materially False and Misleading Sarbanes-Oxley Certifications

299.    In its 2018 Form 20-F, filed on June 26, 2018, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

300.    This statement was materially false and misleading when made because, TAL's 2018 Form 20-F filed on June 26, 2018, did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. As set forth herein, the 2018 Form 20-F falsely informed investors that TAL was taking corrective measures to comply with the government's February 2018 regulations, however, this was not the case because at the time, TAL was repeatedly violating those very regulations – at a far greater rate than it was being fined – which provoked the Chinese government's action to eliminate the profitable tutoring industry which provided advantages to wealthy families and students. Contrary to TAL's assurances, TAL and the tutoring industry were far from "healthy, "stable" and "sustainable" and the regulations were neither beneficial nor intended by the government to be beneficial to the health of the industry. Defendants' insider sales throughout the Class Period further demonstrate that these statements were knowingly false or made in reckless disregard of the truth.

301. On May 16, 2019, TAL filed its annual report for fiscal year end February 28, 2019 on Form 20-F, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo (the "2019 Form 20-F"). In the 2019 Form 20-F, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

302. This statement was materially false and misleading when made because, TAL's 2019 Form 20-F did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. As set forth above in ¶¶240-41, the 2019 Form 20-F falsely stated that TAL had successfully "adapted [its] operations" to adhere to China's February 2018 regulations; however, this was not the case because at the time, TAL was repeatedly violating those very regulations in order to drive student enrollments and therefore inflate the Company's revenues.

### E. Defendants Omitted Material Facts in Violation of Item 5(D) and Item 105 of Regulation S-K

#### 1. Overview of TAL's Item 5 Disclosure Requirements

303. Throughout the Class Period, Defendants' 20-Fs and 6-Ks incorporating the Company's MD&A disclosures[7] were materially false or misleading because they failed to disclose information required by Item 5.

---

[7] Because the SEC has opined that a MD&A is essentially the same as the "Operating and Financial Review and Prospects," which is what foreign issuers are required to include in registration statements, this Complaint will refer to the latter as MD&A herein. Additionally, this Court has held

304.    TAL Education's annual and quarterly reports filed with the SEC are subject to the disclosure obligations of Item 5, which are akin to Item 303. The SEC has recognized that "for Form 20-F annual reports, the existing MD&A equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies." Thus, certain disclosure obligations must be made in the MD&A section of TAL's annual and quarterly reports filed with the SEC, as required by SEC Regulation S-K.

305.    The purpose of MD&A disclosures, as stated by the SEC, is to give investors information "necessary to an understanding of [a company's] financial condition, changes in financial condition and result of operations."

306.    As Defendants knew or recklessly disregarded that TAL's annual reports on Form 20-F misleadingly omitted information required by SEC rules and regulations to be stated therein.

307.    Specifically, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*" (Emphasis in original.)

308.    Furthermore, Item 5(D), entitled "Trend Information," provides (emphasis added):

The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

that "the same facts underlying any Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter." *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV. 1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).

309. The scope of the information required to be disclosed under this paragraph is coextensive with that required under Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Furthermore, the SEC has recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

310. In 1989, the SEC described the purposes of the MD&A in a release titled: *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co Disclosures, Release No. 6835* (May 18, 1989) (the "1989 Interpretive Release"), which stated, in pertinent part (emphasis added):

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future. . . .

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects,* such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

311. Item 5(d) requires disclosures based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects."

312. The Interpretive Release further provides that foreign issuers listed on the NYSE must disclose: (i) known trends and uncertainties; and (ii) any material impact of such known trends and uncertainties on the company's operations *even if the trends are a matter of public knowledge.*

313.    The SEC's 1989 Interpretive Guidance set forth a two-step test to determine if disclosure is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

314.    The SEC also published interpretive guidance effective December 29, 2003, regarding MD&A requirements of Item 5 of Form 20-F. In this guidance, the SEC stated that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," and cited its prior 1989 Interpretive Release.

### 2.    Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct and Regulatory Violations

315.    Thus, the annual and quarterly reports filed by TAL during the Class Period required that Defendants disclose the information regarding known trends, events, and uncertainties, including:

> (a)    That TAL had habitually been incurring fines and sanctions for its failure to comply with Chinese law governing the for-profit tutoring industry;
>
> (b)    That TAL knew, as early as January 2021, that the impending governmental regulations would make it increasingly difficult for the Company to cooperate;
>
> (c)    That TAL was allowing teachers to tutor students absent the requisite qualifications;

(d)     That TAL was touting falsified or exaggerated course reviews on its website in order to increase student enrollments;

(e)     That TAL was engaging in bait-and-switch pricing wherein it repeatedly offered substantial promotional pricing to lure in students to use its tutoring services only to later charge the full price, if not more, for the tutoring service;

(f)     That TAL was charging tuition for its tutoring courses for periods greater than three months in violation of relevant rules and regulations;

(g)     That TAL was forcing students to pay advances and incur recurring debt; and

(h)     That TAL was repeatedly teaching courses that exceeded the scope of the syllabus in contravention of Chinese law

316.    Defendants failed to disclose any of the foregoing information to investors in TAL's 20-Fs or 6-Ks for fiscal years 2018 through 2021. These omissions violated Item 5(d) because the undisclosed trends, demands, commitments, events, or uncertainties were known to Defendants and were "reasonably likely to have material effects on [TAL's] financial condition or results of operation."

317.    First, as described above in Section V.C, the foregoing trends, demands, commitments, events, and uncertainties were known to Defendants throughout the Class Period. Specifically, Defendants knew that:

(a) The Chinese government was beginning to enact a series of rules and regulations which would have a material impact on the after-school tutoring industry therefore putting at risk TAL's business operations (*see* ¶¶274-78);

(b) These stringent rules and regulations governing the after-school for-profit tutoring industry could impact how and indeed whether TAL could continue in its business (*see* ¶¶277-78); and

(c) The for-profit tutoring industry would likely be dragged down by governmental regulations as evidenced by Defendants' sales of stock for proceeds of $458 million (*see* ¶¶331-37).

318. Second, the below facts demonstrate that the foregoing trends, demands, commitments, events, and uncertainties were reasonably likely to occur and reasonably likely to have a material impact on TAL's business and operations:

       (a) TAL was one of the top for-profit after-school tutoring firms in mainland China and thus should have been privy to any impending governmental regulations affecting its business;

       (b) As a tutoring company offering private education services for students, TAL was required to adhere to all rules and regulations governing the tutoring industry;

       (c) Even before the Class Period began, TAL formed a habit of repeatedly disregarding and offending an array of Chinese laws and regulations; and

       (d) Notwithstanding the aforementioned, TAL continued to flagrantly disregard China's rules and regulations governing the for-profit tutoring industry because it prioritized its student enrollment metrics and growing revenues over compliance.

319. Based on the above, Defendants violated Item 5(d) by failing to disclose in TAL's Forms 20-F for fiscal years 2019 through 2022: (i) the negative trends, demands, commitments, events, and uncertainties set forth above in ¶¶302-313; and (ii) their anticipated impact on TAL's current and future business operations.

320. For these same reasons, Defendants' failure to disclose the information set forth above in ¶¶314-15 in TAL's Forms 6-Ks filed with the SEC throughout the Class Period rendered those filings materially false or misleading.

321. The Form 20-F annual reports filed by TAL during the Class Period violated Item 5 by failing to disclose the adverse facts alleged in ¶¶ 298, 299, 300 and 301 above concerning the Company's wide-ranging misconduct and efforts to artificially inflate TAL's financial results through the illicit business tactics detailed herein and the Chinese government's imposition of increasingly harsh regulations, particularly given TAL's history of flouting less restrictive regulations. These adverse facts and events created known trends and uncertainties that were

reasonably likely to (and ultimately did) have a material adverse impact on the Company's financial condition and results of operations, and, accordingly, appropriate disclosure in the Form 20-F annual reports was required.

### 3. Defendants Failed to Disclose Material Facts in Violation of Item 105 of Regulation S-K

322.    Additionally, TAL's Form 20-F annual reports failed to disclose certain of the most material risks facing the Company at the time of filing, in violation of Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105.

323.    Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." Specifically, Item 105 requires a company to "[e]xplain how each risk affects the registrant or the securities being offered" and "each risk factor should be set forth under a subcaption that adequately describes the risk." Likewise, Item 3 of Part I of Form 20-F requires a foreign private issuer, such as TAL, to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."

324.    TAL's Form 20-F annual reports filed during the Class Period failed to comply with these reporting obligations because, as Defendants knew or recklessly disregarded, the reports failed to disclose the true risks arising from the adverse facts alleged in ¶¶ 314-315 above concerning the Company's wide-ranging misconduct and the Chinese government's imposition of increasingly harsh regulations, given TAL's history of flouting less restrictive regulations. The specific and extreme risks of adverse regulatory action, as well as legal, reputational and financial risks arising from these adverse facts, were not disclosed in the annual reports even though they were some of the most material factors that made an investment in TAL ADSs speculative or risky and were already occurring at the time that the statements were made.

325.    Moreover, the purported "risk disclosures" contained in TAL's Form 20-F annual reports were themselves materially misleading. For example, while the reports stated that TAL "*may*" be subject to adverse regulatory actions if the government found the Company was not in compliance with the existing regulatory regime, nowhere did the reports disclose that TAL knew that the longstanding and increasingly more restive government regulations would have a crippling effect on TAL's business in the long term and that the trend was entirely negative, with no reasonable hope or expectation that the government would reverse its policies.

326.    The Form 20-F annual reports also qualified their discussion of purported regulatory risks by claiming that TAL was taking actions to ensure compliance with the laws, regulations and policies applicable to its business, for example by stating that TAL was "making efforts to ensure compliance," had "adapted [its] operations" to comply with the law and had taken various steps to "comply with PRC laws and regulations." The failure to disclose the Company's actual business practices; actual receipt of fines and sanctions; TAL's efforts to knowingly flout Chinese rules, regulations and policies; the longstanding and increasingly more restrictive governmental regulations which would have a crippling effect on TAL's business in the long-term; and that the trend was entirely negative with no reasonable hope or expectation that the government would reverse its policies, rendered the discussion of purported "risks" relating to TAL's business contained in the annual reports themselves materially misleading and similarly rendered statements of belief or optimism materially misleading.

## VI.    POST CLASS PERIOD DISCLOSURES

327.    On July 30, 2021, TAL announced that it would be cancelling its scheduled earnings release and earnings call in light of the regulatory developments.

328.    In October 2021, staff at Xueersi stated that the Company would cease admitting new students and that their online payment channels were closed.

329.     On October 13, 2021, the *Sixth Tone* released an article stating "the payments freeze ensures that the once-vast for-profit tutoring industry will be largely dissolved by the end of the year."

330.     On November 12, 2021, TAL filed a press release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021. The Company further stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods" and that the revenues derived from offering those services for fiscal year end February 28, 2021, "accounted for a substantial majority of the Company's total revenues in the year."

331.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL ADSs, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

332.     The Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that public documents and statements they issued and disseminated in the name of TAL or in their own name, to the investing public during the Class Period, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding TAL, and their control over and/or receipt and/or modification of TAL's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

333.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity

of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

334.    Further, the Individual Defendants acted with scienter because they possessed the motive and opportunity to commit the fraud alleged herein, as further detailed below in Section F.

335.    The Individual Defendants, because of their high-level positions with TAL, controlled the contents of TAL's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of TAL's corporate statements and is, therefore, responsible and liable for the representations contained therein.

## A.  Motive and Opportunity

### 1.  TAL Insiders Realized $458 Million in Proceeds from Their Class Period Stock Sales

336.    Throughout the Class Period, the Individual Defendants were motivated to issue false statements in order to give themselves the opportunity to sell their common stock at artificially inflated prices. Thus, while Defendants engaged in their scheme to defraud investors during the Class Period by falsely assuring investors that the Company was in compliance with China's heightened laws and regulations governing the tutoring industry, Individual Defendants Zhang and Luo, along with other Company insiders, sold significant amounts of TAL shares at artificially inflated prices.

In total, TAL insiders dumped over *9.5 million shares of stock* during the Class Period for *proceeds of over $450 million.*

337.    The sales are summarized in the following chart:

**TAL Education (TAL)**    **4/26/18 - 7/22/21**    **Insider Sales Summary**

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Liu Yachao** | 4/30/2018 | $35.89 | 100,000 | $3,589,000 |
| Chief Operating | 11/18/2019 | $44.40 | 100,000 | $4,440,000 |
| | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/30/2020 | $49.70 | 100,000 | $4,970,000 |
| | 8/11/2020 | $74.00 | 240,000 | $17,760,000 |
| | 11/9/2020 | $71.23 | 20,000 | $1,424,600 |
| | 11/10/2020 | $71.32 | 20,000 | $1,426,400 |
| | 11/11/2020 | $70.06 | 20,000 | $1,401,200 |
| | 11/16/2020 | $74.59 | 10,000 | $745,900 |
| | 11/17/2020 | $75.18 | 10,000 | $751,800 |
| | 11/18/2020 | $74.01 | 10,000 | $740,100 |
| | 11/19/2020 | $73.73 | 10,000 | $737,300 |
| | 11/20/2020 | $74.75 | 10,000 | $747,500 |
| | 11/23/2020 | $74.44 | 10,000 | $744,400 |
| | 1/28/2021 | $78.38 | 35,649 | $2,794,168 |
| | 2/1/2021 | $76.88 | 10,000 | $768,800 |
| | 2/2/2021 | $76.60 | 60,000 | $4,596,000 |
| | 2/3/2021 | $81.17 | 45,170 | $3,666,448 |
| | | | 846,509 | $52,996,392 |
| | | | | |
| **Rong Luo** | 5/9/2018 | $36.23 | 19,988 | $724,125 |
| Chief Financial | 10/29/2018 | $27.90 | 5,001 | $139,527 |
| | 2/22/2019 | $32.88 | 90,000 | $2,959,200 |
| | 2/22/2019 | $33.97 | 9,000 | $305,730 |
| | 2/25/2019 | $33.97 | 30,000 | $1,019,100 |
| | 10/29/2019 | $41.85 | 120,000 | $5,022,000 |
| | 1/28/2020 | $47.43 | 5,779 | $274,097 |
| | 7/29/2020 | $78.69 | 23,612 | $1,858,028 |
| | 8/4/2020 | $80.97 | 100,000 | $8,097,000 |
| | 1/27/2021 | $78.80 | 54,000 | $4,255,200 |
| | | | 457,380 | $24,654,007 |
| | | | | |

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Yan Huang** | 2/22/2019 | $32.88 | 120,000 | $3,945,600 |
| Chief | 10/31/2019 | $42.81 | 5,952 | $254,805 |
| | 11/4/2019 | $42.75 | 180,000 | $7,695,000 |
| | 11/14/2019 | $44.15 | 100,000 | $4,415,000 |
| | 1/28/2020 | $47.43 | 34,714 | $1,646,485 |
| | | | **440,666** | **$17,956,890** |
| | | | | |
| **Zhang Kaifu** | 10/28/2019 | $43.10 | 5,264 | $226,878 |
| Director | 10/28/2020 | $66.56 | 4,807 | $319,953 |
| | 2/25/2021 | $81.34 | 24,141 | $1,963,628 |
| | | | **34,212** | **$2,510,459** |
| | | | | |
| **Yunfeng Bai** | 11/19/2019 | $44.34 | 106,742 | $4,732,940 |
| President | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/28/2021[8] | $78.38 | 144,000 | $11,286,720 |
| | | | **286,432** | **$17,712,436** |
| | | | | |
| **Bright Unison** | 5/30/2019 | $34.32 | 955,000 | $32,779,611 |
| Shareholder | 5/31/2019 | $34.09 | 1,054,553 | $35,944,966 |
| | 10/29/2019 | $41.85 | 3,500,000 | $146,475,000 |
| | | | **5,509,553** | **$215,199,577** |
| | | | | |
| **Chen Weiru** | 10/28/2019 | $43.10 | 5,264 | $226,878 |
| Director | | | | |
| | | | | |
| **Excellent New** | 4/29/2019 | $38.67 | 3,280,500 | $126,856,935 |
| | | | | |
| **Grand Total** | | | **9,556,627** | **$458,113,574** |

[8] Bai Yunfeng also became Chairman of the Board before making this sale.

[9] Bright Unison Ltd is a corporation incorporated in the state of Virgin Islands, British. https://sec.report/CIK/0001512895.  During the Class Period, Bright Unison Ltd owned more than 5% of TAL Education's shares.  According to TAL Education's June 30, 2020 SEC Form 20-F, Bright Unison Limited is "Mr. Bangxin Zhang's personal holding company." https://sec.report/Document/0001410578-22-001873/. Zhang is also publicly identified as the sole shareholder and sole director of Bright Unison

[10] According to TAL Education's June 30, 2020 SEC Form 20-F, Excellent New Limited is also a British Virgin Islands company over which "Yunfeng Bai has the power to direct the retention or disposal of, and the exercise of any voting rights attached to, the foregoing shares through a trust structure."  https://sec.report/Document/0001410578-22-001873/.

338.    Further, the insider sales were unusual compared to the prior trading history for Yunfeng Bai, Bright Unison Ltd., Rong Luo, and Yan Huang.  The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

**TAL Education (TAL)**    **4/26/16 – 4/25/18**    **Insider Sales Summary**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Yunfeng Bai** | 2/6/2018 | $31.67 | 131,767 | $4,173,060 |
| | 2/8/2017 | $83.76 | 21,833 | $1,828,732 |
| | | | **153,600** | **$6,001,792** |
| | | | | |
| **Bright Unison Ltd** | 8/24/2017 | $30.91 | 2,700,000 | $83,457,000 |
| | | | | |
| **Rong Luo** | 5/4/2016 | $56.88 | 13,634 | $775,501 |
| | | | | |
| **Yan Huang** | 2/28/2018 | $36.70 | 120,000 | $4,404,000 |
| | | | | |
| **Grand Total** | | | **2,987,234** | **$94,638,293** |

339.    The graph below also illustrates the large discrepancy between the amount of insiders' stock sales before and during the class period:



340.    During the two years prior to the Class Period, these same Company insiders sold only 2,987,234 shares of their TAL stock, for proceeds of only $94.6 million.  Notably, Defendant Luo sold only 13,634 shares for $775,501 in proceeds in the prior two years – compared to his Class Period sales of 457,380 shares for proceeds of nearly $25 million.  Moreover, there were no reported sales for four of the eight Company insiders (Chen Weiru, Excellent New Limited, Liu Yachao, Zhang Kaifu) during this time period.  The significantly smaller number of pre-Class Period sales by such a broad swath of Company insiders highlights the suspicious nature of their Class Period insider sales.

341.    The insider sales were also suspicious in timing.  As demonstrated above, the sales were predominantly made before March 2021, when China held its annual "Two Sessions" parliamentary meetings, where it was announced that there would be "stricter regulations" to rein in the online education industry.  Many of the sales were also made at times when the stock was trading

at over $70 per share as Defendants were materially inflating the Company's revenues by falsely assuring investors that the Company's practices were in compliance with China's strict laws and regulations governing the for-profit tutoring industry. Indeed, Defendant Luo sold over 170,000 shares (for over $12 million in proceeds) at prices at and near a 52-week trading high for TAL stock. The suspiciousness of the insider stock sales raises a strong inference that these insiders were aware of TAL's inability to comply with the Chinese government's increasingly restrictive regulations and the unsustainability of TAL's deceptive marketing tactics and illicit business practices when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from the TAL's massive stock price decline.

342. CW1 confirmed that some "core members" of TAL's senior management team divested their TAL shares during the 2021 Spring Festival which took place in January-February 2021 at which time TAL's stock price was trading between USD $70 to USD $80.

### 2. The Individual Defendants' Bonuses

343. The Individual Defendants' motive to issue false statements throughout the Class Period is further evidenced by their desire to optimize their bonuses and other available incentives under TAL's lucrative compensation system for its executives.

344. According to TAL's Forms 20-F for fiscal years 2019, 2020, 2021, and 2022, TAL issues cash compensation and share-based compensation to its executives.

345. In particular, according to TAL's Form 20-F for fiscal year end February 28, 2019, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. Further, for the same fiscal year, TAL granted 354,301 non-vested restricted Class A common shares to its executive officers and non-executive directors as well as a total share-based compensation expense of $5.2 million for its executive officers and non-executive directors.

346.    According to TAL's Form 20-F for FY 2020, the aggregate cash compensation paid to its executive officers for that fiscal year was $1.9 million. For the same fiscal year, TAL granted 51,520 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.4 million for its executive officers and non-executive directors.

347.    According to TAL's Form 20-F for FY 2021, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. For the same fiscal year, TAL granted 28,500 non-vested restricted Class A common shares and 24,000 share options to purchase 24,000 Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.1 million for its executive officers and non-executive directors.

348.    Finally, for TAL's fiscal year end February 28, 2022, the aggregate cash compensation paid to its executive officers and non-executive directors as a group was about $2.4 million. For that same fiscal year, TAL granted 250,700 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a share-based compensation expense of $9.2 million for its executive officers and non-executive directors.

349.    Thus, for fiscal years 2019 through 2022, TAL's executives took home a combined $8.3 million in cash compensation bonuses and $26.82 million in share-based compensation payments.

350.    The cash-compensation paid out to executives and non-executive directors during the Class Period was substantial. These payments further demonstrate that the Individual Defendants had the motive and opportunity to maximize their bonuses.

3.    The Individual Defendants' High-Level Positions and Experience

a.    Defendant Zhang

351.    Defendant Zhang held the highest-level position at TAL. As CEO, Defendant Zhang controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the tutoring industry. Because of his high-level position, Defendant Zhang was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Zhang knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's most senior-level executive, Defendant Zhang was responsible for the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

352.    According to CW1, Defendant Zhang had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "*at least six months in advance*." CW1 stated that the executives – including Defendant Zhang – "knew that a new regulation as forthcoming" and what the main direction of the regulations would be. Defendant Zhang had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

b.    Defendant Luo

353.    As Chief Financial Officer, Defendant Luo held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, non-

public information concerning the fact that TAL education was not incompliance with Chinese regulations and laws governing the after-school tutoring industry, and more generally, education sector. By virtue of his high-level position, Defendant Luo was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Luo knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's second senior-most executive, Defendant Luo was responsible for ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

354.    According to CW1, Defendant Luo had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "*at least six months in advance*." CW1 stated that the executives – including Defendant Luo – "knew that a new regulation as forthcoming" and what the main direction of the regulations would be. Defendant Luo had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

355.    Defendant Luo also has extensive management experience. As reported in several of TAL's Form 20-F filings, Defendant Luo was previously the chief financial officer of eLong Inc. from 2013 to 2014. Prior to that, Defendant Luo was also the finance senior manager for the Lenovo Group in China. Furthermore, before joining Lenovo, Defendant Luo worked at Microsoft Corporation in Beijing and Seattle where he worked in various finance positions including as an analyst, manager, and senior manager. Defendant Luo also has a double major bachelor's degree in

economics and information management and systems from Peking University in addition to a master's degree in management science and engineering from Tsinghua University.

           c.     Defendant He

356.    As the Company's Vice President of Finance, Defendant He also held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the after-school for-profit tutoring industry. Because of her high-level position, Defendant He was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of her position and access to material non-public information about TAL, Defendant He knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's Vice President of Finance, Defendant He was responsible for ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

357.    According to CW1, Defendant He had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "*at least six months in advance*." CW1 stated that the executives – including Defendant He – "knew that a new regulation as forthcoming" and what the main direction of the regulations would be. Defendant He had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

### B. The Sarbanes-Oxley Certifications

358.    The Individual Defendants' scienter is further demonstrated by their Sarbanes-Oxley ("SOX") certifications wherein they certified that certain SEC filings represented, accurately, the financial condition of TAL.

359.    In particular, Defendants Zhang and Luo, as CEO and CFO of the Company, certified pursuant to SOX that TAL's Forms 20-F filed throughout the Class Period, which contain materially false and misleading statements as set forth in Section V.D, above, were compliant with the federal securities laws, and further that "the information contained in [each] report fairly presents, in all material respects, the financial condition and result of operations of the company."

### C.    The SEC Is Threatening to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations

360.    As alleged above, in Section IV.E, TAL is currently at risk of having its ADSs delisted for non-compliance with the PCAOB as early as 2023 or 2024. This is because its auditor, Deloitte Touche, operates in Beijing and therefore the PCAOB is unable to inspect TAL's auditor, because it is based in China.

361.    That TAL's financial filings with the SEC have not properly been investigated by the PCAOB in recent years and that the Company is at risk of having its ADSs delisted from the NYSE further evidence that TAL and the Individual Defendants acted with scienter.

### D.    Executive Resignations

362.    Finally, the resignations of certain Defendants contribute to an inference of scienter. On September 24, 2021, it was reported that Defendant Long would be resigning from TAL effective October 1, 2021 to pursue another opportunity.

## VIII.  LOSS CAUSATION

363.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

364.    During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at artificially inflated prices and were damaged thereby. The price of TAL's ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thus causing investors' losses. As alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TAL's ADSs and operated as a fraud or deceit on purchasers of TAL ADSs. When the truth about Defendants' misconduct was revealed, the value of TAL's ADSs declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of TAL's ADSs were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

365.    The timing and magnitude of the ADS price declines negate any inference that the losses suffered by Lead Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors, or non-TAL specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following charts comparing TAL's ADS price performance to relevant peers/competitors and comparable indices. The first chart shows the entire Class Period and the second chart shows the end of the Class Period:



366.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at artificially inflated prices and were damaged thereby. The price of TAL ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

367.    The economic loss, i.e., damages, suffered by Lead Plaintiff and members of the Class, was a direct result of Defendants' material misrepresentations and omissions to artificially inflate the prices of TAL's ADSs, as well as the subsequent significant decline in the value of TAL's ADSs when Defendants' prior misrepresentations and omissions were revealed.

368.    At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose that TAL's revenue and operational growth was the result of deceptive marketing tactics and illicit business practices that knowingly violated Chinese laws, regulations and policies, and exposed TAL to an extreme risk that more draconian measures would be imposed on the Company, as alleged herein. Before and during the time of Lead Plaintiff's and Class members' purchases of TAL's ADSs, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of TAL's ADSs to be artificially inflated.

369.    Lead Plaintiff and members of the Class purchased TAL's ADSs at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period. However, TAL ADSs continued to trade at artificially inflated prices because investors and the market still did not know the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

370.    On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were reportedly fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews. In addition, TAL was reportedly found to have: (i) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (ii) offered courses that gave students unfair advantages in contravention of Chinese government policies; (iii) engaged in illegal bait-and-switch tactics; (iv) misrepresented teacher qualifications and course qualities; (v) mishandled user data; and (vi) rigged promotional events to defraud consumers. As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

371.    On July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public, effectively ending any potential growth in the for-profit tutoring sector in China. As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

372.    Viewed collectively, the Individual Defendants' stock sales resulting in ***proceeds of $458 million*** combined with their motivation to maximize their cash compensation, the SEC potentially delisting TAL's ADSs from the NYSE due to its auditor's failure to adhere to PCAOB standards, the Defendants' high-level positions and executive tenure, and their SOX certifications raise a compelling inference of scienter.

## IX.    CLASS ACTION ALLEGATIONS

373.    Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased TAL ADSs during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

374.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TAL ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TAL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

375.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

376.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

377.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' statements or omissions during the Class Period were materially false and misleading;

(b)     whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

378.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    NO SAFE HARBOR

379.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made.

380.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of TAL who knew that those statements were false when made.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

381.    At all relevant times, the market for TAL ADSs was an efficient market for the following reasons, among others:

(a)    TAL ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, TAL filed periodic public reports with the SEC;

(c)    TAL regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    TAL was followed by securities analysts employed by major brokerage firms such as: Credit Suisse AG; Morgan Stanley; China International Capital Corporation Limited; Deutsche Bank AG; JP Morgan Chase & Co.; Citigroup Inc.; CICC; Goldman Sachs; and China Renaissance Securities (US) Inc., who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

382.    As a result of the foregoing, the market for TAL ADSs promptly digested current information regarding TAL from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of TAL ADSs during the Class Period suffered similar injury through their purchases of TAL ADSs at artificially inflated prices and a presumption of reliance applies.

383.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the

Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

384.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

385.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

386.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of TAL ADSs during the Class Period.

387.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TAL ADSs. Lead Plaintiff and the Class would

not have purchased TAL ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

388.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of TAL ADSs during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

389.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

390.    The Individual Defendants acted as controlling persons of TAL within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of TAL shares, the Individual Defendants had the power and authority to cause TAL to engage in the wrongful conduct complained of herein. TAL controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XIV.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: October 19, 2022

*/s/ Daniel L. Berger*_____
Daniel L. Berger
Caitlin M. Moyna
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Tel.: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com

*Lead Counsel for New Mexico State
Investment Council and Proposed Lead
Council for the Class*

OFFICE OF THE NEW MEXICO
ATTORNEY GENERAL
HECTOR BALDERAS, Attorney
General,
BRIAN McMATH Assistant Attorney
General
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone: 505/490-4052
hbalderas@nmag.gov
bmmath@nmag.gov

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Additional Counsel for Lead Plaintiff
New Mexico State Investment Council*

*/s/ Michael Dell'Angelo*_____

BERGER MONTAGUE PC
Sherrie R. Savett
Michael Dell'Angelo
Barbara Podell
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ssavett@bm.net
mdellangelo@bm.net
bpodell@bm.net
aabramowitz@bm.net

*Lead Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi and Proposed Lead Counsel for the Class*

CALCATERRA POLLACK LLP
Michael Liskow
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Telephone: 212/899-1765
mliskow@calcaterrapollack.com

*Local Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi*