**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

SUN,

                      **Plaintiffs,**

                  **-against-**

TAL EDUCATION GROUP ET AL.,

                    **Defendants.**

</td></tr>
</table>

**22-cv-01015 (ALC)**

**<u>OPINION & ORDER</u>**

**ANDREW L. CARTER, United States District Judge:**

Co-Lead Plaintiffs New Mexico State Investment Council ("NMSIC") and Public Employees' Retirement System of Mississippi ("MSPERS," and together with NMSIC, "Plaintiffs") brings this securities class action against Defendants TAL Education Group ("TAL" or "the Company"), along with Bangxin Zhang ("Zhang"), Rong Luo ("Luo") and Linda He (collectively "Individual Defendants" and together with TAL, "Defendants"), alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (Count I), and Section 20(a) of the Exchange Act (Count II), individually and on behalf of a class of all persons or entities who purchased TAL American Depository Shares ("ADSs") between April 26, 2018 and July 22, 2021, both dates inclusive (the "Class Period")

Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' Motion is **GRANTED.**

## BACKGROUND

### I.    Procedural Background

Roushui Sun first brought this securities action against TAL and the Individual Defendants on February 4, 2022. ECF No. 1. On April 5, 2022, NMSIC filed a motion seeking appointment

as Lead Plaintiff. ECF No. 20. That same day MSPERS filed a motion seeking appointment as Lead Plaintiff. ECF No. 17. Several other individuals also filed motions seeking appointment as lead plaintiff and appointment of lead counsel. On October 6, 2022, the Court referred these motions to Magistrate Judge Katharine Parker. ECF No. 42. On October 12, 2022, Judge Parker issued an Opinion and Order appointing NMSIC and MSPERS as Lead Plaintiff and approving their selection of co-lead counsel. ECF No. 44.

The Lead Plaintiffs filed the Amended Complaint on October 19, 2022. Amended Compl. ("AC"), ECF No. 46. On November 18, 2022, Defendant TAL filed a pre-motion conference letter requesting leave to move to dismiss Plaintiffs' Amended Complaint. ECF No. 51. The Court granted Defendants leave to file a motion to dismiss and set a briefing schedule. ECF No. 58. Defendant TAL filed the instant motion to dismiss the AC on February 10, 2023, ECF No. 67, and the accompanying memorandum of law ("Mot."), ECF No. 68. Defendant also filed a declaration. *See* Decl. of Xiao Liu ("Liu Decl."), ECF No. 69. On March 27, 2023, Plaintiffs filed their opposition ("Opp."). ECF No. 70. On April 16, 2023, Defendant filed its reply memorandum of law ("Reply"). ECF No. 73. Defendant TAL filed a letter alerting the Court of a supplemental authority on July 28, 2023. ECF No. 77.  The motion is deemed fully briefed. After careful consideration, Defendants' motion to dismiss is **GRANTED**.

## II.    Factual Background

The Court accepts as true for purposes of this motion the well-pled allegations of the Amended Complaint as supplemented by the documents incorporated by reference. [1]

---

[1] The Court also considers facts drawn from news releases, financial reports, and transcripts of earnings calls which Plaintiffs quote from extensively in the AC and are thus incorporated into the AC by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A.  **The Relevant Parties**[2]

Lead Plaintiff NMSIC and MSPERS purchased TAL American Depository Shares ("ADSs") during the Class Period, and purportedly suffered damages as a result of Defendants' violations of the federal securities laws. AC ¶ 26.

NMSIC is a sovereign wealth fund that manages the investments for New Mexico's four permanent funds: (i) the Land Grant Permanent Fund; (ii) the Severance Tax Permanent Fund; (iii) the Tobacco Settlement Permanent Fund; and (iv) the Water Trust Fund. *Id*. ¶ 27. As of 2021, NMSIC manages assets valued at $34 billion including the investment of 23 New Mexico government related clients which, at present, have a combined value of approximately $1.5 billion. *Id*. According to NMSIC's website, it is "focused on optimizing the earnings of New Mexico's permanent funds – funds that contribute to the state's overall operating budget – while preserving and growing the real value of the funds for future generations of New Mexicans." *Id*.

MSPERS was established in 1952 as the retirement system for Mississippi state agencies, as well as counties, cities, and other participating political subdivisions. *Id*. ¶ 28. It provides retirement benefits for employees of the state of Mississippi who work in government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services. *Id*.

Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in China. *Id*. ¶ 29. TAL ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "TAL." *Id*. Each ADS represents one third of one share of TAL common stock. *Id*.

---

[2] Defendants Zhang, Luo, and He have yet to appear.

Defendant Bangxin Zhang ("Zhang") co-founded TAL, was the Chief Executive Officer ("CEO") and a director of TAL during the Class Period, and, until January 2020, the Chairman of the Board of Directors. *Id*. ¶ 30. Defendant Zhang is also the controlling shareholder of the Company. *Id*. Zhang is also the sole shareholder and sole director of Bright Unison Limited, a company incorporated in the British Virgin Islands. *Id*. During the Class Period, Defendant Zhang sold 5,509,553 shares of TAL stock through his company Bright Unison Ltd., realizing proceeds of approximately $215.2 million. *Id*. Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period; he resigned from the Company effective October 29, 2021. *Id*. ¶ 31. During the Class Period, Defendant Luo sold 457,380 shares of TAL stock at artificially inflated prices, realizing approximately $24.7 million in proceeds. *Id*. Defendant Linda He[3] ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019.

Plaintiffs include a history of TAL, including its rise and eventual demise as one of China's largest tutoring companies. The Court recounts this history as alleged in the AC.

### B. History and Structure of TAL

TAL was founded in the People's Republic of China ("China" or the "PRC") in 2003 by Defendant Zhang while he was completing his PhD program at Peking University. AC ¶ 37. When Zhang originally launched TAL, the Company primarily offered mathematics tutoring courses, but later expanded to other subject areas. *Id*. During the Class Period, TAL provided K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese. *Id*. Tutoring services were primarily offered through small classes, personalized premium services

---

[3] According to Plaintiffs, Defendant Linda He's name is often spelled "Linda Huo" on public filings. AC ¶ 32, n.1.

and online course offerings. *Id*. On January 10, 2008, TAL became incorporated in the Cayman Islands as the "holding company for a group of companies engaged in the provision of high quality after-school tutoring programs." *Id*. ¶ 39. Although headquartered in Beijing, China, the Company is organized as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities ("VIEs"), including Beijing Xueersi Education. *Id*.

In or around October 2010, TAL listed its ADSs on the NYSE under the ticker "XRS." In the subsequent years after its initial public offering ("IPO"), the price of TAL ADSs grew by approximately 200%. *Id*. From 2015 to 2019, TAL ranked in the Top 100 Most Valuable Chinese Brands for five consecutive years. *Id*. By February 2021, TAL was valued at $55 billion and Defendant Zhang's wealth grew to over $15 billion. *Id*.

According to Plaintiffs, TAL's primary sources of revenue were (1) small class tutoring services that focus on offline education; and (2) online education services provided through www.xueersi.com. *Id*. ¶ 40. For the fiscal year ending February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively. *Id*. Plaintiffs allege that throughout the Class Period, TAL's gross profits increased exponentially as it experienced robust growth due to "its deceptive pricing and advertising strategies." *Id*. TAL's fiscal year 2019 gross profits were $1.4 million; fiscal year 2020 profits were $1.8 million; and fiscal year 2021 profits were $2.4 million. *Id*. As of February 28, 2021, TAL's network consisted of "more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform." *Id*. ¶ 41. According to

TAL's Form 20-F for its fiscal year end February 29, 2020[4], the net revenue obtained from TAL's VIEs and subsidiaries and schools accounted for 93.4% of TAL's total net revenue. *Id*. During the Class Period TAL had 10 subsidiaries and consolidated affiliated entities.[5] *Id*. ¶ 42.

In addition to TAL's 10 subsidiaries and consolidated affiliated entities, TAL has an additional operating entity called Shenzhen Xueersi Training Center ("Shenzhen School"), which was incorporated in November 2013 in Shenzhen, China. *Id*. ¶ 45. According to Forms 20-F filed with the SEC, for fiscal years 2019,[6] 2020, and 2021[7], TAL owned a 100% legal ownership interest in several entities. *Id*. ¶ 46.[8] For fiscal year end February 28, 2022 ("FY 2022"), TAL's 100% legal ownership over other entities dropped significantly, and TAL reported in its Form 20-F for

---

[4] *See* Ex. D to Liu Decl., ECF No. 69-4.

[5] TAL's subsidiaries are: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. AC ¶ 42. TAL's VIEs are: (1) Beijing Xueersi Education Technology Co., Ltd. ("Beijing Xueersi Education"); (2) Beijing Xueersi Network Technology Co., Ltd. ("Beijing Xueersi Network"); (3) Xinxin Xiangrong Education Technology (Beijing) Co., Ltd. ("Xinxin Xiangrong"). *Id*. ¶ 43. TAL's Affiliated Entities ("AEs") are: (1) Shidai TAL Education Technology (Beijing) Co., Ltd.; (2) TAL Education Technology (Jiangsu) Co., Ltd.; and (3) TAL Training School (Shanghai) Co., Ltd. *Id*. ¶ 44.

[6] *See* Ex. C to Liu Decl., ECF No. 69-3.

[7] *See* Ex. E to Liu Decl., ECF No. 69-5.

[8] According to Forms 20-F filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL owned a 100% legal ownership interest in the following entities: (1) TAL Holding Limited ("TAL Hong Kong"), an intermediate holding company; (2) Beijing Century TAL Education Technology Co., Ltd. ("TAL Beijing"), a software sales and consulting service; (3) Beijing Huanqiu Zhikang Shidai Education Consulting Co., Ltd. ("Huanqiu Zhikang"), an education and management consulting service; (4) Yidu Huida Education Technology (Beijing) Co., Ltd. ("Yidu Huida"), a software sales and consulting service; (5) Beijing Xintang Sichuang Education Technology Co., Ltd. ("Beijing Xintang Sichuang"), a software and network development, sales, and consulting service; (6) Zhixuesi Education Consulting (Beijing) Co., Ltd. ("Zhixuesi Beijing"), a software and network development, sales, and consulting service; (7) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. ("Pengxin TAL"), an investment management and consulting service; (8), Firstleap Education ("Firstleap"), an intermediate holding company; (9) Firstleap Education (HK) Limited ("Firstleap Hong Kong"), an intermediate holding company; (10) Beijing Lebai Information Consulting Co., Ltd. ("Lebai Information"), an education and management consulting service; and (11) Beijing Yizhen Xuesi Education Technology Co., Ltd. ("Yizhen Xuesi"), a software and network development, sales, and consulting service. AC ¶ 46.

FY 2022 that the "Company decided in November 2021 to cease offering services relating to academic subjects from kindergarten through grade nine in the mainland of China by the end of December 2021" and further, that "[t]he Company also has taken actions to restructure its business and operations . . . ." *Id*. ¶ 47.[9] As of the date of the filing of Plaintiffs' AC, TAL operates four major tutoring brands including: (1) Xueersi, which is further divided into Xueersi Peiyou, which provides small-class learning services, and Xueersi.com, which provides online education services; (2) Zhikang, which provides after-school one-on-one learning services; (3) First Leap, which provides English education; and (4) Mobby, its science, technology, engineering, arts and math ("STEAM") education brand. *Id*. ¶ 48. Xueersi Online School is TAL's leading brand; it provides online live lessons to students ages 3–16 and is the longest-running online education brand under TAL. *Id*. ¶ 49.

### C.  Private Tutoring Industry in China

According to Plaintiffs, private after-school tutoring in China has been popular for decades. AC ¶ 50. Plaintiffs allege that Chinese parents are willing to spend significant amounts of money on after-school tutoring to help ensure that their students keep pace with other children. *Id*. ¶ 51. For instance, in 1990, 20% of graduates from local primary schools in Shanghai received at-home tutoring. *Id*. By 2004, the Urban Household Education and Employment Survey of 4,772 households reported that 73.8% of primary school students had taken tutoring lessons. *Id*. By 2016, the value of China's private tutoring sector for primary and secondary education grew to 800 billion RMB (USD $120.3 billion). *Id*. The advent of Zoom and other technologies further contributed to the growth of China's for-profit tutoring industry, and the COVID-19 pandemic caused a surge in China's ed tech market with the "number of online education users in China

---

[9] As of February 28, 2022, TAL only had a 100% legal interest in: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; and (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. AC ¶ 47.

reaching 342 million by 2020, accounting for 34.6 percent of the Internet population," as stated in a Beijing Review article. *Id*.  The article further stated that from "January to October 2020, 82,000 new online education firms sprang up." *Id*.

Plaintiffs' AC explains that parents, "feeling increased social and academic pressure to spend significant amounts of money to help their children excel and ultimately pass the Gaokao – China's college-entrance examination – spent a minimum of $7,000 per year, an average of $17,000 per year on their children's after-school tutoring classes, and as much as $43,500 per year on extracurricular tutoring. *Id*. ¶ 54. In 2021, "it was estimated that the number of entities operating in China's private tutoring industry was almost equal to the number of public schools in China." *Id*. ¶ 56. China's private tutoring industry became a "massive cash cow" with the industry valued "anywhere from $120 to $150 billion, and at one point, as much as $310 billion." *Id*. ¶ 57. TAL became one of the top five tutoring companies in China, and by February 2021, it was valued at over $55 billion, up 323% from its $13 billion valuation in October 2018. *Id*. ¶ 58. However, Plaintiffs allege, as the private tutoring industry grew in popularity and size, the industry "became a target of governmental regulation." *Id*. ¶ 59. Leading up to and during the Class Period, the Chinese government began to implement a series of regulations and laws intended to govern the for-profit tutoring industry. *Id*.

TAL, as one of China's largest tutoring companies, faced significant risks if it failed to comply with China's new and increasing regulation of the industry. *Id*. ¶ 60. Plaintiffs allege that in the midst of exponential year-over-year growth, TAL had no intention of limiting its operations, and that rather than constrain its growth and concomitant profits by complying with the applicable rules, regulations and proscriptions, TAL persistently evaded the Chinese government's new regulations and laws by, among other things: (i) releasing deceptive advertisements and promoting

fake product pricing in order to induce student enrollment; (ii) creating fake course reviews; (iii) forcing students to pay advances and take on recurring debt; and (iv) offering students courses that gave them unfair advantages in contravention of Chinese policies. *Id*.

The National People's Congress is China's highest legislative body, while the State Council is the highest authority of the executive branch of the PRC central government. [10] *Id*. ¶ 61. In 2018, the Chinese government began enacting a series of rules and regulations referred to as "Circulars" and "State Council Opinions" under the regime of the "Law on the Promotion of Private Education of China." *Id*. ¶65.  For instance, in February 2018, the Chinese government promulgated the "Circular on Special Enforcement Campaign Concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle School," or Circular 3, which was aimed at reining in excessive tutoring fees and limiting the perceived societal harm resulting from the for-profit tutoring programs in China. *Id*. Among other restrictions, the regulations prohibited after-school tutoring institutions from providing courses more advanced than the government-approved syllabus and curricula applicable to the respective primary and secondary school students; providing courses designed to enhance exam-taking skills; and linking school enrollment with tutoring results. *Id*. As stated in TAL's Form 20-F for fiscal year 2018 ("FY 2018"), under Circular 3, Chinese "government authorities will carry out a special enforcement campaign to alleviate extracurricular burden on students of elementary schools and middle schools and regulate operations of after-school training institutions." *Id*.; *see also* Ex. A to Liu Decl.

---

[10] There are several ministries and agencies under the authority of the State Council including the Ministry of Education, the General Administration of Press and Publication, the MIIT, the SAIC, and the Ministry of Civil Affairs. AC ¶ 62.

On February 13, 2018, the Ministry of Education ("MOE"), the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the State Administration for Market Regulation ("SAMR") jointly issued a Circular on "Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions," under which government authorities would carry out a series of inspections on after-school training institutions. *Id*. ¶ 66. On August 22, 2018, the Chinese State Council issued an opinion on "Supervising After-School Tutoring Institutions," known as "Circular 80," or "State Council Opinions 80," which provided additional regulations targeting after-school tutoring institutions. *Id*. ¶ 67.  In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than three months' worth of fees. *Id*. Circular 80 also set forth requirements pertaining to the Permit for Operating a Private School, including: the size of the classroom; the teacher's qualifications, insurance, fire safety, environmental protection, as well as health and food safety. *Id*.[11]

On August 31, 2018, the General Office of the MOE promulgated the Circular called "Implementation of Special Measures and Rectification Work on the Private Education Institutions," which pronounced specific requirements for local education departments to enforce

---

[11] That same month, the State Counsel issued the "Opinion on regulating the Tutoring Industry" which set forth the following: (1) course information must be filed with the local education authorities and made publicly available; (2) contents of tutorial courses should not surpass the national guideline (i.e., students should not be placed in courses that match their grade levels); (3) course schedule should not conflict with regular school time; (4) tutorial centers should not offer tutoring courses past 8:30 pm and instructors should not assign homework for students; (5) no examination, competition, or any related rankings can be conducted for courses of primary school and secondary school subjects; (6) tutorial centers cannot receive students' tuition payments for more than 3 months in advance; (7) instructors who teach Chinese, math, foreign language, physics, and chemistry, among others, in the compulsory education system must obtain teaching qualifications; (8) the average floor space per student during one tutoring session cannot be less than three square meters; and (9) public school teachers cannot be employed by after-school tutoring institutions. AC ¶ 68.

State Council Opinions 80. *Id*. ¶ 69. On November 20, 2018, the General Office of the MOE along with the General Office of the SAMR of the PRC and the General Office of the Ministry of Emergency Management of the PRC jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," better known as "Circular 10." Circular 10 provides express requirements for local governments regarding the implementation of State Council Opinions 80, which was issued earlier that year in February. *Id*. ¶ 70.

On March 5, 2019, during China's "Two Sessions" of the 13th CPPCC National Committee (annual political meeting of China's top political advisory body held in Beijing), a notice entitled, "The Urgency of Regulating Out-of-School Tutoring market" was published on the Ministry of Education website by LI Hongpin, the Deputy to the National People's Congress ("NPC"). *Id*. ¶ 71. On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education" marking China's first document centered on reforming education and teaching in compulsory education. *Id*. ¶ 72. Parallel to the July 8, 2019 regulation was the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), promulgated by the MOE and other PRC government bodies such as the Cyberspace Administration of China, on July 12, 2019. *Id*. According to Plaintiffs, these Opinions were intended to regulate academic after-school training that involved internet technology and specifically initiated the supervision of online and offline after-school training. *Id*.

Plaintiffs allege that because TAL operated in a highly regulated industry, the impact of new laws and regulations governing Chinese tutoring industry and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance

to investors, and that TAL acknowledged the material importance of strict compliance with Chinese laws, regulations, and government prerogatives governing the tutoring industry. *Id*. ¶ 75. For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations." *Id*.; *see also* Exs. A, C, D, E to Liu Decl., ECF Nos. 69-1, 69-3, 69-4, 69-5.

On April 7, 2021, China's State Council promulgated the "Amended Regulations on the Implementation of the Law for Promoting Private Education of the PRC," or the "Amended Implementation Regulations of Private Education Law," which became effective on September 1, 2021. *Id*. ¶ 76. The Amended Implementation Regulations of Private Education Law together with State Council Circular 80 "require the learning centers of after-school tutoring institutions to make filings with the relevant education authorities," as reported in TAL's Form 20-F for fiscal year 2022.

### D. China Outlaws the Private Academic Tutoring Industry

On July 23, 2021, China effectively outlawed the entire private academic tutoring industry. *Id*. ¶ 77. In particular, the General Office of the Central Committee of China's Communist Party and the General Office of the State Council jointly released the "Opinions on Further Reducing the Burden of Homework and Off-Campus Training for Compulsory Education Statements" (the "Opinions") which contain a reference to a "Double Reduction" – that is, a reduction in the total amount of time and commitment consumed by school homework as well as a reduction in the burden presented by after-school training or off-campus programs. *Id*. This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China. *Id*. A Reuters report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL. *Id*.

The July 23 rules require, among other things, that all education companies register as nonprofits; and further state that "no new licenses will be issued to tutoring agencies catering to elementary and middle school students." *Id*. Plaintiffs cite to several new articles that reported the government's decision to "further regulate and standardize off-campus training." *Id*. ¶¶ 79–80.

Plaintiffs allege that as the Chinese government enacted these laws, TAL turned a blind eye to the new laws and regulations and instead elected to evade and violate the regulatory framework while assuring investors that it was in compliance or actively seeking to comply. *Id*. ¶ 82. Despite Defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations, and proscriptions of the Chinese government, during the Class Period, the Plaintiffs allege that the Company regularly violated those same rules, regulations and proscriptions designed to artificially inflate the Company's financial results. *Id*. ¶ 83. Plaintiffs allege that these violations were caught by Chinese regulators, who imposed fines ranging from the equivalent of a few hundred to a few thousand dollars. *Id*.

Lead Plaintiffs' investigation uncovered at least 60 infractions; however, Plaintiffs allege that TAL engaged in many additional violations which led the Chinese government to finally, effectively, shut down the Company's operations. *Id*. At a governmental conference announcing the industry-wide fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including 155,000 complaints and reports for education and training services received by authorities in 2020 alone and over 47,000 similar complaints and reports received by authorities in the first quarter of 2021. *Id*. Plaintiffs assert that "[g]iven the concentration in the industry among TAL and a handful of its competitors, it stands

to reason that TAL engaged in many more regulatory infractions which are either unavailable or inaccessible to the public than the 60 referenced above." *Id*.

Plaintiffs also allege that as part of the Chinese government's announcement of the Double Reduction policies, it also announced that various tutoring companies were engaged in serious violations of the rules, regulations and proscriptions governing the tutoring industry. *Id*. ¶ 17. These announcements were made on June 1, 2021. *Id*. ¶ 291. In May 2021, SAMR fined 15 TAL after-school tutoring institutions with financial penalties amounting to CNY 36.50 million ($5.13 million). *Id*. ¶ 83.  In particular, an affiliate of TAL's leading brand Xueersi, Hangzhou Yidu Training School Co. Ltd., was fined CNY 2.5 million ($351,321 USD) for engaging in false advertising and price fraud. *Id*.  Senecaesg.com reported that the tutoring companies were accused of "false publicity, such as fabricating teacher qualifications, exaggerating tutoring effects, fabricating user reviews, and so on." *Id*. According to Plaintiffs, TAL's previously undisclosed misconduct was reported to have also included widespread practices of: (1) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law; (2) offering courses that gave students unfair advantages in contravention of Chinese government policies; (3) engaging in illegal bait-and-switch tactics; (4) misrepresenting teacher qualifications and course qualities; (5) mishandling user data; (6) fabricating favorable course reviews, including by purported consumers who did not in fact exist;  (7) engaging in deceptive advertising and promoting fake product pricing, designed to induce student enrollment and (8) rigging promotional events to defraud consumers. *Id*. ¶¶ 17, 84.

Plaintiffs allege that TAL was an unrepentant serial violator of the Chinese government's rules, regulations and proscriptions engaged in a continuing game of cat and mouse with regulators. *Id*. ¶ 85.

Plaintiffs' Complaint focuses on several alleged violations committed by TAL. First, Plaintiffs allege that TAL flouted Circular 80, which forbade tutoring companies from charging tuition for a period greater than three months. *Id*. ¶ 86. Second, TAL repeatedly engaged in illegal tutoring practices by, among other things, offering course programs that violated state regulations, tutoring beyond the scope of the syllabus, and operating a school without approval. *Id*. ¶¶ 87–92. Third, TAL ignored or skirted China's stringent regulations concerning teachers' qualifications. *Id*. ¶¶ 93–96.[12] Fourth, Plaintiffs allege that TAL's subsidiaries also flagrantly disregarded Chinese law governing pricing by engaging in unlawful pricing practices and price fraud. *Id*. ¶¶ 97-102. Fifth, Plaintiffs contend that TAL repeatedly disseminated unauthorized or illegal publications to promote its tutoring business in defiance of Chinese regulations pertaining to publications. *Id*. ¶¶103–111. For example, during the Class Period, Beijing Xueersi Education Technology Co., Ltd., was fined on June 21, 2022 for publishing and disseminating an online publication between December 12, 2016 and April 6, 2022 that contained illicit content. *Id*. ¶ 104. Sixth, Plaintiffs allege that TAL regularly engaged in false advertising of its services in violation of applicable regulations. *Id*. ¶¶ 112–125.[13] Seventh, Plaintiff allege that an additional 24 incidents for which TAL was sanctions involved "matters not directly related to its tutoring operations further

---

[12] For example, Plaintiffs allege that many Xueersi.com teachers lacked the requisite teaching qualifications; and according to one report dated May 2, 2020, only 27 out of 58 teachers that taught Chinese, Math, and English in Grade 1 via Xueersi.com provided their teaching certificate numbers. AC ¶ 93. Of those that did purport to provide their teachers' qualifications, such "qualifications" did not comply with prevailing regulations. *Id*. Another report dated April 25, 2021 reported that some teachers on Xueersi.com taught students in grades that were more advanced than their teaching qualifications permitted. *Id*. ¶ 94. On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd., on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming to be a high school teacher with six years of teaching experience recommended Xueersi.com online courses. *Id*. ¶ 95.

[13] According to Plaintiffs, before, during, and after the Class Period, TAL and many of its subsidiaries flagrantly disregarded the PRC's advertising rules and regulations thereby incurring repeated sanctions. AC ¶ 113.

minimizing the potential importance of the violations detailed above among the total mix of violations for which the Company was fined during the Class Period." *Id*. ¶ 126.[14] Finally, Plaintiffs explain TAL is at risk of having its ADRs delisted from the NYSE as soon as 2023 or 2024. *Id*. ¶ 157.

### E. TAL's ADSs Price Plummets

Plaintiffs allege that on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. *Id*. ¶¶ 14, 289. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, the provision of tutoring services during weekend hours, and the imposition of industry-wide fee limitations. *Id*. Plaintiffs allege that as a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period. *Id*. ¶ 290. On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. *Id*. ¶ 291. As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period. *Id*. 295. Plaintiffs allege that once the market learned of TAL's previously undisclosed repeated violations and that its core business became effectively outlawed by the July 2021 regulations, the price of TAL ADSs again plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79%

---

[14] These violations included "failure to register for fire engineering completion," AC ¶ 129, "launching an interior decoration project of [] classrooms at a teaching campus without a construction license" *id*. ¶127, "failure to declare individual income tax," *id*. ¶ 132, "unauthorized construction on two teaching campuses," *id*. ¶ 133, violations related to Covid-19 vaccinations, *id*. 139, etc.

decline. *Id*. ¶¶ 18, 297. This represented a greater than 95% decline in just five months from the
February 19, 2021 Class Period high of $90.15 for TAL ADSs. *Id*.

### F.  Defendants' Alleged Misstatements During the Class Period

Plaintiffs allege that throughout the Class Period, Defendants issued materially false and
misleading statements and omissions, including those regarding: (a) TAL's adherence to Chinese
regulations governing the after-school tutoring industry; (b) the ability of TAL to comply with
Chinese regulations; (c) the causes for TAL's increasing student enrollment and financial success;
and (d) the "beneficial" nature of the regulations which would purportedly make the industry
"more healthy." AC ¶ 161.

Plaintiffs allege that Defendants made over 50 materially false and misleading statements
and omissions. *See* AC ¶¶ 163–302; *see also* Chart of Alleged Misstatements ("Misstatements
Chart"), Ex. 1 to Def's Mot., ECF No. 68-1.[15] According to the AC, the first set of alleged
misstatements are related to "TAL's compliance with Chinese regulations governing the after-
school tutoring industry." *See* AC ¶ 163–214.

- The 2018 Form 20-F[16]
  In March 2018, two of our training institutions providing K-12 tutoring services
  received notice under Circular 3 from the local government authority and ***we are
  taking corrective measures in accordance with Circular 3.*** For example, ***we have
  reduced our course hours and schedule for certain of our offline tutoring courses
  to end before 8:30 pm and reduced the coursework assigned to our students***, etc.
  However, ***we cannot assure you that we will fully comply with the above
  mentioned regulations timely or at all***, and will not be fined or otherwise
  penalized by government authorities for offering such classes, in which case our
  business and operations could be materially and adversely affected . . . .*

  ***if we fail to comply with the applicable legal requirements*** concerning obtaining
  and maintaining applicable licenses and permits and fulfilling applicable
  registration and filing requirements to operate our after-school tutoring business,
  including any failure to cure non compliances in a timely manner, we may be
  subject to fines, confiscation of the gains derived from our noncompliant operations

---

[15] Defendants attached to their motion to dismiss a chart of every alleged misstatement in the Plaintiff's
Amended Complaint. Ex 1. to Def's Mot., ECF No. 68-1.
[16] All italicized and bolded texts are as filed in the Amended Complaint.

or the suspension of our noncompliant operations, which may materially and adversely affect our business and results of operations. AC ¶ 165.

- July 28, 2018 Earnings Call
  Defendant Luo stated: TAL is "***fully cooperating with the government directions***, and ***where needed, [will] make adjustments to our business operations accordingly.***" Defendant Luo also stated that the reform policy will "***be very positive*** for the quality and diversity of off-line school tutoring services," "***the direction is -- the regulations will help the online education to be more healthy***" and "***we proactively follow the government regulations and do the adjustments ourselves.***" Defendant Luo further stated: "[T]he regulations will help the online education to be more healthy . . . So we, as a company, is just follow their – and we are going to follow the government regulation requirements if they have in the future. And even before that, we, as a company, also we are operating our own business in a very disciplined way." *Id*. ¶ 167.

- January 24, 2019 Earnings Call
  During the call, Defendant Luo again claimed that TAL was following Chinese law regarding the tutoring industry and adjusting its business practices accordingly:

  As you know, the education industry, including after-school tutoring market is currently in the midst of ongoing education reforms, standardizations and regulations. All these policies are aimed at further improving overall standards and the ecosystem of the entire industry. ***We are following government directions***, ***and where needed, we will continue to make adjustments into our business operations accordingly***.

  Later in the call, Thomas Chong, an analyst with Credit Suisse AG, asked: "Can management give us some update about the off-line and online regulations…." Defendant Luo responded that the government policies were good for TAL's business, as they had "***greatly improved the service standard of the whole industry***." Defendant Luo further added: "***[W]e fully agree with all the policies and try to execute the policies in our operations as much as we can***." Defendant Luo then stated:

  ***[W]e try our best to be compliant with all the government kind of policies***. And ***we believe all of these policies, at the end, their purpose is not to try to kill the industry,*** their purpose is try to protect the rights of parents and give more right of choices back to the parents, which also can protect the whole industry and will be beneficial to all the compliant companies in the long run. ***And besides what you have seen, off-line regulation policies, and we have disclosed and make you very open to all of you guys in the past earning calls. Id.*** ¶ 170.

- January 24, 2019 Earnings Call
  Defendant Luo added during the January 24 earnings call that "***we welcome all the regulations, policies in online environments***." Defendant Luo further reassured

investors that "*[i]f any new policy [comes] out, we definitely will become the first compan[y] who will go and implement all the policies in place*." During the same call, Defendant He stated: "*we are pacing our off-line capacity growth as we continue to invest in new technology and online business to ensure we are following the new standards and regulations that are currently being implemented.*" Finally, Defendant Luo stated: "And we will continue to follow all of government policies and regulations to make sure the new learning centers we enter is compliant with the government requirements." *Id*. ¶ 172.

- April 25, 2019 Earnings Call
  During the call, Defendant Luo stated that the robust student enrollment growth was "mostly driven by the growth in online enrollments of Xueersi Peiyou small class." Further, in regard to the education regulations, defendant Luo stated that "*we continue to invest in new technology and online business to keep improving our overall operational efficiency and ensure we are following the new standards and regulations that are currently being implemented*" and "*[w]e have followed the government directions*, *and where needed, we'll continue to adjust our business operations accordingly.*" Defendant Luo spoke favorably of the government regulations, stating that "*[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry.*" *Id*. ¶ 174.

- July 15, 2019 Earnings Call
  During the call, Defendant Luo continued to assure investors and analysts: "*We will follow the government [] directions in education reforms, standardizations and regulation. Where needed, we will adjust our business operations accordingly*. All these policies are aimed at elevating the standards and improving the entire education – the whole industry, *which is the long-term benefit of peer customers and shareholders alike*." *Id*. ¶ 177.

- October 24, 2019 Earnings Call
  [D]uring an earnings call, in regard to the government policies and regulations, Defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made "*[t]he pressure of being compliant . . . bigger than before.*" Yet, Defendant Luo asserted that "*the policies were a good timing for us to review our business models and be more cautious*," so TAL "*can be more compliant than before*." With respect to off-line centers, he stated: "*we will still be very cautious with the approval policy as first priority to make sure all off-line centers can be more compliant.*" *Id*. ¶ 179.

- October 24, 2019 Earnings Call
  Sheng Zhong, an analyst with Morgan Stanley's research division asked Defendant Luo for an update on how the government's regulations would impact off-line and online segments of TAL's business. With respect to off-line regulations, Defendant Luo stated: "compared to 1 or 2 years ago, we're making better than before."

19

Defendant He answered the analyst's question as it pertained to the online regulations:

As one of the leading online education pioneers, *we are very happy to see and even welcome the online education regulations as always, and we will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services.* And we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students, especially the kids who are based in lower-tier geographic areas.

And finally, *I'd like to emphasize again that we welcome and fully support all these regulations and policies*, which will have improved the standards and services of the industry and further strengthen the overall industry environment. Defendant He later stated: "we invest in new technology and online business to further improve our operational efficiency and *closely follow all the standards and regulations*." She also referred to a document released in September 2019 by the China Ministry of Education, along with ten other related departments, regarding general guidance relating to the online education industry in China. Defendant He stated that "*we are very happy to see and even welcome the online education regulations* . . . and . . . will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services." Defendant He added: "*we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students*" and "*we welcome and fully support all these regulations and policies, which will have improved the standards and services of the industry and further strengthen the overall industry environment*." *Id*. ¶ 181.

- <u>June 30, 2020 Form F-20</u>
  In the Form 20-F, Defendants Zhang and Luo certified pursuant to the SOX that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id*. ¶ 183.

- <u>June 30, 2020 Form F-20</u>
  The 2020 Form 20-F included the Company's annual financial results, and described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's "reputation and brand have also greatly facilitated our student recruitment" and that TAL *"adapted our operations" to comply with existing governmental regulations and "been making efforts to ensure compliance with these regulations and implementation rules."* TAL also explained how on February 13. 2018, the MOE and three other government authorities made changes

to academic competitions which may impact the demand for their after-school tutoring business and personalized premium service and stated: "*We have adapted our operations which may be construed as competitions or ranking activities to these regulations.*" *Id*. ¶ 185.

- June 30, 2020 Form F-20
  The 2020 Form 20-F further explained that under the regime of the Law on the Promotion of Private Education of China, the PRC government authorities had promulgated a number of regulations and implementation rules in 2018 governing the education industry and the after-school tutoring service market, including the Circular 3, the State Council Opinions 80, as well as Circular 10. TAL stated that these new regulations and implementation rules provide a series of requirements in the operation of after-school tutoring business and that TAL has "*been making efforts to ensure compliance with these regulations and implementation rules.*"

  Further, the 2020 Form 20-F explained that the MOE, jointly with certain other PRC government authorities, promulgated the Implementation Opinions on Regulating Online After-School Tutoring, or the Online After-School Tutoring Opinions, effective on July 12, 2019. The Online After-School Tutoring Opinions also imposed a series of new regulatory requirements which TAL stated: "*We are making efforts to comply with*...." *Id*. ¶¶ 187-188.

- January 1, 2021 Earnings Call
  During the call, defendant Luo asserted that TAL "*[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations, including those that regard national public health.*" Defendant Luo further committed to "*investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences.*" He further stated: "we will consistently pursue our long-term strategy regardless of what kind of the *short-term challenges we are facing*. To the end, we will keep investing in technology, teachers and marketing and make every effort to build all-around online services with *top-quality content and customer experiences*. We firmly believe that as an education player, education is education. Our long-term accomplishment is defined only by the quality of our products, services and technology instead of purely marketing." *Id*. ¶ 189.

- April 21, 2021 Earnings Call
  Defendant Luo claimed: "Our view is very clear, is we will comply with government guidelines and follow their requirements to do the off-line learning centers." He further added: "*And looking forward, when the new policy is out, and we'll definitely follow the policies to make the necessary adjustments cause in view of the known. Based on what we see today, we are pretty much on track.*" *Id*. ¶ 190.

- April 22, 2021 Earnings Call
  Defendant He stated: "[W]e have conditionally rented some Peiyou small class learning centers and expect to add a few more and close down some learning centers

based on standard operations. ***We will closely follow up with government guidelines*** . . ." *Id*. ¶ 192.

- October 25, 2018 Earnings Call
  Defendant Luo provided an update on TAL's promotional and marketing efforts for the second quarter:

  You probably have seen in Q2, our sales and marketing has been more than $150 million. Compared to the previous year's, it grew by more than $100 million. Most of that actually was spending on online marketing. And as a result, the online marketing in Q2, we have – especially in online-Xueersi online school-we have 2.4 million enrollments. And let me give some split of this 2.4 million enrollments. The 2.4 million enrollments, including almost 0.5 million that is regular class, with normal price and normal terms. Last year, this number is lower than 160,000, ***so they grow more than 200%***. *Id*. ¶ 194.

- January 21, 2021 Earnings Call
  During the call, Defendant Luo stated: "[W]e always put the managing healthy growth and students and the parents in first priority instead of purely marketing." *Id*. ¶ 196.

- April 22, 2021 Earnings Call
  D.S. Kim, an analyst with JP Morgan Chase & Co. asked Defendants about TAL's compliance with marketing regulations. Defendant Luo claimed, "***very clearly, we comply with the guidelines. We made necessary adjustments.***" *Id*. ¶ 198.

- April 28, 2020 Earnings Call
  Defendant Luo stated: "So the pricing strategy of online will serve our purpose to getting more market share, to serve more people and to make people more satisfy." Defendant Luo further stated: "I think on one side, we tailored price a little bit up, but on the other side, we also give promotions in the coupons and kind of an incentive for the parents and students if they can finish the work." *Id*. ¶ 200

- October 25, 2018 Earnings Call
  Mark Li, an analyst with Citigroup Inc., Research Division, asked Defendant Luo about the advanced tuition payment regulation, stating: "I want to know about the regulation of no more than 3 months of getting the fees." Defendant Luo replied:

  I think we as the top players in this industry, ***we are definitely to comply with the government policies. We're in the process to implement the 3-month policies across our business units.*** For example, the Xueersi Peiyou small class. Their retention period will start from late October, maybe this week and next week, to early December. So we will change our system to fit in the 3-months policy, with no doubt. We will follow the government policy to do this.

And for the Xueersi one-on-on – for Zhikang one-one-one [sic], ***yes we will also adopt this one-on-one policy – this 3-month policies.*** But because for the one-on-one, actually, most of their students, actually, coming up from our small class. ***So we don't foresee a material impact on maybe difference or change to my business due to the change of the 3-month policy. We don't see any material impact on them . . . .***
But again, I think the 3-month policy is very good policy because it gives more right back to the parents. . . .

***So we are also quite confident to this 3-month policy to give more rights back to the parents. And we believe that's the right way and that's the right policy to help improve the quality of the whole industry.*** *Id*. ¶ 202

- January 24, 2019 Earnings Call
  During the call, Yuzhong Gao, an analyst with CICC asked Defendants: "how much of your deferred revenue has been impacted by the new tuition collection policy?" Defendant He replied:

  And for your question, yes, according to the regulations issued last year in August, parents cannot be billed for more than 3 months. It does have impact on our deferred revenue and cash flow. ***Since the policy has been issued, we have followed the government's requirement to make necessary adjustment of our tuition fee charging policies if needed.*** This particular policy actually gives a right of choice back to the parents, ***which we believe is a right and good practice to protect the parents' rights and interest*** and, as I just mentioned, helps to improve the overall industry environment. . . .

  And in terms of the pro forma, we charge tuition fee based on the spring, summer, autumn and winter semesters.

  Defendant He then reemphasized: "in the long run, ***we still believe with all the regulations in place, which aim to protect the parents' rights and which aim to improve the service level or service quality of the whole industry, we -- the compliant companies in the long run will be beneficial"*** and ***"[w]e need to follow the new rule, new policies within this environment.*** *Id*. ¶¶ 204–05.

- October 25, 2018 Earnings Call
  During the call, Yue Wu, an analyst with China International Capital Corporation Limited, asked Defendant Luo about teachers' licenses and in particular, whether the teacher licensing exam affects TAL's next quarter guidance and expansion. Defendant Luo replied:

  I think because ***we have put the teacher license as a very high priority in the past few years, so in this industry***, the percentage of our teachers who have license is higher than the industry average. And based on the government's policy, this year, most of – almost all, but most of our teachers who don't have license, they have

registered exams in November, which will happen after 1 or 2 weeks. ***So we will continue to follow company's – government's policy to make sure all of our teachers can be compliant.*** And we don't see a material impact from teaching license in the short term, especially for the next quarter. *Id.* ¶ 207.

- January 24, 2019 Earnings Call
  During the call, Thomas Chong, an analyst with Credit Suisse AG's research division, asked Defendant Luo for an update regarding teachers' passing rates on exams. Defendant Luo responded: "[W]e will continue to encourage our teachers, who don't have license, to go and apply for the new teacher exams and try to get teacher license by the end of the exams. We continue to encourage all of them to do so." *Id.* ¶ 207.

- April 28, 2020 Earnings Call
  Defendant Luo stated: "***The teaching quality is always the key and the first priority, no matters for off-line business or online business.***" *Id.* ¶ 211.

- June 30, 2020 Earning Call[17]
  Defendant He added: "***For the people-intensive products, the service is very important. So we need to make sure we do right training to the teachers and teacher assistants.*** We give them good compensation to make sure ***we also encourage all of teacher and teacher assistants to serve the students better. I think the necessary investments in the teacher and the teacher assistants are very necessary***." *Id.* ¶ 213.

According to the AC, the second set of alleged misstatements are related to "the drivers behind TAL's 'healthy' and 'stable' student enrollment growth." *See* AC ¶ 215–274.

- April 26, 2019 Form 6-K
  On April 26, 2018, the first day of the Class Period, TAL issued a release attached to a Form 6-K filed with the SEC, signed by Defendant Luo, which announced the Company's financial results for the fourth quarter and fiscal year 2018 ended February 28, 2018.6 The release stated that the Company had achieved total net revenue for the quarter of $504.1 million, a 59.4% year-over-year increase. The release also stated that during the quarter total student enrollment had increased 95.7% year-over-year, to approximately 2.6 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $1.7 billion, a 64.4% year-over-year increase. In the release, Defendant Luo attributed TAL's favorable results to "***rapid enrollment growth and all-around structural improvement in our business***." *Id.* ¶ 217.

---

[17] In their Chart, Defendants state that the accurate date is January 21, 2021. ECF No. 68-1 at 9.

- April 26, 2019 Earnings Call
  During the call, Defendant Luo echoed what was said in TAL's press release filed earlier that day: "Our fourth quarter revenue growth was driven by stable demand in all cities and a rapid growth of our online courses. Revenue growth in the fourth quarter was 59.4% in U.S. dollars [] to $504.1 million. Student enrollments increased by 95.7% year-over-year, mostly driven by the growth in online enrollments." During the same call, Defendant Luo continued: "Our revenue growth in the full fiscal year 2018 was ***supported by higher-than-average enrollments, and supported by the well-paced expansion of small classroom capacity in our spreading geography network***." *Id*. ¶ 218.

- June 26, 2018 Form 20-F
  The 2018 Form 20-F was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo. The 2018 Form 20-F included the Company's annual financial results detailed above. In addition, the 2018 Form 20-F described TAL's marketing and recruitment strategies which includes word-of-mouth referrals, adding that ***"[o]ur reputation and brand have also greatly facilitated our student recruitment."*** Further, the 2018 Form 20-F stated that TAL was "***in the process of adapting [its] operations" and "taking corrective measures***" to ensure compliance with the February 2018 regulations. *Id*. ¶ 220

- July 26, 2018 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $550.6 million, a 71.1% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 88.7% year-over-year, to approximately two million students. In the release, Defendant Luo stated that "the first quarter's financial and operational results reflect the steady growth of our offline and online business revenue and enrollments." Defendant Luo added that ***"we remain committed to a healthy and sustainable overall business development."*** *Id*. ¶ 222

- July 26, 2018 Earnings Call
  Defendant Luo stated: "Our first quarter revenue growth was driven by a ***stable demand*** in the cities we currently cover and a contribution from our online courses. Revenue growth in the first quarter was 71.1% in U.S. dollars and to USD 550.6 million and 57.1 in RMB terms. Student enrollment increased by 88.7% year-over-year, mostly driven by the growth in the online enrollments as well as Peiyou small class." Later in the call, Defendant Luo added: "We continue to pursue a ***healthy growth*** in Peiyou small class and other off-line tutoring services . . ." *Id*. ¶ 223.

- October 25, 2018 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $699.8 million, a 53.5% year-over-year increase. The release also stated that during the quarter total student enrollment increased by 120.2% year-over-year, to approximately 4.9 million students. In the release, Defendant Luo stated that

"revenue and enrollments grew steadily" due to "***stable online and offline business performance***." Defendant Luo added: "Looking ahead, ***we will continue to enhance product quality and customer satisfaction, and further our contribution to the healthy and sustainable development of the education sector***." *Id*. ¶ 225.

- October 25, 2018 Earnings Call
  Defendant Luo hosted the call and began by stating: "Our second quarter revenue growth was ***based on stable demand in the cities we currently cover and a contribution from our online courses***." Defendant Luo further stated that the 120.2% year-over-year student enrollment growth was "***mostly driven by the growth in online enrollments as well as Xueersi Peiyou small class.***" Defendant Luo further stated: "We continue to pursue a healthy growth in Peiyou small class and other off-line tutoring services and further expand our learning center networks at pace." *Id*. ¶ 226.

- January 24, 2019 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $586 million, a 35.3% year-over-year increase. The release also stated that during the quarter total student enrollment had increased by 68.4% year-over-year, to approximately 2.6 million students. In the release, Defendant Luo stated: "Our third quarter revenue performance was based on ***healthy growth*** of small class business and the continued scaling of our online courses." Defendant Luo added that "our overall financial and business performance have further improved ***due to our ongoing efforts to upgrade operational utilization and efficiency."*** *Id*. ¶ 228.

- January 24, 2019 Earnings Call
  Defendant Luo reiterated that TAL's "third quarter revenue performance was based on ***healthy growth*** of small class business in the cities we currently cover and scaling of our online courses." Defendant He then made the following statements regarding TAL's business growth:

  - "Student enrollments increased by 68.4% year-over-year, mostly driven by the growth in the online enrollments as well as Xueersi Peiyou small class."
  - "The ***healthy pace*** of fiscal third quarter revenue growth was driven by the demand for the various education services in the cities we currently cover."
  - "Net revenue from Xueersi Peiyou small class was up by 23% in U.S. dollar terms and 29% in RMB terms, while enrollment increased by 29% year-over-year***. This growth rate reflects stable growth*** in both Peiyou off-line and online class." "***This growth momentum is supported by broad market demand*** across all cities and ***incremental ramp-up of enrollments*** from our earlier classroom expansion. We make ongoing efforts to expand our course offerings. Chinese and English courses continue to grow at a solid pace. Furthermore, during the quarter, we opened 4 new Mobby centers to reach a total of 16 Mobby centers. ***The healthy expansion of Mobby reflects the young parents' keen interest in early childhood activities that combine fun learning with competency building***."

Finally, during the same call, Defendant Luo stated: "Most of our revenue still is contributed by our ***organic growth*** . . . We strong believe most growth – ***we need to drive most growth through our organic drivers, not from the other company***." *Id*. ¶¶ 229-230.

- January 24, 2019 Earnings Call
  Defendants also discussed the positive impact the Company's marketing efforts had on student enrollment. In particular, Yuzhong Gao, an analyst with CICC, asked about TAL's online promotion plan for the summer of 2019. Defendant Luo stated: "This year, we run the marketing promotions. We use RMB 50 classes and some more classes to do that, and we're investing in online marketing channel, including WeChat channels, Baidu channels, Toutiao channels and other channels to attract new students." *Id*. ¶ 232.

- April 25, 2019 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $726.6 million, a 44.1% year-over-year increase. The release also stated that during the quarter total student enrollment had increased by 71.2% year-over-year, to approximately 4.5 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $2.6 billion, a 49.4% year-over-year increase. In the release, Defendant Luo stated: "Our overall education program is proceeding as planned with ***a healthily paced growth*** in online business and measured capacity expansion in our learning center and geographic network." *Id*. ¶ 234.

- April 25, 2019 Earnings Call
  Defendant Luo began the call by highlighting TAL's growing revenues for that quarter:

  Our fourth quarter revenue performance was based on ***healthy growth*** of small class business in the cities we currently cover and the scaling of our online courses. Net revenue growth in the fourth quarter was 44.1% year over year in U.S. dollar term to USD $726.6 million and 52.2% in RMB terms. Student enrollment increased by 71.2% year over year, mostly driven by the growth in online enrollments of Xueersi Peiyou small class.

  Defendant He elaborated on the reasons for TAL's growing revenues, stating the following:

  - "Fiscal fourth quarter revenue was based on ***steady growth momentum*** in the various education services of our tutoring business."
  - "Net revenue from Xueersi Peiyou small class was up by 29% in U.S. dollar terms and 37% in RMB terms, while enrollment increased by 45% year over year. ***This growth rate reflects the stable growth in both Peiyou offline/online class***."

27

- "the Peiyou offline small class revenue increased by 25% in U.S. dollar terms and 32% in RMB terms, while enrollments increased by 18% year over year."
- "Peiyou offline normal priced courses revenue increased by 33% in RMB terms, while enrollments increased by 21% year over year."
- "Revenue generated from cities other than the top 5 grew by 34% in U.S. dollar terms, and the other cities accounted for the remaining 42% of the Xueersi Peiyou small class business*. **This growth momentum is supported by broad market demand across all cities, incremental ramp-up of enrollment from our earlier classroom expansion, as well as our ongoing operational efficiency improvement."***
- Fourth quarter revenue from xueersi.com grew by 187% in U.S. dollar terms year over year and 204% in RMB terms, while enrollments grew by 146% year over year to over 1.7 million . . . . The rapid scaling of online courses was ***mainly driven by sales and the marketing online customer acquisition efforts for the winter term promotion, retentions of the previous quarters as well as the ongoing momentum in demand for online education*.***"

Later in the call, Echo Yan, TAL's Head of Investment Relations, continued to discuss the Company's various business successes. Defendant Luo followed with: "These business results reflect ***solid online business growth, healthy development*** of our offline business, as well as the ongoing efforts we have made in the ***transition for only running one business model to multiple-pronged education service model,*** including online and other ***diversified education programs and the projects during the fiscal year 2019***."

During the same call, Goldman Sachs analyst Christine Cho asked Defendants how low user acquisition costs were achieved and whether such low costs would be sustainable. Defendant Luo explained that TAL uses branding channels as a beneficial way for the Company to gain customers while keeping customer acquisition costs down, stating: "The parents know us and know our name and trust our brand, so ***they come to our Xueersi online school automatically***. So ***we don't have to pay that much in the branding channels***. And we also doubly encourage the parents' referrals. So our current – so ***we try to leverage our word-of-mouth marketing and the branding and the reputations to make sure we can attract more students from branding channels***. *Id.* ¶¶ 235-238

- May 16, 2019 Form F-20
  The 2019 Form 20-F described TAL's marketing and recruitment strategies, stating that the Company's ***"reputation and brand have also greatly facilitated our student recruitment."*** Further, the 2019 Form 20-F stated that TAL had successfully "***adapted [its] operations" to comply with the February 2018 regulations,"*** but that ***"[it] cannot assure you whether relevant governmental authorities will find [its] operations in violation of such regulations."*** The Form 20-F assured investors that ***"[w]e have been making efforts to ensure compliance with these regulations and implementation rules but there is no assurance that***

*our operations comply with all applicable regulations in a timely manner due to various factors beyond our control.*" *Id*. ¶ 240.

- July 25, 2019 Press Release
  The release stated that the Company had achieved total net revenue of $702.8 million for the quarter, a 27.6% year-over-year increase and that during the quarter total student enrollments of normal priced long-term courses had increased by 40.6% year-over-year, to approximately 1.7 million students. In the release, Defendant Luo stated that the favorable results "'reflected the success of our consistent growth strategy" and that "'[l]ooking ahead, our long-term development strategy remains unchanged . . . [while at the same time TAL] will continuously *invest in new technology and other initiatives to accelerate our online business development* and realize the promising potential of online education.'" *Id*. ¶ 242.

- July 25, 2019 Earnings Call
  During the call, Defendant Luo asserted that TAL's "first quarter revenue performance was based on *healthy growth* of small class business in the cities we currently cover and the *scaling of our online courses*." Defendant He echoed this, stating: "Fiscal quarter revenue was based on *steady growth momentum* in the various education services of our tutoring business." Defendant He further stated: "This growth rate reflects the *stable growth* in both Xueeri Peiyou offline/online class" and "[t]his *growth momentum is supported by broad market demand* across all cities. Incremental ramp-up of enrollments from our earlier classroom expansion as well as our ongoing efforts to improve operational efficiency."

  244. Defendant He then discussed Zhikang, TAL's one-on-one business, noting: "As always, we pursue well-paced offline capacity growth, and at the same time, *investment in new technology and online business* to continue to improve overall operational efficiency and closely follow all the standards and regulations." Defendant He then discussed TAL's online business operations, stating: "First quarter revenue from xueersi.com grew by 108% in U.S. dollar terms year-over-year" and this "*rapid growth in online business was supported by a dedicated sales and marketing efforts, retention of the previous quarters, as well as the rising demand for online education*." *Id*. ¶¶ 243-44

- October 24, 2019 Press Release
  The release stated that the Company had achieved total net revenue of $936.6 million for the quarter, a 33.8% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 54.5% year-over-year, to approximately 3.4 million students. In the release, Defendant Luo stated that the results were "'based on the *healthy and broadly distributed growth o*f our overall small class business across the cities we currently cover and the continued scaling of our online courses.'" *Id*. ¶ 246.

- October 24, 2019 Earnings Call
  During the call, Defendant Luo stated that TAL's second quarter revenue performance "***was based on the robust and healthy growth of our overall small class business in the cities we currently cover and the continuous scaling of our online courses***." Defendant He elaborated on TAL's business and revenue growth making the following statements:
    - "The drivers of this widely spread growth are solid market demand across all cities, incremental ramp-up of enrollments from our earlier classroom expansion as well as our ongoing efforts to improve operational efficiency."
    - "The rapid growth in online business was supported by dedicated sales and marketing efforts, retentions of the previous quarters as well as the growing demand for online education."

  Later in the call, Defendant Luo issued the following false statements regarding TAL's growing business:

    - "As an education product and service provider, we will never just go after a high-revenue growth base only, but more importantly, the fast growth rate should be achieved in a healthy and sustainable way . . .. We will continuously invest to innovate our products and operational efficiency with ***full attention to the necessary details.***"
    - "More importantly, the growth rate must be achieved in a ***healthy and sustainable way, healthy and sustainable way***."
    - "[W]e'll continue to leverage the online offer to attract more students, get more market share, have more enrollment. And at the same time, we'll continue to [improve] the product quality and the product experiences and the satisfaction from students and the parents as the key for everything, especially in education sectors."
    - "So we will make sure both online and off-line growth can be in a ***healthy and sustainable way. That's our key priority***."
    - "But again, we don't think promotion, marketing money is the only way to grow a business. ***The key of growing our business is still go back to the product, go back to operational efficiency***, go back to do a lot of detail in your dirty works." *Id*. ¶¶ 247-48

- January 21, 2020 Press Release
  The release stated that the Company had achieved total net revenue of $862.4 million for the quarter, a 47.2% year-over-year increase. The release also stated that, during the quarter, total student enrollment of normal priced long-term courses had increased by 66% year-over-year, to approximately 2.3 million students. In the release, Defendant Luo stated that the results "'reflect the progress in our efforts to build ***a healthy and sustainable business model***.'" Defendant Luo also stated that "'[w]e expect growth momentum of our overall business to continue.'" *Id*. ¶ 250.

- January 21, 2020 Earnings Call
  During the call, Defendant Luo made the following false and misleading statements regarding TAL's growing revenues and student enrollments:

  - "Our third quarter revenue performance was ***based on solid growth momentum of both our overall small class business in the cities we currently cover and the continued scaling of our online courses***."
  - "This quarter's results ***reflect the progress in our efforts to build a healthy and sustainable business model based on our product development, technology, customer satisfaction and operational efficiencies***."
  - "This outspread growth is ***based on solid market demand across our cities, incremental ramp-up of enrollments from our earlier classroom expansion, faster growth of Peiyou online courses as well as our ongoing efforts to improve operational efficiency***."
  - "The rapid growth in online business was ***supported by seasonality-driven sales and marketing efforts, retentions of the previous quarters as well as the secular demand for online education***."
  - "The growth dynamic of our business and our operational efficiency efforts have made positive contributions and will continue to do so to help balance our growth and profitability as well."
  - TAL "can further leverage our off-line and online advantages . . . [to enable TAL] to build ***an education services model which is demand-driven and sustainable for the long term***." *Id*. ¶ 251.
  -

- January 21, 2020 Earnings Call
  Zhangxiang Liu, an analyst with China Renaissance Securities (US) Inc. asked Defendants: "What are the major drivers for [Peiyou's] notable off-line enrollments acceleration?" Defendant Luo responded: "[W]e're adding more classrooms," "we improved a little bit in our key operational KPIs, including the refund rate, retention rate and the seats fulfillment rate," and "we try to manage and improve our operational efficiencies in the Peiyou small class every day." Liu then asked: "What's the sort of the growth strategy we are seeing in the lower tier cities in the coming fiscal year?" Defendant Luo responded that "***this kind of accelerations is because we leveraged the power of dual-teacher model and the power of technology***." *Id*. ¶ 252.

- January 21, 2020 Earnings Call
  Defendant He made the following materially false and misleading statements regarding TAL's third quarter FY 2020 increased revenues and growing business:

  - "Fiscal third quarter revenue was based on ***solid growth momentum in the various education services of our tutoring business***."
  - Alongside any expansion effort, we invest in new technology and online business to improve overall operational efficiency and ***abide by the standards and regulations***."
  - "***We do not pursue growth for growth's sake***."

31

- "The new customer acquisitions or some kind of the marketing channels, promotions, that's not the most important features which we are different from the other one. ***We care more of teaching quality and the students***." *Id*. ¶ 254.

- April 28, 2020 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $857.7 million, an 18% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 56.6% year-over-year, to approximately 4.6 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $3.3 billion, a 27.7% year-over-year increase. Finally, TAL continued to make misrepresentations when attesting that: "[o]ther than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 29, 2020 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions." *Id*. ¶ 256.

- April 28, 2020 Earnings Call
  Defendant Luo discussed an instance of wrongdoing on the part of one of TAL's employees which the Company announced in a Form 6-K filing on April 7, 2020. As a result of the employee's wrongdoing, TAL's financial metrics were artificially inflated; in particular, its revenue for the first three quarters of fiscal year 2020 was inflated by $86.1 million USD. In discussing this incident, Defendant Luo assured investors and analysts: "I would like to reiterate that ***we will always follow the highest standards of corporate governance and always have 0 tolerance for any illegal conduct.***" *Id*. ¶ 257.

- April 28, 2020 Earnings Call
  Zhangxiang Liu, an analyst with China Renaissance Securities (US) Inc., asked about Xueersi.com's market position and whether TAL considered it important to be the first player in the online education market. Defendant Luo replied: "[W]e don't have any kind of intention to say, we need to maintain #1 in this market. Because #1, when you say #1 means the size, the volume. But what ***we care more is the quality*** . . . being bigger is not our priority***, being stronger and being more competitive and being better to the students and the parents, that's our key priority***. *Id*. ¶ 259.

- April 28, 2020 Earnings Call
  Defendant He elaborated on TAL's financial results for the fourth quarter of FY 2020, noting that: "Net revenue from Xueersi Peiyou small class was up by 6% in U.S. dollar terms and 8% in RMB terms while our normal priced long-term course enrollment increased by 37% year-over-year." Defendant He further stated: "The rapid growth in online business was ***supported by the current circumstances***

*driving the secular demand for online education as well as sales and marketing efforts and retentions of the previous quarters*." *Id*. ¶ 261.

- July 30, 2020 Press Release
  The release stated that the Company had achieved total net revenue of $910.7 million for the quarter, a 35.2% year-over-year increase. The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 72.1% year-over-year, to approximately 2.96 million students. In the release, Defendant Luo stated that "'[t]he first fiscal quarter revenue results were driven by solid performance of online courses and the *healthy growth* of Xueersi Peiyou business.'" *Id*. ¶ 263.

- July 30, 2020 Earning Call
  During the call, Defendants continued to tout the Company's growing revenues with Defendant Luo stating: "Net revenue growth in the first quarter was 35.2% year-over-year." Defendant He later added: "Our first quarter performance reflected stable growth of small class business across our cities." *Id*. ¶ 264.

- October 22, 2020 Press Release
  The release stated that the Company had achieved total net revenue of $1.1 billion for the quarter, a 20.8% year-over-year increase. The release also stated that during the quarter total enrollments of normal priced long-term courses had increased by 65% year-over-year, to approximately 5.6 million students. *Id*. ¶ 266.

- October 22, 2020 Earnings Call
  Defendant He stated: "In line with our longstanding approach, *we will continue to pursue healthy and sustainable learning center network expansion by following government guidelines and market demand."* Defendant Luo stated that TAL would continue to enlarge its online market share "*by continued investment in technology, teacher supply chain and marketing and consistent hard work of building all-around online services with superior customer experiences*."

  Defendant Luo stated that in order to maintain its leading position in the online sector, TAL will "keep our investment in technology, in teacher supply chain . . . as well as marketing." During the same earnings call, Defendant He similarly stated that "[t]he growth in online business was supported by . . . [a number of factors including] sales and marketing efforts." Defendant Luo explained: "*Education, in the end, is now a simple game of marketing. That is a game -- that is -- the key to playing education is we need to focus to providing the high-quality service to students. We need to put students in the first priority.* We need to not only taking care of the efficiency of the marketing, but also taking care of effectiveness of the students." *Id*. ¶ 267.

- January 21, 2021 Form 6-K
  The release stated that "Net revenues increased by 35.0% year-over-year to US $1,119.1 million from US $829.0 million in the same period of the prior year." The

release further stated that "total student enrollments of normal priced long-term course increased by 46.5% year-over-year to approximately 3.4 million students." *Id*. ¶ 270.

- January 21, 2021 Earnings Call
  That same day, TAL held an earnings call hosted by Defendants Luo and He. During the call, Defendant He discussed TAL's developing business and increased enrollments, stating: "we reaccelerated the widening of our learning center network in the third quarter, based on a ***healthy and sustainable approach***, and by ***following government guidelines and market demand***." *Id*. ¶ 271.

- April 22, 2021 Earnings Call
  During the call, D.S. Kim, an analyst with JPMorgan Chase & Co., asked Defendants: "But in an unlikely scenario of government limiting advertisements significantly, what do you think will be the sustainable growth rate for xueersi.com or online tutoring industry as a whole in a less-advertisement or no-advertisement environment?" Defendant Luo responded: "***We prefer we teach the students well and we make people satisfied and we drive our growth through our high-quality services. That's the typical way we drive up growth***." Defendant He further stated: "The growth in online business was ***supported by increasing demand of online education as well as sales and marketing efforts and retentions of the previous quarters***." Defendant He later stated that TAL's fourth quarter revenues for FY 2021 were "supported by increasing demand for online education as well as sales and marketing efforts and retentions of the previous quarters." Further, Defendant Luo stated that TAL's online business performed better than expected in part, because they "spent a fair amount of the marketing dollars to drive the growth." *Id*. ¶ 273.

According to the AC, the third set of alleged misstatements are related to "the Government's heightened regulations governing the private tutoring industry" and the Government's "concerted campaign to shut down" this industry. *See* AC ¶ 275-298.

- April 22, 2021 Press Release
  The release stated that the Company had achieved total net revenue for the quarter of $1.4 billion, a 58.9% year-over-year increase. The release also stated that during the quarter total student enrollment of normal priced long-term courses had increased by 44% year-over-year, to approximately 6.7 million students. For the fiscal year, the release stated that the Company had achieved total net revenue of $4.5 billion, a 37.3% year-over-year increase. The release further stated that TAL was on track to achieve revenues of "between [$1.30] million and [$1.32] million, representing an increase of 43% to 45% on a year-over-year basis," during the first fiscal quarter of 2022. In the release, Defendant Luo attributed TAL's strong annual revenue growth to TAL's "'strength in both offline and online education capabilities.'"

Defendant Luo added: *'"Looking ahead, we will keep investing in the quality of our products, service and technology as well as in sustainable marketing efforts."' Id.* ¶ 282.

- April 22, 2021 Earnings Call
  During the call, Defendant Luo stated that TAL's "tutoring business, both online and off-line, as well as [its] capacity expansion in all cities developed as planned" in the quarter. Defendant Luo added that TAL "*will continuously follow up with the government guidelines for the industry . . . as well as keep investing in the quality of [its] products, services, teachers' training and technologies, supported by sustainable marketing efforts.*" Later in the call, Defendant Luo reiterated that "*we as a company, we will follow the government guidelines*" and that "*if the policy is clear, we will definitely comply with the policies to make necessary adjustments.*" *Id.* ¶ 283.

- May 7, 2021 Form 20-F
  TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." . . . TAL stated: "*We have adapted our operations which may be construed as competitions or ranking activities to these regulations. We cannot assure you whether relevant governmental authorities will find our operations in violation of such regulations.*" TAL also referenced the State Council Opinion 80 and Circular 10 that provide a series of requirements in the operation of after-school tutoring business and that they "*have been making efforts to ensure compliance with these regulations and implementation rules."* Id.* ¶ 285.

- May 7, 2021 Form 20-F
  TAL specifically mentioned how the "market price for [its] ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as…" and then listed several factors, **none of which** included information on TAL's longstanding history of regulatory violations, including for releasing misleading advertisements.

  TAL claimed as part of its filing that "[it] [was] not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 28, 2021 that are reasonably likely to have a material adverse effect on [its] net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions." *Id.* ¶¶ 286-87.

- July 26, 2021 Press Release – Form 6-K
  TAL issued a press release attached to a Form 6-K filed with the SEC on July 26, 2021, that same day stating "that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system," but then misleadingly told the public that TAL "**ha[d] not received official notification of the regulations**." *Id.* ¶ 296.

- June 26, 2018 Form 20-F
  Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id*. ¶ 296.

- May 16, 2019 Form 20-F
  In the 2019 Form 20-F, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id*. ¶ 301.

### G.  Post Class Period Developments

On July 30, 2021, TAL announced that it would be cancelling its scheduled earnings release and earnings call in light of the regulatory developments. AC ¶ 327. In October 2021, staff at Xueersi stated that the Company would cease admitting new students and that their online payment channels were closed. *Id*. ¶ 328. On October 13, 2021, the Sixth Tone released an article stating "the payments freeze ensures that the once-vast for-profit tutoring industry will be largely dissolved by the end of the year." *Id*. ¶ 329.  On November 12, 2021, TAL filed a press release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021. *Id*. ¶ 330. TAL further stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods" and that the revenues derived from offering those services for fiscal year end February 28, 2021, "accounted for a substantial majority of the Company's total revenues in the year." *Id*.  Plaintiffs allege that as a result of

Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL

ADSs, Lead Plaintiffs and Class members have suffered significant losses and damages. *Id.* ¶ 331.

## LEGAL STANDARD

### I.     Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

Court must "accept as true all factual statements alleged in the complaint and draw all reasonable

inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed

when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief."

*Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678

(citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff

must allege sufficient facts to show "more than a sheer possibility that a defendant has acted

unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts

that are "'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557.The

Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a

trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*,

754 F.2d 1059, 1067 (2d Cir. 1985).

Although the Court generally should not look outside of the pleadings to decide a motion

to dismiss a complaint, the Court may consider "any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007).

## II.    Motions to Dismiss under Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

### III.   Section 10(b) of the Exchange Act and Rule 10b-5

Plaintiff brings claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, against all Defendants, as well as claims for violations of Section 20(a) against Defendants Zhang, Luo, and He.

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Under Rule 10b-5, promulgated thereunder, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. SEC Rule 10b–5 b "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 204 (S.D.N.Y. 2020) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

To state a private civil claim under Section 10(b) and Rule 10b-5, Plaintiff must prove the following six elements: "'(1) a material misrepresentation or omission by the defendant; (2)

scienter; (3) a connection with the purchase or sale of securities; (4) Plaintiff's reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

### A. Actionable Misstatement or Omission

The first element of a Section 10(b) and Rule 10b–5 securities fraud claim requires an actionable misstatement or omission. "With respect to misstatements, there are two components to this requirement: the statement must be false, and the statement must be material." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571. Neither immaterial false statements nor material true statements are actionable. *Id*.

As to falsity, a violation of Section 10(b) and Rule 10b-5 premised on misstatements "cannot occur unless an alleged material misstatement was false *at the time it was made*." *Id*. at 571. "The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so." *Id*. Omissions are only actionable if a defendant is under a duty to disclose information and fails to do so. *Id*. "Such a duty may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *16 (S.D.N.Y. Mar. 29, 2021) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)).

Additionally, to be actionable under Section 10(b) and Rule 10b-5, "the alleged misstatement or omission must be material." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 572 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a

reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).; *see also Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496 (2d Cir. 2019) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."). This test is objective and looks to the understanding of the "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015).

"Moreover, under the federal securities laws, 'literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 195 (S.D.N.Y. 2022) (quoting *Omnicare*, 575 U.S. at 192. Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44, (quoting 17 C.F.R. 240.10b-5(b)). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

### B. Scienter

To plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *see* 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (quoting *Kalnit v. Eichler*, 264 F.3d

131, 138 (2d Cir. 2001)). Recklessness may also suffice to plead scienter for securities fraud in the Second Circuit. *See ECA*, 553 F.3d at 198.

As mentioned above, to create a strong inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. In determining whether this inference exists, courts consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (citing *ECA*, 553 F.3d at 198). "Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA*, 553 F.3d at 198. "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco*, 559 F. Supp. 3d at 317 (S.D.N.Y. 2021) (quoting *ECA*, 553 F.3d at 198).

### C. Loss Causation

Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4. "To establish loss causation, Plaintiffs must show that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi, S.A. Securities Litigation*, 838 F.3d at 261). "Plaintiffs must allege not only the but-for causation of their losses but also the proximate causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'" *Id.* (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

### IV.    Section 20(a)

Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates Section 10. *See* 15 U.S.C. § 78t(a). To establish a Section 20(a) claim, Plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns.*, 493 F.3d at 108.

### DISCUSSION

Defendants argue that (1) Plaintiffs fail to plead scienter; (2) Plaintiffs fail to plead that any statements were false when made; (3) Plaintiffs' allegation of a breach of Item 5(D) of Form 20-F fails because Plaintiffs have failed to allege conduct sufficiently widespread or ongoing to constitute a "trend" and (4) Plaintiffs fail to plead loss causation.

### I.    Scienter

Defendants argue that (1) Plaintiffs cannot rely on their single confidential witness to plead scienter (2) Plaintiffs cannot rely on the so-called "core operations" doctrine; and (3) Plaintiffs' trading and compensation allegations do not support scienter. *See* Mot. at 11-16. Plaintiffs argue that Defendants had actual knowledge that TAL was flouting rules and regulations to induce student enrollments and increase revenues and that Defendants had actual knowledge that the impending governmental regulations would severely impact TAL's business. *See* Opp. at 6-10.

A "strong inference of fraudulent intent can be established by alleging with sufficient particularity (i) 'that defendants had the motive and opportunity to commit fraud' or (ii) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 848 (S.D.N.Y. 2019) (quoting *ECA*, 553 F.3d at 198).

### A.     Motive and Opportunity

"A strong inference of scienter through 'motive and opportunity' will only be raised where plaintiffs allege that defendants 'benefitted in some concrete and personal way from the purported fraud.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (quoting *ECA.*, 553 F.3d at 198). "The desire for the corporation to maintain the appearance of profitability, keep stock prices high to increase officer compensation, and sustain the success of an investment does not suffice to establish a motive." *In re Plug Power, Inc. Sec. Litig.*, No. 21 CIV. 2004 (ER), 2022 WL 4631892, at *11 (S.D.N.Y. Sept. 29, 2022) (citing *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020) and *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013). Instead, "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.* (citing *Novak*, 216 F.3d at 308).

Here, Plaintiffs allege the Individual Defendants[18] were motivated to issue false statements in order to give themselves the opportunity to sell their common stock at artificially inflated prices. Opp. at 10; AC ¶ 336. In support of this theory, Plaintiffs lay out Defendants' trading records from before and during the Class Period.[19] In total, Plaintiffs allege that eight TAL insiders dumped over 9.5 million shares of stock during the Class Period for proceeds of over $450 million. AC ¶ 336. Plaintiffs also allege that during the two years prior to the Class Period, four of these same Company insiders sold "only 2,987,234 shares of their TAL stock, for proceeds of only $94.6 million." *Id.* ¶ 340.[20] Plaintiffs allege that "the significantly smaller number of pre-Class Period

---

[18] Plaintiffs only refer to Individual Defendants Zhang and Luo along with "other Company insiders" who sold significant amounts of TAL shares during the Class Period.  AC ¶ 336.

[19] Plaintiffs included charts of sales by multiple TAL executive insiders, including Defendants Luo and Zhang (through his company Bright Unison Ltd.) but not Defendant He.

[20] There were no reported sales for four of the eight TAL insiders (Chen Weiru, Excellent New Limited, Liu Yachao, Zhang Kaifu) during this time period. AC ¶ 340.

sales by such a broad swath of Company insiders highlights the suspicious nature of their Class Period insider sales." *Id*. For example, Defendant Luo sold 54,000 shares for nearly $4.3 million on January 27, 2021 immediately after TAL's senior executives allegedly learned of the then-confidential impending July 2021 regulations. *Id*. ¶¶ 36, 298, 336, 342, 352, 354. In total, Defendant Luo sold 457,380 shares realizing $24,654,007 in proceeds during the Class Period. Additionally, Defendant Zhang sold 5,509,553 shares of TAL stock through his company Bright Unison Ltd., realizing proceeds of approximately $215.2 million during the Class Period. *Id*. ¶¶ 30, 184, 336. Plaintiffs allege that in the two years prior to the Class Period (4/26/16 – 4/25/18), Defendant Luo sold 13,634 shares for $775,501 and Defendant Zhang (via Bright Unison Ltd.) sold 2,700,000 shares for $83,457,000. *Id*. ¶ 338.

Plaintiffs additionally allege that the Individual Defendants' motive to issue false statements throughout the Class Period is evidenced by their desire to optimize their bonuses and other available incentives under TAL's compensation system for its executives. AC ¶¶ 343–350. Plaintiffs argue that the lucrative bonuses received by TAL insiders, considered in tandem with their stock sale proceeds of $458 million, further support an inference of scienter. *See* Opp. at 12.

"Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (citing *Rothman*, 220 F.3d at 94). "A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." *Id*. (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). To determine whether trading is unusual or suspicious, a court examines the following factors:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider

defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *13 (citing *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021)); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

"[T]he mere fact that insider stock sales occurred does not suffice;" Plaintiffs must establish that the sales were "unusual or "suspicious." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (quotation omitted). A plaintiff bears the burden of demonstrating that a defendant's stock sales are "unusual." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020).

As for the insider sales, the only Individual Defendants implicated are Luo and Zhang. Defendants point out that Defendant Luo ceased selling more than three months before the first alleged corrective disclosure of May 12, 2021 and that Mr. Zhang's last alleged sale was in late 2019. Mot. at 12–13. Because "the sales took place more than a month prior to the [] corrective disclosures," the Court "decline[s] to find trading on such a timeline inherently suspicious." *In re Plug Power, Inc. Sec. Litig.*, , 2022 WL 4631892, at *14.

Additionally, Plaintiffs fail to allege or argue what portion or percentage of the Defendants' stockholdings were sold, and so they again fail to allege suspicious or unusual trading. "When alleging unusual trading, '[p]laintiffs must allege not only the insider defendants' selling activity during the relevant period, but also . . . overall percentage changes in defendant's holdings.'" *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *8 (S.D.N.Y. Jan. 21, 2021), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret.*

*Plan*, No. 21-909-CV, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) (quoting *Glaser*, 772 F. Supp. 2d at 587). Further, Plaintiff fail to allege the Defendants' net profits. *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *13 ("Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to gross proceeds."). Here, Plaintiffs only allege the proceeds Defendants allegedly received from their sales, and "proceeds alone say nothing about a seller's motive." *City of N. Miami Beach,* 2021 WL 212337, at *8.

Moreover, Defendants argue that Mr. Zhang beneficially held over 100 million shares as of June 8, 2020 even after his last alleged Class Period sale in October 2019. Mot. at 15 (citing 2020 Form 20-F). During the Class Period, as alleged by Plaintiffs, Zhang sold 5,509,553 shares of TAL stock through his company Bright Unison Ltd., realizing proceeds of approximately $215.2 million. Based on these figures, he retained the vast majority of his equity. Courts have held that more significant trading was not indicative of scienter, specifically where there were no additional indications that the defendants' traders were unusual or suspicious. *See, e.g.*, *Reilly v. U.S. Physical Therapy, Inc*., No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (finding sales of 40% of shares, without more, not suspicious and holding that "courts routinely find that raw sales numbers alone are insufficient to establish scienter"); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) (finding sales of 100%, 36%, and 26% of defendants' shares, standing alone, to be inadequate proof of scienter).

Even though the Court finds that the timeline of the alleged insider trading does not support a strong inference of scienter, and that Plaintiffs have fatally failed to allege the Defendants' net

profits or what percentage of the Defendants' stockholdings were sold, the Court will address Plaintiff's remaining arguments as to the motive or opportunity prong of the analysis.

Plaintiffs argue that Defendants ignore the fact that the TAL executive insiders completed all their stock sales before China held its "Two Sessions" meetings in March 2021, wherein it publicly announced stricter regulations over the online education industry, and that many insiders, including Defendant Luo, sold millions of dollars of common stock in January 2021 immediately after learning of the then confidential impending July 2021 regulations. Opp. at 11; AC ¶¶ 336, 341. However, Plaintiffs do not allege that the Two Sessions meeting was a corrective disclosure. *See* Opp. at 28–29 (Plaintiffs point only to May 12, 2021, June 1, 2021, and July 23, 2021). Plaintiffs seem to concede that the sales were all completed several months before the first corrective disclosure and thus, this argument fails.

Plaintiffs rely on Confidential Witness 1 ("CW1") for their allegation that Defendant Luo sold millions of dollars of stock immediately after learning of the impending July 2021 regulations. Plaintiffs allege that CW1 worked at TAL's Nanjing branch from July 2012 to September 2021. AC ¶ 36. "There, CW1 served as a deputy head and deputy general manager, responsible for government relations." *Id*. According to Plaintiffs, CW1 disclosed that at least as early as January 2021 – months before rumors emerged in March 2021 during China's Two Sessions and the Chinese government formally issued regulations in July 2021 – TAL's senior executives, including the Individual Defendants, had been aware that stringent regulations were forthcoming. *Id*. ¶¶ 36, 298, 342, 352, 354, 357. The Amended Complaint specifically alleges that:

> According to CW1, [the Individual Defendants] had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "***at least six months in advance.***" CW1 stated that the executives – including Defendant [Zhang, Luo, and He] – "knew that a new regulation as forthcoming" and what the main direction of the regulations would be. Defendant [Zhang, Luo, and He] had an understanding that the pending

> July regulation would affect TAL's scale of operations, forbid TAL from further
> expansion, and reduce the number of the Company's campuses, possibly by as
> much as 20%.

*See* AC ¶¶ 352, 354, 357. In resolving a motion to dismiss under the PSLRA, a "complaint

may rely on information from confidential witnesses if 'the[y] are described in the complaint with

sufficient particularity to support the probability that a person in the position occupied by the

source would possess the information alleged.'" *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305

(2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314). Plaintiffs fail to meet this standard.

The Court notes on the outset that CW1 is not alleged to have had any personal interaction

with TAL's top executives. Although this "fact, by itself is not necessarily fatal," the complaint

must still "describe the nature of the CW's contact with the individual defendants that would be

probative of defendants' mental state." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F.

Supp. 3d 772, 780–81 (S.D.N.Y. 2021) (cleaned up). The AC simply alleges that CW1 was

"responsible for government relations" at TAL's Nanjing branch.[21] AC ¶¶ 36. Plaintiffs do not

allege CW1's specific duties or responsibilities or how the CW knew what the Defendants knew

or had access to.[22] Plaintiffs further do not allege that CW1 had any "particular communications"

---

[21] In their opposition, Plaintiffs argue that the Complaint describes with particularity that CW1 worked "as TAL's 'head deputy and deputy general manager, responsible for government relations'" and that therefore CW1 was in a position to know that Defendants learned of China's double reduction laws months before the regulations were formally issued in July 2021. Opp. at 9 (quoting AC ¶ 36). However, as Defendants point out, in the AC, Plaintiffs allege that CW1 was a head deputy and deputy general manager in their Nanjing branch—they do not allege CW1 was a company-wide manager. Therefore, the Court declines to conclude that that this CW was actually a company-wide manager or deputy because the AC fails to allege so.

[22] Although "Courts "will credit confidential source allegations . . . when those sources' positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations," *Glaser*, 772 F. Supp. 2d at 590, here the Court is not convinced that Plaintiff's description of CW1's job responsibilities is enough to meet this threshold. The description "head deputy and deputy general manager, responsible for government relations" at a local branch does not indicate, with particularity, that such a person would know that the Company's top executives had knowledge of the impending government regulations.

with the Individual Defendants nor did Plaintiffs point to any specific "internal documents" regarding the impending Chinese regulations or noncompliance with existing Chinese regulations.[23] *City of Omaha Police & Fire Ret. Sys.*, 450 F. Supp. 3d at 41. Plaintiffs argue that Defendants ignore that "electronic communications transcend geography, connecting far flung business operations and employees instantaneously." Opp. at 8–9. While this may certainly be true, Plaintiffs never allege that the CW1 communicated through electronic means, or any means, with the top executives. There is merely a conclusory statement that according to CW1, the executives "knew that a new regulation as[sic] forthcoming." *See* AC ¶¶ 352, 354, 357. "In the absence of direct personal contact between the confidential witnesses and the Individual Defendants, Plaintiffs must demonstrate scienter by other means." *Maloney*, 518 F. Supp. 3d at 781; *see also Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 880 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) ("Furthermore, the confidential witness does not describe any communications with the Defendants or provide grounds to believe they were aware of the alleged scheme."); *cf. In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019).[24] Because Plaintiffs cannot rely on CW1, the Court declines to find the timing of Defendant Luo's sales unusual or suspicious.

---

[23] Plaintiffs further argue that unlike in *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013), where the discounted CW lacked first-hand knowledge of the alleged information, here, CW1's knowledge is based on first-hand accounts. *See* Opp. at 9 n.5. However, the AC makes no allegation that CW1's knowledge is based on first-hand accounts. Therefore, this argument also fails.

[24] In *In re Avon Sec. Litig.*, the Court held that "[t]he notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law" and ultimately credited the seven confidential witnesses cited in the complaint. *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21. However, in this case, the Plaintiffs' complaint included detailed descriptions of the CWs' job responsibilities, which indicated their specific duties, the programming for which they provided oversight, who they oversaw and managed, and who they reported to. *Id.* at *2. Plaintiffs, here, did not include such particular allegations in the AC.

Finally, Plaintiffs' argument that "the lucrative bonuses received by TAL insiders, considered in tandem with their stock sale proceeds of $458 million . . . support an inference of scienter" must fail. Opp. at 12. In the AC, Plaintiffs allege that the "Individual Defendants' motive to issue false statements throughout the Class Period is further evidenced by their desire to optimize their bonuses and other available incentives under TAL's lucrative compensation system for its executives." AC ¶ 343.   However, "Second Circuit's case law . . . clearly provides that an incentive-based compensation system is generally insufficient to support a strong inference of scienter." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 526 (S.D.N.Y. 2020). Plaintiffs point to *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d at 185 where the Court found that defendant's bonus indicative of scienter when considered with other allegations of motive and opportunity to commit fraud. However, as explained above, there are no other significant allegations of motive present in the Complaint. Therefore, this argument fails as well.

For these stated reasons, Plaintiffs fail to show scienter under the first prong of motive and opportunity.

### B.  Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

"If there is no showing of improper motive, as is the case here, a plaintiff may establish scienter by 'strong circumstantial evidence of conscious misbehavior or recklessness' by, among other things, 'sufficiently alleg[ing] that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *City of Omaha Police & Fire Ret. Sys.*, 450 F. Supp. 3d at 421 (quoting *ECA*, 553 F.3d at 199 (quotation marks and citations omitted)).  "In the absence of motive and opportunity, 'the strength of the circumstantial allegations must be correspondingly greater.'"  *Maloney*, 518 F. Supp. 3d at 780 (quoting *ECA*, 553 F.3d at 198–99). Conscious

51

misbehavior refers to "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citations omitted). "Recklessness is harder to identify but involves 'an extreme departure from the standards of ordinary care.'" *Maloney*, 518 F. Supp. 3d at 780 (quoting *Kalnit*, 264 F.3d at 142). "To state a claim based on recklessness . . . the complaint must 'specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements.'" *Maloney*, 518 F. Supp. 3d at 780 (quoting *Novak*, 216 F.3d at 308). "'Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Id*. (quoting *Novak*, 216 F.3d at 309).

Here, Plaintiffs mainly rely on conclusory allegations, CW1, and the "core operations" doctrine. For example, Plaintiffs allege that:

> As Chief Financial Officer, Defendant Luo held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, non- public information concerning the fact that TAL education was not incompliance with Chinese regulations and laws governing the after-school tutoring industry, and more generally, education sector. By virtue of his high-level position, Defendant Luo was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Luo knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete.

AC ¶ 353; *see also* AC ¶ 351(Defendant Zhang); AC ¶ 356 (Defendant He). Plaintiffs rely heavily on CW1, but as stated previously, the Court will not credit this testimony. Plaintiffs argue that "Defendants were aware of a vast number of violations" and that the reported fines in the Complaint "were just the tip of the iceberg." Opp. at 6. However, it is unclear whether the

Individual Defendants had access to information on these other violations or alleged unreported instances of misconduct. Plaintiffs point to no specific documents or reports that were accessed by the Individual Defendants. Additionally, Plaintiffs allege that because of the Defendants' "high-level position[s]", they must have had "had access to material, adverse, non- public information concerning the fact that TAL education was not in compliance with Chinese regulations and laws." AC ¶ 353 (Defendant Luo) AC ¶ 351 (Defendant Zhang); AC ¶ 356 (Defendant He). This argument fails because "pleading access to information based on an individual defendant's executive position is insufficient to support an inference of scienter." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 221 (E.D.N.Y.), *reconsideration denied*, 616 F. Supp. 3d 192 (E.D.N.Y. 2022) (collecting cases).

In support of their scienter argument, Plaintiffs also point to the core-operations doctrine. *See* Pl.'s Opp. at 6–8. Plaintiffs assert that TAL derived nearly all of its revenue from its tutoring operations and that because the fines and sanctions at issue concerned TAL's "core operations," it would be implausible that Defendants were blind to the fraud. *Id*. "Under the 'core operations' doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income." *City of Omaha Police & Fire Ret. Sys.*, 450 F. Supp. 3d at 423. "[C]ourts in this Circuit generally treat core operations allegations as providing supplementary but not independently sufficient means to plead scienter." *Denny v. Canaan Inc*., 2023 WL 2647855, at *14 (S.D.N.Y. Mar. 27, 2023) (quotation omitted).  Because Plaintiffs have failed to allege facts that are independently sufficient to plead scienter, the Plaintiffs' core operations argument cannot save these claims. Plaintiffs have failed to meet the second scienter prong.

Plaintiffs have failed to put forward well-pleaded allegations that any of the Individual Defendants acted with scienter. "In the absence of scienter, Plaintiffs cannot state a claim under Section 10(b) or Rule 10b-5" and therefore these claims "must be dismissed." *Maloney*, 518 F. Supp. 3d at 782. Because Plaintiffs have failed to plead scienter, the Court gives no opinion as to the parties' arguments concerning falsity and loss causation. *Id*. at 778. ("If [Plaintiffs] have failed to plead scienter, the Court need not proceed further.").

## II.     Item 5(D) of Form 20-F and Item 105 of Regulation S-K

Plaintiffs allege that Defendants violated their affirmative duties pursuant to Item 5(D) of Form 20-F and Item 105 of Regulation S-K to disclose the impacts of the known uncertainties and risks concerning TAL's flagrant and repeated violations of governmental rules and regulations. Opp. at 3; AC ¶ 315. Plaintiffs specifically allege that the annual and quarterly reports filed by TAL during the Class Period required that Defendants disclose the information regarding known trends, events, and uncertainties, including:

> (a) that TAL had habitually been incurring fines and sanctions for its failure to comply with Chinese law governing the for-profit tutoring industry; (b) That TAL knew, as early as January 2021, that the impending governmental regulations would make it increasingly difficult for the Company to cooperate; (c) That TAL was allowing teachers to tutor students absent the requisite qualifications; (d) that TAL was touting falsified or exaggerated course reviews on its website in order to increase student enrollments; (e) That TAL was engaging in bait-and-switch pricing wherein it repeatedly offered substantial promotional pricing to lure in students to use its tutoring services only to later charge the full price, if not more, for the tutoring service; (f) That TAL was charging tuition for its tutoring courses for periods greater than three months in violation of relevant rules and regulations; (g) That TAL was forcing students to pay advances and incur recurring debt; and (h) That TAL was repeatedly teaching courses that exceeded the scope of the syllabus in contravention of Chinese law.

AC ¶ 315. The disclosure obligations under Items 5(D) of Form 20-F and Item 105 of Regulation S-K are akin to Item 303 of Regulation S-K. *See Garnett v. RLX Tech Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022). ("Item 303 compels disclosure of 'any known trends or

uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.' Likewise, Item 5(D) of Form 20-F requires that registrants 'discuss . . . any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.'") (quotation omitted). To state a claim under these regulations, "plaintiffs must allege that 'a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Garnett*, 632 F. Supp. 3d at 599 (quoting *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 716 (2d Cir. 2011)). "Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 CIV. 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010)

First, Plaintiffs allege that Defendants knew that: (a) the Chinese government was beginning to enact a series of rules and regulations which would have a material impact on the after-school tutoring industry therefore putting at risk TAL's business operations, *see* AC ¶¶ 317, 274–78; (b) these stringent rules and regulations governing the after-school for-profit tutoring industry could impact how and indeed whether TAL could continue in its business, *id*. ¶¶ 317, 277–78; and (c) the for-profit tutoring industry would likely be dragged down by governmental regulations as evidenced by Defendants' sales of stock for proceeds of $458 million *id*. ¶¶ 317, 331–37. Second, Plaintiffs allege that the following facts demonstrate that the foregoing trends, demands, commitments, events, and uncertainties were reasonably likely to occur and reasonably likely to

have a material impact on TAL's business and operations: "(a) TAL was one of the top for-profit after-school tutoring firms in mainland China and thus should have been privy to any impending governmental regulations affecting its business; (b) As a tutoring company offering private education services for students, TAL was required to adhere to all rules and regulations governing the tutoring industry; (c) Even before the Class Period began, TAL formed a habit of repeatedly disregarding and offending an array of Chinese laws and regulations; and (d) Notwithstanding the aforementioned, TAL continued to flagrantly disregard China's rules and regulations governing the for-profit tutoring industry because it prioritized its student enrollment metrics and growing revenues over compliance." AC ¶ 318.

Plaintiffs' allegations essentially mirror the Plaintiffs' allegations related to their Section 10b claims. As explained above, Plaintiffs have failed to show that Defendants were aware of the fines, alleged misconduct, and the upcoming regulations. Therefore, the claims under these regulations must fail. Additionally, TAL expressly disclosed the trend of increasing regulatory scrutiny in the Forms 20-F. The Forms explained that "uncertainties still exist as the competent authorities may set more specific and stringent operation requirements for after-school tutoring institutions. We may be unable to meet such requirements in a prompt manner or incur additional costs in complying with such requirements, which may adversely affect our business, financial conditions and results of operations." *See* Form F-20 for fiscal years 2019 and 2020, ECF No. 69-3-69-4; s*ee also* Form F-20 for fiscal year 2021, ECF No. 69-5 ("In addition, uncertainties still exist as the competent authorities may set more specific and stringent operation requirements for after-school tutoring institutions on various aspects including the means and timing of fee collection, pricing, advertisements and promotion content, prepaid funds under supervision, teachers' qualification licenses, refunds, course time and content, homework arrangement, and student enrollment, among

others. For instance, with respect to educational fees supervision, on August 17, 2020, the MoE and other four departments jointly issued the Opinion on Further Strengthening and Regulating the Management of Educational Fees, which puts forward more specific and stricter requirements on educational fees supervision."). Therefore, Defendants disclosed the "known trends" and "uncertainties." *See Garnett*, 632 F. Supp. 3d at 612. Accordingly, Plaintiffs claims under Items 105 and 5(D) are dismissed.

### III.     Section 20(a) Claim

As Plaintiffs have failed to adequately allege their § 10(b) claim, Plaintiffs' claim under § 20(a) fails as a matter of law. See *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) ("plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant"); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Therefore, Count II is dismissed.

### IV.     Leave to Amend

Defendants request that the Court deny Plaintiff's Amended Complaint with prejudice. Plaintiff requests leave to amend to cure any pleading deficiencies. Opp. at 30.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178 (1962). The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). Plaintiff is therefore granted leave to amend the amended complaint.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** without prejudice. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 68 Plaintiff is granted leave to file a second amended complaint by **October 27, 2023.**

**SO ORDERED.**

Dated:    **September 29, 2023**
             **New York, New York**

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**