UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW MEXICO STATE INVESTMENT COUNCIL and PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:22-cv-01015 (ALC) (KHP) The Honorable Andrew L. Carter Jr. The Honorable Katharine H. Parker |
| Plaintiff, | |
| vs. | CLASS ACTION |
| TAL EDUCATION GROUP, BANGXIN ZHANG, RONG LUO, and LINDA HE, | SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Defendants. | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION AND OVERVIEW ............................................................. 1

II. JURISDICTION AND VENUE .................................................................................. 6

III. PARTIES ................................................................................................................. 7

    A. Lead Plaintiff ..................................................................................................... 7

    B. Defendants ......................................................................................................... 8

    C. Confidential Witnesses .................................................................................... 11

IV. FACTS ................................................................................................................... 16

    A. Overview of TAL ............................................................................................. 16

    B. The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry ................................................................... 19

    C. Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws ................................................................ 26

        1. Illegal Tutoring .................................................................................... 28

        2. Falsification of Teacher Qualifications ............................................... 29

        3. Unlawful Pricing Practices .................................................................. 30

        4. Unauthorized and Illegal Promotional Publications ........................... 32

        5. False Advertising and Publicity .......................................................... 34

        6. Unauthorized Expansion of Tutoring Sites ......................................... 37

    D. SEC Investigations .......................................................................................... 38

V. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ................................................................. 39

    A. Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry ........................ 39

        1. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations ....................................... 52

        2. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations ....................... 53

        3. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations ............... 55

B.     Materially False and Misleading Statements and Omissions Regarding the Government's Heightened Regulations Governing the Private Tutoring Industry......................................... 58

C.     Materially False and Misleading Sarbanes-Oxley Certifications........................................... 67

D.     Defendants Omitted Material Facts in Violation of Item 5(D) and Item 105 of Regulation S-K ................................................................................................................................... 69

     1.     Overview of TAL's Item 5 Disclosure Requirements ............................................. 69

     2.     Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct and Regulatory Violations ........................................................ 72

     3.     Defendants Failed to Disclose Material Facts in Violation of Item 105 of Regulation S-K ...................................................................................................................... 74

VI.     POST CLASS PERIOD DISCLOSURES ............................................................. 76

VII.     ADDITIONAL SCIENTER ALLEGATIONS ....................................................... 77

    A.     Motive and Opportunity................................................................................. 78

     1.     Defendants Had Advance Warning of the Double Reduction Policies.................... 78

     2.     TAL Insiders Realized Approximately $458 Million in Net Profits from Their Class Period Stock Sales ............................................................................................. 78

     3.     The Individual Defendants' Bonuses..................................................................... 85

     4.     The Individual Defendants' High-Level Positions and Experience........................ 86

       a.     Defendant Zhang ....................................................................... 86

       b.     Defendant Luo .......................................................................... 87

       c.     Defendant He ............................................................................ 88

    B.     The Alleged Fraud Concerns the Core Operation of TAL's Business................................ 89

    C.     The Sarbanes-Oxley Certifications ................................................................. 92

    D.     The SEC Is Threatening to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations ............................................................................................................ 93

    E.     Executive Resignations................................................................................. 95

VIII.     LOSS CAUSATION........................................................................................ 95

IX.     CLASS ACTION ALLEGATIONS .................................................................... 99

X.     NO SAFE HARBOR ...................................................................................... 101

XI.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ... 101

XII.     CLAIMS FOR RELIEF ................................................................................... 102

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ............. 102

COUNT II For Violation of §20(a) of the Exchange Act Against the Individual Defendants ..................... 103

XIII.    PRAYER FOR RELIEF ............................................................................................................. 104

XIV.    JURY DEMAND ....................................................................................................................... 104

New Mexico State Investment Council ("NMSIC") and Public Employees' Retirement System of Mississippi ("MSPERS," and, together with NMSIC, "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation which includes without limitation: (a) review and analysis of regulatory filings made by TAL Education Group ("TAL" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by TAL; (c) review of other publicly available information concerning TAL; (d) review of regulatory filings with the People's Republic of China ("PRC"); and (e) interviews with confidential witnesses.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    The PRC's competitive academic environment had long been a boon for private tutoring companies. From the time children are toddlers in preschool, social pressure to excel academically weighs heavily on Chinese parents with daunting exams such as the Gaokao—China's very difficult college entrance exam—on the horizon.

2.    Parents, concerned that other children will outperform their own, began enrolling their children in expensive tutoring courses to supplement their already intense public-school education. Supplemental tutoring became the norm with Chinese parents spending between 25% and 50% of their annual income on after-school tutoring.

3.    These fierce social and academic pressures to excel in China enabled TAL—a private tutoring company founded in 2003—to thrive in an industry that at one point was valued as much as $310 billion. TAL soon became one of the top five tutoring companies in China, and investors reacted accordingly. TAL's once modest market cap of just $5.67 billion in 2016 grew nearly ten-fold to $55

billion by February 2021. TAL began trading its ADSs on the NYSE in October 2010, and within just a few years after its IPO, the price of its ADSs grew by approximately 200%.

4.      At the start of the Class Period on April 26, 2018, the regulatory environment governing China's private education industry began to change. The Chinese government began enacting rules and regulations which forbade private education companies from offering tutoring services on the weekends or after certain times of the day. Companies like TAL needed to adjust their corporate behaviors to maintain compliance or face sanctions and fines. The purpose of the new regulations was to restrict the influence and scope of private education companies; thus, by their nature, these regulations should have limited TAL's ability to grow its business.

5.      Defendants were aware of these new government regulations and repeatedly assured the investing public that TAL complied with them. Rather than admit that compliance would slow or halt its growth plans, Defendants instead told investors that the new regulations were "beneficial" to the Company. In fact, despite those representations, TAL was intentionally flouting the new regulations to fuel its rapid growth.

6.      In July 2021, the PRC ratcheted up its regulatory regime which effectively shuttered the private tutoring business in China.

7.      By January 2021, and likely earlier, TAL and its executives knew that prior to July 2021, Chinese regulators had caught just a few dozen of TAL's violations. Of those that Chinese regulators did catch, most were inconsequential or petty violations. In response, in all but a handful of instances, the Chinese government imposed *de minimis* fines ranging from the equivalent of a few hundred to a few thousand dollars. TAL knew, however, that it was just a matter of time before Chinese regulators would detect the private tutoring business that TAL was continuing to operate in flagrant violation of the new violations designed to curb the private education industry in China.

8.    TAL engaged in *many* more violations of the applicable rules, regulations and proscriptions during the Class Period than those for which it had been caught and fined, which were inaccessible or unknown to the investing public during the Class Period and not disclosed until thereafter.  Against that backdrop and despite the truth then known to them, Defendants falsely represented to the investing public that TAL was in near perfect compliance with Chinese rules, regulations and proscriptions. All the while, however, TAL was engaged in a persistent pattern of flagrant violations of the very rules, regulations and proscriptions it purported to comply with, in order to grow its student enrollments against the will of the PRC and its new regulatory scheme.

9.    Defendants knew of the restrictive regulations. They cited them repeatedly in SEC filings, claiming that more regulation would be beneficial to its business and to the tutoring industry as a whole and that TAL was "fully cooperating with the government directions, and where needed, [would] make adjustments to [its] business operations accordingly." They thus expressed unrelenting confidence about the health, stability and sustainability of TAL's tutoring business, its "long term" prospects, that it was operating in a "healthy," "stable" and "sustainable" environment, and even claimed that the reforms were "very positive" and would make the tutoring industry "more healthy."

10.    Nothing was further from the truth. TAL's dominance in the industry and continued growth was only possible because it was ignoring the new regulations, and had escaped detection by the PRC. These representations of compliance were unfounded because Defendants knew or recklessly disregarded throughout the Class Period that TAL's persistent violations would lead to a government crackdown. Indeed, Defendants learned during the Class Period—well before the public—that the government's regulations and enforcement efforts were expected to increase. Defendants' representations that heightened regulations were positive for TAL's business and the industry in which it operates were thus inconsistent with their knowledge of an imminent shutdown of the industry.

11.      On May 12, 2021, news of the severity and magnitude of the impending government crackdown on the for-profit tutoring industry began to surface. As a result, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, representing a 13% decline.

12.      On June 1, 2021, 15 off-campus tutoring organizations, including TAL, were fined for illegal activities including false advertising and fraud. As the news hit the market, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, representing an 18% decline over the two-day period.

13.      Then, on July 23, 2021, the Chinese government released its "Double Reduction" policies, which effectively upended the private education sector and banned companies that teach the school curriculum from making profits, raising capital or going public. Specifically, the PRC announced that it would no longer issue for-profit tutoring licenses.  In other words, all after-school tutoring had to be conducted by non-profits.  Thus, companies like TAL were precluded from profiting from their core business models.

14.      As part of the Chinese government's announcement of the Double Reduction policies, it also announced that various tutoring companies—including TAL—were engaged in serious violations of the rules, regulations and proscriptions governing the tutoring industry. For example, TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which it had created to drive student enrollments. TAL's misconduct that was now being reported was far more serious than the previously reported *de minimis* infractions, (for example, improper waste disposal) as they included widespread practices of: (a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law; (b) offering courses that gave students unfair advantages in contravention of Chinese government policies; (c)

misrepresenting teacher qualifications and course qualities; (d) mishandling user data; and (e) rigging promotional events to defraud consumers.

15.     As a result, TAL's ADSs dropped from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly **79% decline**. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

16.     The Individual Defendants fared much better than the investing public as they unloaded hundreds of thousands of shares—which they had acquired at incredibly low IPO exercise prices or, in some cases, on *zero cost bases*, thanks to TAL's executive controlled compensation committee—with non-public knowledge of and in advance of the PRC's crackdown on the education industry. The Individual Defendants knew that the impending crackdown would curtail or destroy TAL's ability to earn future profits under its then-current business model, particularly against the backdrop of TAL's persistent and serious violations of Chinese regulations. By the end of the Class Period, these insiders realized **net profits of approximately $450 million** by selling more than 9.5 million shares of TAL common stock which had declined by 95% as a result of their fraud.

17.     On July 30, 2021, TAL cancelled its scheduled earnings release and earnings call as a result of the news.

18.     On November 12, 2021, TAL announced that it would no longer offer academic subjects to students in K-9 in mainland China and that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year end February 28, 2022 and subsequent periods" because the revenues derived from those services for its previous fiscal year had "accounted for a substantial majority of the Company's total revenues in the year."

19.     On May 16, 2022, the *New Yorker* reported that "TAL Education Group, renowned for its Math Olympiad-style courses, transitioned to a 'quality education' program that teaches

calligraphy instead of calculus." These business changes which purported to comply with PRC regulations were a façade, however. As local Chinese media outlet CaiLian reported in March 2023, TAL has continued to violate PRC regulations governing the private education industry. In fact, since the enactment of the 2021 Double Reduction crackdown in July 2021, TAL has taught course content prohibited under the 2021 regulations such as mathematics and English, disguising them as "thinking" and "eloquence" courses. Indeed, just last month another lawsuit was filed against TAL and several of its executives in connection with its pervasive violations of relevant PRC laws and regulations since the implementation of the Double Reduction policies in 2021.

20. This Second Amended Complaint contains the detailed accounts of nine former TAL employees who explain how the Company and its subsidiaries violated an array of PRC laws—and incurred fines as a result—for instance, by allowing unqualified teachers to tutor students, throughout the Class Period. The former employees also report that TAL's headquarters in Beijing assigned teachers who lacked the legally required qualifications to teach at TAL's teaching facilities throughout China in violation of PRC law. They further report that TAL executives knew at least as early as January 2021 that the PRC would issue severe regulations which would materially change the status quo of its business operations.

21. Lead Plaintiff brings this action under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, to recover for Defendants' misleading statements made to investors between April 26, 2018, through July 22, 2021 (the "Class Period").

## II.   JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act. TAL ADSs trade on the New York Stock Exchange ("NYSE"), located within this District, and Defendants disseminated the statements alleged herein to be materially false and misleading into this District.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Lead Plaintiff

26.     MSPERS and NMSIC purchased TAL American Depository Shares ("ADSs") during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein.

27.     NMSIC is a sovereign wealth fund that manages the investments for New Mexico's four permanent funds: (i) the Land Grant Permanent Fund; (ii) the Severance Tax Permanent Fund; (iii) the Tobacco Settlement Permanent Fund; and (iv) the Water Trust Fund. As of 2021, NMSIC manages assets valued at $34 billion including the investment of 23 New Mexico government related clients which, at present, have a combined value of approximately $1.5 billion. According to NMSIC's website, it is "focused on optimizing the earnings of New Mexico's permanent funds – funds that contribute to the state's overall operating budget – while preserving and growing the real value of the funds for future generations of New Mexicans."

28.     MSPERS was established in 1952 as the retirement system for Mississippi state agencies, as well as counties, cities, and other participating political subdivisions. It provides

retirement benefits for employees of the state of Mississippi who work in government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services. These retirement benefits help retain a strong public workforce in the state of Mississippi. The 10-member MSPERS Board of Trustees includes the State Treasurer, a gubernatorial appointee who is a member of MSPERS, two retirees, two state employees, and one representative each of public schools and community colleges, institutions of higher learning, counties, and municipalities. With the exception of the State Treasurer and the gubernatorial appointee, members are elected to staggered six-year terms. The Board is responsible for designating the System's executive director and for establishing the policies for administration of the trust. The Board also works to carry out the intent and purposes of the state Legislature by establishing rules and regulations for the administration of MSPERS and the transaction of its business. The Government Finance Officers Association of the United States and Canada awarded a Certificate of Achievement for Excellence in Financial Reporting to MSPERS for its comprehensive annual financial report for the fiscal year end June 30, 2020. MSPERS received the Public Pension Coordinating Council's Public Pension Standards 2021 Award in recognition of meeting professional standards for plan design and administration. As set forth in its Certification, ECF 18-1, MSPERS acquired TAL ADSs during the Class Period at prices that were artificially inflated as a result of Defendants' fraud.

### B.    Defendants

29.    Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in China. TAL ADSs trade on the NYSE under the ticker symbol "TAL." Each ADS represents one third of one share of TAL common stock.

30.     Defendant Bangxin Zhang ("Zhang") co-founded TAL. He was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period and continues to hold those positions to-date. Defendant Zhang is also the controlling shareholder of the Company. Zhang is also the sole shareholder and sole director of Bright Unison Limited, a company incorporated in the British Virgin Islands. During the Class Period, Defendant Zhang issued materially false and misleading statements, and failed to disclose material facts to investors, as further alleged herein. During the Class Period, Defendant Zhang sold *5,509,553 shares* of TAL stock— which he acquired at very low IPO prices or even at zero cost bases—through his company Bright Unison Ltd., realizing net profits of approximately *$215.2 million*.

31.     Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period. Luo resigned from the Company effective October 29, 2021. During the Class Period Defendant Luo made materially false and misleading statements and failed to disclose material facts to investors as alleged herein. Also during the Class Period, Defendant Luo sold *457,380 shares* of TAL stock—which, like Defendant Zhang, he had acquired at extremely low IPO prices or even at zero cost bases—at artificially inflated prices, realizing approximately *$24.7 million in net profits.*

32.     Defendant Linda He[1] ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019. Defendant He made materially false and misleading statements and failed to disclose material facts to investors during the Class Period, as further alleged herein.

33.     Defendants Zhang, Luo, and He (the "Individual Defendants," and together with TAL, the "Defendants"), were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the

---

[1] Defendant Linda He's name is often spelled "Linda Huo" on public filings.

Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

34.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded ADSs would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, Defendants Luo and He participated in conference calls with investors during which false and misleading statements were made, and/or each Individual Defendant had the ability and/or opportunity to prevent the issuance of such documents and statements or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

C. **Confidential Witnesses**

36.    CW1[2] worked at TAL's Nanjing branch from July 2012 to September 2021. There, CW1 served as a deputy head and deputy general manager, responsible for government relations. CW1 disclosed that at least as early as January 2021—*months before rumors emerged* in March 2021 during China's Two Sessions and the Chinese government's formal issuance of the regulations in July 2021—TAL's senior executives knew that stringent regulations were forthcoming. CW1 further reported that TAL's senior executives and others within the Company engaged in internal discussions, meetings, and emails during the first half of 2021—before the regulations were disclosed and implemented—regarding the forthcoming regulations. CW1 stated that TAL employees talked about the potential new regulations almost daily and knew that changes were forthcoming.

37.    CW2 worked at the Jiangsu branch of TAL's subsidiary Xueersi Education Technology Co. ("Xueersi") from August 2018 to June 2023. There, CW2 was responsible for human resource management. CW2 reported that between 2018 and 2021, TAL expanded its business relatively quickly. CW2 provided evidence that TAL misrepresented teacher qualifications and course qualities. For example, CW2 disclosed that in 2018, Xueersi's Jiangsu branch had online school teachers who did not possess the requisite qualification certificates. CW2 further disclosed that in 2018, TAL and its subsidiaries, including Xueersi's Jiangsu branch, were punished by the government for inadequate teacher qualifications. CW2 further disclosed that TAL's online school engaged in illegal and deceptive pricing policies. For example, CW2 disclosed that TAL's online school adopted low-priced courses to recruit new students. For instance, according to CW2, TAL would discount online courses by over 90% to drive traffic. This testimony corroborates the testimony of CW4 *infra*, and is consistent with reports of regulatory fines that TAL received as a result of such conduct. As a result of this sales tactic, TAL's headquarters was fined more than RMB

---

[2] Chinese law currently prohibits disclosure of last names of witnesses such as these.

500,000 ($72,690 USD) by the Beijing Municipal Administration for Market Regulation, according to CW2. That TAL's headquarters received a substantial fine would have put Defendants on notice of such misconduct. CW2 further reported that in May 2021, one of TAL's operating entities, Hangzhou Yidu Training School Co. Ltd. was fined RMB 2.5 million ($389,281 USD) by the government for false publicity and price gouging. Hangzhou Yidu Training School was also fined RMB 500,000 ($77,856 USD) in or around May 2021 in connection with violating the pricing law by luring consumers in through false pricing means, according to CW2.

38.    CW3 worked at TAL's headquarters in Beijing from April 2017 to March 2022 as the PR manager of TAL's Reebok English Division. There, CW3 was responsible for the construction of the Beijing Libu English Teaching Campus and the approval of teaching licenses by working with the Beijing Municipal and District Education Authorities. In this role, CW3 communicated with the education bureaus in Beijing. CW3 disclosed that in 2018, a number of TAL's Libu English and Xueersi Peiyou campuses did not have qualification approvals to operate the schools. CW3 further stated that the Beijing education authorities identified TAL schools that possessed business licenses, but not the required licenses to operate schools and were therefore required to rectify the violations. CW3 further stated that even though many of TAL's campuses did not have school licenses, they still carried out teaching work despite TAL's knowledge that such school licenses were required. CW3 disclosed that the Beijing education authorities were primarily concerned with whether private tutoring institutions were collecting large tuition fees in advance as TAL was later determined to have done and for which it was, in part, ultimately shut down as part of the Double Reduction.

39.    CW4 worked as the regional manager of TAL's Xiaogao section of the Xueersi Online School Division from May 2018 to September 2021. As regional manager, CW4 was responsible for the sales management of the TAL's Xiaogao section and was later transferred to the Xiaohou Enlightenment Division in March 2021 where CW4 was responsible for the online sales management

of the southwest region of Xiaohou and reported directly to Zhao Puzheng, the general manager of the Xiaohou Enlightenment Division. CW4 disclosed that Xueersi Online School attracted students to join its educational program by offering courses originally priced at RMB 7800 ($1,227 USD) for just RMB 20 ($3 USD) and that Xueersi's online school division was ultimately fined for such conduct.

40.    CW5 worked at TAL as a City Operations Manager between September 2010 and April 2023. In this role, CW5 was responsible for business operation management in Hangzhou, Nanjing, and other regions. In 2021, CW5 returned to Beijing headquarters where they were responsible for business operation management of high schools. CW5 reported that TAL's subsidiaries were punished for various problems throughout the Class Period. For instance, in 2018, Xueersi Online School was punished by the Beijing Municipal Bureau of Culture and Tourism for illegal online publications. In April 2021, Xueersi was notified and criticized by the Beijing Municipal Education Commission because some of Xueersi Online School's live courses ended later than 9:00 pm. CW5 also reported that Xueersi engaged in false and misleading advertising by advertising courses on Tmall[3] wherein it would promote the original course price of RMB 799 ($126 USD) and a current price of RMB 20 ($3 USD) for promotional activities in order to induce parents to enroll their children. CW5 further reported that Xueersi did not actually sell its courses at a price of RMB 799 ($123 USD) so in April 2021, the Beijing Municipal Administration for Market Regulation fined it RMB 500,000 ($76,720 USD) for suspected false publicity and price regulations violations. Finally, CW5 stated that Xueersi Online School was also suspected of false publicity. In particular, in 2021, the Beijing Haidian District Market Supervision Administration fined Xueersi

---

[3] Tmall is a consumer platform for local Chinese and international businesses in Greater China.

more than RMB 10,000 ($1,573 USD) because a person purporting to be a teacher in a video advertisement was actually an actor, not a real teacher.

41.     CW6 worked at TAL between April 2018 to January 2022 as the executive principal of Xueersi Education Technology Co., Ltd. in Harbin. In this role, CW6 managed Xueersi's Harbin branch. CW6 disclosed that TAL had teaching staff who lacked teacher qualification certificates and that in some cases, the main teachers lacked the required qualification certificates. CW6 provided evidence of TAL's misrepresentation of teacher qualifications and course qualities. CW6 stated that when Xueersi's Harbin branch was first established in 2018, TAL's headquarters would train and assign teachers who they knew did not possess the required teacher qualification certificates. CW6 also stated that Xueersi's Harbin branch taught courses that exceeded the outline in violation of PRC regulations.

42.     CW7 worked as a finance manager at Xueersi's Nanchang Xihu branch from February 2016 to September 2021. In this role, CW7 was responsible for financial work. CW7 disclosed that in 2016, Xueersi Education and Training School knowingly recruited students despite TAL's knowledge that the school did not have approval to operate as a school. CW7 stated that Xueersi's Nanchang Xihu branch operated without a license for nearly two years. CW7 further described the PRC's 2018 regulations which proscribed teaching outside of the scope of the syllabus. CW7 disclosed that courses gave students unfair advantages in contravention of Chinese government policies because TAL's high-level classes were based on Olympiad and other content that went beyond the syllabus permitted by regulators. CW7 stated that the school ignored the regulations proscribing teaching past 8:30 pm or on holidays and during winter and summer vacations.  Instead, TAL offered courses during these time periods at various teaching sites in Nanchang in contravention of Chinese government policies.

43.    CW8 worked at Xueersi's Chengdu branch as an administrative manager from August 2011 to December 2021. In this role, CW8 was responsible for comprehensive procurement and administrative management. CW8 left TAL in December 2021 after most of the teaching sites closed due to the implementation of the Double Reduction policy. CW8 provided information regarding TAL's misrepresentation of teacher qualifications and course qualities. Specifically, CW8 disclosed that many of TAL's teachers did not have teacher qualification certificates. CW8 also explained that TAL offered courses that gave students unfair advantages in contravention of Chinese government policies. For example, CW8 stated that in 2018, at which time there was a policy in effect that required that teaching could not exceed the curriculum, Xueersi's Chengdu branch taught courses such as mathematics and science which exceeded the syllabus, and further, other classes taught Olympiad-related training content which also exceeded the curriculum syllabus. Finally, CW8 reported that TAL was punished by the government in connection a pricing scheme by Xueersi Online School in which it lured new students in with false promises of low prices.

44.    CW9 worked as the HR Manager of its Aizhikang Business Unit at Xueersi's Shenzhen branch from June 2011 to December 2021. CW9 reported that TAL misrepresented teacher qualifications and utilized unqualified teachers. For example, CW9 stated that although the government required teacher qualification certificates, some less populous cities may have had personnel without teaching qualifications who were engaged in teaching activities. CW9 further reported that the PRC punished TAL branches for falsely advertising its teacher qualifications. CW9 stated that after the Chinese government began enacting new education laws in 2018, including stricter regulations for teacher credentials, TAL's teachers who lacked the proper teacher qualification certificates continued to teach in its schools in violation of PRC regulations. Finally, CW9 stated that during the 2021 Qingming Festival, which was held in April, Xueersi's Shanghai branch was fined RMB 350,000 ($53,704 USD) by the Shanghai Yangpu District Market Supervision

Administration for rigging promotional events to defraud consumers in connection with a coupon promotion.

## IV.  FACTS

### A.  Overview of TAL

45.     TAL was founded in China in 2003 by Defendant and CEO Bangxin Zhang who began working as a part-time tutor in 2002 while completing his PhD program at Peking University. When Zhang originally launched TAL, the Company primarily offered mathematics tutoring courses, but later expanded to other subject areas as well. During the Class Period, TAL provided K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese. Tutoring services are primarily offered through small classes, personalized premium services and online course offerings, which the Company began offering in 2010.

46.     Soon after its formation, TAL began experiencing success and a growing student base. In 2007, Defendant Zhang dropped out of his PhD program at Peking University to focus entirely on the Company.

47.     On January 10, 2008, TAL Education Group became incorporated in the Cayman Islands as the "holding company for a group of companies engaged in the provision of high quality after-school tutoring programs." Although headquartered in Beijing, China, the Company is organized as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities ("VIEs"), including Beijing Xueersi Education. In or around October 2010, TAL listed its ADSs on the NYSE under the ticker "XRS." In the subsequent years after its IPO, the price of TAL ADSs grew by approximately **200%**. Thus, by 2016, Defendant Zhang was worth **$1.5 billion at just 36 years old**. From 2015 to 2019, TAL ranked

in the Top 100 Most Valuable Chinese Brands for five consecutive years. By February 2021, TAL was valued at **$55 billion** and Defendant Zhang's wealth grew to **over $15 billion**.

48.     TAL's primary sources of revenue are: (i) small class tutoring services that focus on offline education; and (ii) online education services provided through www.xueersi.com. For the fiscal year end February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively. Further, throughout the Class Period, TAL's gross profits increased exponentially as it experienced robust growth due to its deceptive pricing and advertising strategies. For instance, TAL's fiscal year 2019 gross profits were $1.4 million; fiscal year 2020 profits were $1.8 million; and fiscal year 2021 profits were $2.4 million.

49.     As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform. According to TAL's Form 20-F for its fiscal year end February 29, 2020, the net revenue obtained from TAL's VIEs and subsidiaries and schools accounted for 93.4% of TAL's total net revenue.

50.     During the Class Period TAL had 10 subsidiaries and consolidated affiliated entities. TAL's subsidiaries are: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

51.     TAL's VIEs are: (1) Beijing Xueersi Education Technology Co., Ltd. ("Beijing Xueersi Education"); (2) Beijing Xueersi Network Technology Co., Ltd. ("Beijing Xueersi Network"); (3) Xinxin Xiangrong Education Technology (Beijing) Co., Ltd. ("Xinxin Xiangrong").

52.     TAL's Affiliated Entities ("AEs") are: (1) Shidai TAL Education Technology (Beijing) Co., Ltd.; (2) TAL Education Technology (Jiangsu) Co., Ltd.; and (3) TAL Training School (Shanghai) Co., Ltd.

53.     In addition to TAL's 10 subsidiaries and consolidated affiliated entities named above, TAL has an additional operating entity called Shenzhen Xueersi Training Center ("Shenzhen School"), which was incorporated in November 2013 in Shenzhen, China.

54.     According to Forms 20-F filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL had a 100% legal ownership interest in the following entities: (1) TAL Holding Limited ("TAL Hong Kong"), an intermediate holding company; (2) Beijing Century TAL Education Technology Co., Ltd. ("TAL Beijing"), a software sales and consulting service; (3) Beijing Huanqiu Zhikang Shidai Education Consulting Co., Ltd. ("Huanqiu Zhikang"), an education and management consulting service; (4) Yidu Huida Education Technology (Beijing) Co., Ltd. ("Yidu Huida"), a software sales and consulting service; (5) Beijing Xintang Sichuang Education Technology Co., Ltd. ("Beijing Xintang Sichuang"), a software and network development, sales, and consulting service; (6) Zhixuesi Education Consulting (Beijing) Co., Ltd. ("Zhixuesi Beijing"), a software and network development, sales, and consulting service; (7) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. ("Pengxin TAL"), an investment management and consulting service; (8), Firstleap Education ("Firstleap"), an intermediate holding company; (9) Firstleap Education (HK) Limited ("Firstleap Hong Kong"), an intermediate holding company; (10) Beijing Lebai Information Consulting Co., Ltd. ("Lebai Information"), an education and management consulting service; and (11) Beijing Yizhen Xuesi Education Technology Co., Ltd. ("Yizhen Xuesi"), a software and network development, sales, and consulting service.

55.     For fiscal year end February 28, 2022 ("FY 2022"), TAL's 100% legal ownership over other entities dropped significantly. TAL reported in its Form 20-F for FY 2022 that the

"Company decided in November 2021 to cease offering services relating to academic subjects from kindergarten through grade nine in the mainland of China by the end of December 2021" and further, that "[t]he Company also has taken actions to restructure its business and operations . . . ." Thus, as of February 28, 2022, TAL only had a 100% legal interest in: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; and (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

56.     As of the date of this filing, TAL operates four major tutoring brands including: (1) Xueersi, which is further divided into Xueersi Peiyou, which provides small-class learning services, and Xueersi.com, which provides online education services; (2) Zhikang, which provides after-school one-on-one learning services; (3) Firstleap, which provides English education; and (4) Mobby, its science, technology, engineering, arts and math ("STEAM") education brand.

57.     TAL also provides overseas study consulting services and test preparation courses for major overseas exams. Xueersi Online School is TAL's leading brand. It provides online live lessons to students ages 3-16 and is the longest-running online education brand under TAL. Mobby is TAL's preschool education program which was first launched in 2011.

### B.     The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry

58.     The National People's Congress is China's highest legislative body. The State Council is the highest authority of the executive branch of the PRC central government. There are several ministries and agencies under the authority of the State Council including the Ministry of Education, the General Administration of Press and Publication, the MIIT, the SAIC, and the Ministry of Civil Affairs.

59.     As stated in TAL's Forms 20-F filed with the SEC for fiscal years 2018 through 2022, "The principal laws and regulations governing private education in China consist of the PRC Education

Law, the Private Education Law and Implementation Rules, and the Regulations on PRC-Foreign Cooperation in Operating School."

60.    In the 1990s, the Chinese government began to take concrete measures to make education in China more equitable and less burdensome on parents and students. For instance, in 1995, the Chinese government enacted Regulations on the Qualifications of Teachers as a supplement to the Teachers Law of the People's Republic of China.[4] The 1995 supplementary regulation provided further details regarding the acceptable forms of teaching qualifications, prerequisites, examinations, as well as teaching credentials. Thus, in the past several decades, the Chinese government has taken concrete steps to regulate the burgeoning private education industry, particularly by enacting various laws and regulations.

61.    Then, in 2010, the Department of Development and Planning (within the Ministry of Education, "MOE"), which is responsible for national educational development, proposed the National Long-Term Education Reform and Development Plan (2010-2020) ("Long-Term Education Reform"), a strategic plan for reforming and developing education of all levels throughout China between the years of 2010-2020. The Long-Term Education Reform was, for a while, the most salient guidance in Chinese education.

62.    In 2018, the Chinese government began enacting a series of rules and regulations referred to as "Circulars" and "State Council Opinions" under the regime of the Law on the Promotion of Private Education of China. For instance, in February 2018, the Chinese government promulgated the "Circular on Special Enforcement Campaign Concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle School," or "Circular 3," which was intended to rein in excessive tutoring fees and limit the perceived societal harm resulting from the

---

[4] According to a report issued on oecd.org, at times, the Chinese government supplements education *laws* with *regulations. See* https://www.oecd.org/china/Education-in-China-a-snapshot.pdf.

for-profit tutoring programs in China. Among other restrictions, the regulations prohibited after-school tutoring institutions from: (i) providing courses more advanced than the government-approved syllabus and curricula applicable to the respective primary and secondary school students; (ii) providing courses designed to enhance exam-taking skills; and (iii) linking school enrollment with tutoring results. On the whole, the regulations purported to reduce disparities in school performance between relatively affluent students who could afford after-school tutoring and those that could not. Specifically, Circular 3 prohibits private training organizations from organizing academic competitions or tests for students in elementary or middle school and further prohibits elementary and middle schools from considering the results from private training organizations in the enrollment process. As stated in TAL's Form 20-F for fiscal year 2018 ("FY 2018"), under Circular 3, Chinese "government authorities will carry out a special enforcement campaign to alleviate extracurricular burden on students of elementary schools and middle schools and regulate operations of after-school training institutions."

63. On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the State Administration for Market Regulation ("SAMR") jointly issued a Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, under which government authorities would carry out a series of inspections on after-school training institutions.

64. On August 22, 2018, the Chinese State Council issued an opinion on Supervising After-School Tutoring Institutions, known as "Circular 80," or "State Council Opinions 80," which provided additional regulations targeting after-school tutoring institutions. In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than three months' worth of fees. Circular 80 also set forth requirements pertaining to the Permit for

Operating a Private School, including: the size of the classroom; the teacher's qualifications, insurance, fire safety, environmental protection, as well as health and food safety.

65.    That same month, the State Counsel issued the "Opinion on regulating the Tutoring Industry" which set forth the following: (1) course information must be filed with the local education authorities and made publicly available; (2) contents of tutorial courses should not surpass the national guideline; (3) course schedule should not conflict with regular school time; (4) tutorial centers should not offer tutoring courses past 8:30 pm and instructors should not assign homework for students; (5) no examination, competition, or any related rankings can be conducted for courses of primary school and secondary school subjects; (6) tutorial centers cannot receive students' tuition payments for more than 3 months in advance; (7) instructors who teach Chinese, math, foreign language, physics, and chemistry, among others, in the compulsory education system must obtain teaching qualifications; (8) the average floor space per student during one tutoring session cannot be less than three square meters; and (9) public school teachers cannot be employed by after-school tutoring institutions.

66.    On August 31, 2018, the General Office of the MOE promulgated the Circular called "Implementation of Special Measures and Rectification Work on the Private Education Institutions," which pronounced specific requirements for local education departments to enforce State Council Opinions 80.

67.    On November 20, 2018, the General Office of the MOE along with the General Office of the SAMR of the PRC and the General Office of the Ministry of Emergency Management of the PRC jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," better known as "Circular 10." Circular 10 provides express requirements for local governments regarding the implementation of State Council Opinions 80, which was issued earlier that year in February.

68.     Approximately one year later, on March 5, 2019, during China's "Two Sessions" of the 13th CPPCC National Committee (annual political meeting of China's top political advisory body held in Beijing), a notice entitled, "The Urgency of Regulating Out-of-School Tutoring market" was published on the Ministry of Education website by LI Hongpin, the Deputy to the National People's Congress ("NPC").

69.     In China, living close to a school is often a prerequisite to a child's enrollment. As a result, home prices have risen significantly in neighborhoods near the best schools. On January 1, 2019, Beijing implemented price controls on houses in certain school districts. Houses purchased after that date no longer guarantee enrollment of owners' children in certain schools. Beijing housing authorities also suspended and fined two real estate brokers as part of a sweeping inspection of more than 100 brokerages to determine whether they continue advertising school district houses to mislead buyers. On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education" marking China's first document centered on reforming education and teaching in compulsory education.

70.     Parallel to the July 8, 2019 regulation was the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), promulgated by the MOE and other PRC government bodies such as the Cyberspace Administration of China, on July 12, 2019. These opinions were intended to regulate academic after-school training that involved internet technology and specifically initiated the supervision of online and offline after-school training.

71.     On April 21, 2020, the Ministry of Human Resources and Social Welfare promulgated the Notice of Implementing the Phased Measures of "Taking Certificate after Starting Career."

72.     Because TAL operated in a highly regulated industry within China, the impact of new laws and regulations governing the Chinese tutoring industry, and the Company's compliance with the

Chinese regulatory framework and government prerogatives were of material importance to investors. TAL acknowledged the material importance of maintaining strict compliance with Chinese laws, regulations and government prerogatives governing the tutoring industry. For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations."

73.    On April 7, 2021, China's State Council promulgated the Amended Regulations on the Implementation of the Law for Promoting Private Education of the PRC, or the Amended Implementation Regulations of Private Education Law, which became effective on September 1, 2021. The Amended Implementation Regulations of Private Education Law together with State Council Circular 80 "require the learning centers of after-school tutoring institutions to make filings with the relevant education authorities," as reported in TAL's Form 20-F for fiscal year 2022.

74.    Then, on July 23, 2021, China **effectively outlawed the entire private academic tutoring industry.** In particular, the General Office of the Central Committee of China's Communist Party and the General Office of the State Council jointly released the Opinions on Further Reducing the Burden of Homework and Off-Campus Training for Compulsory Education Statements (the "Opinions") which contain a reference to a "Double Reduction" – that is, a reduction in the total amount of time and commitment consumed by school homework as well as a reduction in the burden presented by after-school training or off-campus programs. This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China. Indeed, a *Reuters* report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL.

75.     The July 23 rules require, among other things, that all education companies register as nonprofits; and further state that "no new licenses will be issued to tutoring agencies catering to elementary and middle school students."

76.     The media's reaction to the new policies reflected their severity. For instance, *Sixth Tone*, a Chinese "online publication that produces informed and insightful content on contemporary China, referred to the "double reductions," as a "a massive campaign to take the heat out of the country's educational rat race." *Reuters* reported that the new restrictions barring for-profit tutoring are an effort by China to "boost the country's birth rate by lowering family living costs."

77.     Further, a *JD Supra* article stated:

Double Reduction policy is intended to improve the overall health of students, relieve the burdens and anxiety of parents, reduce social inequity, further regulate and standardize off-campus training (including both online and offline training), and strictly implement the Compulsory Education Law, the Protection of Minors Law and other laws and regulations governing the education industry.

78.     Today, the primary regulations that govern the private education sector in China include: The Private Education Law ("Private Education Law") and the Implementation Rules for Private Education Law ("Implementation Rules").

79.     The Defendants and senior TAL executives were aware that the Chinese government was planning to enact increasingly stringent regulations before the public was aware. In anticipation of the enactment of heighted regulations and as the Chinese government enacted these laws, TAL turned a blind eye to the new laws and regulations and knowingly continued to operate as it had long since by evading and violating the regulatory framework while assuring investors that it was in compliance. In some cases, it even claimed that any increased regulatory scheme would be beneficial to the Company. Defendants made these assurances despite the serious financial and reputational consequences that the they knew would likely arise if TAL was caught. Despite the increased regulation, China's Gaokao remained a college entry requirement and general expectations of academic excellence had not

25

diminished; thus, TAL continued to experience heightened demand for its tutoring services and wanted to continue to capitalize on the demand. As further detailed below, TAL consciously violated the new laws and instead moved its business operations underground.

### C.    Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws

80.    Despite Defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations and proscriptions of the Chinese government and that increased regulation was beneficial to the company, during the Class Period, the Company regularly violated those same rules, regulations and proscriptions in an attempt to artificially inflate the Company's financial results. These violations long went undetected, but were eventually caught by Chinese regulators, who imposed fines ranging from the equivalent of a few hundred to a few thousand dollars. Such fines—which, as alleged herein, were disclosed to Lead Plaintiff by several of TAL's former employees—eventually contributed to the shutdown of the private education industry in China.

81.    As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States. Lead Plaintiff's investigation uncovered at least 60 infractions and eight of the nine former employees interviewed by Lead Plaintiff disclosed the specifics of certain of these violations; however, TAL engaged in many additional and far more serious violations which led the Chinese government to ultimately, effectively, shut down the Company's operations. Indeed, at a governmental conference announcing the industry-wide fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including **155,000** complaints and reports for education and training services received by authorities in 2020 alone and over **47,000** similar complaints and reports received by authorities in the first quarter of 2021. Given that the

26

market share in the industry was dominated by TAL and a handful of its competitors, it stands to reason that TAL engaged in *many* more regulatory infractions which are either unavailable or inaccessible to the public than the roughly 60 referenced above.

82.    Further, in May 2021, SAMR fined 15 TAL after-school tutoring institutions with financial penalties amounting to RMB 36.50 million ($5,683,496 USD). In particular, an affiliate of TAL's leading brand Xueersi, Hangzhou Yidu Training School Co. Ltd., was fined RMB 2.5 million ($389,281 USD) for engaging in false advertising and price fraud. Senecaesg.com reported that the tutoring companies were accused of "false publicity, such as fabricating teacher qualifications, exaggerating tutoring effects, fabricating user reviews, and so on."

83.    Among the transgressions for which TAL was sanctioned by Chinese regulators, TAL reportedly: (i) engaged in deceptive advertising and promoted fake product pricing, designed to induce student enrollment, as reported by CW2, CW4, CW5, and CW9; (ii) fabricated favorable course reviews, including by purported consumers who did not in fact exist; (iii) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (iv) offered courses that gave students unfair advantages in contravention of Chinese government policies; (vi) misrepresented teacher qualifications and course qualities as reported by CW6, CW8, and CW9; (vii) mishandled user data; and (viii) rigged promotional events to defraud consumers.

84.    TAL was an unrepentant serial violator of the Chinese government's rules, regulations and proscriptions and engaged in a continuing game of cat and mouse with regulators. As one Chinese language source[5] observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]." Instead, the Company continued to engage in "over-standard and advanced tutoring, illegal charges, false publicity, tricking consumer[s] into transactions, [the use of] vulgar

---

[5] The Chinese-language sources cited herein have been translated into English by translators hired by Lead Plaintiff's counsel.

videos, illegal recruiting and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

### 1. Illegal Tutoring

85.    TAL repeatedly engaged in illegal tutoring practices by, among other things, offering course programs that violated state regulations, tutoring beyond the scope of the syllabus as corroborated by CW6, CW7, and CW8, and operating a school without approval as confirmed by CW3 and CW7. Below is a mere sample of the infractions that TAL incurred during the Class Period; upon information and belief, TAL likely incurred hundreds, if not thousands, of sanctions and fines for violating regulations and laws governing the for-profit tutoring industry throughout the Class Period.

86.    A TAL tutoring institution based in Yingzhou District, Fuyang City of the Anhui province organized primary school students to take a junior high school entrance examination, which was allegedly designed to send overachieving candidates to the better junior high schools. The local Yingzhou District Education Bureau issued a public notice that the TAL institution was involved in unauthorized illegal tutoring and ordered the institution to suspend operations in June 2021.

87.    TAL's Hangzhou branch, Hangzhou Xueersi, violated the new senior high school entrance examination policy by using terms like "top achievers' class "target class," and "competition class" during student enrollment promotions.

88.    On March 24, 2021, TAL Training School (Shanghai) Co. Ltd., was fined for operating a tutoring business in the name of "Zhangyang Road Branch" from July 2020 to January 2021 without having obtained the relevant branch registration. (Penalty Decision No. 152020001595.)

89.    TAL's Xinxin Zhixue Education Technology (Beijing) Co Ltd., a wholly owned subsidiary of Xinxin Xiangrong, enrolled students in May 2021 and offered Xueersi Peiyou training services at its Guangzhou campus from July to August 2021 in direct violation of state regulations which forbade unauthorized private tutoring services. As a result, the state ordered it to suspend its operations on January 11, 2022. (Penalty Decision No. 326.)

90.    TAL's Chongqing Jiulongpo District Xueersi Yizhi Technology training Co., Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, engaged in illicit practices such as advanced tutoring, tutoring beyond the scope of the syllabus, and charging tuition for periods longer than the allowable three-month period. As a result, the company was blacklisted by the Education Commission of Jiulongpo District, Chongqing in May 2021. The company later changed its name on May 18, 2022, to Chongqing Jiulongpo District Zhikang Education Training Co. Ltd.

91.    On April 16, 2021, Kunshan Yizhen Education Technology Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong was fined for operating a school without approval. (Penalty Decision No. 010002.)

## 2. Falsification of Teacher Qualifications

92.    Throughout the Class Period, the PRC imposed stringent regulations concerning teachers' qualifications, and closely watched for infractions. However, TAL also ignored or skirted these rules. For example, and as corroborated by CW2, CW6, and CW8, and CW9, many online Xueersi teachers lacked the requisite teaching qualifications. According to one report dated May 2, 2020, only 27 out of 58 teachers that taught Chinese, math, or English in Grade 1 via Xueersi.com provided their teaching certificate numbers. Worse, of those that did purport to provide their teaching qualifications, such "qualifications" did not comply with prevailing regulations. CW2, CW6, CW8, and CW9 each disclosed that TAL and its subsidiaries allowed teachers who did not possess the

requisite qualifications to teach courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to teach at sites.

93.    Another report dated April 25, 2021 reported that some teachers on Xueersi.com taught students in grades that were more advanced than their teaching qualifications permitted. For instance, a teacher with the surname "Qi" had a teaching certificate that indicated that she was qualified to teach primary school subjects, however, she was actually teaching junior high school subjects on Xueersi.com.

94.    On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd. on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming to be a high school teacher with six years of teaching experience recommended Xueersi.com online courses. Beijing Xueersi Education spent RMB 2,622.58 ($401 USD) on the video advertisement. (Penalty Decision No. 323.) Similarly, CW5 disclosed that in 2021 the Beijing Haidan District Market Supervisions Administration fined Xueersi more than RMB 10,000 ($1,573 USD) for false publicity because a person purporting to be a teacher in its video advertisement was actually an actor.

95.    On May 30, 2021, one of TAL's operating entities, Hangzhou Yidu Training School Co. Ltd., was fined RMB 2.5 million ($392,450 USD) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

### 3.  Unlawful Pricing Practices

96.    As alleged above, Circular 80, enacted in 2018, forbade tutoring companies from charging tuition for a period greater than three months, yet TAL flouted this regulation. For example, Xueersi, TAL's leading brand, had a practice of charging students advance tuition for more than three

months of courses (typically in Xueersi.com's Summer and Autumn Course Package, which, according to a report by the Economic Observer, often lasted more than three months) and required prepayment in full. Therefore, TAL had students pay tuition in advance of course programs.

97.    TAL's subsidiaries also flagrantly disregarded Chinese law governing pricing. For instance, on August 21, 2019, Shanghai Xueersi Education Training Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for illegal pricing after an inspection revealed that an IZhikang store located in Shanghai did not provide a public notice of its tutoring courses' prices and promotional details, which constituted failure of clear price marking. (Penalty Decision No. 122019007925.)

98.    Thereafter, on April 25, 2021, the Beijing Municipal government issued a warning and imposed a fine on Beijing Xueersi Education for offering discounted prices for several of its courses in violation of pricing laws as well as selling courses more than three months in advance and holdings courses past 9:00 pm. (Penalty Decision No. 58.) Specifically, regulators found that TAL's VIE, Beijing Xueersi Education Technology Co., Ltd., had been misrepresenting the non-discounted costs of enrollment in its courses to consumers, thereby deceiving customers into paying the full price for courses they believed they were receiving at a discount. For example, TAL promoted online courses as being offered at a 97% discount from the purported regular price when in fact no Company courses had ever been sold at this purported regular price. On one occasion, TAL marked up the price of an online course by nearly 4,000% despite offering a substantially lower price initially.

99.    Beijing authorities stated that they were acting on serious concerns that had been raised by the general public regarding the Company's business practices. In its May 7, 2021 Form 20-F filing, TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." For

example, the PRC Pricing Law provides that an operator is prohibited from using false or confusing pricing methods to induce consumers or other operators into trading with it.

100.    On July 23, 2021, Xi'an Yanta District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., a wholly-owned subsidiary of TAL's Beijing Xueersi Education, was fined RMB 1.3 million ($200,577 USD) for violating the: (1) Anti Unfair Competition Law by setting unclear terms while offering a prize-attached sale; (2) the Advertising Law by explicitly or implicitly promising training effects; (3) Advertising Law by providing false or misleading contents in its advertisements; and (4) the Price Law by using false or misleading pricing measures to induce customers or other operators into transactions. (Penalty Decision No. 0168.)

101.    Even after the Class Period, TAL continued to flagrantly disregard Chinese pricing laws. For instance, on November 16, 2021, Wenzhou Xueersi Culture Communication Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., was ordered to rectify its illegal practice of marketing eight tutoring courses for RMB 1 each ($0.16 USD), where the market price was more than 30 times higher between July 2021 and September 2021.

102.    On September 13, 2021, Hangzhou Xiashan Money School Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined for failing to display its pricing standards to the public. (Penalty Decision No. 45.)

103.    These accounts of price fraud, price gouging, and illicit bait and switch practices to entice parents to sign their children up for tutoring are corroborated by the accounts of CW2, CW4, and CW5.

### 4.   Unauthorized and Illegal Promotional Publications

104.    China strictly regulates the publication and dissemination of information, regardless of the medium of expression. The Administrative Regulations on Publications, or No. 343 Order of the State Council of the PRC, was first adopted on December 12, 2001, and later amended on

February 6, 2016. It applies to activities such as: publishing, printing, copying, importing or distributing publications, including books, newspapers, periodicals, audio and video products. Under the Administrative Regulations on Publications, any entity engaged in these aforementioned activities must obtain a permit to do so. Despite these rules, TAL regularly disseminated materials without the requisite permits.

105.    During the Class Period, Defendants were fined for engaging in unauthorized or illegal publications. In particular, Beijing Xueersi Education Technology Co., Ltd., was fined on June 21, 2022 for publishing and disseminating an online publication between December 12, 2016 and April 6, 2022 that contained illicit content. (Penalty Decision No. 400076.)

106.    Additionally, Qingdao Xueersi Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined on July 27, 2021, for offering unauthorized versions of electronic textbooks available for free public download via its WeChat Public Account named "Qingdao Kindergarten to Primary School Information" between May and June 2021. (Penalty Decision No. F-000020.)

107.    On May 17, 2021, Nantong Yizhen Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for unauthorized publication and had one of its computers and 173 sets of a publication confiscated. (Penalty Decision No. 46.)

108.    On February 24, 2021, Nanjing Xintang Sichuang Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for the unauthorized publication of 556 sets of two booklets. (Penalty Decision No. 6.)

109.    On January 13, 2021, Beijing Xueersi Education was fined because it failed to obtain review and approval procedures for a map which was uploaded and published by a website operated by the company, in violation of Regulation on Map Management. (Penalty Decision No. 2.)

110.    On September 29, 2020, Shanghai YY Information Technology Co. Ltd., which is 81.1% owned by Beijing Xueersi Education Technology Co. Ltd., was fined for the provision of an online publication without the relevant license or prior approval by authorities. (Penalty Decision No. 20200220.)

111.    On September 6, 2021, Suzhou Industrial Park Xueersi Culture Training Center Co. Ltd. and Suzhou Wujiang District Xueersi Training Center Co. Ltd. (wholly owned subsidiaries of Suzhou Yizhen Education Technology Co. Ltd., which in turn is wholly owned by Pengxin TAL Industrial Investment (Shanghai) Co. Ltd.) were fined for illegal publications. (Penalty Decision Nos. 21 and 72).

112.    On August 27, 2018, Beijing Xueersi Education was fined for publishing and disseminating an online publication containing forbidden content. (Penalty Decision No. 40764.) Beijing Xueersi Education was also fined on June 10, 2015, for an illegal online publication. (Penalty Decision No. 40194.)

113.    These incidences of false advertising and publicity are corroborated by the accounts of CW2, CW5, and CW9 as further discussed above in ¶¶ 37, 40, 44.

### 5.  False Advertising and Publicity

114.    According to TAL's Form 20-F for fiscal year end February 28, 2019, the principal regulations governing the advertising businesses in China include: the PRC Advertising Law, which went into effect in September 2015, and was recently amended in October 2018, and the Advertising Administrative Regulations promulgated by the State Council. These laws require companies that advertise their services to obtain a business license that permits advertising in that particular scope from either the SAIC or its local branches.

115.    Before, during, and after the Class Period, TAL and many of its subsidiaries flagrantly disregarded tthe PRC's advertising rules and regulations, thereby incurring repeated sanctions. In

particular, leading up to the Class Period, TAL demonstrated that it had little regard for the PRC's regulations given that it incurred a number of regulatory sanctions including, among others: one on June 21, 2017 after one of its subsidiaries launched a project for a teaching campus without proper authorization; one on August 25, 2017 after one of its entities failed to properly register for fire engineering completion; one on April 25, 2018, after one of TAL's subsidiaries provided false statistics.

116.    Moreover, during the Class Period, TAL and many of its subsidiaries continued to receive financial penalties for engaging in an array of false promotional and advertising schemes. For example, on June 27, 2018, Beijing Bangxue Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for publishing training advertisements that explicitly or implicitly stated that examination institution personnel or exam preparation staff participated in the preparation of education or tutoring contents. (Penalty Decision No. 1045.) Previously, another administrative penalty had been issued to Beijing Bangxue on June 15, 2018, in connection with the company using the name or image of a scientific research institute, academic institution, education institution, industry association, specialized professional, or beneficiary person to recommend or substantiate education or tutoring advertisements, but no penalty was imposed at that time.

117.    On September 10, 2018, Beijing Xueersi Education was fined after the company unlawfully used the name or image of a scientific research institute, academic institution, education institution, industry association, specialized professional, or beneficiary person, to recommend or substantiate education or tutoring advertisements. (Penalty Decision No. 27.)

118.    On November 13, 2020, Hangzhou Xuesi Training School Co. Ltd, a wholly owned subsidiary of Xinxin Xiangrong, was fined for illegally publishing an education and training advertisement on August 14, 2020. (Penalty Decision No. 091.)

119. On December 11, 2020, Nanchang Xueersi After-School Service Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined for displaying a large outdoor advertisement board without approval. (Penalty Decision Nos. 0406013, 0406014.)

120. Further, and as discussed in ¶ 95, on May 30, 2021, Hangzhou Yidu Training School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined RMB 2.5 million ($351,321 USD) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

121. Changzhou Xuesi Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined on June 30, 2021, for publishing a false advertisement. (Penalty Decision No. 179.)

122. TAL and its subsidiaries were sanctioned after the Class Period for false advertising schemes employed during the Class Period. For instance, Xueersi Education Training Co. Ltd., which is 80% owned by Beijing Xueersi Education, was fined on August 31, 2021, for violating China's Anti Unfair Competition Law – a law initially enacted in 1993 and later amended in 2017 and 2019 which contains 33 articles concerning the types of unfair competition and the procedures by which to investigate the unfair competition and the legal liabilities for such acts. In particular, Xueersi Education violated the "false prize-attached sales" provision of the Anti Unfair Competition Law which "refers to the act of the operator who conducts the sales promotion with prizes in a fraudulent way, or with a top prize of the lottery sale exceeding CNY 50,000."

123. On September 13, 2021, Chongqing Shapingba District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., ("Chongqing Shapingba") a wholly-owned subsidiary of Beijing Xueersi Education, was fined for releasing a promotional video on its WeChat[6] public account that

---

[6] WeChat is a marketing and social messaging app with more than 1.1 billion registered accounts and 846 million monthly active users.

contained statements by two students of the Xueersi Peiyou courses recommending Xueersi Peiyou's tutoring service, in violation of the Advertising Law of the People's Republic of China. The video further stated that a teacher was teaching more than 90% of the students that participated in competitions, which was not true. (Penalty Decision No. 226.)

124.    On November 4, 2021, Tianjin Xueersi Education Information Consulting Co. Ltd, a wholly owned subsidiary of Beijing Xueersi Education, was fined for illegal advertising.

125.    On January 10, 2022, Beijing Shunshun Bida Information Consulting Co. Ltd., which is 80% owned by Beijing Xueersi Education was fined for falsely overstating that its overseas study enrollment rate of students tutored by Beijing Dongfang reached 98% whereas the actual rate was 87%. (Penalty Decision No. 9.)

126.    TAL falsely claimed that the Company maintained industry-leading compliance with applicable rules and regulations governing the Chinese for-profit tutoring industry when, in fact, it repeatedly violated those rules and regulations while claiming that the Company would benefit from the very regulations it was violating. As a result of Defendants' scheme to defraud investors and issue materially false and misleading statements during the Class Period, the price of TAL ADSs traded at artificially inflated prices as detailed herein.

### 6.    Unauthorized Expansion of Tutoring Sites

127.    On January 8, 2020, Changsha Tianxin District Xueersi Education Training School Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., was fined for the unauthorized construction on two teaching campus renovation projects. (Penalty Decision Nos. G-1, G-2.)

128.    On January 11, 2021, Changsha Yuhua District Xueersi Training School Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined for the

unauthorized construction of three teaching campus renovation projects. (Penalty Decision No. 1, 2, and 16, respectively.)

129.    On April 30, 2021, Changsha Yuelu District Xueersi School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined for unauthorized construction. (Penalty Decision No. G-13.)

### D.    SEC Investigations

130.    On July 30, 2019, the SEC began investigating TAL. According to a Probes Report, based on the SEC's investigation, FOIA requests to the SEC and appeals of those FOIA requests, "the timing of SEC responses to us suggests that ***TAL education Group management may have known about an SEC probe since at least Jul-2019.***"

131.    On June 30, 2020, the Probes Reporter issued an update on an SEC probe entitled "SEC Investigation Update" which included the following timeline of the SEC's investigation into TAL:

| 20-Aug-2018 | FOIA Response | No SEC investigative records found. |
| --- | --- | --- |
| 30-Jul-2019 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 19-Sep-2019 | Appeal Response | Existence of on-going SEC enforcement proceedings officially confirmed on appeal; Access to records remains blocked. |
| 27-Mar-2020 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 4-Jun-2020 | Appeal Response | **Existence of on-going SEC enforcement proceedings officially confirmed on appeal**; Access to records remains blocked. |

132.    The update stated that "an undisclosed SEC investigation is again confirmed" and that "TAL Education Group remains on our Watch list of companies with confirmed, undisclosed SEC investigations."

133.    On September 28, 2023 the SEC issued an order in connection with cease-and-desist proceedings it had brought against TAL pursuant to Section 21C of the Exchange Act concerning TAL's financial reporting for the first three quarters of its 2020 fiscal year. The proceedings were

instituted after TAL's subsidiary, "Light Class" Business Line, entered into phony contracts with third parties in violation of the Foreign Corrupt Practices Act in order to inflate the Light Class Business Line's revenue. In particular, the SEC alleged that TAL's Light Class Business Line had deficient internal accounting controls which resulted in TAL overstating its net revenues and net income for the first three quarters of its 2020 fiscal year by $86.1 million and $26.6 million, respectively, resulting in the filing of a restatement by TAL. In or around September 2023, TAL agreed to pay the SEC $1.25 million to settle these charges.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

134.    Throughout the Class Period, Defendants issued materially false and misleading statements and omissions, including those regarding: (a) TAL's adherence to Chinese regulations governing the after-school tutoring industry; (b) the ability of TAL to comply with Chinese regulations; and (c) the "beneficial" nature of the regulations which would purportedly make the industry "more healthy."

### A.    Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry

135.    During the Class Period, Defendants misled investors about: (i) TAL's continued failure to comply with Chinese regulations overseeing the private, for-profit tutoring industry; (ii) the repeated fines and sanctions imposed on TAL; and (iii) that TAL's repeated reckless regulatory violations would fuel the Chinese government's increasingly harsh regulation of the industry and risk and or provoke a complete shut-down of the industry and, with it, TAL's profitable private tutoring business.  In their Forms 20-F and 6-K filed with the SEC, earnings calls; press releases; and interviews with analysts, Defendants consistently reassured the public that the Company was complying with the government's evolving regulations pertaining to the tutoring industry and in fact, that the government's rules and regulations would benefit the industry. In actuality, however,

Defendants' core business operations were severely impacted by the regulations which ultimately contributed to the demise of the entire tutoring industry, but Defendants continued to reassure the public that all was well while selling hundreds of millions of dollars of TAL stock for their personal enrichment.

136.    These statements were false. Accounts from several confidential witnesses, all of whom were former employees of TAL, demonstrate that TAL repeatedly ignored and violated the PRC regulations and policies that governed its industry. For instance, and as further detailed herein, CW2, CW6, CW8, and CW9 all disclosed that TAL and its subsidiaries allowed teachers who did not possess the requisite qualifications to teach courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to TAL's branches. Further, CW2, CW4, and CW5, disclosed that TAL used illegal price tactics— for instance, charging 20 yuan for courses that were actually several hundred or even thousand yuan– –to attract parents of students to enroll their children and were fined accordingly. CW3 and CW7 reported that Xueersi operated several schools that lacked the requisite licenses or approvals necessary to operate schools. Finally, CW6, CW7, and CW8 reported that TAL taught content that exceeded the scope of the syllabus in violation of certain regulations. CW5 and CW7 reported that TAL and its subsidiaries violated teaching curfews or taught courses during restricted times such as on the weekends or during summer and winter vacations. CW2, CW5, and CW9 reported that TAL was fined for false publicity.  Defendants knew that these persistent violations detailed above would culminate in increasingly restrictive laws and regulations yet persistently flouted such laws anyway while falsely assuring investors that the Company was law-abiding and even welcoming of heightened regulations.

137.    The 2018 Form 20-F explained the 2018 regulations, including, Circular 3, or the Circular on Special Enforcement Campaign concerning After-school Training Institutions to

Alleviate Extracurricular Burden on Students of Elementary Schools and Middle Schools, which the

MOE had promulgated earlier in the year on February 13, 2018. The Form 20-F further provided that

(emphases added):

> In March 2018, two of our training institutions providing K-12 tutoring services received notice under Circular 3 from the local government authority and *we are taking corrective measures in accordance with Circular 3.* For example, *we have reduced our course hours and schedule for certain of our offline tutoring courses to end before 8:30 pm and reduced the coursework assigned to our students*, etc. However, *we cannot assure you that we will fully comply with the above mentioned regulations timely or at all, and will not be fined or otherwise penalized by government authorities for offering such classes, in which case our business and operations could be materially and adversely affected . . ..*
>
> *if we fail to comply with the applicable legal requirements* concerning obtaining and maintaining applicable licenses and permits and fulfilling applicable registration and filing requirements to operate our after-school tutoring business, including any failure to cure non compliances in a timely manner, we may be subject to fines, confiscation of the gains derived from our noncompliant operations or the suspension of our noncompliant operations, which may materially and adversely affect our business and results of operations.

138.    This statement was false and misleading when made and omitted material facts

because, as described in Section IV(C)(1), contrary to its assurances that the Company was taking

corrective measures to reduce its course hours, end tutoring courses by 8:30 pm, and reduce the

coursework assigned to students, TAL was violating these very laws and incurring significant

sanctions as a result. In particular, CW5 and CW7 reported that TAL and its subsidiaries violated

teaching curfews or taught courses during restricted times such as on the weekends or during summer

and winter vacations.

139.    One month later, on July 26, 2018, TAL held an earnings call with analysts and

investors hosted by Defendant Luo. During the call, Defendant Luo acknowledged the policies that

the government had released relating to the tutoring market and stated that the policies were aimed

at further improving the overall standards of the industry. In particular, Defendant Luo stated: TAL

is "*fully cooperating with the government directions*, and *where needed, [will] make adjustments*

*to our business operations accordingly."* Defendant Luo also stated that the reform policy will "*be very positive* for the quality and diversity of off-line school tutoring services," "*the direction is -- the regulations will help the online education to be more healthy*" and *"we proactively follow the government regulations and do the adjustments ourselves."* Defendant Luo further stated: "[T]he regulations will help the online education to be more healthy . . . So we, as a company, is just follow their – and we are going to follow the government regulation requirements if they have in the future. And even before that, we, as a company, also we are operating our own business in a very disciplined way."

140.    The statements that TAL was "fully cooperating" with and "proactively following" the government's regulations governing the for-profit tutoring industry were materially false and misleading when made because the Company was flagrantly violating those regulations. As such, TAL was *not* adjusting its "business accordingly" but rather, intentionally or recklessly flouting Chinese rules and regulations governing the tutoring industry. CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9 each confirmed that TAL was not, in fact, "proactively following" the government's regulations as each described an array of conduct that TAL took which directly contravened the laws and regulations in place at the time.

141.    On January 24, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo again claimed that TAL was following Chinese law regarding the tutoring industry and adjusting its business practices accordingly:

> As you know, the education industry, including after-school tutoring market is currently in the midst of ongoing education reforms, standardizations and regulations. All these policies are aimed at further improving overall standards and the ecosystem of the entire industry. *We are following government directions, and where needed, we will continue to make adjustments into our business operations accordingly.*

142.    Later in the call, Thomas Chong, an analyst with Credit Suisse AG, asked: "Can management give us some update about the off-line and online regulations…." Defendant Luo

responded that the government policies were good for TAL's business, as they had "***greatly improved***

***the service standard of the whole industry***." Defendant Luo further added: "***[W]e fully agree with***

***all the policies and try to execute the policies in our operations as much as we can***." Defendant

Luo then stated:

> ***[W]e try our best to be compliant with all the government kind of policies***. And ***we***
> ***believe all of these policies, at the end, their purpose is not to try to kill the industry,***
> their purpose is try to protect the rights of parents and give more right of choices back
> to the parents, which also can protect the whole industry and will be beneficial to all
> the compliant companies in the long run. ***And besides what you have seen, off-line***
> ***regulation policies, and we have disclosed and make you very open to all of you***
> ***guys in the past earning calls.***

143.    The statements set forth above in ¶¶ 141-42 were materially false and misleading

because Defendants did not genuinely believe that the Chinese government's stringent policies

"greatly improved" the for-profit tutoring industry and did not genuinely believe that "**their purpose**

**is not to try to kill the industry**." Further, TAL was not following the government's directions by

adjusting its business practices to be compliant with the new policies. Instead, TAL was engaging in

a wide range of illegal conduct in violation of these policies, as further alleged in Section (IV)(D)

and as corroborated by CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9. Indeed, Defendants'

sale of vast amounts of their personal holdings in TAL at the same time reveal that they did not

believe their statements to the market regarding the beneficial impact the new regulations would have

on TAL's business or TAL's ability to comply with said regulations; rather, these statements operated

as a means by which to jack up the stock price while Defendants cashed out on their insider sales.

Defendants also knew that the purpose of the new regulations was to "kill the industry," and these

assurances were designed specifically to mislead nervous investors.

144.    Defendant Luo added during the January 24 earnings call that "***we welcome all the***

***regulations, policies in online environments***." Defendant Luo further reassured investors that "***[i]f***

***any new policy [comes] out, we definitely will become the first compan[y] who will go and***

*implement all the policies in place*." During the same call, Defendant He stated: "*we are pacing our off-line capacity growth as we continue to invest in new technology and online business to ensure we are following the new standards and regulations that are currently being implemented.*" Finally, Defendant Luo stated: "And we will continue to follow all of government policies and regulations to make sure the new learning centers we enter is compliant with the government requirements."

145.    The statements in the preceding paragraph were false and misleading when made because despite Defendants' assurances that TAL was "following the new standards" and would become the "first company" to "implement all the policies," as reported by CW2, CW4, and CW5, TAL was disregarding the new policies by, among other illegal acts, using improper pricing campaigns designed to lure in new students, and as confirmed by CW2, CW5, and CW9, engaging in false publicity. Further, CW2, CW6, CW8, and CW9 each disclosed that TAL and its subsidiaries permitted teachers who lacked the requisite qualifications to teach tutoring courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to TAL's tutoring branches. Finally, CW3 and CW7 reported that Xueersi operated several schools that lacked the requisite licenses or approvals necessary to operate schools. Finally, CW6, CW7, and CW8 reported that TAL taught content that exceeded the scope of the syllabus in violation of certain regulations. CW5 and CW7 reported that TAL and its subsidiaries violated teaching curfews or taught courses during restricted times such as on the weekends or during summer and winter vacations. Thus, in reality, TAL was repeatedly violating the new policies and regulations governing the for-profit tutoring industry. Defendants' insider sales further reveal that they did not genuinely hold the belief that TAL was complying with governmental regulations and that their reassurances to the market that they were in compliance were merely to artificially inflate the stock price while they cashed out on their insider sales.

146.    On April 25, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo stated that the robust student enrollment growth was "mostly driven by the growth in online enrollments of Xueersi Peiyou small class." Further, in regard to the education regulations, Defendant Luo stated that ***"we continue to invest in new technology and online business to keep improving our overall operational efficiency and ensure we are following the new standards and regulations that are currently being implemented***" and "***[w]e have followed the government directions***, ***and where needed, we'll continue to adjust our business operations accordingly."*** Defendant Luo spoke favorably of the government regulations, stating that ***"[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry."***

147.    Defendant Luo's statements above were materially false and misleading when made because TAL was not, in fact, following "the government directions" or "adjust[ing] [its] business operations accordingly." Rather, TAL was disregarding the government's rules and regulations and continuing to operate its business in a way that violated existing and new laws governing the after-school tutoring industry, for instance, by: operating schools without the requisite business licenses as reported by CW3 and CW7; allowing unqualified teachers to teach tutoring courses in violation of regulations, as reported by CW2, CW6, CW8, and CW9; utilizing illegal pricing tactics to lure in students for instance, by charging 20 yuan for courses that were actually several hundred or even several thousand yuan as reported by CW2, CW4, and CW5; teaching content outside the scope of the syllabus in violation of PRC regulations as confirmed by CW6, CW7, and CW8; teaching at prohibited times as reported by CW5 and CW7; and engaging in false publicity as reported by CW2, CW5, and CW9.

148.    Further, Luo knew that increasingly harsh and restrictive government regulations would make the operation of TAL's tutoring business virtually impossible in an environment where

the Chinese government was progressively moving toward curtailing the tutoring industry entirely. Thus, Luo did not genuinely believe that "[a]ll these policies are aimed to further improving our standards and ecosystem of the entire industry," as evidenced by his sales of stock contemporaneous with this statement.

149.    On July 25, 2019, TAL held an earnings call for its first fiscal quarter of 2020. During the call, Defendant Luo continued to assure investors and analysts: "***We will follow the government [] directions in education reforms, standardizations and regulation. Where needed, we will adjust our business operations accordingly***. All these policies are aimed at elevating the standards and improving the entire education – the whole industry, ***which is the long-term benefit of peer customers and shareholders alike***."

150.    Defendant Luo's statement above was materially false and misleading because contrary to his assurances that TAL would heed the government's directions on education reforms and regulation and "adjust [its] business operations accordingly," in actuality, TAL was purposely flouting those very laws its promised to heed by: employing deceptive pricing measures to lure in new students as corroborated by CW2, CW4, and CW5, creating false publicity to attract new clientele as corroborated by CW2, CW5, and CW9, falsifying teaching certifications which it posted on its website, and various other illegal measures designed to increase its student base and thereby increase revenues.

151.    On October 24, 2019, during an earnings call, in regard to the government policies and regulations, Defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made ***"[t]he pressure of being compliant . . . bigger than before."*** Yet, Defendant Luo asserted that "***the policies were a good timing for us to review our business models and be more cautious***," so TAL "***can be more***

46

*compliant than before*." With respect to off-line centers, he stated: "*we will still be very cautious with the approval policy as first priority to make sure all off-line centers can be more compliant.*"

152.    This statement was materially false and misleading when made because, contrary to Defendant Luo's assurances that TAL "can be more compliant than before" and that it would make it a priority to ensure that its offline centers can be more compliant, in reality, Defendants were not prioritizing compliance with PRC laws and regulations as evidenced by the fact that they were actively contravening the very laws with which they purported to comply. Defendant Luo's statement that TAL would be "more compliant than before" is materially misleading because it insinuates that as of October 24, 2019, TAL had been complying with PRC regulations and that it would continue such compliance. However, at the time this statement was issued, TAL had already flouted numerous laws as reported by CW2, CW3, CW5, CW6, and CW7, CW8, and CW9, and incurred fines as a result. Additionally, that these statements are materially false and misleading is further evidenced by the fact that Defendant Luo had already sold more than $5 million worth of his stock at that point and just five days after he issued the above statements, he proceeded to sell another $5 million worth of stock while TAL's stock was trading at artificially inflated prices due to Defendants' false and misleading statements.

153.    Also during the October 24, 2019 earnings call, Sheng Zhong, an analyst with Morgan Stanley's research division asked for an update on how the government's regulations would impact off-line and online segments of TAL's business. With respect to off-line regulations, Defendant He answered the analyst's question as it pertained to the online regulations:

> As one of the leading online education pioneers, *we are very happy to see and even welcome the online education regulations as always, and we will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services.* And we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students, especially the kids who are based in lower-tier geographic areas.

And finally, ***I'd like to emphasize again that we welcome and fully support all these regulations and policies***, which will have improved the standards and services of the industry and further strengthen the overall industry environment.

Defendant He later stated: "we invest in new technology and online business to further improve our operational efficiency and ***closely follow all the standards and regulations***." Defendant He also referred to a document released in September 2019 by the China Ministry of Education, along with ten other related departments, regarding general guidance relating to the online education industry in China. Defendant He stated that "***we are very happy to see and even welcome the online education regulations*** . . . and . . . will do our best to support and work with the whole industry and government to keep improving the online education product, technologies and services." Defendant He added: "***we believe that with the government's support, technology developments and industry efforts, the online education will benefit more and more students***" and "***we welcome and fully support all these regulations and policies, which will have improved the standards and services of the industry and further strengthen the overall industry environment***."

154.    The statements above were false and misleading when made because Defendant He knew that the government was intent upon increasingly harsh regulation of the tutoring industry which, in turn, made compliance by TAL more difficult, thus rendering He's statement about the beneficial effect of the regulations and the future of the tutoring industry unfounded.

155.    On June 30, 2020, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year end February 29, 2020, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo ("2020 Form 20-F"). In the Form 20-F, Defendants Zhang and Luo certified pursuant to the SOX that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

156.    This statement was materially false and misleading because although Defendants Zhang and Luo certified that TAL's annual report was true and did not omit material facts, behind the scenes TAL was engaging in an array of illegal behaviors such as employing deceptive pricing measures to lure in new students, creating false or misleading advertisements to attract new clientele, falsifying teaching certifications which it posted on its website, and incurring dozens, if not hundreds or even thousands, of sanctions as a result. These illegal behaviors are corroborated by the accounts of CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9.

157.    The 2020 Form 20-F included the Company's annual financial results, and described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's "reputation and brand have also greatly facilitated our student recruitment" and that TAL *"adapted our operations" to comply with existing governmental regulations and "been making efforts to ensure compliance with these regulations and implementation rules."* TAL also explained how on February 13. 2018, the MOE and three other government authorities made changes to academic competitions which may impact the demand for their after-school tutoring business and personalized premium service and stated: "*We have adapted our operations which may be construed as competitions or ranking activities to these regulations.*"

158.    These statements were false and misleading when made because at the time these statements were issued, TAL had not adapted its operations to adhere to existing governmental regulations; rather, and as corroborated by CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9,

TAL was engaging in serious violations of PRC laws and regulations which precipitated the July 2021 crackdown that signaled the end of the private for-profit tutoring industry.

159.    The 2020 Form 20-F further explained that under the regime of the Law on the Promotion of Private Education of China, the PRC government authorities had promulgated a number of regulations and implementation rules in 2018 governing the education industry and the after-school tutoring service market, including the Circular 3, the State Council Opinions 80, as well as Circular 10. TAL stated that these new regulations and implementation rules provide a series of requirements in the operation of after-school tutoring business and that TAL has "***been making efforts to ensure compliance with these regulations and implementation rules.***"

160.    Further, the 2020 Form 20-F explained that the MOE, jointly with certain other PRC government authorities, promulgated the Implementation Opinions on Regulating Online After-School Tutoring, or the Online After-School Tutoring Opinions, effective on July 12, 2019. The Online After-School Tutoring Opinions also imposed a series of new regulatory requirements which TAL stated: "***We are making efforts to comply with***…."

161.    That same day, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo asserted that TAL "***[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations, including those that regard national public health.***" Defendant Luo further committed to "***investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences.***" He further stated: "we will consistently pursue our long-term strategy regardless of what kind of the ***short-term challenges we are facing***. To the end, we will keep investing in technology, teachers and marketing and make every effort to build all-around online services with ***top-quality content and customer experiences***. We firmly believe that as an education

player, education is education. Our long-term accomplishment is defined only by the quality of our products, services and technology instead of purely marketing."

162.    These statements were false because the challenges were not short term, but instead were part of an increasingly harsh campaign by the Chinese government to regulate the tutoring industry, which regulations TAL had a long history of flouting and was continuing to flout in order to support its growth and dominance of the industry.

163.    On April 21, 2021, TAL held its fourth quarter fiscal year 2021 ("FY 2021") earnings call with investors and analysts, during which Defendant Luo claimed: "Our view is very clear, is we will comply with government guidelines and follow their requirements to do the off-line learning centers." He further added: "***And looking forward, when the new policy is out, and we'll definitely follow the policies to make the necessary adjustments cause in view of the known. Based on what we see today, we are pretty much on track.***"

164.    This statement was false and misleading when made because TAL had no intention of following the existing or new policies that the Chinese government was promulgating and further, it was not "pretty much on track," because, as confirmed by numerous former employees, by April 2021, TAL had already incurred dozens—and likely even hundreds or thousands—of regulatory penalties as a result of its flagrant disregard for the laws governing the for-profit tutoring industry and was committing serious violations, as first revealed by the Chinese government at the end of the Class Period. For instance, by April 2021, TAL had already violated a number of PRC laws as confirmed by CW2, CW3, CW5, CW6, and CW7, CW8, and CW9, and even incurred fines as a result. Defendant Luo's approximately $25 million in net profits from his insider sales at this point in time—when the stock price was artificially inflated—further demonstrates that he did not genuinely hold the belief that TAL was "on track" to adhere to the government's increasingly

stringent violations and knew that the impending government crackdown of the tutoring industry was on the horizon.

165.    On April 22, 2021, during TAL's fourth quarter FY 2021 earnings call, D.S. Kim, an analyst with JP Morgan Chase & Co. asked Defendants about TAL's compliance with marketing regulations. Defendant Luo claimed, "***very clearly, we comply with the guidelines***. ***We made necessary adjustments.***"

166.    This statement was materially false and misleading when made because at the time it was made, TAL was not complying with the government's marketing guidelines and regulations or making the "necessary adjustments." Rather, TAL was employing deceptive marketing techniques to induce students and parents to sign up for its tutoring classes and incurred many regulatory fines for doing so, as described above in Section IV(C)(5) and as corroborated by the accounts of CW2, CW4, CW5, and CW9. Further, Defendant Luo knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Additionally, at the time Defendant Luo issued the above statement, he had already realized net profits of nearly **$25 million** from unloading his TAL stock which he had acquired at very low IPO prices or, in some cases, at zero cost bases, further evidencing that he could not have genuinely believed that TAL complied with the Chinese government's guidelines or was making the "necessary adjustments."

### 1. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations

167.    On April 28, 2020, during an earnings call, Defendant Luo stated: "So the pricing strategy of online will serve our purpose to getting more market share, to serve more people and to make people more satisfy." Defendant Luo further stated: "I think on one side, we tailored price a

little bit up, but on the other side, we also give promotions in the coupons and kind of an incentive for the parents and students if they can finish the work."

168.    This statement was materially false and misleading and omitted material facts because, as described above in Section IV(C)(3), and as confirmed by the accounts of CW2, CW4, and CW5, TAL was violating the Chinese government's regulations and rules regarding pricing for tutoring classes throughout the Class Period. Thus, Defendant Luo's statement regarding TAL's pricing strategy, for instance, using promotions and coupons to incentivize parents and students, was misleading because it omitted TAL's deceptive pricing practice of offering substantial discounts on tutoring courses and later, requiring parents to pay substantially more for the course. For instance, on one occasion, TAL marked up a course by **4,000%** and on another occasion, TAL marketed eight tutoring courses for just 1 RMB each where the market price was actually much higher.

### 2. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations

169.    Throughout the Class Period, Defendants also repeatedly assured the public that the Company was complying with China's regulations regarding advanced tuition payments. For instance, on October 25, 2018, during TAL's second quarter earnings call for fiscal year 2019, Mark Li, an analyst with Citigroup Inc., Research Division, asked Defendant Luo about the advanced tuition payment regulation, stating: "I want to know about the regulation of no more than 3 months of getting the fees." Defendant Luo replied:

> I think we as the top players in this industry, ***we are definitely to comply with the government policies. We're in the process to implement the 3-month policies across our business units.*** For example, the Xueersi Peiyou small class. Their retention period will start from late October, maybe this week and next week, to early December. So we will change our system to fit in the 3-months policy, with no doubt. We will follow the government policy to do this.
>
> And for the Xueersi one-on-on – for Zhikang one-one-one [sic], ***yes we will also adopt this one-on-one policy – this 3-month policies.*** But because for the one-on-one, actually, most of their students, actually, coming up from our small class. ***So we don't***

*foresee a material impact on maybe difference or change to my business due to the change of the 3-month policy. We don't see any material impact on them . . . .*

But again, I think the 3-month policy is very good policy because it gives more right back to the parents. . . .

*So we are also quite confident to this 3-month policy to give more rights back to the parents. And we believe that's the right way and that's the right policy to help improve the quality of the whole industry.*

170.    These statements were materially false and misleading because Luo knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Further, as described above in ¶¶ 38, 90, 96, TAL was not complying with the three-month tuition policy required by Circular 80 and could not possibly have thought the three-month policy was a "very good policy" given that it continuously disregarded such policy. Rather, throughout 2018 and thereafter, TAL's leading brand Xueersi was in the practice of charging advance tuition for **more than three months**, for instance, in its summer and autumn course packages. Further, TAL's subsidiary Chongqing was violating the tuition payment regulations and in fact, was blacklisted by the Education Commission in May 2021.

171.    On January 24, 2019, TAL held its earnings call for its third fiscal quarter of 2019. During the call, Yuzhong Gao, an analyst with CICC asked Defendants: "how much of your deferred revenue has been impacted by the new tuition collection policy?" Defendant He replied:

And for your question, yes, according to the regulations issued last year in August, parents cannot be billed for more than 3 months. It does have impact on our deferred revenue and cash flow. *Since the policy has been issued, we have followed the government's requirement to make necessary adjustment of our tuition fee charging policies if needed.* This particular policy actually gives a right of choice back to the parents, *which we believe is a right and good practice to protect the parents' rights and interest* and, as I just mentioned, helps to improve the overall industry environment. . . .

And in terms of the pro forma, we charge tuition fee based on the spring, summer, autumn and winter semesters.

172.    Defendant He then reemphasized: "in the long run, *we still believe with all the regulations in place, which aim to protect the parents' rights and which aim to improve the service level or service quality of the whole industry, we -- the compliant companies in the long run will be beneficial"* and *"[w]e need to follow the new rule, new policies within this environment.*

173.    These statements were materially false and misleading when made because Defendant He knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Contrary to Defendant He's assurances that TAL had been following the government's regulations by adjusting its tuition fee policies and that TAL believed that the policies were a "right and good practice to protect the parents' rights and interest," TAL was actually charging tuition for periods greater than three months in direct violation of the PRC's 2018 regulation, Circular 80. For instance, TAL's leading brand, Xueersi.com, was violating this law with respect to tuition payments for its summer and autumn course packages, which further supports that Defendant He's statement was misleading when made.

> ### 3.  Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations

174.    During the Class Period, TAL continuously represented that it was complying with regulations regarding teacher qualifications. For instance, on October 25, 2018, TAL held its second quarter earnings call for fiscal year 2019. During the call, Yue Wu, an analyst with China International Capital Corporation Limited, asked Defendant Luo about teachers' licenses and in particular, whether the teacher licensing exam affects TAL's next quarter guidance and expansion. Defendant Luo replied:

> I think because *we have put the teacher license as a very high priority in the past few years, so in this industry*, the percentage of our teachers who have license is

higher than the industry average. And based on the government's policy, this year, most of – almost all, but most of our teachers who don't have license, they have registered exams in November, which will happen after 1 or 2 weeks. ***So we will continue to follow company's – government's policy to make sure all of our teachers can be compliant.*** And we don't see a material impact from teaching license in the short term, especially for the next quarter.

175.    This statement was false when made because, despite Defendant Luo's assurances to

the public that TAL had put teacher licenses as a "very high priority" and would comply with the

"government's policy to make sure all of our teachers can be compliant," in actuality, TAL was

misrepresenting its teachers' qualifications by displaying incomplete teaching credentials or no

teaching credentials at all on its website, allowing teachers to teach grades more advanced than their

teaching qualifications permitted, and falsifying teacher qualifications by creating fake teacher

qualifications which they posted on the Company's website. In fact, CW2, CW6, CW8, and CW9

each reported that TAL and its subsidiaries allowed teachers who did not possess the requisite

qualifications to teach courses.  CW6 even recounted that TAL's headquarters trained teachers who

lacked the proper qualification certificates and then assigned them to various TAL branches to teach.

Therefore, despite assurances that TAL would "continue" to make sure its teachers were compliant,

Defendants were knowingly or recklessly engaging in conduct that was the exact opposite.

176.    On January 24, 2019, TAL held an earnings call for its third fiscal quarter of 2019.

During the call, Thomas Chong, an analyst with Credit Suisse AG's research division, asked

Defendant Luo for an update regarding teachers' passing rates on exams. Defendant Luo responded:

"[W]e will continue to encourage our teachers, who don't have license, to go and apply for the new

teacher exams and try to get teacher license by the end of the exams. We continue to encourage all

of them to do so."

177.    This statement was materially false and misleading and omitted material facts because

Defendants were not encouraging teachers to get licenses or take the teaching exams to get their

licenses. Rather, as described above in Section IV(C)(2), TAL falsified its teachers' qualifications or at the very least, misrepresented their qualifications by displaying incomplete teaching credentials or entirely omitting teaching credentials from its website and allowing teachers to teach grades more advanced than their teaching qualifications permitted.

178.    On April 28, 2020, TAL held an earnings call for its fourth quarter fiscal year 2020 ("FY 2020") financial results. During the call, Defendant Luo stated: "***The teaching quality is always the key and the first priority, no matters for off-line business or online business.***"

179.    This statement was materially false and misleading when made. Teaching quality was not Defendants' "first priority" as evidenced by the fact that TAL was fabricating teacher's qualifications and allowing its teachers to tutor students even though they lacked the requisite credentials, as confirmed by CW2, CW6, CW8, and CW9. Rather, Defendants' "first priority" was increasing the Company's revenues in order to maximize their performance bonuses and sell their stock at artificially inflated prices.

180.    On June 30, 2020, during an earnings call, Defendant He added: "***For the people-intensive products, the service is very important. So we need to make sure we do right training to the teachers and teacher assistants.*** We give them good compensation to make sure ***we also encourage all of teacher and teacher assistants to serve the students better. I think the necessary investments in the teacher and the teacher assistants are very necessary***."

181.    This statement was materially false and misleading and omitted material facts because TAL did not make sure to "do right training to the teacher and teacher assistants" and did not "encourage all of the teacher and teacher assistants to serve the students better." Indeed, TAL was doing just the opposite; according to CW2, CW6, CW8, and CW9, the Company was allowing unqualified teachers to teach students. Further, as described above in Section IV(C)(2) and ¶¶ 37, 41, 43, 44, Defendants misrepresented teachers' credentials by posting incomplete qualifications,

entirely omitting teachers' qualifications from TAL's website, allowing teachers to teach grades more advanced than their teaching qualifications allowed, fabricating teaching credentials, and allowing teachers without the legally required qualifications to teach students.

**B.    Materially False and Misleading Statements and Omissions Regarding the Government's Heightened Regulations Governing the Private Tutoring Industry**

182.    Long before the Chinese government effectively outlawed the private, for-profit tutoring industry in July 2021, Defendants knew or recklessly disregarded that the government was on a concerted campaign to shut down the profitable private tutoring industry, as corroborated by CW1. This information was material non-public information which Defendants knew and failed to disclose to the investing public. Despite having knowledge of this material non-public information which substantially impacted the nature of TAL's business and ability to continue operating as it had been, Defendants continued to issue false and misleading statements regarding the government's regulatory impacts on TAL's business.

183.    From March 4, 2021 through March 11, 2021, China held its annual "Two Sessions" parliamentary meetings, where the two main political bodies of China meet, discuss, and reveal plans for China's policies involving the economy, military, trade, diplomacy, the environment and more.

184.    Media reports stated that attendees of the ongoing Two Sessions conference had proposed "stricter regulations" to rein in the online education industry, such as regulations aimed at enhancing teacher quality, limiting fee scams, reducing market "abuse" by large players like TAL, and reducing the stress that for-profit tutoring companies had placed on students in the Chinese educational system.

185.    For example, on March 8, 2021, the *China Daily* published an article titled "Political advisers discuss regulations for online education," which stated in pertinent part:

Political advisers have proposed stricter regulations for the extracurricular online education industry in China during the ongoing annual session of the Chinese People's Political Consultative Conference National Committee.

These regulations are aimed at enhancing teaching quality and avoid hidden risks faced by customers.

\* \* \*

"However, the rapid surge in such short time has created several hidden risks," said Ma Jin, a member of the National Committee of the CPPCC and deputy chairman of the Shanghai municipal committee of China Zhi Gong Party.

"***To seize the opportunity in the emerging market, a few huge companies have abused their dominant position in the sector, whereas small and medium-sized firms are lacking time and finances to grow***," he said.

***In addition, many online education platforms require advance payment, which leads to risks of advance fee scams and customers encountering difficulties in getting refunds, he said***.

\* \* \*

To tackle these problems, Ma said the government should formulate regulations for extracurricular online education, including standards for the establishment of education institutions, teaching environment and content.

"Online education platforms should display their teachers' qualifications to the public," he said.

With regard to financial risks, Ma suggested that around 30 percent of the company's reserve fund should be supervised by the government. Once financial risks emerge, the use of these funds should be restricted.

Furthermore, online education platform institutions should not charge more than three months' worth of tuition fees at a time, and the fee should be used for only teaching related activities, instead of investment. A third-party payment platform could be used to supervise customer advance payments.

This sentiment was echoed by another political adviser Sima Hong, who is also the chairman of the Beijing Municipal Committee of the Democratic National Construction Association.

Sima advised education authorities to cooperate with banks to establish a supervision system for online education platforms to address the issue of potential misappropriation of advance payments.

"***Any legal person and major shareholders of institutions which illegally charge tuition fees before they disappear should be seriously punished***," she added.

Li Xin, chairman of the Guangdong Provincial Committee, associated the negative impact of substandard online education with children's eye health.

Data from the National Health Commission shows that 53.6 percent of children in China suffered from myopia in 2018.

"Services from some substandard online education platforms have increased students' burden of schoolwork these years," she said.

In her proposal, Li suggested online education institutions be prohibited from cooperation with schools or classes.

"***Schools and teachers should not recommend extracurricular online education platforms and products to parents and students or force students to take e-learning lessons***," she said.

"The length for a web-based course in senior high school should not exceed 30 minutes, while for junior high school students, it should be within 25 minutes, and within for 20 minutes primary school students, to ensure children's eye health," Li said.

"Efforts should also be made by local authorities to limit the students' e-learning time on extracurricular education platforms," she added.

186.    Similarly, on March 11, 2021, the *South China Morning Post* published an article titled "China two sessions: tightened regulation of 'chaotic' K-12 off-campus education market may spoil Big Tech's expansion plans." The article described how an impending "regulatory storm" presented a headwind for after-school tutoring businesses in China such as TAL, although the article stated that these businesses were likely to be able to navigate the regulatory environment to continue their expansion plans, stating in pertinent part:

China's US$110 billion K-12 off-campus education market, which has struggled during the coronavirus pandemic, is now bracing for a regulatory storm amid comments expressed by the country's leaders, lawmakers and advisers in the "two sessions", the country's biggest annual political gathering.

President Xi Jinping described the domestic market for K-12 – referring to kindergarten to 12th grade – after-school training services as a "social problem" in a

meeting last week of the Chinese People's Political Consultative Conference (CPPCC).

"It can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it," Xi said in comments published by official media.

While it remains unclear exactly how regulations are going to be rolled out, the message from the National People's Congress (NPC), China's top legislature, indicated that off-campus training services are "chaotic" and create problems for the country's education sector. Typically, primary school pupils take extracurricular tutoring on top of their studies on campus to perform well in examinations.

***The prospects of tightened regulation could bring uncertainty to the market and the plans of Chinese Big Tech companies to expand operations in the education sector***. Tech unicorn ByteDance, owner of short video-sharing apps TikTok and Douyin, recently announced its intention to recruit some 13,000 new employees for its growing Dali education business.

Big Tech's vast resources are expected to help them continue their expansion into education. "The internet giants won't give up their education initiatives," said Claudia Wang, a partner at management consulting firm Oliver Wyman, said on Thursday.

"Most of them have businesses in the education sector that are aligned with government initiatives to improve access to quality education via different channels. They are also equipped with strong capital to be compliant with government regulation."

***A number of big players in the market, including TAL Education Group and New Oriental Education & Technology Group, have become listed companies on the back of domestic demand***.

\* \* \*

Dozens of NPC and CPPCC delegates have been vocal about the need to strengthen spot inspections of K-12 off-campus education providers and punish those found guilty of false advertising. Zhu Yongxin, a CPPCC member, suggested that advertising by these providers should be curbed, while fellow delegate Chen Zhongyi suggested a permanent ban on all off-campus tutoring services.

187.    Then, on March 31, 2021, China's MOE announced that education departments should limit the times at which primary and secondary school students take part in online learning to ensure they are getting enough sleep.

188.    Although Defendants knew or recklessly disregarded the government's campaign to eliminate the profitable private tutoring industry throughout the Class Period, unsuspecting investors first became aware of it after the news emerged and the price of TAL ADSs began to drop from $76.04 when the market closed on March 5, 2021, to $56.31 by April 1, 2021, a 26% decline. However, the price of TAL ADSs remained artificially inflated because Defendants continued to make materially false and misleading statements regarding TAL's business prospects and operations and the impending impact of new governmental regulations on the for-profit tutoring industry following the Two Sessions meetings.

189.    In their May 7, 2021 Form 20-F filing, TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations."  For example, the PRC Pricing Law provides that an operator is prohibited from using false or misunderstanding pricing methods to induce consumers or other operators into trading with it. In the filing, TAL referenced several of the same regulations and policies referenced in its prior June 30, 2021 filing including the regulations and policies which focus on the efforts to de-emphasize scholastic competition achievements in college and high school admissions or the efforts to forbid academic competitions referred to as Circular 3. TAL stated: "*We have adapted our operations which may be construed as competitions or ranking activities to these regulations. We cannot assure you whether relevant governmental authorities will find our operations in violation of such regulations.*" TAL also referenced the State Council Opinion 80 and Circular 10 that provide a series of requirements in the operation of after-school tutoring business and stated that they "*have been making efforts to ensure compliance with these regulations and implementation rules.*"

62

190.    TAL specifically mentioned how the "market price for [its] ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as…" and then listed several factors, **none of which** included information on TAL's longstanding history of regulatory violations, including for releasing misleading advertisements.

191.    TAL claimed as part of its filing that "[it] [was] not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 28, 2021 that are reasonably likely to have a material adverse effect on [its] net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions."

192.    On May 11, 2021, *China Daily* reported that in April 2021 the Beijing municipal administration for market regulation handed out fines of RMB 500,000 ($76,720 USD) to four online education companies for misleading customers with false advertising, including TAL's subsidiary Xueersi for labeling their online courses with misleading prices.

193.    Then, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, the provision of tutoring services during weekend hours, and the imposition of industry-wide fee limitations. For example, a *Reuters* article titled "China planning new crackdown on private tutoring sector," stated that regulators had taken adverse actions against for-profit tutoring companies, including ordering TAL advertising to be pulled in April 2021, and otherwise summarized the impending regulatory changes in pertinent part as follows:

> *China is framing tough new rules to clamp down on a booming private tutoring industry*, aiming both to ease pressure on school children and boost the country's birth rate by lowering family living costs, sources told Reuters.

The clampdown will also have the effect of cooling China's cutthroat tutoring market for kindergarten through to the 12th grade, or K-12 pupils, that has grown exponentially in recent years to around $120 billion.

\* \* \*

The changes being drafted by the Ministry of Education and other authorities target before- and after-school K-12 tutoring, three people with knowledge of the matter told Reuters.

One source said the draft rules could be unveiled as early as by end-June. All three sources requested anonymity as they were not authorised [sic] to speak publicly.

***Under the planned rules, on-campus academic tutoring classes will be banned, as will both on and off-campus tutoring during fs, two of the people said. Regulators will also clamp down on off-campus tutoring, in particular for English and math, they added, restricting class times on weekdays***.

\* \* \*

***The new rules would seek to limit fees charged by companies for tutoring, one of the sources told Reuters***.

\* \* \*

The planned rules would add to restrictions imposed in March, including a ban on live-streamed classes for minors after 9 p.m., a crackdown on advertising, and a ban on academic tutoring course offerings for pre-school kids.

\* \* \*

***A source told Reuters that a large state broadcaster was told by regulators last month to remove TV commercials from two players, New Oriental Education & Technology Group and TAL Education Group that they had placed earlier***.

194.    As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a **13% decline over the two-day period**. However, TAL ADSs continued to trade at artificially inflated prices because Defendants continued to deceive investors and the market about the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

195.   On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews.

196.   TAL's previously undisclosed misconduct was reported to have included widespread practices of:

   (a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law;

   (b) offering courses that gave students unfair advantages in contravention of Chinese government policies;

   (c) engaging in illegal bait-and-switch tactics;

   (d) misrepresenting teacher qualifications and course qualities;

   (e) mishandling user data; and

   (f) rigging promotional events to defraud consumers.

197.   TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which would drive enrollments. The regulators explained that Xueersi had advertised false parent user reviews in Beijing and Shanghai, such as one purportedly from a mother stating: "[T]he most powerful thing about Xueersi is that parents are allowed to listen, get refund fees and transfer classes at any time. Parents are at ease." Another, from a father claimed: "The hardware development of Xueer Si Peiyou is very scientific and really great!" However, the governmental investigation concluded that the parents attributed to these reviews and comments did not exist. The offending companies, including TAL, were hit with maximum penalties for their illegal business practices, totaling a combined RMB 36.5 million ($5,679,122 USD). At a governmental conference announcing the fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of

complaints against bad industry actors, including **155,000** complaints and reports for education and training services received by authorities in 2020 alone and over **47,000** similar complaints and reports received by authorities in the first quarter of 2021.

198.    As one Chinese language source observed, TAL had been on the government "blacklist" for repeat offenses "but never stopped its illegal act[s]." Instead, despite its assurances that it complied with the Chinese government's rules, regulations and proscriptions, TAL continued to engage in "[o]ver-standard and advanced tutoring, illegal charge, false publicity, tricking consumers into transaction, [the use of] vulgar videos, illegal recruit[ing] and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

199.    As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

200.    Finally, on July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public. In response, TAL issued a press release attached to a Form 6-K filed with the SEC on July 26, 2021, stating "that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system," but then misleadingly told the public that TAL "**ha[d] not received official notification of the regulations**."

201.    As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly **79% decline**.

This represented a **greater than 95% decline** in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs, as follows:



202.    The statements set forth above were materially false and misleading because, according to CW1, Defendants knew that the Double Reduction policies were going to be implemented and affect TAL's business **at least six months before** they were actually issued and further, Defendants knew the severe consequences that the Double Reduction policies posed on the Company's business operations.

### C.    Materially False and Misleading Sarbanes-Oxley Certifications

203.    In its 2018 Form 20-F, filed on June 26, 2018, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report

does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

204.    This statement was materially false and misleading when made because TAL's 2018 Form 20-F filed on June 26, 2018, did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. As set forth herein, the 2018 Form 20-F falsely informed investors that TAL was taking corrective measures to comply with the government's February 2018 regulations, however, this was not the case because at the time, TAL was repeatedly violating those very regulations—at a far greater rate than it was being fined—which provoked the Chinese government's action to eliminate the profitable tutoring industry which provided advantages to wealthy families and students. Contrary to TAL's assurances, TAL and the tutoring industry were far from "healthy, "stable" and "sustainable" and the regulations were neither beneficial nor intended by the government to be beneficial to the health of the industry. Defendants' insider sales throughout the Class Period further demonstrate that these statements were knowingly false or made in reckless disregard of the truth.

205.    On May 16, 2019, TAL filed its annual report for fiscal year end February 28, 2019 on Form 20-F, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo (the "2019 Form 20-F"). In the 2019 Form 20-F, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this

68

report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

206.    This statement was materially false and misleading when made because TAL's 2019 Form 20-F did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. The 2019 Form 20-F falsely stated that TAL had successfully "adapted [its] operations" to adhere to China's February 2018 regulations; however, this was not the case because at the time, TAL was repeatedly violating those very regulations in order to drive student enrollments and therefore inflate the Company's revenues.

### D. Defendants Omitted Material Facts in Violation of Item 5(D) and Item 105 of Regulation S-K

#### 1. Overview of TAL's Item 5 Disclosure Requirements

207.    Throughout the Class Period, Defendants' Forms 20-F and 6-K incorporating the Company's MD&A disclosures[7] were materially false or misleading because they failed to disclose information required by Item 5.

208.    TAL's annual and quarterly reports filed with the SEC are subject to the disclosure obligations of Item 5, which are akin to Item 303. The SEC has recognized that "for Form 20-F annual reports, the existing MD&A equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies." Thus, certain disclosure

---

[7] Because the SEC has opined that a MD&A is essentially the same as the "Operating and Financial Review and Prospects," which is what foreign issuers are required to include in registration statements, this Complaint will refer to the latter as MD&A herein. Additionally, this Court has held that "the same facts underlying any Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter." *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV. 1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).

obligations must be made in the MD&A section of TAL's annual and quarterly reports filed with the SEC, as required by SEC Regulation S-K.

209.    The purpose of MD&A disclosures, as stated by the SEC, is to give investors information "necessary to an understanding of [a company's] financial condition, changes in financial condition and result of operations."

210.    Defendants knew or recklessly disregarded that TAL's annual reports on Form 20-F misleadingly omitted information required by SEC rules and regulations to be stated therein.

211.    Specifically, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*" (Emphasis in original.)

212.    Furthermore, Item 5(D), entitled "Trend Information," provides (emphasis added):

The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

213.    The scope of the information required to be disclosed under this paragraph is coextensive with that required under Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Furthermore, the SEC has recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

70

214.    In 1989, the SEC described the purposes of the MD&A in a release titled:

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co*

*Disclosures, Release No. 6835* (May 18, 1989) (the "1989 Interpretive Release"), which stated, in

pertinent part (emphasis added):

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future. . . .
>
> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects,*** such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

215.    Item 5(d) requires disclosures based on "currently known trends, events, and

uncertainties that are reasonably expected to have material effects."

216.    The Interpretive Release further provides that foreign issuers listed on the NYSE must

disclose: (i) known trends and uncertainties; and (ii) any material impact of such known trends and

uncertainties on the company's operations *even if the trends are a matter of public knowledge*.

217.    The SEC's 1989 Interpretive Guidance set forth a two-step test to determine if

disclosure is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless

management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

218.    The SEC also published interpretive guidance effective December 29, 2003, regarding MD&A requirements of Item 5 of Form 20-F. In this guidance, the SEC stated that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," and cited its prior 1989 Interpretive Release.

### 2. Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct and Regulatory Violations

219.    Thus, the annual and quarterly reports filed by TAL during the Class Period required that Defendants disclose information regarding known trends, events, and uncertainties, including:

(a)    That TAL had habitually been incurring fines and sanctions for its failure to comply with Chinese law governing the for-profit tutoring industry;

(b)    That TAL knew, as early as January 2021, that the impending governmental regulations would make it increasingly difficult for the Company to cooperate;

(c)    That TAL was allowing teachers to tutor students absent the requisite qualifications;

(d)    That TAL was touting falsified or exaggerated course reviews on its website in order to increase student enrollments;

(e)    That TAL was engaging in bait-and-switch pricing wherein it repeatedly offered substantial promotional pricing to lure in students to use its tutoring services only to later charge the full price, if not more, for the tutoring service;

(f)    That TAL was charging tuition for its tutoring courses for periods greater than three months in violation of relevant rules and regulations;

(g)    That TAL was forcing students to pay advances and incur recurring debt; and

(h)    That TAL was repeatedly teaching courses that exceeded the scope of the syllabus in contravention of Chinese law

220.    Defendants failed to disclose any of the foregoing information to investors in TAL's Forms 20-F or 6-K for fiscal years 2018 through 2021. These omissions violated Item 5(d) because

the undisclosed trends, demands, commitments, events, or uncertainties were known to Defendants and were "reasonably likely to have material effects on [TAL's] financial condition or results of operation."

221.    First, as described above in ¶ 219, the foregoing trends, demands, commitments, events, and uncertainties were known to Defendants throughout the Class Period. Specifically, Defendants knew that:

     (a)    The Chinese government was beginning to enact a series of rules and regulations which would have a material impact on the after-school tutoring industry therefore putting at risk TAL's business operations (*see* ¶¶ 36, 182, 202, 241, 262, 264, 267, 273);

     (b)    These stringent rules and regulations governing the after-school for-profit tutoring industry could impact how and indeed whether TAL could continue in its business (*see* ¶¶ 72, 135, 151, 153, 157, 171, 182, 188, 194); and

     (c)    The for-profit tutoring industry would likely be dragged down by governmental regulations as evidenced by Defendants' sales of stock for net profits of approximately $458 million (*see* ¶¶ 242-52).

222.    Second, the below facts demonstrate that the foregoing trends, demands, commitments, events, and uncertainties were reasonably likely to occur and reasonably likely to have a material impact on TAL's business and operations:

     (a)    TAL was one of the top for-profit after-school tutoring firms in mainland China and thus should have been privy to any impending governmental regulations affecting its business;

     (b)    As a tutoring company offering private education services for students, TAL was required to adhere to all rules and regulations governing the tutoring industry;

     (c)    Even before the Class Period began, TAL formed a habit of repeatedly disregarding and offending an array of Chinese laws and regulations; and

     (d)    Notwithstanding the aforementioned, TAL continued to flagrantly disregard China's rules and regulations governing the for-profit tutoring industry because it prioritized its student enrollment metrics and growing revenues over compliance.

223.    Based on the above, Defendants violated Item 5(d) by failing to disclose in TAL's Forms 20-F for fiscal years 2019 through 2022: (i) the negative trends, demands, commitments, events, and uncertainties set forth above in ¶ 219; and (ii) their anticipated impact on TAL's current and future business operations.

224.    For these same reasons, Defendants' failure to disclose the information set forth above in ¶¶ 135-36, 200, 207, 220 in TAL's Forms 6-Ks filed with the SEC throughout the Class Period rendered those filings materially false or misleading.

225.    The Form 20-F annual reports filed by TAL during the Class Period violated Item 5 by failing to disclose the adverse facts alleged in Section (IV)(C), above concerning the Company's wide-ranging misconduct and efforts to artificially inflate TAL's financial results through the illicit business tactics detailed herein and the Chinese government's imposition of increasingly harsh regulations, particularly given TAL's history of flouting less restrictive regulations. These adverse facts and events created known trends and uncertainties that were reasonably likely to (and ultimately did) have a material adverse impact on the Company's financial condition and results of operations, and, accordingly, appropriate disclosure in the Form 20-F annual reports was required.

### 3.  Defendants Failed to Disclose Material Facts in Violation of Item 105 of Regulation S-K

226.    Additionally, TAL's Form 20-F annual reports failed to disclose certain of the most material risks facing the Company at the time of filing, in violation of Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105.

227.    Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." Specifically, Item 105 requires a company to "[e]xplain how each risk affects the registrant or the securities being offered" and "each risk factor should be set forth under a subcaption that adequately

describes the risk." Likewise, Item 3 of Part I of Form 20-F requires a foreign private issuer, such as TAL, to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."

228.    TAL's Form 20-F annual reports filed during the Class Period failed to comply with these reporting obligations because, as Defendants knew or recklessly disregarded, the reports failed to disclose the true risks arising from the adverse facts alleged above in Section (IV)(C) concerning the Company's wide-ranging misconduct and the Chinese government's imposition of increasingly harsh regulations, given TAL's history of flouting less restrictive regulations. The specific and extreme risks of adverse regulatory action, as well as legal, reputational and financial risks arising from these adverse facts, were not disclosed in the annual reports even though they were some of the most material factors that made an investment in TAL ADSs speculative or risky and were already occurring at the time that the statements were made.

229.    Moreover, the purported "risk disclosures" contained in TAL's Form 20-F annual reports were themselves materially misleading. For example, while the reports stated that TAL "**may**" be subject to adverse regulatory actions if the government found the Company was not in compliance with the existing regulatory regime, nowhere did the reports disclose that TAL knew that the longstanding and increasingly more restive government regulations would have a crippling effect on TAL's business in the long term and that the trend was entirely negative, with no reasonable hope or expectation that the government would reverse its policies.

230.    The Form 20-F annual reports also qualified their discussion of purported regulatory risks by claiming that TAL was taking actions to ensure compliance with the laws, regulations and policies applicable to its business, for example, by stating that TAL was "making efforts to ensure compliance," had "adapted [its] operations" to comply with the law and had taken various steps to "comply with PRC laws and regulations." The failure to disclose the Company's actual business

practices; actual receipt of fines and sanctions; TAL's efforts to knowingly flout Chinese rules, regulations and policies; the longstanding and increasingly more restrictive governmental regulations which would have a crippling effect on TAL's business in the long-term; and that the trend was entirely negative with no reasonable hope or expectation that the government would reverse its policies, rendered the discussion of purported "risks" relating to TAL's business contained in the annual reports themselves materially misleading and similarly rendered statements of belief or optimism materially misleading.

## VI.    POST CLASS PERIOD DISCLOSURES

231.    On July 30, 2021, TAL announced that it would be cancelling its scheduled earnings release and earnings call in light of the regulatory developments.

232.    In October 2021, staff at Xueersi stated that the Company would cease admitting new students and that their online payment channels were closed.

233.    On October 13, 2021, the *Sixth Tone* released an article stating "the payments freeze ensures that the once-vast for-profit tutoring industry will be largely dissolved by the end of the year."

234.    On November 12, 2021, TAL filed a press release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021. The Company further stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods" and that the revenues derived from offering those services for fiscal year end February 28, 2021, "accounted for a substantial majority of the Company's total revenues in the year."

235.    On March 14, 2023, CaiLian, a local media outlet based in China, published an expose on TAL's continuous violations of PRC regulations governing the private education sector. In particular, the expose discussed TAL's violations of the July 2021 Double Reduction policy. Both JP Morgan and China Merchant released analyst reports immediately thereafter. On March 14, 2023,

China Merchant referred to the news as "Negative press on TAL's K-9 non-academic business," and on March 15, 2023, JP Morgan reported that in light of the news, "investors may take a 'better safe than sorry' approach" and further, that "[t]his article could bring back memories of the 2021 tutoring regulatory cycle."

236.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL ADSs, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

237.    Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were engaged in serious and persistent violations of Chinese government regulations (many of which were unknown to the public or not reasonably discoverable), aware of material non-public information that far more stringent regulations would be enacted in mid to late 2021, and that the existing regulatory scheme and additional regulation was not beneficial to TAL's business. The Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that public documents and statements they issued and disseminated in the name of TAL or in their own name, to the investing public during the Class Period, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding TAL, and their control over and/or receipt and/or modification of TAL's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

238.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity

of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

239.    Further, the Individual Defendants acted with scienter because they possessed the motive and opportunity to commit the fraud alleged herein, as further detailed below in Section (VII)(A).

240.    The Individual Defendants, because of their high-level positions at TAL, controlled the contents of TAL's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of TAL's corporate statements and is, therefore, responsible and liable for the representations contained therein.

**A.  Motive and Opportunity**

**1.  Defendants Had Advance Warning of the Double Reduction Policies**

241.    According to CW1, at least as early as January 2021—*months before rumors emerged* in March 2021 during China's Two Sessions and the Chinese government formally issued regulations in July 2021—*TAL's senior executives knew* that stringent regulations were forthcoming. Thus, Defendants had access to and obtained nonpublic information about the Chinese government's adoption of the Double Reduction policies long before the investing public.

**2.  TAL Insiders Realized Approximately $458 Million in Net Profits
from Their Class Period Stock Sales**

242.    Throughout the Class Period, the Individual Defendants were motivated to issue false statements to give themselves the opportunity to sell their common stock at artificially inflated prices before the full truth emerged. Thus, while Defendants engaged in their scheme to defraud investors during the Class Period by falsely assuring investors that the Company was in compliance with China's heightened laws and regulations governing the tutoring industry, Individual Defendants Zhang and Luo, along with other Company insiders, sold significant amounts of TAL shares at artificially inflated prices. As the Individual Defendants misled investors about the Company's regulatory compliance, with advance knowledge of the forthcoming Double Reduction policies which they knew would decimate TAL's core business, they and other Company insiders unloaded hundreds of millions of dollars of their personally held shares. The Individual Defendants and TAL senior executives were motivated to hide the Company's repeated regulatory violations and forthcoming Double Reduction policies to benefit from sales of their personally held shares at artificially inflated prices. Because TAL is a foreign private issuer, it is exempt from Section 16 of the Securities Exchange Act of 1034. As a result, unlike insiders of United-States domiciled issuers, corporate insiders of TAL are not required to publicly disclose sales of TAL ADSs on Form 4. As a result, pre-discovery, Lead Plaintiff has no practical ability to identify sales of all registered TAL shares by the Individual Defendants or senior executives during the Class Period, as the Individual Defendants were not required to report all sales of registered shares with the SEC.

243.    In total, TAL insiders are known to have dumped over **9.5 million shares of stock** during the Class Period for approximate **net profits of over $450 million.** However, for the aforementioned reasons, pre-discovery, Lead Plaintiff cannot determine the full extent of insider sales by the Individual Defendants and senior executives during the Class Period. TAL executives planning to sell unregistered shares of Company stock were required to file a Form 144 with the SEC which provides notice of a proposed sale of securities.

244.    As reflected in Forms 144 filed with the SEC[8] and as set forth below, during the Class Period, the Individual Defendants and senior executives of TAL sold at least $458 million of their personally held shares, as summarized in the following chart:

TAL Education          4/26/18 - 7/22/21        Insider Sales Summary
(TAL)

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Liu Yachao** | 4/30/2018 | $35.89 | 100,000 | $3,589,000 |
| Chief Operating | 11/18/2019 | $44.40 | 100,000 | $4,440,000 |
| | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/30/2020 | $49.70 | 100,000 | $4,970,000 |
| | 8/11/2020 | $74.00 | 240,000 | $17,760,000 |
| | 11/9/2020 | $71.23 | 20,000 | $1,424,600 |
| | 11/10/2020 | $71.32 | 20,000 | $1,426,400 |
| | 11/11/2020 | $70.06 | 20,000 | $1,401,200 |
| | 11/16/2020 | $74.59 | 10,000 | $745,900 |
| | 11/17/2020 | $75.18 | 10,000 | $751,800 |
| | 11/18/2020 | $74.01 | 10,000 | $740,100 |
| | 11/19/2020 | $73.73 | 10,000 | $737,300 |
| | 11/20/2020 | $74.75 | 10,000 | $747,500 |
| | 11/23/2020 | $74.44 | 10,000 | $744,400 |
| | 1/28/2021 | $78.38 | 35,649 | $2,794,168 |
| | 2/1/2021 | $76.88 | 10,000 | $768,800 |
| | 2/2/2021 | $76.60 | 60,000 | $4,596,000 |
| | 2/3/2021 | $81.17 | 45,170 | $3,666,448 |
| | | | **846,509** | **$52,996,392** |
| | | | | |
| **Rong Luo** | 5/9/2018 | $36.23 | 19,988 | $724,125 |
| Chief Financial | 10/29/2018 | $27.90 | 5,001 | $139,527 |
| | 2/22/2019 | $32.88 | 90,000 | $2,959,200 |
| | 2/22/2019 | $33.97 | 9,000 | $305,730 |
| | 2/25/2019 | $33.97 | 30,000 | $1,019,100 |
| | 10/29/2019 | $41.85 | 120,000 | $5,022,000 |
| | 1/28/2020 | $47.43 | 5,779 | $274,097 |

[8] The net profit calculation is an approximation because the PRC has opaque reporting requirements for insiders. Additionally, unlike the domestic SEC Form 4 which is filed electronically within two business days of the trade and provides extensive information on each insider transaction, the SEC Form 144 used by foreigners' insiders is not required to be filed either speedily or electronically and does not always contain the same extensive information to calculate a net profit for each trade.

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | 7/29/2020 | $78.69 | 23,612 | $1,858,028 |
| | 8/4/2020 | $80.97 | 100,000 | $8,097,000 |
| | 1/27/2021 | $78.80 | 54,000 | $4,255,200 |
| | | | **457,380** | **$24,654,007** |
| | | | | |
| **Yan Huang** | 2/22/2019 | $32.88 | 120,000 | $3,945,600 |
| Chief | 10/31/2019 | $42.81 | 5,952 | $254,805 |
| | 11/4/2019 | $42.75 | 180,000 | $7,695,000 |
| | 11/14/2019 | $44.15 | 100,000 | $4,415,000 |
| | 1/28/2020 | $47.43 | 34,714 | $1,646,485 |
| | | | **440,666** | **$17,956,890** |
| | | | | |
| **Zhang Kaifu** | 10/28/2019 | $43.10 | 5,264 | $226,878 |
| Director | 10/28/2020 | $66.56 | 4,807 | $319,953 |
| | 2/25/2021 | $81.34 | 24,141 | $1,963,628 |
| | | | **34,212** | **$2,510,459** |
| | | | | |
| **Yunfeng Bai** | 11/19/2019 | $44.34 | 106,742 | $4,732,940 |
| President | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/28/2021[9] | $78.38 | 144,000 | $11,286,720 |
| | | | **286,432** | **$17,712,436** |
| | | | | |
| **Bright Unison** | 5/30/2019 | $34.32 | 955,000 | $32,779,611 |
| Shareholder | 5/31/2019 | $34.09 | 1,054,553 | $35,944,966 |
| | 10/29/2019 | $41.85 | 3,500,000 | $146,475,000 |
| | | | **5,509,553** | **$215,199,577** |
| | | | | |
| **Chen Weiru** | 10/28/2019 | $43.10 | 5,264 | $226,878 |
| Director | | | | |
| | | | | |
| **Excellent New** | 4/29/2019 | $38.67 | 3,280,500 | $126,856,935 |

[9] Bai Yunfeng also became Chairman of the Board before making this sale.

[10] Bright Unison Ltd is a corporation incorporated in the state of Virgin Islands, British. https://sec.report/CIK/0001512895. During the Class Period, Bright Unison Ltd owned more than 5% of TAL Education's shares. According to TAL Education's June 30, 2020 SEC Form 20-F, Bright Unison Limited is "Mr. Bangxin Zhang's personal holding company." https://sec.report/Document/0001410578-22-001873/. Zhang is also publicly identified as the sole shareholder and sole director of Bright Unison

[11] According to TAL Education's June 30, 2020 SEC Form 20-F, Excellent New Limited is also a British Virgin Islands company over which "Yunfeng Bai has the power to direct the retention or

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | | | | |
| **Grand Total** | | | **9,556,627** | **$458,113,574** |

245.    Further, to the extent that TAL insiders acquired any shares during the Class Period – such shares were acquired on a zero-cost basis. Thus, the proceeds netted by these insiders are virtually the same as their profits.

246.    The insider sales were unusual compared to the prior trading history for Yunfeng Bai, Bright Unison Ltd., Rong Luo, and Yan Huang, departed from their prior trading patterns and far exceeded the proceeds they received from sales of TAL shares over the same period prior to the Class Period. The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

**TAL Education        4/26/16 – 4/25/18        Insider Sales Summary (TAL)**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Yunfeng Bai** | 2/6/2018 | $31.67 | 131,767 | $4,173,060 |
| | 2/8/2017 | $83.76 | 21,833 | $1,828,732 |
| | | | **153,600** | **$6,001,792** |
| | | | | |
| **Bright Unison Ltd** | 8/24/2017 | $30.91 | 2,700,000 | $83,457,000 |
| | | | | |
| **Rong Luo** | 5/4/2016 | $56.88 | 13,634 | $775,501 |
| | | | | |
| **Yan Huang** | 2/28/2018 | $36.70 | 120,000 | $4,404,000 |
| | | | | |
| **Grand Total** | | | **2,987,234** | **$94,638,293** |

disposal of, and the exercise of any voting rights attached to, the foregoing shares through a trust structure."  https://sec.report/Document/0001410578-22-001873/.

247.    The graph below also illustrates the large discrepancy between the amount of insiders'

stock sales before and during the class period:



248.    During the two years prior to the Class Period, these same Company insiders sold only

2,987,234 shares of their TAL stock, for proceeds of only $94.6 million. Notably, Defendant Luo

sold only 13,634 shares for $775,501 in proceeds in the prior two years – compared to his Class

Period sales of 457,380 shares for approximate net profits of nearly $25 million. Moreover, there

were no reported sales for four of the eight Company insiders (Chen Weiru, Excellent New Limited,

Liu Yachao, Zhang Kaifu) during this time period. The significantly smaller number of pre-Class

Period sales by such a broad swath of Company insiders highlights the suspicious nature of their

Class Period insider sales.

249.    During the Class Period, Defendant Zhang sold 3.7% of his stockholdings and

Defendant Luo sold 19.11% of his stockholdings.

250.    Because TAL insiders were gifted with substantial equity in the Company shortly after TAL's formation in 2003, the percentage of stockholdings sold by TAL insiders appears lower; however, this does not negate an inference of scienter.

251.    The insider sales were also suspicious in timing. As alleged above, the Individual Defendants and senior TAL executives were aware of forthcoming regulations in early 2021 *before* the Double Reduction policies were announced (or even rumored) and those changes were a frequent topic of discussion among senior TAL executives at TAL's headquarters. As demonstrated above, the sales were predominantly made *before* March 2021, when China held its annual "Two Sessions" parliamentary meetings, where it was announced that there would be "stricter regulations" to rein in the online education industry. Many of the sales were also made at times when the stock was trading at over $70 per share as Defendants were materially inflating the Company's revenues by falsely assuring investors that the Company's practices were in compliance with China's strict laws and regulations governing the for-profit tutoring industry and knew, unlike the investing public, that stricter regulations were forthcoming. Indeed, Defendant Luo sold over 170,000 shares (for over $12 million in proceeds) at prices at and near a 52-week trading high for TAL stock. The suspiciousness of the insider stock sales raises a strong inference that these insiders were aware of TAL's inability to comply with the Chinese government's increasingly restrictive regulations and the unsustainability of TAL's deceptive marketing tactics and illicit business practices when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from the TAL's massive stock price decline.

252.    CW1 confirmed that some "core members" of TAL's senior management team divested their TAL shares during the 2021 Spring Festival which took place in January-February 2021 at which time TAL's stock price was trading between USD $70 to USD $80.

### 3. The Individual Defendants' Bonuses

253.    The Individual Defendants' motive to issue false statements throughout the Class Period is further evidenced by their desire to optimize their bonuses and other available incentives under TAL's lucrative compensation system for its executives.

254.    According to TAL's Forms 20-F for fiscal years 2019, 2020, 2021, and 2022, TAL issues cash compensation and share-based compensation to its executives.

255.    In particular, according to TAL's Form 20-F for fiscal year end February 28, 2019, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. Further, for the same fiscal year, TAL granted 354,301 non-vested restricted Class A common shares to its executive officers and non-executive directors as well as a total share-based compensation expense of $5.2 million for its executive officers and non-executive directors.

256.    According to TAL's Form 20-F for FY 2020, the aggregate cash compensation paid to its executive officers for that fiscal year was $1.9 million. For the same fiscal year, TAL granted 51,520 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.4 million for its executive officers and non-executive directors.

257.    According to TAL's Form 20-F for FY 2021, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. For the same fiscal year, TAL granted 28,500 non-vested restricted Class A common shares and 24,000 share options to purchase 24,000 Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.1 million for its executive officers and non-executive directors.

258.    Finally, for TAL's fiscal year end February 28, 2022, the aggregate cash compensation paid to its executive officers and non-executive directors as a group was about $2.4

million. For that same fiscal year, TAL granted 250,700 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a share-based compensation expense of $9.2 million for its executive officers and non-executive directors.

259.    Thus, for fiscal years 2019 through 2022, TAL's executives took home a combined $8.3 million in cash compensation bonuses and $26.82 million in share-based compensation payments.

260.    The cash-compensation paid out to executives and non-executive directors during the Class Period was substantial. These payments further demonstrate that the Individual Defendants had the motive and opportunity to maximize their bonuses.

### 4.  The Individual Defendants' High-Level Positions and Experience

#### a.    Defendant Zhang

261.    Defendant Zhang held the highest-level position at TAL. As CEO, Defendant Zhang controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the tutoring industry. Because of his high-level position, Defendant Zhang was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Zhang knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's most senior-level executive, Defendant Zhang was responsible for the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

262.    According to CW1, Defendant Zhang had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "*at least six months in advance*." CW1 stated that the executives – including Defendant Zhang – "knew that a new regulation as forthcoming" and what the main direction of the regulations would be. Defendant Zhang had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

b.    Defendant Luo

263.    As Chief Financial Officer, Defendant Luo held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, non-public information concerning the fact that TAL education was not incompliance with Chinese regulations and laws governing the after-school tutoring industry, and more generally, its education sector. By virtue of his high-level position, Defendant Luo was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Luo knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's second senior-most executive, Defendant Luo was responsible for ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

264.    According to CW1, Defendant Luo had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "**at least six months in advance**." CW1 stated that the executives – including Defendant

Luo – "knew that a new regulation was forthcoming" and what the main direction of the regulations would be. Defendant Luo had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

265.    Defendant Luo also has extensive management experience. As reported in several of TAL's Form 20-F filings, Defendant Luo was previously the chief financial officer of eLong Inc. from 2013 to 2014. Prior to that, Defendant Luo was the finance senior manager for the Lenovo Group in China. Furthermore, before joining Lenovo, Defendant Luo worked at Microsoft Corporation in Beijing and Seattle where he worked in various finance positions including as an analyst, manager, and senior manager. Defendant Luo also has a double major bachelor's degree in economics and information management and systems from Peking University in addition to a master's degree in management science and engineering from Tsinghua University.

### c.    Defendant He

266.    As the Company's Vice President of Finance, Defendant He also held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the after-school for-profit tutoring industry. Because of her high-level position, Defendant He was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of her position and access to material non-public information about TAL, Defendant He knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's Vice President of Finance, Defendant He was responsible for

ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

267.    According to CW1, Defendant He had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "**at least six months in advance**." CW1 stated that the executives – including Defendant He – "knew that a new regulation was forthcoming" and what the main direction of the regulations would be. Defendant He had an understanding that the pending July regulation would affect TAL's scale of operations, forbid TAL from further expansion, and reduce the number of the Company's campuses, possibly by as much as 20%.

## B.    The Alleged Fraud Concerns the Core Operation of TAL's Business

268.    The alleged fraud concerns the most important part of TAL's business and the government regulations and compliance violations concealed from investors were topics that the Individual Defendants claimed to know about during investor conference calls held throughout the Class Period. Given the fundamental importance of after-school tutoring to TAL's existence as a business, the Company's compliance with the regulations governing after-school tutoring, as well as the insight of TAL's senior executives into regulatory developments, was a subject of intense market scrutiny and concern, and a topic on which the Defendants made numerous public statements during the Class Period. The Individual Defendants, who were the Company's highest-ranking executives, made numerous statements about these subjects in response to analyst questions, and were aware that the market was relying on the veracity of those statements. The Individual Defendants were intimately familiar with the Company's noncompliance with the regulations they professed to monitor (or were reckless touting their oversight and commitment to compliance) and knew about the government's policy shift at the time they made their misstatements, which strongly supports an inference of scienter.

269.    TAL Education is fundamentally a private, for-profit, after-school tutoring company. In its website copyrighted 2017, it describes itself as "a smart learning solutions provider in China." It states that "TAL Education Group offers comprehensive learning services to students from all ages through diversified class formats," and that its "learning services mainly cover enrichment programs and some academic subjects in and out of China." TAL does not have any source of revenue or profit other than private tutoring. To state that the regulations the PRC was enacting would affect TAL's "core operations" is an understatement. Given that for-profit after-school tutoring was TAL's entire business, the Company's compliance with the regulations governing after-school tutoring, as well as the insight of TAL's senior executives into regulatory developments, was a subject of intense market scrutiny and concern, and a topic on which the Defendants made numerous public statements during the Class Period.

270.    That private tutoring was TAL's overwhelming core operation – in fact, its sole operation – is also reflected in reports issued by analysts who were aware that new regulations might be coming out, and were hyper-focused on the effect they might have on TAL's profitability. For example, a May 24, 2021 Credit Suisse report considering what the effect of the PRC's new regulations might be states, "We expect the new policy to pilot post-class services (mainly extra-curricular activities) of public schools on weekends in key cities but allow students to choose AST. And we expect most students of TAL to stick to its services as TAL focuses more on the high-end demand of parents and students who are willing to invest more time and resources in academic study."

271.    A JP Morgan analyst report dated April 23, 2021, had this to say about the anticipated changes to the regulations:

> Management remains confident on successfully navigating policy uncertainty, though it refrained from providing any color on regulation itself. The company believes (and we agree) that TAL's core competitiveness lies in its products – high quality

curriculums and teachers – as well as unparalleled brand equity & operational execution. Therefore, TAL's competitive positioning would actually outshine in a scenario where the government severely restricts tutoring advertisement (note: the company declined to speculate on the possibility of this happening), allowing it to mitigate potential negative impact with share gains.

Thus, while JP Morgan believed TAL's false narrative surrounding the impending government regulations (i.e., that they would not shutter the business entirely, but rather might be beneficial to TAL), what is certain is that JP Morgan recognized that any changes in Chinese regulations to the private tutoring business would have an enormous impact on TAL.

272.    UBS wrote in a report dated July 6, 2021, just before the Double Reduction policy was officially released:

> We are still waiting for the final release of the Opinion to Further Reduce the Homework and Afterschool Tutoring (AST) Burden on Students of Compulsory Education (the Opinion, aka. The "Double Reduction" regulation), which was approved on 21 May . . . We are seeing local governments already moving towards the direction outlined by the Opinion: 1) increase the supply of tutoring/childcare services from the public system and 2) strict regulation enforcements on the AST sector . . . Re 1), we view more services provided by the public system could cannibalise [sic] low-end AST providers that provide quasi-childcare services and do not see material threat to the better quality providers such as TAL.

Similar to JP Morgan, the UBS analyst was fooled by TAL's false statements that the new regulations would positively impact its business. But what is clear is that, like TAL, UBS understood that these regulations would affect TAL's core operations.

273.    The Individual Defendants certainly followed developments of the PRC's new regulatory regime. CW1, who was a deputy head and deputy general manager, responsible for TAL's relations with the PRC, disclosed that the Individual Defendants knew about the new regulations at least as early as January 2021. Further, the Individual Defendants spoke during TAL's analyst calls as if they had direct, inside knowledge concerning the anticipated new regulations during the Class Period. For instance, as alleged above, on April 21, 2021—months before the Double Reduction policies were publicly released—Defendant Luo assured TAL investors that the Company was

"pretty much on track" to comply with the forthcoming policies. That Defendants were confidently making assurances of corporate compliance with laws not yet publicly implemented indicates that they had knowledge of the forthcoming regulations. The Individual Defendants, who were the Company's highest-ranking executives, made numerous statements about these subjects in response to analyst questions, and were aware that the market was relying on the veracity of those statements. The Individual Defendants were intimately familiar with the Company's noncompliance with the regulations they professed to monitor (or were reckless in touting their oversight and commitment to compliance) and knew about the government's policy shift at the time they made their misstatements, which strongly supports an inference of scienter.

274. Because TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and only *one* in the United States during the Class Period, the few dozen publicly reported infractions relating to its tutoring business obscured the actual magnitude of TAL's unreported violations and its egregious non-compliance, as announced by the Chinese government at the end of the Class Period.

## C. The Sarbanes-Oxley Certifications

275. The Individual Defendants' scienter is further demonstrated by their Sarbanes-Oxley ("SOX") certifications wherein they certified that certain SEC filings represented, accurately, the financial condition of TAL.

276. In particular, Defendants Zhang and Luo, as CEO and CFO of the Company, certified pursuant to SOX that TAL's Forms 20-F filed throughout the Class Period, which contain materially false and misleading statements as set forth in Section (V)(D), above, were compliant with the federal securities laws, and further that "the information contained in [each] report fairly presents, in all material respects, the financial condition and result of operations of the company."

D.     **The SEC Is Threatening to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations**

277.    TAL's auditor – Deloitte Touche Tohmatsu Certified Public Accountants LLP – operates in Beijing, PRC. In December 2021, the PCAOB reported that it is "unable to inspect or investigate completely registered public accounting firms headquartered in Mainland China and Hong Kong." TAL's auditor, Deloitte, was identified as one such auditor.

278.    China has stringent privacy laws hamper the PCAOB's ability to monitor accounting firms in China.

279.    Enacted in December 2020, the Holding Foreign Companies Accountable Act ("HFCAA") is a law that requires the SEC to "identify public companies that have retained a registered public accounting firm to issue an audit report where the firm has a branch or office that: (1) is located in a foreign jurisdiction, and (2) the Public Company Accounting Oversight Board ('PCAOB') has determined that it is unable to inspect or investigate completely because of a position taken by an authority in the foreign jurisdiction. If the issuer remains a "Commission-Identified Issuer" for three consecutive years – that is, the PCAOB is unable to inspect the issuer's auditor for three consecutive years – the SEC will prohibit the issuer from trading its securities on U.S. stock exchanges. For instance: "[a]fter a company has been a Commission-identified issuer for three consecutive years, the SEC will issue an order prohibiting trading of the company's securities on any national securities exchange or in the over-the-counter market in the United States."

280.    On June 24, 2022, TAL was provisionally identified as a "Commission-Identified Issuer" – i.e., a company subject to the HFCAA and on July 19, 2022, the SEC conclusively identified TAL Education as an issuer under the HFCAA. TAL disclosed this in its Form 20-F filed with the SEC on June 14, 2022.

281.    On June 14, 2022, TAL filed its annual report on Form 20-F for fiscal year end February 28, 2022. The annual report stated, in relevant part:

> Our ADSs will be delisted and our ADSs and shares will be prohibited from trading in the over-the-counter market in 2024 under the Holding Foreign Companies Accountable Act, or the HFCAA, if the PCAOB is unable to inspect or fully investigate auditors located in China, or in 2023 if proposed changes to the law are enacted. **The PCAOB has been unable, and is currently unable, to inspect our auditor in relation to their audit work performed for our financial statements.** On December 16, 2021, the PCAOB issued a report to notify the SEC of its determination that the PCAOB is unable to inspect or investigate completely registered public accounting firms headquartered in Mainland China and Hong Kong**. The PCAOB identified our auditor, Deloitte Touche Tohmatsu Certified Public Accountants LLP, as one of the registered public accounting firms that the PCAOB is unable to inspect or investigate completely.** Under the current law, delisting and prohibition from over-the-counter trading in the United States could take place in 2024. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. In addition, the proposed changes to the law would decrease the number of non-inspection years from three years to two, thus reducing the time period before our ADSs may be prohibited from over-the-counter trading or delisted. If the proposed provision is enacted, **our ADS could be delisted from the exchange and prohibited from over-the-counter trading in the United States in 2023.**

282.    On June 28, 2022, TAL filed a Form 6-K with the SEC disclosing that it was updating its status under the HFCAA to "Commission-Identified Issuer." TAL further disclosed that the SEC identified TAL as a "Commission-Identified Issuer" because "the Company used an auditor [Deloitte] whose working paper cannot be inspected or investigated" by the PCAOB to issue the audit opinion for its financial statements for the fiscal year end February 28, 2022.

283.    TAL had until July 18, 2022, to submit evidence disputing the SEC's identification of it as a "Commission-Identified Issuer" under the HFCAA.

284.    On July 19, 2022, TAL was conclusively identified as an issuer under the HFCAA.

285.    On December 29, 2022, President Biden signed the Consolidated Appropriations Act, 2023, which, according to sec.gov, "amended the HFCAA to reduce the number of consecutive years

an issuer can be identified as a Commission-Identified Issuer before the Commission must impose

an initial trading prohibition on the issuer's securities from three years to two years."

286.    Accordingly, TAL is currently at risk of having its ADSs delisted for non-compliance

with the PCAOB as early as July 19, 2024. This is because its auditor, Deloitte Touche, operates in

Beijing and therefore the PCAOB is unable to inspect TAL's auditor, because it is based in China.

287.    That TAL's financial filings with the SEC have not properly been investigated by the

PCAOB in recent years and that the Company is at risk of having its ADSs delisted from the NYSE

further evidence that TAL and the Individual Defendants acted with scienter.

### E.    Executive Resignations

288.    Finally, the resignations of certain Defendants contribute to an inference of scienter.

On September 24, 2021, it was reported that Defendant Long would be resigning from TAL effective

October 29, 2021 to pursue another opportunity. Shortly thereafter, on November 1, 2021, Defendant

Long was reported to have joined TAL's competitor Baidu, Inc., as Chief Financial Officer.

289.    Defendant He left TAL after the April 22, 2021 earnings conference call.

## VIII.  LOSS CAUSATION

290.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

economic loss suffered by Lead Plaintiff and the Class.

291.    During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at

artificially inflated prices and were damaged thereby. The price of TAL's ADSs significantly

declined when the misrepresentations made to the market, and/or the information alleged herein to

have been concealed from the market, and/or the effects thereof, were revealed, thus causing

investors' losses. As alleged herein, Defendants engaged in a scheme to deceive the market and a

course of conduct that artificially inflated the price of TAL's ADSs and operated as a fraud or deceit

on purchasers of TAL ADSs. When the truth about Defendants' misconduct was revealed, the value

of TAL's ADSs declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of TAL's ADSs were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

292.    The timing and magnitude of the ADS price declines negate any inference that the losses suffered by Lead Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors, or non-TAL specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following charts comparing TAL's ADS price performance to relevant peers/competitors and comparable indices. The first chart shows the entire Class Period and the second chart shows the end of the Class Period:





293.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at artificially inflated prices and were damaged thereby. The price of TAL ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

294.    The economic loss, i.e., damages, suffered by Lead Plaintiff and members of the Class, was a direct result of Defendants' material misrepresentations and omissions to artificially inflate the prices of TAL's ADSs, as well as the subsequent significant decline in the value of TAL's ADSs when Defendants' prior misrepresentations and omissions were revealed.

295.    At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose that TAL's revenue and operational growth was the result of deceptive marketing tactics and illicit business practices that knowingly violated Chinese laws, regulations and policies, and exposed TAL to an extreme risk that more draconian measures would be imposed on the Company,

97

as alleged herein. Before and during the time of Lead Plaintiff's and Class members' purchases of TAL's ADSs, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of TAL's ADSs to be artificially inflated.

296.    Lead Plaintiff and members of the Class purchased TAL's ADSs at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period. However, TAL ADSs continued to trade at artificially inflated prices because investors and the market still did not know the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

297.    On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were reportedly fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews. In addition, TAL was reportedly found to have: (i) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (ii) offered courses that gave students unfair advantages in contravention of Chinese government policies; (iii) engaged in illegal bait-and-switch tactics; (iv) misrepresented teacher qualifications and course qualities; (v) mishandled user data; and (vi) rigged promotional events to defraud consumers. As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

298.    On July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public, effectively ending any potential growth in the for-profit tutoring sector in China. As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

299.    Viewed collectively, the Individual Defendants' stock sales resulting in **net profits of approximately $458 million** combined with their motivation to maximize their cash compensation, the SEC potentially delisting TAL's ADSs from the NYSE due to its auditor's failure to adhere to PCAOB standards, the accounts of nine former TAL employees who detailed Defendants' flagrant and persistent violations of PRC laws, the Defendants' high-level positions and executive tenure, and their SOX certifications raise a compelling inference of scienter.

## IX.    CLASS ACTION ALLEGATIONS

300.    Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased TAL ADSs during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

301.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TAL ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be

identified from records maintained by TAL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

302.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

303.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

304.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' statements or omissions during the Class Period were materially false and misleading;

(b)    whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

305.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    NO SAFE HARBOR

306.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made.

307.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of TAL who knew that those statements were false when made.

## XI.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

308.    At all relevant times, the market for TAL ADSs was an efficient market for the following reasons, among others:

(a)    TAL ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, TAL filed periodic public reports with the SEC;

(c)    TAL regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    TAL was followed by securities analysts employed by major brokerage firms such as: Credit Suisse AG; Morgan Stanley; China International Capital Corporation Limited; Deutsche

Bank AG; JP Morgan Chase & Co.; Citigroup Inc.; CICC; Goldman Sachs; and China Renaissance Securities (US) Inc., who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

309. As a result of the foregoing, the market for TAL ADSs promptly digested current information regarding TAL from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of TAL ADSs during the Class Period suffered similar injury through their purchases of TAL ADSs at artificially inflated prices and a presumption of reliance applies.

310. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

311. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

312.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

313.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of TAL ADSs during the Class Period.

314.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TAL ADSs. Lead Plaintiff and the Class would not have purchased TAL ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

315.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of TAL ADSs during the Class Period.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

316.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

317.    The Individual Defendants acted as controlling persons of TAL within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of TAL shares, the Individual Defendants had the power and authority to cause TAL to engage in the wrongful conduct complained of herein. TAL controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XIV.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  November 17, 2023

/s/ Daniel L. Berger

Daniel L. Berger
Caitlin M. Moyna
Mica A. Cocco
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Tel.: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: mcocco@gelaw.com

*Lead Counsel for New Mexico State Investment Council and Proposed Lead Council for the Class*

OFFICE OF THE NEW MEXICO
ATTORNEY GENERAL
RAUL TORREZ, Attorney General
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone: 505/490-4052

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Additional Counsel for Lead Plaintiff New Mexico State Investment Council*

_/s/ Michael Dell'Angelo_
BERGER MONTAGUE PC
Sherrie R. Savett
Michael Dell'Angelo
Barbara Podell
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ssavett@bm.net
mdellangelo@bm.net
bpodell@bm.net
aabramowitz@bm.net

_Lead Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi and Proposed Lead Counsel for the Class_

_/s/ Tricia Beale,_ MSB# 99113
_/s/ Laken H. Ryals,_ MSB# 106300
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-3680 / (601) 359-2003
Email: Tricia.beale@ago.ms.gov
          Laken.ryals@ago.ms.gov


George W. Neville
Neville Law, LLC
403 Garden Park Cove
Brandon, Mississippi 39047
Telephone: (601) 940-8815
Email: george.w.neville@gmail.net


_Additional Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi_