UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW MEXICO STATE INVESTMENT COUNCIL and PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TAL EDUCATION GROUP, BANGXIN ZHANG, RONG LUO, and LINDA HE,<br><br>Defendants. | Case No. 1:22-cv-01015 (ALC) (KHP)<br><br>The Honorable Andrew L. Carter Jr.<br><br>The Honorable Katharine H. Parker<br><br>CLASS ACTION<br><br>THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page


I. NATURE OF THE ACTION AND OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 8

III. PARTIES ..... 8

- A. Lead Plaintiff ..... 8
- B. Defendants ..... 10
- C. Confidential Witnesses ..... 12

IV. FACTS ..... 17

- A. Overview of TAL ..... 17
- B. The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry ..... 21
- C. Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws ..... 27
  - 1. Illegal Tutoring ..... 29
  - 2. Falsification of Teacher Qualifications ..... 30
  - 3. Unlawful Pricing Practices ..... 32
  - 4. Unauthorized and Illegal Promotional Publications ..... 34
  - 5. False Advertising and Publicity ..... 35
  - 6. Unauthorized Expansion of Tutoring Sites ..... 39
- D. SEC Investigation ..... 39

V. REVELATION OF THE TRUTH ..... 40

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ..... 45

- A. Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry ..... 45
  - 1. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations ..... 57
  - 2. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations ..... 58
  - 3. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations ..... 59

B. Materially False and Misleading Statements and Omissions Regarding the PRC's Impending Double Reduction Policies ........ 61

C. Materially False and Misleading Sarbanes-Oxley Certifications........ 69

D. Defendants Omitted Material Facts Rendering Defendants' Affirmative Statements Misleading in Violation of Item 5(D) and Item 105 of Regulation S-K........ 71

1. Overview of TAL's Item 5 and Item 105 Disclosure Requirements........ 71

2. Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct, Regulatory Violations, and Material Risks Facing the Company........ 75

VII. POST CLASS PERIOD DISCLOSURES........ 83

VIII. ADDITIONAL SCIENTER ALLEGATIONS........ 84

A. Motive and Opportunity........ 85

1. Defendants Had Advance Warning of the Double Reduction Policies........ 85

2. TAL Insiders Realized Approximately $458 Million in Net Profits from Their Class Period Stock Sales........ 87

3. The Individual Defendants' Bonuses........ 93

4. The Individual Defendants' High-Level Positions and Experience........ 94

a. Defendant Zhang........ 94

b. Defendant Luo........ 95

c. Defendant He........ 96

B. The Alleged Fraud Concerns the Core Operation of TAL's Business........ 97

C. The Sarbanes-Oxley Certifications........ 100

D. The SEC Threatened to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations........ 101

E. Executive Resignations........ 103

IX. LOSS CAUSATION........ 104

X. CLASS ACTION ALLEGATIONS........ 107

XI. NO SAFE HARBOR........ 109

XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET........ 109

XIII. CLAIMS FOR RELIEF........ 111

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants........ 111

COUNT II For Violation of §20(a) of the Exchange Act Against the Individual Defendants........ 112

XIV. PRAYER FOR RELIEF ........................................................................................................ 112

XV. JURY DEMAND ................................................................................................................. 112

New Mexico State Investment Council ("NMSIC") and Public Employees' Retirement System of Mississippi ("MSPERS," and, together with NMSIC, "Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, Lead Counsel's investigation which includes without limitation: (a) review and analysis of regulatory filings made by TAL Education Group ("TAL" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by TAL; (c) review of other publicly available information concerning TAL; (d) review of regulatory filings with the People's Republic of China ("PRC"); and (e) interviews with confidential witnesses.

For the convenience of the Court, a redline showing all changes from the Second Amended Complaint to the Third Amended Complaint is attached hereto as Exhibit 1.

## I. NATURE OF THE ACTION AND OVERVIEW

1. The PRC's competitive academic environment had long been a boon for private tutoring companies. From the time children are toddlers in preschool, social pressure to excel academically weighs heavily on Chinese parents with daunting exams such as the Gaokao—China's very difficult college entrance exam—on the horizon.

2. Parents, concerned that other children will outperform their own, began enrolling their children in expensive tutoring courses to supplement their already intense public-school education. Supplemental tutoring became the norm with Chinese parents spending between 25% and 50% of their annual income on after-school tutoring.

3. These fierce social and academic pressures to excel in China enabled TAL—a private tutoring company founded in 2003—to thrive in an industry that at one point was valued as much as

$310 billion. TAL soon became one of the top five tutoring companies in China, and investors reacted accordingly. TAL's once modest market cap of just $5.67 billion in 2016 grew nearly ten-fold to $55 billion by February 2021. TAL began trading its ADSs on the NYSE in October 2010, and within just a few years after its IPO, the price of its ADSs grew by approximately 200%.

4. At the start of the Class Period on April 26, 2018, the regulatory environment governing China's private education industry began to change. The Chinese government began enacting rules and regulations which forbade private education companies from offering tutoring services on the weekends or after certain times of the day. Companies like TAL needed to adjust their corporate behaviors to maintain compliance or face sanctions and fines. The purpose of the new regulations was to restrict the influence and scope of private education companies; thus, by their nature, these regulations should have limited TAL's ability to grow its business.

5. Defendants were aware of these new government regulations and repeatedly assured the investing public that TAL complied with them. Rather than admit that compliance would slow or halt its growth plans, Defendants instead told investors that the new regulations were "beneficial" to the Company. In fact, despite those representations, TAL was intentionally flouting the new regulations to fuel its rapid growth.

6. Analysts and investors themselves believed Defendants' statements that TAL was complying with government regulations. For instance, on February 4, 2020, HSBC reported that "we believe that TAL Education" is "in compliance with these [the PRC's 2018 State Council Opinion 80] regulations." Further, throughout the Class Period, when issuing stock price guidance, New Street repeatedly stated that TAL was "softening rhetoric on regulations," in affirming its buy position. *See* July 26, 2019 and January 22, 2021 New Street reports. Likewise, UBS reported on March 11, 2021 that "[b]ased on the experience in 2018/19, stricter enforcements typically hurt offline SMEs more, ***as the***

***leading players like TAL/EDU in general have reached good compliance status following the initial AST regulation in 2018*.”**

7. In July 2021, the PRC ratcheted up its regulatory regime which effectively shuttered the private tutoring business in China.

8. By January 2021, and likely earlier, TAL and its executives knew that prior to July 2021, Chinese regulators had caught just a few dozen of TAL’s violations. Of those that Chinese regulators did catch, most were inconsequential or petty violations. In response, in all but a handful of instances, the Chinese government imposed fines ranging from the equivalent of a few hundred to a few thousand dollars. TAL knew, however, that it was just a matter of time before Chinese regulators would detect the private tutoring business that TAL was continuing to operate in flagrant violation of the new violations designed to curb the private education industry in China.

9. TAL engaged in *many* more violations of the applicable rules, regulations and proscriptions during the Class Period than those for which it had been caught and fined, which were inaccessible or unknown to the investing public during the Class Period and not disclosed until thereafter. Against that backdrop and despite the truth then known to them, ***Defendants falsely represented to the investing public that TAL was in near perfect compliance with Chinese rules, regulations and proscriptions***. All the while, however, TAL was engaged in a persistent pattern of flagrant violations of the very rules, regulations and proscriptions it purported to comply with, in order to grow its student enrollments against the will of the PRC and its new regulatory scheme.

10. Defendants knew of the restrictive regulations. They cited them repeatedly in SEC filings, claiming that more regulation would be beneficial to its business and to the tutoring industry as a whole and that TAL was “fully cooperating with the government directions, and where needed, [would] make adjustments to [its] business operations accordingly.” They thus expressed unrelenting confidence about the health, stability and sustainability of TAL’s tutoring business, its “long-term”

prospects, that it was operating in a "healthy," "stable" and "sustainable" environment, and even claimed that the reforms were "very positive" and would make the tutoring industry "more healthy."

11. Nothing was further from the truth. TAL's dominance in the industry and continued growth was only possible because it was ignoring the new regulations, and had escaped detection by the PRC. These representations of compliance were unfounded because Defendants knew or recklessly disregarded throughout the Class Period that TAL's persistent violations would lead to a government crackdown. Indeed, Defendants learned during the Class Period—well before the public—that the government's regulations and enforcement efforts were expected to increase. Defendants' representations that heightened regulations were positive for TAL's business and the industry in which it operates were thus inconsistent with their knowledge of an imminent shutdown of the industry.

12. On May 12, 2021, news of the severity and magnitude of the impending government crackdown on the for-profit tutoring industry began to surface. As a result, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, representing a 13% decline.

13. On June 1, 2021, 15 off-campus tutoring organizations, including TAL, were fined for illegal activities including false advertising and fraud. As the news hit the market, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, representing an 18% decline over the two-day period.

14. Then, on July 23, 2021, the Chinese government released its "Double Reduction" policies, which effectively upended the private education sector and banned companies that teach the school curriculum from making profits, raising capital or going public. Specifically, the PRC announced that it would no longer issue for-profit tutoring licenses. In other words, all after-school

tutoring had to be conducted by non-profits. Thus, companies like TAL were precluded from profiting from their core business models.

15. Defendants were well aware of the forthcoming Double Reduction policies for at least six months prior to their formal release on July 23, 2021. Yet ***Defendants failed to disclose the forthcoming Double Reduction policies and the anticipated impact the policies would have on TAL's business***.

16. As part of the Chinese government's announcement of the Double Reduction policies, it also announced that various tutoring companies—including TAL—were engaged in serious violations of the pre-Double Reduction rules, regulations and proscriptions governing the tutoring industry. For example, TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which it had created to drive student enrollments. TAL's misconduct that was now being reported was far more serious than the previously reported infractions (for example, improper waste disposal) as they included widespread practices of: (a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law; (b) offering courses that gave students unfair advantages in contravention of Chinese government policies; (c) misrepresenting teacher qualifications and course qualities; (d) mishandling user data; and (e) rigging promotional events to defraud consumers.

17. During the Class Period, Defendants' disclosures to investors included a slew of half-truths that were misleading in light of Defendants' failure to disclose TAL's then-existing regulatory violations and fines, and the forthcoming Double Reduction policies.[1] For example, Defendants represented that TAL complied with existing tutoring regulations and that TAL hypothetically "may"

[1] *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024) (holding omissions are actionable as "half-truths" if the "omission renders affirmative statements made misleading").

incur fines if it violates regulations, but Defendants omitted that TAL was actually violating regulations and incurring fines on a consistent companywide basis. Defendants also represented in boilerplate risk warnings that the Chinese government "may" impose more stringent tutoring regulations, but Defendants omitted that more stringent regulations were in fact forthcoming via the Double Reduction policies.

18. As a result of the PRC's July 23, 2021 announcement of the Double Reduction policies, TAL's ADSs dropped from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly ***79% decline***. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

19. The Individual Defendants fared much better than the investing public as they unloaded hundreds of thousands of shares—which they had acquired at incredibly low IPO exercise prices or, in some cases, on *zero cost bases*, thanks to TAL's executive controlled compensation committee—with non-public knowledge of and in advance of the PRC's crackdown on the education industry. The Individual Defendants knew that the impending crackdown would curtail or destroy TAL's ability to earn future profits under its then-current business model, particularly against the backdrop of TAL's persistent and serious violations of Chinese regulations. By the end of the Class Period, these insiders realized ***net profits of approximately $450 million*** by selling more than 9.5 million shares of TAL common stock which had declined by 95% as a result of their fraud.

20. On July 30, 2021, TAL cancelled its scheduled earnings release and earnings call as a result of the news.

21. On November 12, 2021, TAL announced that it would no longer offer academic subjects to students in K-9 in mainland China and that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year end February 28, 2022 and

subsequent periods" because the revenues derived from those services for its previous fiscal year had "accounted for a substantial majority of the Company's total revenues in the year."

22. On May 16, 2022, the *New Yorker* reported that "TAL Education Group, renowned for its Math Olympiad-style courses, transitioned to a 'quality education' program that teaches calligraphy instead of calculus." These business changes which purported to comply with PRC regulations were a façade, however. As local Chinese media outlet CaiLian reported in March 2023, TAL has continued to violate PRC regulations governing the private education industry. In fact, since the enactment of the 2021 Double Reduction crackdown in July 2021, TAL has taught course content prohibited under the 2021 regulations such as mathematics and English, disguising them as "thinking" and "eloquence" courses. Indeed, on March 29, 2023 another securities fraud class action was filed against TAL and several of its executives in connection with its pervasive violations of relevant PRC laws and regulations since the implementation of the Double Reduction policies in 2021. That class action survived the defendants' motion to dismiss and is ongoing. *Lewandowski v. TAL Education Group et al.*, No. 23-cv-01769 (D.N.J.).

23. This Third Amended Complaint contains the detailed accounts of nine former TAL employees who explain how the Company and its subsidiaries violated an array of PRC laws—and incurred fines as a result—for instance, by allowing unqualified teachers to tutor students, throughout the Class Period. The former employees also report that TAL's headquarters in Beijing assigned teachers who lacked the legally required qualifications to teach at TAL's teaching facilities throughout China in violation of PRC law. They further report that TAL executives knew at least as early as January 2021 that the PRC would issue severe regulations which would materially change the status quo of its business operations.

24. Lead Plaintiff brings this action under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, to recover for Defendants' misleading statements made to investors between April 26, 2018, through July 22, 2021 (the "Class Period").

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

27. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act. TAL ADSs trade on the New York Stock Exchange ("NYSE"), located within this District, and Defendants disseminated the statements alleged herein to be materially false and misleading into this District.

28. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

29. MSPERS and NMSIC purchased TAL American Depository Shares ("ADSs") during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein.

30. NMSIC is a sovereign wealth fund that manages the investments for New Mexico's four permanent funds: (i) the Land Grant Permanent Fund; (ii) the Severance Tax Permanent Fund; (iii) the Tobacco Settlement Permanent Fund; and (iv) the Water Trust Fund. As of 2021, NMSIC manages assets

valued at $34 billion including the investment of 23 New Mexico government related clients which, at present, have a combined value of approximately $1.5 billion. According to NMSIC's website, it is "focused on optimizing the earnings of New Mexico's permanent funds – funds that contribute to the state's overall operating budget – while preserving and growing the real value of the funds for future generations of New Mexicans."

31. MSPERS was established in 1952 as the retirement system for Mississippi state agencies, as well as counties, cities, and other participating political subdivisions. It provides retirement benefits for employees of the state of Mississippi who work in government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services. These retirement benefits help retain a strong public workforce in the state of Mississippi. The 10-member MSPERS Board of Trustees includes the State Treasurer, a gubernatorial appointee who is a member of MSPERS, two retirees, two state employees, and one representative each of public schools and community colleges, institutions of higher learning, counties, and municipalities. With the exception of the State Treasurer and the gubernatorial appointee, members are elected to staggered six-year terms. The Board is responsible for designating the System's executive director and for establishing the policies for administration of the trust. The Board also works to carry out the intent and purposes of the state Legislature by establishing rules and regulations for the administration of MSPERS and the transaction of its business. The Government Finance Officers Association of the United States and Canada awarded a Certificate of Achievement for Excellence in Financial Reporting to MSPERS for its comprehensive annual financial report for the fiscal year end June 30, 2020. MSPERS received the Public Pension Coordinating Council's Public Pension Standards 2021 Award in recognition of meeting professional standards for plan design and administration. As set forth in its Certification, ECF 18-1, MSPERS

acquired TAL ADSs during the Class Period at prices that were artificially inflated as a result of Defendants' fraud.

### B. Defendants

32. Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in China. TAL ADSs trade on the NYSE under the ticker symbol "TAL." Each ADS represents one third of one share of TAL common stock.

33. Defendant Bangxin Zhang ("Zhang") co-founded TAL. He was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period and continues to hold those positions to-date. Defendant Zhang is also the controlling shareholder of the Company. Zhang is also the sole shareholder and sole director of Bright Unison Limited, a company incorporated in the British Virgin Islands. During the Class Period, Defendant Zhang issued materially false and misleading statements, and failed to disclose material facts to investors, as further alleged herein. During the Class Period, Defendant Zhang sold ***5,509,553 shares*** of TAL stock—which he acquired at very low IPO prices or even at zero cost bases—through his company Bright Unison Ltd., realizing net profits of approximately ***$215.2 million***.

34. Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period. Luo resigned from the Company effective October 29, 2021. During the Class Period Defendant Luo made materially false and misleading statements and failed to disclose material facts to investors as alleged herein. Also during the Class Period, Defendant Luo sold ***457,380 shares*** of TAL stock—which, like Defendant Zhang, he had acquired at extremely low IPO prices or even at zero cost bases—at artificially inflated prices, realizing approximately ***$24.7 million in net profits.***

35. Defendant Linda He[2] ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019. Defendant He made materially false and misleading statements and failed to disclose material facts to investors during the Class Period, as further alleged herein.

36. Defendants Zhang, Luo, and He (the "Individual Defendants," and together with TAL, the "Defendants"), were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

37. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded ADSs would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

[2] Defendant Linda He's name is often spelled "Linda Huo" on public filings.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, Defendants Luo and He participated in conference calls with investors during which false and misleading statements were made, and/or each Individual Defendant had the ability and/or opportunity to prevent the issuance of such documents and statements or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### C. Confidential Witnesses

39. CW1[3] worked at TAL's Nanjing branch from July 2012 to September 2021. There, CW1 served as a deputy head and deputy general manager, responsible for government relations. CW1 disclosed that at least as early as January 2021—*months before rumors emerged* in March 2021 during China's Two Sessions and the Chinese government's formal issuance of the regulations in July 2021—TAL's senior executives knew that stringent regulations were forthcoming. CW1 further reported that TAL's senior executives and others within the Company engaged in internal discussions, meetings, and emails during the first half of 2021—before the regulations were disclosed and implemented—regarding the forthcoming regulations. CW1 stated that TAL employees talked about the potential new regulations almost daily and knew that changes were forthcoming.

40. CW2 worked at the Jiangsu branch of TAL's subsidiary Xueersi Education Technology Co. ("Xueersi") from August 2018 to June 2023. There, CW2 was responsible for human resource management. CW2 reported that between 2018 and 2021, TAL expanded its business relatively quickly. CW2 provided evidence that TAL misrepresented teacher qualifications and

[3] Chinese law currently prohibits disclosure of last names of witnesses such as these.

course qualities. For example, CW2 disclosed that in 2018, Xueersi's Jiangsu branch had online school teachers who did not possess the requisite qualification certificates. CW2 further disclosed that in 2018, TAL and its subsidiaries, including Xueersi's Jiangsu branch, were punished by the government for inadequate teacher qualifications. CW2 further disclosed that TAL's online school engaged in illegal and deceptive pricing policies. For example, CW2 disclosed that TAL's online school adopted low-priced courses to recruit new students. For instance, according to CW2, TAL would discount online courses by over 90% to drive traffic. This testimony corroborates the testimony of CW4 *infra*, and is consistent with reports of regulatory fines that TAL received as a result of such conduct. As a result of this sales tactic, TAL's headquarters was fined more than RMB 500,000 ($72,690 USD) by the Beijing Municipal Administration for Market Regulation, according to CW2. That TAL's headquarters received a substantial fine would have put Defendants on notice of such misconduct. CW2 further reported that in May 2021, one of TAL's operating entities, Hangzhou Yidu Training School Co. Ltd. was fined RMB 2.5 million ($389,281 USD) by the government for false publicity and price gouging. Hangzhou Yidu Training School was also fined RMB 500,000 ($77,856 USD) in or around May 2021 in connection with violating the pricing law by luring consumers in through false pricing means, according to CW2.

41. CW3 worked at TAL's headquarters in Beijing from April 2017 to March 2022 as the PR manager of TAL's Reebok English Division. There, CW3 was responsible for the construction of the Beijing Libu English Teaching Campus and the approval of teaching licenses by working with the Beijing Municipal and District Education Authorities. In this role, CW3 communicated with the education bureaus in Beijing. CW3 disclosed that in 2018, a number of TAL's Libu English and Xueersi Peiyou campuses did not have qualification approvals to operate the schools. CW3 further stated that the Beijing education authorities identified TAL schools that possessed business licenses, but not the required licenses to operate schools and were therefore required to rectify the violations.

CW3 further stated that even though many of TAL's campuses did not have school licenses, they still carried out teaching work despite TAL's knowledge that such school licenses were required. CW3 disclosed that the Beijing education authorities were primarily concerned with whether private tutoring institutions were collecting large tuition fees in advance as TAL was later determined to have done and for which it was, in part, ultimately shut down as part of the Double Reduction.

42. CW4 worked as the regional manager of TAL's Xiaogao section of the Xueersi Online School Division from May 2018 to September 2021. As regional manager, CW4 was responsible for the sales management of the TAL's Xiaogao section and was later transferred to the Xiaohou Enlightenment Division in March 2021 where CW4 was responsible for the online sales management of the southwest region of Xiaohou and reported directly to Zhao Puzheng, the general manager of the Xiaohou Enlightenment Division. CW4 disclosed that Xueersi Online School attracted students to join its educational program by offering courses originally priced at RMB 7800 ($1,227 USD) for just RMB 20 ($3 USD) and that Xueersi's online school division was ultimately fined for such conduct.

43. CW5 worked at TAL as a City Operations Manager between September 2010 and April 2023. In this role, CW5 was responsible for business operation management in Hangzhou, Nanjing, and other regions. In 2021, CW5 returned to Beijing headquarters where they were responsible for business operation management of high schools. CW5 reported that TAL's subsidiaries were punished for various problems throughout the Class Period. For instance, in 2018, Xueersi Online School was punished by the Beijing Municipal Bureau of Culture and Tourism for illegal online publications. In April 2021, Xueersi was notified and criticized by the Beijing Municipal Education Commission because some of Xueersi Online School's live courses ended later than 9:00 pm. CW5 also reported that Xueersi engaged in false and misleading advertising by

advertising courses on Tmall[4] wherein it would promote the original course price of RMB 799 ($126 USD) and a current price of RMB 20 ($3 USD) for promotional activities in order to induce parents to enroll their children. CW5 further reported that Xueersi did not actually sell its courses at a price of RMB 799 ($123 USD) so in April 2021, the Beijing Municipal Administration for Market Regulation fined it RMB 500,000 ($76,720 USD) for suspected false publicity and price regulations violations. Finally, CW5 stated that Xueersi Online School was also suspected of false publicity. In particular, in 2021, the Beijing Haidian District Market Supervision Administration fined Xueersi more than RMB 10,000 ($1,573 USD) because a person purporting to be a teacher in a video advertisement was actually an actor, not a real teacher.

44. CW6 worked at TAL between April 2018 to January 2022 as the executive principal of Xueersi Education Technology Co., Ltd. in Harbin. In this role, CW6 managed Xueersi's Harbin branch. CW6 disclosed that TAL had teaching staff who lacked teacher qualification certificates and that in some cases, the main teachers lacked the required qualification certificates. CW6 provided evidence of TAL's misrepresentation of teacher qualifications and course qualities. CW6 stated that when Xueersi's Harbin branch was first established in 2018, TAL's headquarters would train and assign teachers who they knew did not possess the required teacher qualification certificates. CW6 also stated that Xueersi's Harbin branch taught courses that exceeded the outline in violation of PRC regulations.

45. CW7 worked as a finance manager at Xueersi's Nanchang Xihu branch from February 2016 to September 2021. In this role, CW7 was responsible for financial work. CW7 disclosed that in 2016, Xueersi Education and Training School knowingly recruited students despite TAL's knowledge that the school did not have approval to operate as a school. CW7 stated that Xueersi's

[4] Tmall is a consumer platform for local Chinese and international businesses in Greater China.

Nanchang Xihu branch operated without a license for nearly two years. CW7 further described the PRC's 2018 regulations which proscribed teaching outside of the scope of the syllabus. CW7 disclosed that courses gave students unfair advantages in contravention of Chinese government policies because TAL's high-level classes were based on Olympiad and other content that went beyond the syllabus permitted by regulators. CW7 stated that the school ignored the regulations proscribing teaching past 8:30 pm or on holidays and during winter and summer vacations. Instead, TAL offered courses during these time periods at various teaching sites in Nanchang in contravention of Chinese government policies.

46. CW8 worked at Xueersi's Chengdu branch as an administrative manager from August 2011 to December 2021. In this role, CW8 was responsible for comprehensive procurement and administrative management. CW8 left TAL in December 2021 after most of the teaching sites closed due to the implementation of the Double Reduction policy. CW8 provided information regarding TAL's misrepresentation of teacher qualifications and course qualities. Specifically, CW8 disclosed that many of TAL's teachers did not have teacher qualification certificates. CW8 also explained that TAL offered courses that gave students unfair advantages in contravention of Chinese government policies. For example, CW8 stated that in 2018, at which time there was a policy in effect that required that teaching could not exceed the curriculum, Xueersi's Chengdu branch taught courses such as mathematics and science which exceeded the syllabus, and further, other classes taught Olympiad-related training content which also exceeded the curriculum syllabus. Finally, CW8 reported that TAL was punished by the government in connection a pricing scheme by Xueersi Online School in which it lured new students in with false promises of low prices.

47. CW9 worked as the HR Manager of its Aizhikang Business Unit at Xueersi's Shenzhen branch from June 2011 to December 2021. CW9 reported that TAL misrepresented teacher qualifications and utilized unqualified teachers. For example, CW9 stated that although the

government required teacher qualification certificates, some less populous cities may have had personnel without teaching qualifications who were engaged in teaching activities. CW9 further reported that the PRC punished TAL branches for falsely advertising its teacher qualifications. CW9 stated that after the Chinese government began enacting new education laws in 2018, including stricter regulations for teacher credentials, TAL's teachers who lacked the proper teacher qualification certificates continued to teach in its schools in violation of PRC regulations. Finally, CW9 stated that during the 2021 Qingming Festival, which was held in April, Xueersi's Shanghai branch was fined RMB 350,000 ($53,704 USD) by the Shanghai Yangpu District Market Supervision Administration for rigging promotional events to defraud consumers in connection with a coupon promotion.

## IV. FACTS

### A. Overview of TAL

48. TAL was founded in China in 2003 by Defendant and CEO Bangxin Zhang who began working as a part-time tutor in 2002 while completing his PhD program at Peking University. When Zhang originally launched TAL, the Company primarily offered mathematics tutoring courses, but later expanded to other subject areas as well. During the Class Period, TAL provided K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese. Tutoring services are primarily offered through small classes, personalized premium services and online course offerings, which the Company began offering in 2010.

49. Soon after its formation, TAL began experiencing success and a growing student base. In 2007, Defendant Zhang dropped out of his PhD program at Peking University to focus entirely on the Company.

50. On January 10, 2008, TAL Education Group became incorporated in the Cayman Islands as the "holding company for a group of companies engaged in the provision of high quality after-school tutoring programs." Although headquartered in Beijing, China, the Company is organized as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities ("VIEs"), including Beijing Xueersi Education. In or around October 2010, TAL listed its ADSs on the NYSE under the ticker "XRS." In the subsequent years after its IPO, the price of TAL ADSs grew by approximately ***200%***. Thus, by 2016, Defendant Zhang was worth ***$1.5 billion at just 36 years old***. From 2015 to 2019, TAL ranked in the Top 100 Most Valuable Chinese Brands for five consecutive years. By February 2021, TAL was valued at ***$55 billion*** and Defendant Zhang's wealth grew to ***over $15 billion***.

51. TAL's primary sources of revenue are: (i) small class tutoring services that focus on offline education; and (ii) online education services provided through www.xueersi.com. For the fiscal year end February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively. Further, throughout the Class Period, TAL's gross profits increased exponentially as it experienced robust growth due to its deceptive pricing and advertising strategies. For instance, TAL's fiscal year 2019 gross profits were $1.4 million; fiscal year 2020 profits were $1.8 million; and fiscal year 2021 profits were $2.4 million.

52. In 2021, TAL and New Oriental dominated the for-profit tutoring industry in China. TAL reported revenues of $4.496 billion for fiscal year ended February 29, 2021, and New Oriental had revenues of $4.277 billion for its fiscal year, which ended May 31, 2021. In contrast, Gaotu Techadu was a distant third, with revenues of $1.09 billion for its fiscal year which ended December 31, 2020. TAL's revenues were $3.3 billion and $2.6 billion in fiscal 2020 and 2019, respectively. TAL's employee count was 70,914, 45,271, and 34,733 in fiscal 2021, 2020, and 2019, respectively.

53. As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform. According to TAL's Form 20-F for its fiscal year end February 29, 2020, the net revenue obtained from TAL's VIEs and subsidiaries and schools accounted for 93.4% of TAL's total net revenue.

54. During the Class Period TAL had 10 subsidiaries and consolidated affiliated entities. TAL's subsidiaries are: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

55. TAL's VIEs are: (1) Beijing Xueersi Education Technology Co., Ltd. ("Beijing Xueersi Education"); (2) Beijing Xueersi Network Technology Co., Ltd. ("Beijing Xueersi Network"); (3) Xinxin Xiangrong Education Technology (Beijing) Co., Ltd. ("Xinxin Xiangrong").

56. TAL's Affiliated Entities ("AEs") are: (1) Shidai TAL Education Technology (Beijing) Co., Ltd.; (2) TAL Education Technology (Jiangsu) Co., Ltd.; and (3) TAL Training School (Shanghai) Co., Ltd.

57. In addition to TAL's 10 subsidiaries and consolidated affiliated entities named above, TAL has an additional operating entity called Shenzhen Xueersi Training Center ("Shenzhen School"), which was incorporated in November 2013 in Shenzhen, China.

58. According to Forms 20-F filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL had a 100% legal ownership interest in the following entities: (1) TAL Holding Limited ("TAL Hong Kong"), an intermediate holding company; (2) Beijing Century TAL Education Technology Co., Ltd. ("TAL Beijing"), a software sales and consulting service; (3) Beijing Huanqiu Zhikang Shidai Education Consulting Co., Ltd. ("Huanqiu Zhikang"), an education and management consulting service; (4) Yidu Huida Education Technology (Beijing) Co., Ltd. ("Yidu Huida"), a

software sales and consulting service; (5) Beijing Xintang Sichuang Education Technology Co., Ltd. ("Beijing Xintang Sichuang"), a software and network development, sales, and consulting service; (6) Zhixuesi Education Consulting (Beijing) Co., Ltd. ("Zhixuesi Beijing"), a software and network development, sales, and consulting service; (7) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. ("Pengxin TAL"), an investment management and consulting service; (8), Firstleap Education ("Firstleap"), an intermediate holding company; (9) Firstleap Education (HK) Limited ("Firstleap Hong Kong"), an intermediate holding company; (10) Beijing Lebai Information Consulting Co., Ltd. ("Lebai Information"), an education and management consulting service; and (11) Beijing Yizhen Xuesi Education Technology Co., Ltd. ("Yizhen Xuesi"), a software and network development, sales, and consulting service.

59. For fiscal year end February 28, 2022 ("FY 2022"), TAL's 100% legal ownership over other entities dropped significantly due to business losses from the Double Reduction policies. TAL reported in its Form 20-F for FY 2022 that the "Company decided in November 2021 to cease offering services relating to academic subjects from kindergarten through grade nine in the mainland of China by the end of December 2021" and further, that "[t]he Company also has taken actions to restructure its business and operations . . . ." Thus, as of February 28, 2022, TAL only had a 100% legal interest in: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; and (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd.

60. During the Class Period, TAL operated four major tutoring brands including: (1) Xueersi, which was further divided into Xueersi Peiyou, which provided small-class learning services, and Xueersi.com, which provided online education services; (2) Zhikang, which provided after-school one-on-one learning services; (3) Firstleap, which provided English education; and (4) Mobby, its science, technology, engineering, arts and math ("STEAM") education brand.

61. TAL also provided overseas study consulting services and test preparation courses for major overseas exams. Xueersi Online School was TAL's leading brand. It provided online live lessons to students ages 3-16 and was the longest-running online education brand under TAL. Mobby was TAL's preschool education program which was first launched in 2011.

### B. The Chinese Government Enacted Heightened Laws and Regulations Governing the Tutoring Industry

62. The National People's Congress is China's highest legislative body. The State Council is the highest authority of the executive branch of the PRC central government. There are several ministries and agencies under the authority of the State Council including the Ministry of Education, the General Administration of Press and Publication, the MIIT, the SAIC, and the Ministry of Civil Affairs.

63. As stated in TAL's Forms 20-F filed with the SEC for fiscal years 2018 through 2022, "The principal laws and regulations governing private education in China consist of the PRC Education Law, the Private Education Law and Implementation Rules, and the Regulations on PRC-Foreign Cooperation in Operating School."

64. In the 1990s, the Chinese government began to take concrete measures to make education in China more equitable and less burdensome on parents and students. For instance, in 1995, the Chinese government enacted Regulations on the Qualifications of Teachers as a supplement to the Teachers Law of the People's Republic of China.[5] The 1995 supplementary regulation provided further details regarding the acceptable forms of teaching qualifications, prerequisites, examinations, as well as teaching credentials. Thus, in the past several decades, the Chinese government has taken concrete steps to regulate the burgeoning private education industry, particularly by enacting various laws and regulations.

[5] According to a report issued by oecd.org, at times, the Chinese government "supplements education *laws* with *regulations*." *See* https://www.skillsforemployment.org/sites/default/files/2024-01/wcmstest4_186095.pdf (emphasis added).

65. Then, in 2010, the Department of Development and Planning (within the Ministry of Education, "MOE"), which is responsible for national educational development, proposed the National Long-Term Education Reform and Development Plan (2010-2020) ("Long-Term Education Reform"), a strategic plan for reforming and developing education of all levels throughout China between the years of 2010-2020. The Long-Term Education Reform was, for a while, the most salient guidance in Chinese education.

66. In 2018, the Chinese government began enacting a series of rules and regulations referred to as "Circulars" and "State Council Opinions" under the regime of the Law on the Promotion of Private Education of China. For instance, in February 2018, the Chinese government promulgated the "Circular on Special Enforcement Campaign Concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle School," or "Circular 3," which was intended to rein in excessive tutoring fees and limit the perceived societal harm resulting from the for-profit tutoring programs in China. Among other restrictions, the regulations prohibited after-school tutoring institutions from: (i) providing courses more advanced than the government-approved syllabus and curricula applicable to the respective primary and secondary school students; (ii) providing courses designed to enhance exam-taking skills; and (iii) linking school enrollment with tutoring results. On the whole, the regulations purported to reduce disparities in school performance between relatively affluent students who could afford after-school tutoring and those that could not. Specifically, Circular 3 prohibits private training organizations from organizing academic competitions or tests for students in elementary or middle school and further prohibits elementary and middle schools from considering the results from private training organizations in the enrollment process. As stated in TAL's Form 20-F for fiscal year 2018 ("FY 2018"), under Circular 3, Chinese "government authorities will carry out a special enforcement campaign to alleviate extracurricular burden on students of elementary schools and middle schools and regulate operations of after-school training institutions."

67. On February 13, 2018, the MOE, the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the State Administration for Market Regulation ("SAMR") jointly issued a Circular on Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions, under which government authorities would carry out a series of inspections on after-school training institutions.

68. On August 22, 2018, the Chinese State Council issued an opinion on Supervising After-School Tutoring Institutions, known as "Circular 80," or "State Council Opinions 80," which provided additional regulations targeting after-school tutoring institutions. In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than three months' worth of fees. Circular 80 also set forth requirements pertaining to the Permit for Operating a Private School, including: the size of the classroom; the teacher's qualifications, insurance, fire safety, environmental protection, as well as health and food safety.

69. That same month, the State Counsel issued the "Opinion on regulating the Tutoring Industry" which set forth the following: (1) course information must be filed with the local education authorities and made publicly available; (2) contents of tutorial courses should not surpass the national guideline; (3) course schedule should not conflict with regular school time; (4) tutorial centers should not offer tutoring courses past 8:30 pm and instructors should not assign homework for students; (5) no examination, competition, or any related rankings can be conducted for courses of primary school and secondary school subjects; (6) tutorial centers cannot receive students' tuition payments for more than 3 months in advance; (7) instructors who teach Chinese, math, foreign language, physics, and chemistry, among others, in the compulsory education system must obtain teaching qualifications; (8) the average floor space per student during one tutoring session cannot be less than three square meters; and (9) public school teachers cannot be employed by after-school tutoring institutions.

70. On August 31, 2018, the General Office of the MOE promulgated the Circular called "Implementation of Special Measures and Rectification Work on the Private Education Institutions," which pronounced specific requirements for local education departments to enforce State Council Opinions 80.

71. On November 20, 2018, the General Office of the MOE along with the General Office of the SAMR of the PRC and the General Office of the Ministry of Emergency Management of the PRC jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," better known as "Circular 10." Circular 10 provides express requirements for local governments regarding the implementation of State Council Opinions 80, which was issued earlier that year in February.

72. Approximately one year later, on March 5, 2019, during China's "Two Sessions" of the 13th CPPCC National Committee (annual political meeting of China's top political advisory body held in Beijing), a notice entitled, "The Urgency of Regulating Out-of-School Tutoring market" was published on the Ministry of Education website by LI Hongpin, the Deputy to the National People's Congress ("NPC").

73. In China, living close to a school is often a prerequisite to a child's enrollment. As a result, home prices have risen significantly in neighborhoods near the best schools. On January 1, 2019, Beijing implemented price controls on houses in certain school districts. Houses purchased after that date no longer guarantee enrollment of owners' children in certain schools. Beijing housing authorities also suspended and fined two real estate brokers as part of a sweeping inspection of more than 100 brokerages to determine whether they continue advertising school district houses to mislead buyers. On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory

Education" marking China's first document centered on reforming education and teaching in compulsory education.

74. Parallel to the July 8, 2019 regulation was the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), promulgated by the MOE and other PRC government bodies such as the Cyberspace Administration of China, on July 12, 2019. These opinions were intended to regulate academic after-school training that involved internet technology and specifically initiated the supervision of online and offline after-school training.

75. On April 21, 2020, the Ministry of Human Resources and Social Welfare promulgated the Notice of Implementing the Phased Measures of "Taking Certificate after Starting Career."

76. Because TAL operated in a highly regulated industry within China, the impact of new laws and regulations governing the Chinese tutoring industry, and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance to investors. TAL acknowledged the material importance of maintaining strict compliance with Chinese laws, regulations and government prerogatives governing the tutoring industry. For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations."

77. On April 7, 2021, China's State Council promulgated the Amended Regulations on the Implementation of the Law for Promoting Private Education of the PRC, or the Amended Implementation Regulations of Private Education Law, which became effective on September 1, 2021. The Amended Implementation Regulations of Private Education Law together with State Council Circular 80 "require the learning centers of after-school tutoring institutions to make filings with the relevant education authorities," as reported in TAL's Form 20-F for fiscal year 2022.

78. Then, on July 23, 2021, China ***effectively outlawed the entire private academic tutoring industry.*** In particular, the General Office of the Central Committee of China's Communist Party and

the General Office of the State Council jointly released the Opinions on Further Reducing the Burden of Homework and Off-Campus Training for Compulsory Education Statements (the "Opinions") which contain a reference to a "Double Reduction" – that is, a reduction in the total amount of time and commitment consumed by school homework as well as a reduction in the burden presented by after-school training or off-campus programs. This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China. Indeed, a *Reuters* report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL.

79. The July 23, 2021 rules required, among other things, that all education companies register as nonprofits; and further stated that "no new licenses will be issued to tutoring agencies catering to elementary and middle school students."

80. The media's reaction to the new policies reflected their severity. For instance, *Sixth Tone*, a Chinese "online publication that produces informed and insightful content on contemporary China, referred to the "double reductions," as a "a massive campaign to take the heat out of the country's educational rat race." *Reuters* reported that the new restrictions barring for-profit tutoring are an effort by China to "boost the country's birth rate by lowering family living costs."

81. Further, a *JD Supra* article stated:

> Double Reduction policy is intended to improve the overall health of students, relieve the burdens and anxiety of parents, reduce social inequity, further regulate and standardize off-campus training (including both online and offline training), and strictly implement the Compulsory Education Law, the Protection of Minors Law and other laws and regulations governing the education industry.

82. Today, the primary regulations that govern the private education sector in China include: The Private Education Law ("Private Education Law") and the Implementation Rules for Private Education Law ("Implementation Rules").

83. The Defendants and senior TAL executives were aware that the Chinese government was planning to enact increasingly stringent regulations before the public was aware. In anticipation of the enactment of heighted regulations and as the Chinese government enacted these laws, TAL turned a blind eye to the new laws and regulations and knowingly continued to operate as it had long since by evading and violating the regulatory framework while assuring investors that it was in compliance. In some cases, it even claimed that any increased regulatory scheme would be beneficial to the Company. Defendants made these assurances despite the serious financial and reputational consequences that they knew would likely arise if TAL was caught. Despite the increased regulation, China's Gaokao remained a college entry requirement and general expectations of academic excellence had not diminished; thus, TAL continued to experience heightened demand for its tutoring services and wanted to continue to capitalize on the demand. As further detailed below, TAL consciously violated the new laws and instead moved its business operations underground.

### C. Throughout the Class Period, in Contrast to Their Public Statements, Defendants Flouted Chinese Laws

84. Despite Defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations and proscriptions of the Chinese government and that increased regulation was beneficial to the company, during the Class Period, the Company regularly violated those same rules, regulations and proscriptions in an attempt to artificially inflate the Company's financial results. These violations long went undetected, but were eventually caught by Chinese regulators, who imposed fines ranging from the equivalent of a few hundred dollars to hundreds of thousands of dollars. Such fines—which, as alleged herein, were disclosed to Lead Plaintiff by several of TAL's former employees—eventually contributed to the shutdown of the private education industry in China.

85. As of February 28, 2021, TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States.

Lead Plaintiff's investigation uncovered ***at least 60 infractions*** and eight of the nine former employees interviewed by Lead Plaintiff disclosed the specifics of certain of these violations; however, TAL engaged in many additional and far more serious violations which led the Chinese government to ultimately, effectively, shut down the Company's operations. Indeed, at a governmental conference announcing the industry-wide fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including ***155,000*** complaints and reports for education and training services received by authorities in 2020 alone and over ***47,000*** similar complaints and reports received by authorities in the first quarter of 2021. Given that the market share in the industry was dominated by TAL and a handful of its competitors, it stands to reason that TAL engaged in *many* more regulatory infractions which are either unavailable or inaccessible to the public than the roughly 60 referenced above.

86. Further, on June 1, 2021, SAMR fined 15 after-school tutoring institutions, including TAL, with financial penalties amounting to RMB 36.50 million ($5,683,496 USD). In particular, an affiliate of TAL's leading brand Xueersi, Hangzhou Yidu Training School Co. Ltd., was fined RMB 2.5 million ($389,281 USD) for engaging in false advertising and price fraud. Senecaesg.com reported that the tutoring companies were accused of "false publicity, such as fabricating teacher qualifications, exaggerating tutoring effects, fabricating user reviews, and so on."

87. Among the transgressions for which TAL was sanctioned by Chinese regulators, TAL reportedly: (i) engaged in deceptive advertising and promoted fake product pricing, designed to induce student enrollment, as reported by CW2, CW4, CW5, and CW9; (ii) fabricated favorable course reviews, including by purported consumers who did not in fact exist; (iii) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (iv) offered courses that gave students unfair advantages in contravention of Chinese government policies; (vi) misrepresented teacher

qualifications and course qualities as reported by CW6, CW8, and CW9; (vii) mishandled user data; and (viii) rigged promotional events to defraud consumers.

88. TAL was an unrepentant serial violator of the Chinese government's rules, regulations and proscriptions and engaged in a continuing game of cat and mouse with regulators. As one Chinese language source[6] observed, TAL had been on the government "'blacklist'" for repeat offenses "but never stopped its illegal act[s]." Instead, the Company continued to engage in "over-standard and advanced tutoring, illegal charges, false publicity, tricking consumer[s] into transactions, [the use of] vulgar videos, illegal recruiting and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

**1. Illegal Tutoring**

89. TAL repeatedly engaged in illegal tutoring practices by, among other things, offering course programs that violated state regulations, tutoring beyond the scope of the syllabus as corroborated by CW6, CW7, and CW8, and operating a school without approval as confirmed by CW3 and CW7. Below is a mere sample of the infractions that TAL incurred during the Class Period; upon information and belief, TAL incurred hundreds, if not thousands, of sanctions and fines for violating regulations and laws governing the for-profit tutoring industry throughout the Class Period.

90. A TAL tutoring institution based in Yingzhou District, Fuyang City of the Anhui province organized primary school students to take a junior high school entrance examination, which was allegedly designed to send overachieving candidates to the better junior high schools. The local Yingzhou District Education Bureau issued a public notice that the TAL institution was involved in unauthorized illegal tutoring and ordered the institution to suspend operations in June 2021.

[6] The Chinese-language sources cited herein have been translated into English by translators hired by Lead Plaintiff's counsel.

91. TAL's Hangzhou branch, Hangzhou Xueersi, violated the new senior high school entrance examination policy by using terms like "top achievers' class," "target class," and "competition class" during student enrollment promotions.

92. On March 24, 2021, TAL Training School (Shanghai) Co. Ltd., was fined for operating a tutoring business in the name of "Zhangyang Road Branch" from July 2020 to January 2021 without having obtained the relevant branch registration. (Penalty Decision No. 152020001595.)

93. TAL's Xinxin Zhixue Education Technology (Beijing) Co Ltd., a wholly owned subsidiary of Xinxin Xiangrong, enrolled students in May 2021 and offered Xueersi Peiyou training services at its Guangzhou campus from July to August 2021 in direct violation of state regulations which forbade unauthorized private tutoring services. As a result, the state ordered it to suspend its operations on January 11, 2022. (Penalty Decision No. 326.)

94. TAL's Chongqing Jiulongpo District Xueersi Yizhi Technology training Co., Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, engaged in illicit practices such as advanced tutoring, tutoring beyond the scope of the syllabus, and charging tuition for periods longer than the allowable three-month period. As a result, the company was blacklisted by the Education Commission of Jiulongpo District, Chongqing in May 2021. The company later changed its name on May 18, 2022, to Chongqing Jiulongpo District Zhikang Education Training Co. Ltd.

95. On April 16, 2021, Kunshan Yizhen Education Technology Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong was fined for operating a school without approval. (Penalty Decision No. 010002.)

**2. Falsification of Teacher Qualifications**

96. Throughout the Class Period, the PRC imposed stringent regulations concerning teachers' qualifications, and closely watched for infractions. However, TAL also ignored or skirted

these rules. For example, and as corroborated by CW2, CW6, CW8, and CW9, many online Xueersi teachers lacked the requisite teaching qualifications. According to one report dated May 2, 2020, only 27 out of 58 teachers that taught Chinese, math, or English in Grade 1 via Xueersi.com provided their teaching certificate numbers. Worse, of those that did purport to provide their teaching qualifications, such "qualifications" did not comply with prevailing regulations. CW2, CW6, CW8, and CW9 each disclosed that TAL and its subsidiaries allowed teachers who did not possess the requisite qualifications to teach courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to teach at sites.

97. Another report dated April 25, 2021 reported that some teachers on Xueersi.com taught students in grades that were more advanced than their teaching qualifications permitted. For instance, a teacher with the surname "Qi" had a teaching certificate that indicated that she was qualified to teach primary school subjects, however, she was actually teaching junior high school subjects on Xueersi.com.

98. On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd. on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming to be a high school teacher with six years of teaching experience recommended Xueersi.com online courses. Beijing Xueersi Education spent RMB 2,622.58 ($401 USD) on the video advertisement. (Penalty Decision No. 323.) Similarly, CW5 disclosed that in 2021 the Beijing Haidan District Market Supervisions Administration fined Xueersi more than RMB 10,000 ($1,573 USD) for false publicity because a person purporting to be a teacher in its video advertisement was actually an actor.

99. On May 30, 2021, one of TAL's operating entities, Hangzhou Yidu Training School Co. Ltd., was fined RMB 2.5 million ($392,450 USD) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information

regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

**3. Unlawful Pricing Practices**

100. As alleged above, Circular 80, enacted in 2018, forbade tutoring companies from charging tuition for a period greater than three months, yet TAL flouted this regulation. For example, Xueersi, TAL's leading brand, had a practice of charging students advance tuition for more than three months of courses (typically in Xueersi.com's Summer and Autumn Course Package, which, according to a report by the Economic Observer, often lasted more than three months) and required prepayment in full. Therefore, TAL had students pay tuition in advance of course programs.

101. TAL's subsidiaries also flagrantly disregarded Chinese law governing pricing. For instance, on August 21, 2019, Shanghai Xueersi Education Training Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for illegal pricing after an inspection revealed that an IZhikang store located in Shanghai did not provide a public notice of its tutoring courses' prices and promotional details, which constituted failure of clear price marking. (Penalty Decision No. 122019007925.)

102. Thereafter, on April 25, 2021, the Beijing Municipal government issued a warning and imposed a fine on Beijing Xueersi Education for offering discounted prices for several of its courses in violation of pricing laws as well as selling courses more than three months in advance and holdings courses past 9:00 pm. (Penalty Decision No. 58.) Specifically, regulators found that TAL's VIE, Beijing Xueersi Education Technology Co., Ltd., had been misrepresenting the non-discounted costs of enrollment in its courses to consumers, thereby deceiving customers into paying the full price for courses they believed they were receiving at a discount. For example, TAL promoted online courses as being offered at a 97% discount from the purported regular price when in fact no Company

courses had ever been sold at this purported regular price. On one occasion, TAL marked up the price of an online course by nearly 4,000% despite offering a substantially lower price initially.

103. Beijing authorities stated that they were acting on serious concerns that had been raised by the general public regarding the Company's business practices. In its May 7, 2021 Form 20-F filing ("2021 Form 20-F"), TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." For example, the PRC Pricing Law provides that an operator is prohibited from using false or confusing pricing methods to induce consumers or other operators into trading with it.

104. On July 23, 2021, Xi'an Yanta District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., a wholly-owned subsidiary of TAL's Beijing Xueersi Education, was fined RMB 1.3 million ($200,577 USD) for violating the: (1) Anti Unfair Competition Law by setting unclear terms while offering a prize-attached sale; (2) the Advertising Law by explicitly or implicitly promising training effects; (3) Advertising Law by providing false or misleading contents in its advertisements; and (4) the Price Law by using false or misleading pricing measures to induce customers or other operators into transactions. (Penalty Decision No. 0168.)

105. Even after the Class Period, TAL continued to flagrantly disregard Chinese pricing laws. For instance, on November 16, 2021, Wenzhou Xueersi Culture Communication Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., was ordered to rectify its illegal practice of marketing eight tutoring courses for RMB 1 each ($0.16 USD), where the market price was more than 30 times higher between July 2021 and September 2021.

106. On September 13, 2021, Hangzhou Xiashan Money School Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong Education Technology (Beijing) Co. Ltd., was fined for failing to display its pricing standards to the public. (Penalty Decision No. 45.)

107. These accounts of price fraud, price gouging, and illicit bait and switch practices to entice parents to sign their children up for tutoring are corroborated by the accounts of CW2, CW4, and CW5.

**4. Unauthorized and Illegal Promotional Publications**

108. China strictly regulates the publication and dissemination of information, regardless of the medium of expression. The Administrative Regulations on Publications, or No. 343 Order of the State Council of the PRC, was first adopted on December 12, 2001, and later amended on February 6, 2016. It applies to activities such as: publishing, printing, copying, importing or distributing publications, including books, newspapers, periodicals, audio and video products. Under the Administrative Regulations on Publications, any entity engaged in these aforementioned activities must obtain a permit to do so. Despite these rules, TAL regularly disseminated materials without the requisite permits.

109. During the Class Period, Defendants were fined for engaging in unauthorized or illegal publications. In particular, Beijing Xueersi Education Technology Co., Ltd., was fined on June 21, 2022 for publishing and disseminating an online publication between December 12, 2016 and April 6, 2022 that contained illicit content. (Penalty Decision No. 400076.)

110. Additionally, Qingdao Xueersi Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined on July 27, 2021, for offering unauthorized versions of electronic textbooks available for free public download via its WeChat Public Account named "Qingdao Kindergarten to Primary School Information" between May and June 2021. (Penalty Decision No. F-000020.)

111. On May 17, 2021, Nantong Yizhen Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for unauthorized publication and had one of its computers and 173 sets of a publication confiscated. (Penalty Decision No. 46.)

112. On February 24, 2021, Nanjing Xintang Sichuang Education Information Consulting Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education, was fined for the unauthorized publication of 556 sets of two booklets. (Penalty Decision No. 6.)

113. On January 13, 2021, Beijing Xueersi Education was fined because it failed to obtain review and approval procedures for a map which was uploaded and published by a website operated by the company, in violation of Regulation on Map Management. (Penalty Decision No. 2.)

114. On September 29, 2020, Shanghai YY Information Technology Co. Ltd., which is 81.1% owned by Beijing Xueersi Education Technology Co. Ltd., was fined for the provision of an online publication without the relevant license or prior approval by authorities. (Penalty Decision No. 20200220.)

115. On September 6, 2021, Suzhou Industrial Park Xueersi Culture Training Center Co. Ltd. and Suzhou Wujiang District Xueersi Training Center Co. Ltd. (wholly owned subsidiaries of Suzhou Yizhen Education Technology Co. Ltd., which in turn is wholly owned by Pengxin TAL Industrial Investment (Shanghai) Co. Ltd.) were fined for illegal publications. (Penalty Decision Nos. 21 and 72).

116. On August 27, 2018, Beijing Xueersi Education was fined for publishing and disseminating an online publication containing forbidden content. (Penalty Decision No. 40764.) Beijing Xueersi Education was also fined on June 10, 2015, for an illegal online publication. (Penalty Decision No. 40194.)

117. These incidences of false advertising and publicity are corroborated by the accounts of CW2, CW5, and CW9 discussed in Section III(C) above.

**5. False Advertising and Publicity**

118. According to TAL's Form 20-F for fiscal year end February 28, 2019, the principal regulations governing the advertising businesses in China include: the PRC Advertising Law, which

went into effect in September 2015, and was recently amended in October 2018, and the Advertising Administrative Regulations promulgated by the State Council. These laws require companies that advertise their services to obtain a business license that permits advertising in that particular scope from either the SAIC or its local branches.

119. Before, during, and after the Class Period, TAL and many of its subsidiaries flagrantly disregarded the PRC's advertising rules and regulations, thereby incurring repeated sanctions. In particular, leading up to the Class Period, TAL demonstrated that it had little regard for the PRC's regulations given that it incurred a number of regulatory sanctions including, among others: one on June 21, 2017 after one of its subsidiaries launched a project for a teaching campus without proper authorization; one on August 25, 2017 after one of its entities failed to properly register for fire engineering completion; and one on April 25, 2018, after one of TAL's subsidiaries provided false statistics.

120. Moreover, during the Class Period, TAL and many of its subsidiaries continued to receive financial penalties for engaging in an array of false promotional and advertising schemes. For example, on June 27, 2018, Beijing Bangxue Education Technology Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong, was fined for publishing training advertisements that explicitly or implicitly stated that examination institution personnel or exam preparation staff participated in the preparation of education or tutoring contents. (Penalty Decision No. 1045.) Previously, another administrative penalty had been issued to Beijing Bangxue on June 15, 2018, in connection with the company using the name or image of a scientific research institute, academic institution, education institution, industry association, specialized professional, or beneficiary person to recommend or substantiate education or tutoring advertisements, but no penalty was imposed at that time.

121. On September 10, 2018, Beijing Xueersi Education was fined after the company unlawfully used the name or image of a scientific research institute, academic institution, education

institution, industry association, specialized professional, or beneficiary person, to recommend or substantiate education or tutoring advertisements. (Penalty Decision No. 27.)

122. On November 13, 2020, Hangzhou Xuesi Training School Co. Ltd, a wholly owned subsidiary of Xinxin Xiangrong, was fined for illegally publishing an education and training advertisement on August 14, 2020. (Penalty Decision No. 091.)

123. On December 11, 2020, Nanchang Xueersi After-School Service Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined for displaying a large outdoor advertisement board without approval. (Penalty Decision Nos. 0406013, 0406014.)

124. On May 11, 2021, *China Daily* reported that in April 2021, the Beijing municipal administration for market regulation issued fines of RMB 500,000 ($76,720 USD) to four online education companies for misleading customers with false advertising, including TAL's subsidiary Xueersi, for labeling their online courses with misleading prices.

125. Further, and as discussed in ¶ 99, on May 30, 2021, Hangzhou Yidu Training School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined RMB 2.5 million ($351,321 USD) for failing to indicate the meaning of two prices attached to a Xueersi Peiyou Junior High School Summer Training Course, providing false information regarding the qualifications of its teaching staff, and citing certain trainees' parents as references, which were not authenticated. (Penalty Decision No. 7.)

126. Changzhou Xuesi Education Consulting Co. Ltd., a wholly owned subsidiary of Xinxin Xiangrong was fined on June 30, 2021, for publishing a false advertisement. (Penalty Decision No. 179.)

127. TAL and its subsidiaries were sanctioned after the Class Period for false advertising schemes employed during the Class Period. For instance, Xueersi Education Training Co. Ltd., which is 80% owned by Beijing Xueersi Education, was fined on August 31, 2021, for violating China's Anti Unfair Competition Law – a law initially enacted in 1993 and later amended in 2017 and 2019 which contains 33 articles concerning the types of unfair competition and the procedures by which to

investigate the unfair competition and the legal liabilities for such acts. In particular, Xueersi Education violated the "false prize-attached sales" provision of the Anti Unfair Competition Law which "refers to the act of the operator who conducts the sales promotion with prizes in a fraudulent way, or with a top prize of the lottery sale exceeding CNY 50,000."

128. On September 13, 2021, Chongqing Shapingba District Xueersi Peiyou Extra-curriculum Training School Co. Ltd., ("Chongqing Shapingba") a wholly-owned subsidiary of Beijing Xueersi Education, was fined for releasing a promotional video on its WeChat[7] public account that contained statements by two students of the Xueersi Peiyou courses recommending Xueersi Peiyou's tutoring service, in violation of the Advertising Law of the People's Republic of China. The video further stated that a teacher was teaching more than 90% of the students that participated in competitions, which was not true. (Penalty Decision No. 226.)

129. On November 4, 2021, Tianjin Xueersi Education Information Consulting Co. Ltd, a wholly owned subsidiary of Beijing Xueersi Education, was fined for illegal advertising.

130. On January 10, 2022, Beijing Shunshun Bida Information Consulting Co. Ltd., which is 80% owned by Beijing Xueersi Education was fined for falsely overstating that its overseas study enrollment rate of students tutored by Beijing Dongfang reached 98% whereas the actual rate was 87%. (Penalty Decision No. 9.)

131. TAL falsely claimed that the Company maintained industry-leading compliance with applicable rules and regulations governing the Chinese for-profit tutoring industry when, in fact, it repeatedly violated those rules and regulations while claiming that the Company would benefit from the very regulations it was violating. As a result of Defendants' scheme to defraud investors and issue

[7] WeChat is a marketing and social messaging app with more than 1.1 billion registered accounts and 846 million monthly active users.

materially false and misleading statements during the Class Period, the price of TAL ADSs traded at artificially inflated prices as detailed herein.

**6. Unauthorized Expansion of Tutoring Sites**

132. On January 8, 2020, Changsha Tianxin District Xueersi Education Training School Co. Ltd., a wholly-owned subsidiary of Pengxin TAL Industrial Investment (Shanghai) Co. Ltd., was fined for the unauthorized construction on two teaching campus renovation projects. (Penalty Decision Nos. G-1, G-2.)

133. On January 11, 2021, Changsha Yuhua District Xueersi Training School Co. Ltd., a wholly owned subsidiary of Beijing Xueersi Education Technology Co. Ltd., was fined for the unauthorized construction of three teaching campus renovation projects. (Penalty Decision No. 1, 2, and 16, respectively.)

134. On April 30, 2021, Changsha Yuelu District Xueersi School Co. Ltd., a wholly-owned subsidiary of Xinxin Xiangrong, was fined for unauthorized construction. (Penalty Decision No. G-13.)

**D. SEC Investigation**

135. On July 30, 2019, the SEC began investigating TAL. According to a Probes Report, based on the SEC's investigation, FOIA requests to the SEC and appeals of those FOIA requests, "the timing of SEC responses to us suggests that ***TAL education Group management may have known about an SEC probe since at least Jul-2019.***"

136. On June 30, 2020, the Probes Reporter issued an update on an SEC probe entitled "SEC Investigation Update" which included the following timeline of the SEC's investigation into TAL:

| | | |
|---|---|---|
| 20-Aug-2018 | FOIA Response | No SEC investigative records found. |
| 30-Jul-2019 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 19-Sep-2019 | Appeal Response | Existence of on-going SEC enforcement proceedings officially confirmed on appeal; Access to records remains blocked. |
| 27-Mar-2020 | FOIA Response | SEC denies access to records over concern their release, "could reasonably be expected to interfere with enforcement activities." |
| 4-Jun-2020 | Appeal Response | **Existence of on-going SEC enforcement proceedings officially confirmed on appeal**; Access to records remains blocked. |

137. The update stated that "an undisclosed SEC investigation is again confirmed" and that "TAL Education Group remains on our Watch list of companies with confirmed, undisclosed SEC investigations."

138. On September 28, 2023 the SEC issued an order in connection with cease-and-desist proceedings it had brought against TAL pursuant to Section 21C of the Exchange Act concerning TAL's financial reporting for the first three quarters of its 2020 fiscal year. The proceedings were instituted after TAL's subsidiary, "Light Class" Business Line, entered into phony contracts with third parties in violation of the Foreign Corrupt Practices Act in order to inflate the Light Class Business Line's revenue. In particular, the SEC alleged that TAL's Light Class Business Line had deficient internal accounting controls which resulted in TAL overstating its net revenues and net income for the first three quarters of its 2020 fiscal year by $86.1 million and $26.6 million, respectively, resulting in the filing of a restatement by TAL. In or around September 2023, TAL agreed to pay the SEC $1.25 million to settle these charges.

## V. REVELATION OF THE TRUTH

139. The truth began to be revealed regarding Defendants' false and misleading statements on May 12, 2021. On that date, news reports revealed that the impending Double Reduction government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, banning the provision of tutoring services

during weekend hours, and the imposition of industry-wide fee limitations. For example, a *Reuters* article titled "China planning new crackdown on private tutoring sector," stated that regulators had taken adverse actions against for-profit tutoring companies, including ordering TAL advertising to be pulled in April 2021, and otherwise summarized the impending regulatory changes in pertinent part as follows:

> ***China is framing tough new rules to clamp down on a booming private tutoring industry***, aiming both to ease pressure on school children and boost the country's birth rate by lowering family living costs, sources told Reuters.
>
> The clampdown will also have the effect of cooling China's cutthroat tutoring market for kindergarten through to the 12th grade, or K-12 pupils, that has grown exponentially in recent years to around $120 billion.
>
> * * *
>
> The changes being drafted by the Ministry of Education and other authorities target before- and after-school K-12 tutoring, three people with knowledge of the matter told Reuters.
>
> One source said the draft rules could be unveiled as early as by end-June. All three sources requested anonymity as they were not authorised [sic] to speak publicly.
>
> ***Under the planned rules, on-campus academic tutoring classes will be banned, as will both on and off-campus tutoring during weekends, two of the people said. Regulators will also clamp down on off-campus tutoring, in particular for English and math, they added, restricting class times on weekdays***.
>
> * * *
>
> ***The new rules would seek to limit fees charged by companies for tutoring, one of the sources told Reuters***.
>
> * * *
>
> The planned rules would add to restrictions imposed in March, including a ban on live-streamed classes for minors after 9 p.m., a crackdown on advertising, and a ban on academic tutoring course offerings for pre-school kids.
>
> * * *

> ***A source told Reuters that a large state broadcaster was told by regulators last month to remove TV commercials from two players, New Oriental Education & Technology Group and TAL Education Group that they had placed earlier***.

140. As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a ***13% decline over the two-day period***. However, TAL ADSs continued to trade at artificially inflated prices because Defendants continued to deceive investors and the market about the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

141. On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews.

142. TAL's previously undisclosed misconduct was reported to have included widespread practices of:

> (a) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law;
>
> (b) offering courses that gave students unfair advantages in contravention of Chinese government policies;
>
> (c) engaging in illegal bait-and-switch tactics;
>
> (d) misrepresenting teacher qualifications and course qualities;
>
> (e) mishandling user data; and
>
> (f) rigging promotional events to defraud consumers.

143. TAL's subsidiary, Xueersi, was singled out by the Chinese government for advertising false parent user reviews which would drive enrollments. The regulators explained that Xueersi had advertised false parent user reviews in Beijing and Shanghai, such as one purportedly from a mother stating: "[T]he most powerful thing about Xueersi is that parents are allowed to listen, get refund fees

and transfer classes at any time. Parents are at ease." Another, from a father claimed: "The hardware development of Xueer Si Peiyou is very scientific and really great!" However, the governmental investigation concluded that the parents attributed to these reviews and comments did not exist. The offending companies, including TAL, were hit with maximum penalties for their illegal business practices, totaling a combined RMB 36.5 million ($5,679,122 USD). At a governmental conference announcing the fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including ***155,000*** complaints and reports for education and training services received by authorities in 2020 alone and over ***47,000*** similar complaints and reports received by authorities in the first quarter of 2021.

144. As one Chinese language source observed, ***TAL had been on the government "blacklist" for repeat offenses*** "but never stopped its illegal act[s]." Instead, despite its assurances that it complied with the Chinese government's rules, regulations and proscriptions, TAL continued to engage in "[o]ver-standard and advanced tutoring, illegal charge, false publicity, tricking consumers into transaction, [the use of] vulgar videos, illegal recruit[ing] and financial fraud." Another investigative journalist found that "such problems are common on many course platforms under TAL" and that the Company had failed to remediate the deficiencies despite having been "fined and named in circulars repeatedly for violations."

145. As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

146. Finally, on July 23, 2021, China unveiled a sweeping overhaul of its education sector via the Double Reduction policies, banning companies that teach the school curriculum from making profits, raising capital or going public. In response, TAL issued a press release attached to a Form 6-

K filed with the SEC on July 26, 2021, stating that "certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system," but then misleadingly told the public that TAL "***ha[d] not received official notification of the regulations***."

147. As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly ***79% decline***. This represented a ***greater than 95% decline*** in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs, as follows:



## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

148. Throughout the Class Period, Defendants issued materially false and misleading statements and omissions, including those regarding: (a) TAL's adherence to Chinese regulations governing the after-school tutoring industry; (b) the ability of TAL to comply with Chinese regulations; and (c) the forthcoming Double Reduction regulations. Defendants' affirmative statements were misleading half-truths in light of the omission of then-existing regulatory violations and fines, and the impending Double Reduction regulations.

### A. Materially False and Misleading Statements and Omissions Regarding TAL's Compliance with Chinese Regulations Governing the After-School Tutoring Industry

149. During the Class Period, Defendants misled investors about: (i) TAL's continued failure to comply with Chinese regulations overseeing the private, for-profit tutoring industry; (ii) the repeated fines and sanctions imposed on TAL; and (iii) that TAL's repeated reckless regulatory violations would fuel the Chinese government's increasingly harsh regulation of the industry and risk and or provoke a complete shut-down of the industry and, with it, TAL's profitable private tutoring business. In their Forms 20-F and 6-K filed with the SEC, earnings calls, press releases, and interviews with analysts, Defendants consistently reassured the public that the Company was complying with the government's evolving regulations pertaining to the tutoring industry and in fact, that the government's rules and regulations would benefit the industry. In actuality, however, Defendants' core business operations were severely impacted by the regulations which ultimately contributed to the demise of the entire tutoring industry, but Defendants continued to reassure the public that all was well while selling hundreds of millions of dollars of TAL stock for their personal enrichment.

150. Investors and analysts took note of these assurances of compliance. For example, on February 4, 2020, HSBC issued an analyst report stating that it "believe[d] that TAL Education" is

"in compliance with" the PRC's 2018 State Council Opinion 80 regulations. Similarly, on March 11, 2021, UBS issued an analyst report stating that "[b]ased on the experience in 2018/19, stricter enforcement" of the PRC's policies "typically hurt offline SMEs more, as the leading players like TAL/EDU in general have reached good compliance status following the initial AST regulations in 2018." HSBC and UBS thus interpreted TAL's statements to mean it was actually complying with the regulations. Finally, New Street included language in its Class Period analyst reports that TAL was "softening rhetoric on regulations," indicating that it too interpreted TAL's public statements about compliance as eliminating risk that it was not in compliance or that there would be negative repercussions from non-compliance.

151. These statements were false. In 2020, there were 155,000 violations of the PRC's regulations, and there were 47,000 violations during just the first quarter of 2021. TAL was the second largest for-profit tutoring company in China, a close second to New Oriental. TAL employed tens of thousands of employees during this time. It was labeled a "repeat offender" by the PRC and was fined hundreds of thousands of dollars for violations on June 2, 2021. Thus, TAL was committing thousands of violations of the PRC's regulations during the Class Period.

152. Accounts from a cross-section of TAL's former employees provide details about how TAL violated the PRC's regulations. For instance, and as further detailed herein, CW2, CW6, CW8, and CW9 all disclosed that TAL and its subsidiaries allowed teachers who did not possess the requisite qualifications to teach courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to TAL's branches. Further, CW2, CW4, and CW5, disclosed that TAL used illegal price tactics—for instance, charging 20 yuan for courses that were actually several hundred or even thousand yuan—to attract parents of students to enroll their children and were fined accordingly. CW3 and CW7 reported that Xueersi operated several schools that lacked the requisite licenses or approvals necessary to operate schools.

CW6, CW7, and CW8 reported that TAL taught content that exceeded the scope of the syllabus in violation of certain regulations. CW5 and CW7 reported that TAL and its subsidiaries violated teaching curfews or taught courses during restricted times such as on the weekends or during summer and winter vacations. CW2, CW5, and CW9 reported that TAL was fined for false publicity. Defendants knew that these persistent violations detailed above would culminate in increasingly restrictive laws and regulations yet persistently flouted such laws anyway while falsely assuring investors that the Company was law-abiding and even welcoming of heightened regulations.

153. The 2018 Form 20-F explained the 2018 regulations, including Circular 3, or the Circular on Special Enforcement Campaign concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle Schools, which the MOE had promulgated earlier in the year on February 13, 2018. The Form 20-F further provided that (emphases added):

> In March 2018, two of our training institutions providing K-12 tutoring services received notice under Circular 3 from the local government authority and ***we are taking corrective measures in accordance with Circular 3.*** For example, ***we have reduced our course hours and schedule for certain of our offline tutoring courses to end before 8:30 pm and reduced the coursework assigned to our students***, etc. However, we cannot assure you that we will fully comply with the above mentioned regulations timely or at all, and will not be fined or otherwise penalized by government authorities for offering such classes, in which case our business and operations could be materially and adversely affected . . ..
>
> ***[I]f we fail to comply with the applicable legal requirements*** concerning obtaining and maintaining applicable licenses and permits and fulfilling applicable registration and filing requirements to operate our after-school tutoring business, including any failure to cure non compliances in a timely manner, we ***may*** be subject to fines, confiscation of the gains derived from our noncompliant operations or the suspension of our noncompliant operations, which may materially and adversely affect our business and results of operations.

154. These statements were false and misleading. Specifically, it was misleading to state that TAL could not "assure" that it would "fully comply" with the PRC's regulations when in fact, it was not complying with the PRC's regulations. Further, contrary to its assurances that the Company

was taking corrective measures to reduce its course hours, end tutoring courses by 8:30 pm, and reduce the coursework assigned to students, TAL was violating these very laws and incurring significant sanctions as a result. In particular, CW5 and CW7 reported that TAL and its subsidiaries violated teaching curfews or taught courses during restricted times such as on the weekends or during summer and winter vacations. Further, the statement that TAL hypothetically "may" be subject to fines was misleading because TAL was in fact actively incurring fines and penalties. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted TAL's statements to mean that it actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

155. One month later, on July 26, 2018, TAL held an earnings call with analysts and investors hosted by Defendant Luo. During the call, Defendant Luo acknowledged the policies that the government had released relating to the tutoring market and stated that the policies were aimed at further improving the overall standards of the industry. In particular, Defendant Luo stated: TAL is "***fully cooperating with the government directions*** and where needed, [will] make adjustments to our business operations accordingly." Defendant Luo also stated that ***"we proactively follow the government regulations*** and do the adjustments ourselves." Defendant Luo further stated "[w]e, as a company, also we are operating our own business in a very disciplined way."

156. The statement that TAL was "fully cooperating" with and "proactively follow[ing]" the government's regulations governing the for-profit tutoring industry were materially false and misleading when made because the Company was flagrantly violating those regulations. TAL was committing thousands of violations of the PRC's regulations, and thus it was not "cooperating" with PRC regulations or "following" the PRC's directives. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted Defendant Luo's statements to mean

that TAL actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

157. On January 24, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, Defendant Luo again claimed that TAL was following Chinese law regarding the tutoring industry and adjusting its business practices accordingly:

> As you know, the education industry, including after-school tutoring market is currently in the midst of ongoing education reforms, standardizations and regulations. All these policies are aimed at further improving overall standards and the ecosystem of the entire industry. ***We are following government directions***, ***and where needed, we will continue to make adjustments into our business operations accordingly***.

This statement was false and misleading. TAL was a "repeat offender," committing thousands of violations of the PRC's regulations, and was therefore not "following government directions." Further, the statement that TAL would "continue to make adjustments" was false because it suggested that TAL was already making adjustments, but in fact, it was violating the PRC's directives. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted Defendant Luo's statement to mean that TAL actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

158. Defendant Luo added during the January 24, 2019 earnings call that "we welcome all the regulations, policies in online environments." Defendant Luo further reassured investors that "***[i]f any new policy [comes] out, we definitely will become the first compan[y] who will go and implement all the policies in place***." During the same call, Defendant He stated: "we are pacing our off-line capacity growth as we continue to invest in new technology and online business to ensure ***we are following the new standards and regulations that are currently being implemented.***" Finally, Defendant Luo stated: "And we will continue to follow all of government policies and regulations to make sure the new learning centers we enter is compliant with the government requirements."

159. The statements in the preceding paragraph were false and misleading when made because despite Defendants' assurances that TAL was "follow[ing] the new standards" and would become the "first company" to "implement all the policies," it was in fact a "repeat offender" which committed thousands of violations of the PRC's regulations. To give some examples, as reported by CW2, CW4, and CW5, TAL was disregarding the new policies by, among other illegal acts, using improper pricing campaigns designed to lure in new students, and as confirmed by CW2, CW5, and CW9, engaging in false publicity. Further, CW2, CW6, CW8, and CW9 each disclosed that TAL and its subsidiaries permitted teachers who lacked the requisite qualifications to teach tutoring courses. In particular, CW6 stated that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to TAL's tutoring branches. Also, CW3 and CW7 reported that Xueersi operated several schools that lacked the requisite licenses or approvals necessary to operate schools. CW6, CW7, and CW8 reported that TAL taught content that exceeded the scope of the syllabus in violation of certain regulations. Finally, CW5 and CW7 reported that TAL and its subsidiaries violated teaching curfews or taught courses during restricted times such as on the weekends or during summer and winter vacations. Thus, in reality, TAL was repeatedly violating the new policies and regulations governing the for-profit tutoring industry. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted Defendant Luo's statement to mean that TAL actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

160. On April 25, 2019, TAL held an earnings call with analysts and investors hosted by Defendants Luo and He. During the call, in regard to the education regulations, Defendant Luo stated that "we continue to invest in new technology and online business to keep improving our overall operational efficiency and ***ensure we are following the new standards and regulations that are***

***currently being implemented***" and "***[w]e have followed the government directions***, ***and where needed, we'll continue to adjust our business operations accordingly.***"

161. Defendant Luo's statements above were materially false and misleading when made because TAL in fact had not "followed the government directions." Instead, TAL was a "repeat offender" which committed thousands of violations of the PRC's regulations. To give some examples, TAL was operating schools without the requisite business licenses as reported by CW3 and CW7; allowing unqualified teachers to teach tutoring courses in violation of regulations, as reported by CW2, CW6, CW8, and CW9; utilizing illegal pricing tactics to lure in students for instance, by charging 20 yuan for courses that were actually several hundred or even several thousand yuan as reported by CW2, CW4, and CW5; teaching content outside the scope of the syllabus in violation of PRC regulations as confirmed by CW6, CW7, and CW8; teaching at prohibited times as reported by CW5 and CW7; and engaging in false publicity as reported by CW2, CW5, and CW9. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted Defendant Luo's statement to mean that TAL actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

162. On October 24, 2019, during an earnings call, in regard to the government policies and regulations, Defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made "[t]he pressure of being compliant . . . bigger than before." Yet, Defendant Luo asserted that "the policies were a good timing for us to review our business models and be more cautious," so TAL "***can be more compliant than before***." With respect to off-line centers, he stated: "***we will still be very cautious with the approval policy as first priority to make sure all off-line centers can be more compliant.***"

163. These statements were materially false and misleading when made because they suggest that TAL had previously been compliant, but in fact it was a "repeat offender" which had

committed thousands of violations of the PRC's regulations. Reports of CW2, CW3, CW5, CW6, CW7, CW8, and CW9, give examples of these violations. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted Defendant Luo's statements to mean that TAL actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

164. On June 30, 2020, TAL filed with the SEC on Form 20-F the Company's financial results for the fiscal year end February 29, 2020, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo ("2020 Form 20-F"). In the Form 20-F, Defendants Zhang and Luo certified pursuant to the SOX that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

165. This statement was materially false and misleading because although Defendants Zhang and Luo certified that TAL's annual report was true and did not omit material facts, behind the scenes TAL was engaging in an array of illegal behaviors such as employing deceptive pricing measures to lure in new students, creating false or misleading advertisements to attract new clientele, falsifying teaching certifications which it posted on its website, and incurring hundreds or even thousands of sanctions as a result. These illegal behaviors are corroborated by the accounts of CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9.

166. The 2020 Form 20-F included the Company's annual financial results, and described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's

"reputation and brand have also greatly facilitated our student recruitment" and that TAL ***"adapted our operations" to comply with existing governmental regulations and had "been making efforts to ensure compliance with these regulations and implementation rules."*** TAL also explained how on February 13. 2018, the MOE and three other government authorities made changes to academic competitions which may impact the demand for their after-school tutoring business and personalized premium service and stated: "We have adapted our operations which may be construed as competitions or ranking activities to these regulations."

167. These statements were false and misleading when made because at the time the statements were issued, TAL had not adapted its operations to adhere to existing governmental regulations; rather, and as corroborated by CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9, TAL was engaging in serious violations of PRC laws and regulations which precipitated the July 2021 crackdown that signaled the end of the private for-profit tutoring industry. TAL was labeled a "repeat offender" which had committed thousands of violations of the PRC's regulations. Further, the statement that it had been "making efforts to ensure compliance with these regulations" was also false because TAL was not, in fact, "making efforts to ensure compliance," but had committed thousands of violations. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted TAL's statements to mean that it actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

168. The 2020 Form 20-F further explained that under the regime of the Law on the Promotion of Private Education of China, the PRC government authorities had promulgated a number of regulations and implementation rules in 2018 governing the education industry and the after-school tutoring service market, including the Circular 3, the State Council Opinions 80, as well as Circular 10. TAL stated that these new regulations and implementation rules provided a series of

requirements in the operation of after-school tutoring business and that TAL has "***been making efforts to ensure compliance with these regulations and implementation rules***."

169. Further, the 2020 Form 20-F explained that the MOE, jointly with certain other PRC government authorities, promulgated the Implementation Opinions on Regulating Online After-School Tutoring, or the Online After-School Tutoring Opinions, effective on July 12, 2019. The Online After-School Tutoring Opinions also imposed a series of new regulatory requirements which TAL stated: "***We are making efforts to comply with***…."

170. The 2020 Form 20-F included additional affirmative statements that were misleading half-truths in light of the omission of then-existing fines and penalties the Company was incurring. For example, the 2020 Form 20-F stated:

- "If we fail to comply with the applicable legal requirements concerning the operation of after-school tutoring business . . . , the relevant learning centers ***may*** be subject to the order of rectification, fines, confiscation of the gains derived from noncompliant operations or the suspension of noncompliant operations . . .."

- "If we fail to . . . comply with other applicable regulatory requirements, we ***may*** be subject to fines, regulatory orders to suspend our operations or other regulatory and disciplinary sanctions . . .."

- "[I]f we fail to . . . fulfill requisite registration and filing requirements to operate our after-school tutoring business, including any failure to cure non-compliance in a timely manner, we ***may*** be subject to fines, confiscation of the gains derived from non-compliant operations or the suspension of non-compliant operations . . .."

- "Violation of these laws, rules and regulations ***may*** result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information . . .."

171. It was misleading for Defendants to assert that fines and penalties hypothetically "may" be imposed, yet omit that, in fact, throughout 2020, TAL was incurring fines and penalties on a regular basis due to its serial violations of PRC laws and regulations. Defendants' risk warnings

were ineffective because they warned of a risk that had already materialized. Analyst reports, such as those listed in ¶ 150 above, demonstrate that the investing community interpreted TAL's statements to mean that it actually was in compliance with the applicable regulations, not merely that it hoped to be in compliance.

172. On January 21, 2021, TAL held an earnings call for its third fiscal quarter of 2021, hosted by Defendants Luo and He. During the call, Defendant Luo asserted that TAL "***[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations,*** including those that regard national public health." Defendant Luo further committed to "investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences." Defendant Luo further stated: "we will consistently pursue our long-term strategy regardless of what kind of the short-term challenges we are facing."

173. These statements were false and misleading because, as of January 21, 2021, TAL was not "conduct[ing] [its] business in line with all relevant government policies and regulations." Rather, TAL was routinely violating relevant government policies and regulations as alleged above. This statement was also false and misleading because Defendants knew the challenges presented by government policies and regulations were not "short-term." Instead, they were "long-term" challenges to TAL's business because they were part of an increasingly harsh regulatory campaign by the Chinese government to regulate the tutoring industry, and TAL had a long history of flouting such regulations and was continuing to flout the regulations in order to support its growth and dominance of the industry.

174. On April 22, 2021, TAL held its fourth quarter fiscal year 2021 ("FY 2021") earnings call with investors and analysts. On the call, D.S. Kim, an analyst with JP Morgan Chase & Co. asked Defendants about TAL's compliance with marketing regulations. Defendant Luo claimed, "***very clearly, we comply with the guidelines***. ***We made necessary adjustments.***"

175. This statement was materially false and misleading when made because, at the time it was made, TAL was not complying with the government's marketing guidelines and regulations or making the "necessary adjustments." Rather, TAL was employing deceptive marketing techniques to induce students and parents to sign up for its tutoring classes and incurred many regulatory fines for doing so, as described above in Section IV(C)(5) and as corroborated by the accounts of CW2, CW4, CW5, and CW9. Further, Defendant Luo knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Additionally, at the time Defendant Luo issued the above statement, he had already realized net profits of nearly ***$25 million*** from unloading his TAL stock which he had acquired at very low IPO prices or, in some cases, at zero cost bases, further evidencing that he could not have genuinely believed that TAL complied with the Chinese government's guidelines or was making the "necessary adjustments."

176. On May 7, 2021, TAL issued the 2021 Form 20-F. The 2021 Form 20-F included additional affirmative statements that were misleading half-truths in light of the omission of then-existing fines and penalties the Company was incurring. For example, the 2021 Form 20-F stated:

- "Our advertising and promotional content ***may*** subject us to penalties and other administrative actions. Under PRC advertising, pricing and anti-unfair competition laws and regulations, we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations. . . . Violation of these laws and regulations ***may*** subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to publish an announcement correcting the misleading information. . . . If we are found to be in violation of applicable PRC advertising, pricing and anti-unfair competition laws and regulations, we ***may*** be subject to penalties . . .."

- "If we fail to comply with the applicable legal requirements concerning the operation of after-school tutoring business in a timely manner, the relevant learning centers ***may*** be subject to the order of rectification, fines, confiscation of the gains derived from noncompliant operations or the suspension of noncompliant operations . . .."

- "If we fail to . . . comply with other applicable regulatory requirements, we ***may*** be subject to fines, regulatory orders to suspend our operations or other regulatory and disciplinary sanctions . . .."

177. It was misleading for Defendants to assert that TAL hypothetically "may" be subject to fines and penalties, yet omit that TAL already had incurred extensive fines and penalties due to its serial violations of PRC law. Defendants' risk warnings were ineffective because they warned of a risk that had already materialized.

**1. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Pricing Regulations**

178. On April 28, 2020, during an earnings call, Defendant Luo stated: "So the pricing strategy of online will serve our purpose to getting more market share, to serve more people and to make people more satisfy." Defendant Luo further stated: "I think on one side, we tailored price a little bit up, but on the other side, we also give promotions in the coupons and kind of an incentive for the parents and students if they can finish the work."

179. This statement was materially false and misleading and omitted material facts because, as described above in Section IV(C)(3), and as confirmed by the accounts of CW2, CW4, and CW5 and the SAMR's June 1, 2021 fine of $5.7 million to 15 tutoring institutions including TAL for violations including pricing violations, TAL was violating the Chinese government's regulations and rules regarding pricing for tutoring classes throughout the Class Period. Thus, Defendant Luo's statement regarding TAL's pricing strategy, for instance, using promotions and coupons to incentivize parents and students, was misleading because it omitted TAL's deceptive pricing practice of offering substantial discounts on tutoring courses and later, requiring parents to pay substantially more for the course. For instance, on one occasion, TAL marked up a course by ***4,000%*** and on another occasion, TAL marketed eight tutoring courses for just 1 RMB each where the market price was actually much higher.

### 2. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Tuition Payment Regulations

180. Throughout the Class Period, Defendants also repeatedly assured the public that the Company was complying with China's regulations regarding advanced tuition payments. For instance, on October 25, 2018, during TAL's second quarter earnings call for fiscal year 2019, Mark Li, an analyst with Citigroup Inc., Research Division, asked Defendant Luo about the advanced tuition payment regulation, stating: "I want to know about the regulation of no more than 3 months of getting the fees." Defendant Luo replied:

> I think we as the top players in this industry, ***we are definitely to comply with the government policies. We're in the process to implement the 3-month policies across our business units.*** For example, the Xueersi Peiyou small class. Their retention period will start from late October, maybe this week and next week, to early December. So we will change our system to fit in the 3-months policy, with no doubt. We will follow the government policy to do this.
>
> And for the Xueersi one-on-on – for Zhikang one-one-one [sic], ***yes we will also adopt this one-on-one policy – this 3-month policies.*** But because for the one-on-one, actually, most of their students, actually, coming up from our small class. ***So we don't foresee a material impact on maybe difference or change to my business due to the change of the 3-month policy. We don't see any material impact on them . . . .***
>
> But again, I think the 3-month policy is very good policy because it gives more right back to the parents. . . .
>
> ***So we are also quite confident to this 3-month policy to give more rights back to the parents. And we believe that's the right way and that's the right policy to help improve the quality of the whole industry.***

181. These statements were materially false and misleading because Luo knew or recklessly disregarded that the regulations were designed to constrain the tutoring industry and make compliance with increasingly restrictive regulations increasingly difficult. Further, as described above by CW3 and in ¶¶ 94, 100, and 102 regarding fines and sanctions, TAL was not complying with the three-month tuition policy required by Circular 80 and could not possibly have thought the three-month policy was a "very good policy" given that TAL continuously disregarded such policy.

Rather, throughout 2018 and thereafter, TAL's leading brand Xueersi was in the practice of charging advance tuition for ***more than three months***, for instance, in its summer and autumn course packages. Further, TAL's subsidiary Chongqing was violating the tuition payment regulations and in fact, was blacklisted by the Education Commission in May 2021.

182. On January 24, 2019, TAL held its earnings call for its third fiscal quarter of 2019. During the call, Yuzhong Gao, an analyst with CICC asked Defendants: "how much of your deferred revenue has been impacted by the new tuition collection policy?" Defendant He replied:

> And for your question, yes, according to the regulations issued last year in August, parents cannot be billed for more than 3 months. It does have impact on our deferred revenue and cash flow. ***Since the policy has been issued, we have followed the government's requirement to make necessary adjustment of our tuition fee charging policies if needed.*** This particular policy actually gives a right of choice back to the parents, which we believe is a right and good practice to protect the parents' rights and interest and, as I just mentioned, helps to improve the overall industry environment. . . .
>
> And in terms of the pro forma, we charge tuition fee based on the spring, summer, autumn and winter semesters.

183. These statements were materially false and misleading when made. Contrary to Defendant He's assurances that TAL had been following the government's regulations by adjusting its tuition fee policies, TAL was actually charging tuition for periods greater than three months in direct violation of the PRC's 2018 regulation, Circular 80, as noted above. For instance, TAL's leading brand, Xueersi.com, was violating this law with respect to tuition payments for its summer and autumn course packages, which further supports that Defendant He's statement was misleading when made.

### 3. Materially False and Misleading Statements and Omissions Concerning TAL's Compliance with Teacher Qualification Regulations

184. During the Class Period, TAL continuously represented that it was complying with regulations regarding teacher qualifications. For instance, on October 25, 2018, TAL held its second

quarter earnings call for fiscal year 2019. During the call, Yue Wu, an analyst with China International Capital Corporation Limited, asked Defendant Luo about teachers' licenses and in particular, whether the teacher licensing exam affects TAL's next quarter guidance and expansion. Defendant Luo replied:

> I think because ***we have put the teacher license as a very high priority in the past few years***, so in this industry, the percentage of our teachers who have license is higher than the industry average. And based on the government's policy, this year, most of – almost all, but most of our teachers who don't have license, they have registered exams in November, which will happen after 1 or 2 weeks. ***So we will continue to follow company's – government's policy to make sure all of our teachers can be compliant.*** And we don't see a material impact from teaching license in the short term, especially for the next quarter.

185. This statement was false and misleading when made because, despite Defendant Luo's assurances to the public that TAL had made teacher licenses a "very high priority" and would comply with the "government's policy to make sure all of our teachers can be compliant," in actuality, TAL was misrepresenting its teachers' qualifications by displaying incomplete teaching credentials or no teaching credentials at all on its website, allowing teachers to teach grades more advanced than their teaching qualifications permitted, and falsifying teacher qualifications by creating fake teacher qualifications which they posted on the Company's website. In fact, CW2, CW6, CW8, and CW9 each reported that TAL and its subsidiaries allowed teachers who did not possess the requisite qualifications to teach courses. CW6 even recounted that TAL's headquarters trained teachers who lacked the proper qualification certificates and then assigned them to various TAL branches to teach. TAL's violations of teacher qualification regulations are further confirmed by fines described above in Section IV(C)(2) and by the SAMR's June 1, 2021 fine of $5.7 million to 15 tutoring institutions including TAL for violations including teacher qualification violations. Therefore, despite assurances that TAL was ensuring its teachers were compliant, Defendants were knowingly or recklessly engaging in conduct that was the exact opposite.

186. On January 24, 2019, TAL held an earnings call for its third fiscal quarter of 2019. During the call, Thomas Chong, an analyst with Credit Suisse AG's research division, asked Defendant Luo for an update regarding teachers' passing rates on exams. Defendant Luo responded: "[W]e will continue to encourage our teachers, who don't have license, to go and apply for the new teacher exams and try to get teacher license by the end of the exams. We continue to encourage all of them to do so."

187. This statement was materially false and misleading and omitted material facts because Defendants were not encouraging teachers to get licenses or take the teaching exams to get their licenses. Rather, as described above in Section IV(C)(2), TAL falsified its teachers' qualifications or at the very least, misrepresented their qualifications by displaying incomplete teaching credentials or entirely omitting teaching credentials from its website and allowing teachers to teach grades more advanced than their teaching qualifications permitted.

188. On April 28, 2020, TAL held an earnings call for its fourth quarter fiscal year 2020 ("FY 2020") financial results. During the call, Defendant Luo stated: "The teaching quality is always the key and the first priority, no matters for off-line business or online business."

189. This statement was materially false and misleading when made. Teaching quality was not Defendants' "first priority" as evidenced by the fact that TAL was fabricating teacher's qualifications and allowing its teachers to tutor students even though they lacked the requisite credentials, as confirmed by CW2, CW6, CW8, and CW9 and further discussed in Section IV(C)(2).

### B. Materially False and Misleading Statements and Omissions Regarding the PRC's Impending Double Reduction Policies

190. Long before the Chinese government effectively outlawed the private, for-profit tutoring industry in July 2021, Defendants knew or recklessly disregarded that the government was on a concerted campaign to shut down the profitable private tutoring industry, as corroborated by

CW1. This information was material non-public information which Defendants knew and failed to disclose to the investing public. Despite having knowledge of this material non-public information which substantially impacted the nature of TAL's business and ability to continue operating as it had been, Defendants continued to issue false and misleading statements regarding the government's regulatory impacts on TAL's business.

191. From March 4, 2021 through March 11, 2021, China held its annual "Two Sessions" parliamentary meetings, where the two main political bodies of China meet, discuss, and reveal plans for China's policies involving the economy, military, trade, diplomacy, the environment and more.

192. Media reports stated that attendees of the ongoing Two Sessions conference had proposed "stricter regulations" to rein in the online education industry, such as regulations aimed at enhancing teacher quality, limiting fee scams, reducing market "abuse" by large players like TAL, and reducing the stress that for-profit tutoring companies had placed on students in the Chinese educational system.

193. For example, on March 8, 2021, the *China Daily* published an article titled "Political advisers discuss regulations for online education," which stated in pertinent part:

> Political advisers have proposed stricter regulations for the extracurricular online education industry in China during the ongoing annual session of the Chinese People's Political Consultative Conference National Committee.
>
> These regulations are aimed at enhancing teaching quality and avoid hidden risks faced by customers.
>
> * * *
>
> "However, the rapid surge in such short time has created several hidden risks," said Ma Jin, a member of the National Committee of the CPPCC and deputy chairman of the Shanghai municipal committee of China Zhi Gong Party.
>
> "***To seize the opportunity in the emerging market, a few huge companies have abused their dominant position in the sector***, whereas small and medium-sized firms are lacking time and finances to grow," he said.

***In addition, many online education platforms require advance payment, which leads to risks of advance fee scams and customers encountering difficulties in getting refunds, he said*.

* * *

To tackle these problems, Ma said the government should formulate regulations for extracurricular online education, including standards for the establishment of education institutions, teaching environment and content.

"Online education platforms should display their teachers' qualifications to the public," he said.

With regard to financial risks, Ma suggested that around 30 percent of the company's reserve fund should be supervised by the government. Once financial risks emerge, the use of these funds should be restricted.

Furthermore, online education platform institutions should not charge more than three months' worth of tuition fees at a time, and the fee should be used for only teaching related activities, instead of investment. A third-party payment platform could be used to supervise customer advance payments.

This sentiment was echoed by another political adviser Sima Hong, who is also the chairman of the Beijing Municipal Committee of the Democratic National Construction Association.

Sima advised education authorities to cooperate with banks to establish a supervision system for online education platforms to address the issue of potential misappropriation of advance payments.

"***Any legal person and major shareholders of institutions which illegally charge tuition fees before they disappear should be seriously punished***," she added.

Li Xin, chairman of the Guangdong Provincial Committee, associated the negative impact of substandard online education with children's eye health.

Data from the National Health Commission shows that 53.6 percent of children in China suffered from myopia in 2018.

"Services from some substandard online education platforms have increased students' burden of schoolwork these years," she said.

In her proposal, Li suggested online education institutions be prohibited from cooperation with schools or classes.

> "***Schools and teachers should not recommend extracurricular online education platforms and products to parents and students or force students to take e-learning lessons***," she said.
>
> "The length for a web-based course in senior high school should not exceed 30 minutes, while for junior high school students, it should be within 25 minutes, and within for 20 minutes primary school students, to ensure children's eye health," Li said.
>
> "Efforts should also be made by local authorities to limit the students' e-learning time on extracurricular education platforms," she added.

194. Similarly, on March 11, 2021, the *South China Morning Post* published an article titled "China two sessions: tightened regulation of 'chaotic' K-12 off-campus education market may spoil Big Tech's expansion plans." The article described how an impending "regulatory storm" presented a headwind for after-school tutoring businesses in China such as TAL, although the article stated that these businesses were likely to be able to navigate the regulatory environment to continue their expansion plans, stating in pertinent part:

> China's US$110 billion K-12 off-campus education market, which has struggled during the coronavirus pandemic, is now bracing for a regulatory storm amid comments expressed by the country's leaders, lawmakers and advisers in the "two sessions", the country's biggest annual political gathering.
>
> President Xi Jinping described the domestic market for K-12 – referring to kindergarten to 12th grade – after-school training services as a "social problem" in a meeting last week of the Chinese People's Political Consultative Conference (CPPCC).
>
> "It can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it," Xi said in comments published by official media.
>
> While it remains unclear exactly how regulations are going to be rolled out, the message from the National People's Congress (NPC), China's top legislature, indicated that off-campus training services are "chaotic" and create problems for the country's education sector. Typically, primary school pupils take extracurricular tutoring on top of their studies on campus to perform well in examinations.
>
> ***The prospects of tightened regulation could bring uncertainty to the market and the plans of Chinese Big Tech companies to expand operations in the education sector***. Tech unicorn ByteDance, owner of short video-sharing apps TikTok and Douyin,

> recently announced its intention to recruit some 13,000 new employees for its growing Dali education business.
>
> Big Tech's vast resources are expected to help them continue their expansion into education. "The internet giants won't give up their education initiatives," said Claudia Wang, a partner at management consulting firm Oliver Wyman, said on Thursday.
>
> "Most of them have businesses in the education sector that are aligned with government initiatives to improve access to quality education via different channels. They are also equipped with strong capital to be compliant with government regulation."
>
> ***A number of big players in the market, including TAL Education Group and New Oriental Education & Technology Group, have become listed companies on the back of domestic demand.***
>
> * * *
>
> Dozens of NPC and CPPCC delegates have been vocal about the need to strengthen spot inspections of K-12 off-campus education providers and punish those found guilty of false advertising. Zhu Yongxin, a CPPCC member, suggested that advertising by these providers should be curbed, while fellow delegate Chen Zhongyi suggested a permanent ban on all off-campus tutoring services.

195. Then, on March 31, 2021, China's MOE announced that education departments should limit the times at which primary and secondary school students take part in online learning to ensure they are getting enough sleep.

196. Although Defendants knew or recklessly disregarded the government's campaign to eliminate the profitable private tutoring industry throughout the Class Period, unsuspecting investors first became aware of it after the news emerged and the price of TAL ADSs began to drop from $76.04 when the market closed on March 5, 2021, to $56.31 by April 1, 2021, a 26% decline. However, the price of TAL ADSs remained artificially inflated because Defendants continued to make materially false and misleading statements regarding TAL's business prospects and operations and the impending impact of new governmental regulations on the for-profit tutoring industry following the Two Sessions meetings.

197. In TAL's 2021 Form 20-F, filed on May 7, 2021, the Company reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." For example, the PRC Pricing Law provides that an operator is prohibited from using false or misleading pricing methods to induce consumers or other operators into trading with it. In the filing, TAL referenced several of the same regulations and policies referenced in its prior June 30, 2020 Form 20-F filing including the regulations and policies which focus on the efforts to de-emphasize scholastic competition achievements in college and high school admissions or the efforts to forbid academic competitions referred to as Circular 3. In the 2021 Form 20-F, TAL stated: "***We have adapted our operations which may be construed as competitions or ranking activities to these regulations.*** We cannot assure you whether relevant governmental authorities will find our operations in violation of such regulations." TAL also referenced the State Council Opinion 80 and Circular 10 that provide a series of requirements in the operation of after-school tutoring business and stated that they "***have been making efforts to ensure compliance with these regulations and implementation rules.***"

198. TAL specifically mentioned how the "market price for [its] ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as . . ." and then listed several factors, *none of which* included information on TAL's longstanding history of regulatory violations, including for releasing misleading advertisements.

199. The 2021 Form 20-F included affirmative statements that were misleading half-truths in light of TAL's omission of the forthcoming Double Reduction policies and their anticipated impact on TAL's operations. For example, the 2021 Form 20-F stated:

- "[U]ncertainties . . . exist as the competent authorities ***may*** set more specific and stringent operation requirements for after-school tutoring institutions on various aspects including the means and timing of fee collection, pricing,

advertisements and promotion content, prepaid funds under supervision, teachers' qualification licenses, refunds, course time and content, homework arrangement, and student enrollment, among others."

- "[U]ncertainties . . . exist as new laws and regulations . . . ***may*** set more specific and stringent requirements for online educational institutions . . .."

200. It was misleading for TAL to warn that Chinese authorities hypothetically "may" "set more specific and stringent operation requirements for after-school tutoring" and online educational institutions, when Defendants knew, by at least January 2021, that those stringent requirements were in fact forthcoming.

201. The 2021 Form 20-F also included a section titled "Regulations on Private Education" that summarized the "principal laws and regulations governing private education in China." This section included a subsection titled "Regulations on After-School Tutoring Institutions" that summarized regulations from 2018 to 2021, but failed to include the impending Double Reduction regulations. The affirmative disclosures were misleading in light of the omission of the forthcoming Double Reduction regulations.

202. The 2021 Form 20-F also stated: "Adverse changes in . . . political policies of the PRC government . . . ***could*** adversely affect our business. Substantially all of our business operations are conducted in China. Accordingly, our business, financial condition, results of operations and prospects are affected significantly by economic, political and legal developments in China."

203. It was misleading for TAL to state that adverse political policies ***could*** affect its business when the PRC's political policies ***had already*** and would continue to adversely affect the Company's business. It was also misleading for TAL to disclose that its operations were "affected significantly by . . . legal developments in China," while entirely omitting that the Double Reduction policies were in fact forthcoming and would have a substantial adverse impact on the Company.

204. TAL also affirmatively represented in its 2021 Form 20-F that it was "not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 28, 2021 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions." This disclosure was false and misleading in light of the omission of the upcoming Double Reduction regulations and their anticipated impact on TAL's operations and profitability.

205. The undisclosed material information at issue here included not only the forthcoming Double Reduction policies, but also the anticipated impact those policies would have on TAL's operations and profitability. Defendants had a duty to disclose these issues to prevent their affirmative statements from being misleading.

206. ***Earlier in the day on May 7, 2021 – the very same day that TAL issued its 2021 Form 20-F – Defendants attended a meeting with high-ranking government officials in China to discuss the Double Reduction policies*. *TAL nevertheless entirely omitted the Double Reduction policies from the 2021 Form 20-F*.** TAL's attendance at the meeting establishes its knowledge of the Double Reduction policies. The meeting was attended by several leading tutoring institutions and public school principals. A Chinese-language newspaper, *Beijing Daily*, described the meeting as follows:

> At the Discussion with Primary and Secondary School Principals and Off-Campus Training Institution Representatives . . . , ***Cai Qi Stressed Solid Promotion of "Double Reduction" Work*** . . ..
>
> On May 7, Secretary of the Beijing Municipal Party Committee Cai Qi went to Xicheng District and Haidian District to investigate and research the reduction of the burdens of homework and off-campus training for students in compulsory education, and held discussions with principals of primary and secondary schools and representatives of off-campus training institutions. ***He stressed that "double reduction" is an important matter relating to the health development of primary and***

> ***secondary school students***, and to the interests of the people. . . . [The government] view[s] "double reduction" as an important political task . . ..
>
> * * *
>
> During the discussion with off-campus training institution representatives, ***Cai Qi pointed out that off-campus training . . . has to deeply recognize its own problems***. . . . Teachers should resolutely prevent advanced training, so as to avoid causing excessive pressure on students and harming physical and mental health. Strengthen supervision of online education, and implement the same standards as offline in terms of teacher qualifications, fund supervision, use of contracts, and course content, and ***resolutely prevent barbaric growth***. . . .
>
> Cai Qi emphasized that it is necessary to strictly control the qualifications of teachers . . .. It is necessary to standardize marketing behaviors such as educational advertising, and strengthen the management of fees and prepayments. . . .
>
> Chen Jining pointed out that it is necessary to comprehensively and thoroughly implement the party's educational directives, deepen education reform, and ***solidly promote the work of "double reduction"*** . . ..
>
> . . . . The off-campus training institution representatives were from ***TAL Education Group***, New Oriental Education, Yuanfudao, Zuoyebang, Youdao, Gaotu Techedu, VIPKID, and Onion Academy.[8]

207. TAL's meeting with the government officials took place on May 7, 2021 in Beijing. Beijing is twelve hours ahead of New York. TAL filed its 2021 Form 20-F at approximately 4:00 pm Eastern time on May 7, 2021. Thus, the Form 20-F was filed nearly a full day after TAL's attendance at the meeting, allowing sufficient time for TAL to incorporate relevant information about the Double Reduction policies into the Form 20-F had it chosen to do so.

### C. Materially False and Misleading Sarbanes-Oxley Certifications

208. In its 2018 Form 20-F, filed on June 26, 2018, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report

[8] The native Chinese version of the article is available at https://www.beijing.gov.cn/gongkai/ldhd/202105/t20210508_2383569.html. A certified English translation is available at *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, No. 22-cv-07966 (E.D.N.Y.), ECF No. 41-6.

does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

209. This statement was materially false and misleading when made because TAL's 2018 Form 20-F filed on June 26, 2018, did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. As set forth herein, the 2018 Form 20-F falsely informed investors that TAL was taking corrective measures to comply with the government's February 2018 regulations, however, this was not the case because at the time, TAL was repeatedly violating those very regulations—at a far greater rate than it was being fined—which provoked the Chinese government's action to eliminate the profitable tutoring industry which provided advantages to wealthy families and students. Contrary to TAL's assurances, TAL and the tutoring industry were far from "healthy," "stable" and "sustainable" and the regulations were neither beneficial nor intended by the government to be beneficial to the health of the industry. Defendants' insider sales throughout the Class Period further demonstrate that these statements were knowingly false or made in reckless disregard of the truth.

210. On May 16, 2019, TAL filed its annual report for fiscal year end February 28, 2019 on Form 20-F, which was signed by Defendant Zhang and included signed certifications attesting to its accuracy by Defendants Zhang and Luo (the "2019 Form 20-F"). In the 2019 Form 20-F, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this

report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

211. This statement was materially false and misleading when made because TAL's 2019 Form 20-F did, in fact, contain "untrue statement[s] of material fact" contrary to what Defendants attested to in their SOX certifications. The 2019 Form 20-F falsely stated that TAL had successfully "adapted [its] operations" to adhere to China's February 2018 regulations; however, this was not the case because at the time, TAL was repeatedly violating those very regulations in order to drive student enrollments and therefore inflate the Company's revenues.

212. Defendants Zhang and Luo signed similar SOX certifications in the 2020 Form 20-F and 2021 Form 20-F. Those certifications were false because the Forms 20-F were false and misleading for the reasons discussed herein.

### D. Defendants Omitted Material Facts Rendering Defendants' Affirmative Statements Misleading in Violation of Item 5(D) and Item 105 of Regulation S-K

#### 1. Overview of TAL's Item 5 and Item 105 Disclosure Requirements

213. Throughout the Class Period, Defendants' Forms 20-F and 6-K incorporating the Company's MD&A disclosures[9] were materially false or misleading because they misleadingly disclosed information required by Item 5.

214. TAL's annual and quarterly reports filed with the SEC are subject to the disclosure obligations of Item 5, which are akin to Item 303. The SEC has recognized that "for Form 20-F

[9] Because the SEC has opined that a MD&A is essentially the same as the "Operating and Financial Review and Prospects," which is what foreign issuers are required to include in registration statements, this Complaint will refer to the latter as MD&A herein. Additionally, this Court has held that "the same facts underlying any Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter." *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV. 1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).

annual reports, the existing MD&A equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies." Thus, certain disclosure obligations must be made in the MD&A section of TAL's annual and quarterly reports filed with the SEC, as required by SEC Regulation S-K.

215. The purpose of MD&A disclosures, as stated by the SEC, is to give investors information "necessary to an understanding of [a company's] financial condition, changes in financial condition and result of operations."

216. Specifically, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods.*" (Emphasis in original.)

217. Furthermore, Item 5(D), entitled "Trend Information," provides (emphasis added):

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition***.

218. The scope of the information required to be disclosed under this paragraph is coextensive with that required under Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Furthermore, the SEC has recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

219. Item 303 specifically instructs foreign private registrants such as TAL to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. Item 303 also requires issuers to disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]" *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance"), available at 2003 WL 22996757, at *1 n.1, 27. Pursuant to these provisions, TAL had a duty to disclose the forthcoming Double Reduction policies and their anticipated impact on TAL's business.

220. In 1989, the SEC described the purposes of the MD&A in a release titled: *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co Disclosures, Release No. 6835* (May 18, 1989) (the "1989 Interpretive Release"), which stated, in pertinent part (emphasis added):

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future. . . .
>
> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects,*** such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

221. Item 5(d) requires disclosures based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects."

222. The Interpretive Release further provides that foreign issuers listed on the NYSE must disclose: (i) known trends and uncertainties; and (ii) any material impact of such known trends and uncertainties on the company's operations even if the trends are a matter of public knowledge.

223. The SEC's 1989 Interpretive Guidance set forth a two-step test to determine if disclosure is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

224. Thus, disclosure of a material uncertainty is required unless the event is "not reasonably likely to occur." Here, adoption of the Double Reduction policies was substantially likely to occur, which Defendants knew for at least six months prior to the PRC's formal announcement of the Double Reduction policies on July 23, 2021.

225. The SEC also published interpretive guidance effective December 29, 2003, regarding MD&A requirements of Item 5 of Form 20-F. In this guidance, the SEC stated that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," and cited its prior 1989 Interpretive Release.

226. Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." Specifically, Item 105 requires a company to "[e]xplain

how each risk affects the registrant or the securities being offered" and "each risk factor should be set forth under a subcaption that adequately describes the risk." Likewise, Item 3 of Part I of Form 20-F requires a foreign private issuer, such as TAL, to "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."

### 2. Defendants Failed to Disclose Material Facts Regarding the Extent and Nature of TAL's Misconduct, Regulatory Violations, and Material Risks Facing the Company

227. The annual and quarterly reports filed by TAL during the Class Period required that Defendants disclose material facts regarding known trends, events, and uncertainties pursuant to the disclosure requirements of Item 5 and Item 303..

228. Additionally, TAL's Form 20-F annual reports failed to disclose certain of the most material risks facing the Company at the time of filing, in violation of Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105.

229. For example, in its 2021 Form 20-F, Defendants disclosed "Risk Factors" factors relating to compliance with China's new regulations and regulatory uncertainty. Specifically, the 2021 Form 20-F stated:

> These new regulations and implementation rules [enacted in 2018] provide a series of requirements in the operation of after-school tutoring business, which include that, among others: (1) key course information, including subjects, course schedules and course syllabi, for school academic courses, shall be filed with the local education administration authorities and be made publicly available; (2) the progress of the courses shall not surpass the same-period progress of local primary schools and secondary schools, and advanced trainings that do not follow the formal school curricula for the students in primary school and secondary school are prohibited; (3) training classes shall not be scheduled in conflict with the regular schooling time in local primary schools and secondary schools; (4) tutoring activities shall end before 8:30 p.m.; (5) homework shall not be assigned; (6) scored examination, competition or ranking in connection with the courses of primary schools or secondary schools shall not be arranged; (7) the periods for which tuition fees is charged shall be consistent with its respective curriculum, and the tuition fees for a period spanning more than three months should not be collected at one time; (8) no fees other than those that have been made public and no compulsory fund raising in any name may be made against the students; (9) student safety

insurance shall be purchased by the after-school tutoring institutions; (10) teaching staff who teach Chinese, mathematics, foreign language, physics, chemistry and other subjects in the compulsory education stage as well as the academic subjects related to the entering of a higher school and their extension training shall have the requisite teacher qualifications; (11) online education institutions shall also make their teachers' names, photographs, teaching classes and teaching qualification numbers public at a prominent location on their home page. In addition, the State Council Opinions 80 provides that relevant governmental authorities of market regulation, cyberspace administration, industry and information technology and others shall cooperate with the educational authorities to the extent of their respective scope of duties to regulate after-school tutoring institutions.

***We have been making efforts to ensure compliance with these regulations and implementation rules*** but there is no assurance that our operations comply with all applicable regulations in a timely manner ***due to various factors beyond our control.*** In particular, certain regulations and implementation provides new requirements and PRC government authorities have significant amount of discretion in interpreting, implementing and enforcing rules and regulations. ***If we fail to comply with the applicable legal requirements*** concerning the operation of after-school tutoring business in a timely manner, the relevant learning centers ***may be subject to the order of rectification, fines***, confiscation of the gains derived from noncompliant operations or the suspension of noncompliant operations, which may materially and adversely affect our business and results of operations.

230. In TAL's 2021 Form 20-F, Defendants also disclosed risk factors relating to TAL's ability to obtain necessary operating licenses and permits. Specifically, the 2021 Form 20-F stated:

***We are required to obtain and maintain various licenses and permits and fulfill registration and filing requirements in order to operate our tutoring service business.*** For instance, a duly approved private school will be granted a Permit for Operating a Private School, and shall be registered with the Ministry of Civil Affairs or its local branches as a non-profit school or registered with the relevant local branch of the SAIC as a for-profit school. In addition, pursuant to the State Council Opinions 80 and relevant RPC laws and regulations, opening branches or learning centers by any after-school tutoring institution shall also be subject to registration or filing requirements. As of February 28, 2021, certain of our learning centers had not completed filing requirements for permits or registrations, which in the aggregate accounted for an immaterial portion of our total net revenues for the fiscal year ended February 28, 2021.

We are in the process of preparing filings and applying for permits for these learning centers in accordance with the State Council Opinions 80 and relevant PRC laws and regulations but do not expect to complete all such filings or obtain all such permits in the near term. We are also considering other potential locations for certain learning centers and we may have difficulty obtaining those permits. ***We***

> ***have been taking steps to meet these requirements***, but there is no assurance that our efforts will result in full compliance given the significant amount of discretion PRC government authorities have in interpreting, implementing and enforcing rules and regulations and due to other factors beyond our control. However, if we fail to obtain or maintain requisite licenses and permits or fulfill requisite registration and filing requirements to operate our after-school tutoring business, including any failure to cure non-compliance in a timely manner, ***we may be subject to fines***, confiscation of the gains derived from non-compliant operations or the suspension of non-compliant operations, which may materially and adversely affect our business and results of operations.

231. These disclosures were misleading because Defendants failed to disclose that TAL was routinely violating government regulations and receiving fines on a chronic companywide basis.

232. Further, as discussed above, both the 2020 Form 20-F and 2021 Form 20-F included various affirmative statements that were misleading half-truths in light of TAL's omissions of the then-existing fines and penalties the Company was incurring. The Forms 20-F stated on several occasions that violations of laws and regulations governing tutoring services "***may***" subject TAL to fines, penalties, and other adverse consequences. It was misleading for Defendants to warn of a hypothetical risk that TAL "may" be subject to fines, yet omit that TAL had already developed a pattern or trend of incurring fines and penalties.

233. Further, as discussed above, the 2021 Form 20-F included various affirmative statements that were misleading half-truths in light of TAL's omission of the forthcoming Double Reduction policies and their anticipated impact on TAL's operations. For example, the 2021 Form 20-F stated:

- "[U]ncertainties . . . exist as the competent authorities ***may*** set more specific and stringent operation requirements for after-school tutoring institutions on various aspects including the means and timing of fee collection, pricing, advertisements and promotion content, prepaid funds under supervision, teachers' qualification licenses, refunds, course time and content, homework arrangement, and student enrollment, among others."

- "[U]ncertainties . . . exist as new laws and regulations . . . ***may*** set more specific and stringent requirements for online educational institutions . . .."

234. It was misleading for TAL to warn that Chinese authorities hypothetically "may" set more stringent requirements, when Defendants already knew – by at least January 2021 – that those stringent requirements were highly likely to be implemented.

235. The May 7, 2021 Form 20-F also included a section titled "Regulations on Private Education" that summarized the "principal laws and regulations governing private education in China." This section included a subsection for "Regulations on After-School Tutoring Institutions" that summarized regulations from 2018 to 2021, but failed to include the impending Double Reduction regulations and their anticipated impact on TAL.

236. Further, the 2021 Form 20-F stated: "Adverse changes in . . . political policies of the PRC government . . . ***could*** adversely affect our business. . . . [O]ur business, financial condition, results of operations and prospects are affected significantly by economic, political and legal developments in China."

237. It was misleading for TAL to state that adverse PRC political policies ***could*** affect TAL's business when such policies ***were already*** adversely affecting TAL's business. It was also misleading for TAL to disclose that its operations were affected significantly by legal developments in China while omitting that the Double Reduction policies were in fact forthcoming and would have a material adverse impact on the Company.

238. Defendants failed to disclose the following material facts necessary to make the above disclosures (Section VI.A-B) not misleading:

(a) That TAL had habitually been incurring fines and sanctions for its failure to comply with Chinese law governing the for-profit tutoring industry;

(b) That TAL was allowing teachers to tutor students absent the requisite qualifications;

(c) That TAL was touting falsified or exaggerated course reviews on its website in order to increase student enrollments;

(d) That TAL was engaging in bait-and-switch pricing wherein it repeatedly offered substantial promotional pricing to lure in students to use its tutoring services only to later charge the full price, if not more, for the tutoring service;

(e) That TAL was charging tuition for its tutoring courses for periods greater than three months in violation of relevant rules and regulations;

(f) That TAL was forcing students to pay advances and incur recurring debt;

(g) That TAL was repeatedly teaching courses that exceeded the scope of the syllabus in contravention of Chinese law; and

(h) That TAL knew, as early as January 2021, that the impending Double Reduction policies would have an adverse impact on TAL's operations.

239. The failure to include these material facts violated Item 5(d) because the undisclosed trends, demands, commitments, events, or uncertainties were known to Defendants and were "reasonably likely to have material effects on [TAL's] financial condition or results of operation."

240. TAL's persistent regulatory violations and fines were a "trend" throughout the Class Period that was reasonably likely to, and did, have a material adverse impact on TAL's financial condition.

241. The forthcoming Double Reduction regulations were an "uncertainty" throughout 2021 that was reasonably likely to, and ultimately did, have a material adverse impact on TAL's financial condition.

242. Defendants failed to disclose the foregoing information to investors in TAL's Forms 20-F or 6-K for fiscal years 2018 through 2021. These omissions violated Item 5(d) because the undisclosed trends, demands, commitments, events, or uncertainties were known to Defendants and were "reasonably likely to have material effects on [TAL's] financial condition or results of operation."

243. First, as described above in ¶ 238, the foregoing trends, demands, commitments, events, and uncertainties were known to Defendants throughout the Class Period. Specifically, Defendants knew that:

(a) The Chinese government was beginning to enact a series of rules and regulations which would have a material impact on the after-school tutoring industry therefore putting at risk TAL's business operations (*see* ¶¶ 39, 190-95, 206, 262-65);

(b) These stringent rules and regulations governing the after-school for-profit tutoring industry could impact how and indeed whether TAL could continue in its business (*see* ¶¶ 76, 149, 166, 199, 201-02, 229)

(c) The for-profit tutoring industry would likely be dragged down by governmental regulations as evidenced by Defendants' sales of stock for net profits of approximately $458 million (*see* ¶¶ 266-76); and

(d) TAL had incurred a series of fines during the period from 2018 to 2021 (*see* ¶¶ 84-134), including as part of $5.7 million in fines issued to 15 tutoring institutions including TAL on June 1, 2021.

244. Second, the below facts demonstrate that the foregoing trends, demands, commitments, events, and uncertainties were reasonably likely to occur and reasonably likely to have a material impact on TAL's business and operations:

(a) TAL was one of the top for-profit after-school tutoring firms in mainland China and thus should have been privy to any impending governmental regulations affecting its business;

(b) As a tutoring company offering private education services for students, TAL was required to adhere to all rules and regulations governing the tutoring industry;

(c) Even before the Class Period began, TAL formed a habit of repeatedly disregarding and offending an array of Chinese laws and regulations; and

(d) Notwithstanding the aforementioned, TAL continued to flagrantly disregard China's rules and regulations governing the for-profit tutoring industry because it prioritized its student enrollment metrics and growing revenues over compliance.

245. The failure to disclose these facts renders Defendants' affirmative statements false and misleading. Similarly, the purported "Risk Factors" contained in TAL's Forms 20-F issued throughout the Class Period were themselves materially misleading because they warned about risks that had already materialized. For example, Defendants stated that they were "***making efforts to ensure compliance with these regulations and implementation rules***" and that any non-compliance would be "***due to various factors beyond our control***." Defendants also claimed that "***[i]f we fail to comply with the applicable legal requirements***" the Company "***may***" be subject to fines and other punishment, at the same time that TAL was failing to comply with the applicable legal requirements and thus incurring fines. Defendants also disclosed that "***uncertainties still exist as the competent authorities may set more specific and stringent operation requirements for after-school tutoring institutions***" when they knew the stringent Double Reduction policies were virtually certain to be put in place.

246. While the Form 20-F annual reports stated that TAL "***may***" be subject to adverse regulatory actions if the government found the Company was not in compliance with the existing regulatory regime, nowhere did the reports disclose that TAL knew that the longstanding and increasingly more restrictive government regulations would have a crippling effect on TAL's business in the long-term and that the trend was entirely negative, with no reasonable hope or expectation that the government would reverse its policies.

247. The Class Period Forms 20-F also qualified their discussion of purported regulatory risks by claiming that TAL was taking actions to ensure compliance with the laws, regulations and policies applicable to its business, for example, by stating that TAL was "making efforts to ensure compliance," had "adapted [its] operations" to comply with the law and had taken various steps to "comply with PRC laws and regulations." The failure to disclose the Company's actual business practices; actual receipt of fines and sanctions; TAL's efforts to knowingly flout Chinese rules,

regulations and policies; the longstanding and increasingly more restrictive governmental regulations which would have a crippling effect on TAL's business in the long-term; and that the trend was entirely negative with no reasonable hope or expectation that the government would reverse its policies, rendered the discussion of purported "risks" relating to TAL's business contained in the annual reports themselves materially misleading and similarly rendered statements of belief or optimism materially misleading.

248. The Forms 20-F filed by TAL during the Class Period violated Item 5 by failing to disclose the adverse facts alleged in Section IV(C) concerning the Company's wide-ranging misconduct and efforts to artificially inflate TAL's financial results through the illicit business tactics detailed herein and the Chinese government's imposition of increasingly harsh regulations, particularly given TAL's history of flouting less restrictive regulations. These adverse facts and events created known trends and uncertainties that were reasonably likely to (and ultimately did) have a material adverse impact on the Company's financial condition and results of operations, and, accordingly, appropriate disclosure in the Forms 20-F was required.

249. TAL's Forms 20-F filed during the Class Period failed to comply with these reporting obligations because, as Defendants knew or recklessly disregarded, the reports failed to disclose the true risks arising from the adverse facts alleged above in Section IV(C) concerning the Company's wide-ranging misconduct and the Chinese government's imposition of increasingly harsh regulations, given TAL's history of flouting less restrictive regulations. The specific and extreme risks of adverse regulatory action, as well as legal, reputational and financial risks arising from these adverse facts, were not disclosed in the annual reports even though they were some of the most material factors that made an investment in TAL ADSs speculative or risky and were already occurring at the time that the statements were made.

## VII. POST CLASS PERIOD DISCLOSURES

250. On July 30, 2021, TAL announced that it would be cancelling its scheduled earnings release and earnings call in light of the regulatory developments.

251. In October 2021, staff at Xueersi stated that the Company would cease admitting new students and that their online payment channels were closed.

252. On October 13, 2021, the *Sixth Tone* released an article stating "the payments freeze ensures that the once-vast for-profit tutoring industry will be largely dissolved by the end of the year."

253. On November 12, 2021, TAL filed a press release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021. The Company further stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods" and that the revenues derived from offering those services for fiscal year end February 28, 2021, "accounted for a substantial majority of the Company's total revenues in the year."

254. On March 14, 2023, CaiLian, a local media outlet based in China, published an expose on TAL's continuous violations of PRC regulations governing the private education sector. In particular, the expose discussed TAL's violations of the July 2021 Double Reduction policy. Both JP Morgan and China Merchant released analyst reports immediately thereafter. On March 14, 2023, China Merchant referred to the news as "Negative press on TAL's K-9 non-academic business," and on March 15, 2023, JP Morgan reported that in light of the news, "investors may take a 'better safe than sorry' approach" and further, that "[t]his article could bring back memories of the 2021 tutoring regulatory cycle."

255. The Double Reduction policies decimated TAL's revenues. TAL's total revenue declined from $4.4 billion for the year ended February 28, 2022 to just $1.0 billion for the fiscal year

ended February 28, 2023. TAL attributed the decline to the Double Reduction regulations, stating in its 2023 Form 20-F:

> In compliance with regulatory policies . . . published in July 2021 . . . , we ceased offering the K-9 Academic AST [after school tutoring] Services in the mainland of China at the end of 2021. The cessation has had a substantial adverse impact on our revenues . . . . Our total net revenues decreased . . . [from] $4,390.9 million for the fiscal year ended February 28, 2022 . . . to $1,019.8 million for the fiscal year ended February 28, 2023. The decrease was mainly driven by the cessation of the K-9 Academic AST Services in the mainland of China by the end of December 2021.

256. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL ADSs, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

257. Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were engaged in serious and persistent violations of Chinese government regulations (many of which were unknown to the public or not reasonably discoverable), aware of material non-public information that far more stringent regulations would be enacted in mid to late 2021, and that the existing regulatory scheme and additional regulation was not beneficial to TAL's business. The Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that public documents and statements they issued and disseminated in the name of TAL or in their own name, to the investing public during the Class Period, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding TAL, and their control over and/or receipt and/or modification of TAL's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

258. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

259. Further, the Individual Defendants acted with scienter because they possessed the motive and opportunity to commit the fraud alleged herein, as further detailed below in Section VIII(A).

260. The Individual Defendants, because of their high-level positions at TAL, controlled the contents of TAL's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of TAL's corporate statements and is, therefore, responsible and liable for the representations contained therein.

261. The Individual Defendants' scienter and knowledge of underlying facts is imputed to TAL for purposes of corporate scienter.

## A. Motive and Opportunity

### 1. Defendants Had Advance Warning of the Double Reduction Policies

262. According to CW1, at least as early as January 2021—*months before rumors emerged* in March 2021 during China's Two Sessions and the Chinese government formally issued regulations

in July 2021—*TAL's senior executives knew* that stringent regulations were forthcoming. Thus, Defendants had access to and obtained nonpublic information about the Chinese government's adoption of the Double Reduction policies long before the investing public.

263. Investigative journalist reports also strongly suggest that as one of the "top private education firms" TAL would have had advance warning of the Double Reduction policies. For example, on July 26, 2021, *Caixin Global* published a report titled "Education Companies Knew Sweeping Rules Were in the Pipeline," in which it reported, "Chinese officials held multiple rounds of talks with top private education firms to discuss the industry's future before announcing sweeping new regulations last week that are set to transform the sector."[10] The same report refers to TAL and two of its competitors.

264. TAL met with government officials to discuss the Double Reduction policies on May 7, 2021, which was the same day TAL issued its 2021 Form 20-F. *See* ¶ 206 above. Yet the 2021 Form 20-F entirely omitted the forthcoming Double Reduction policies and their anticipated impact on TAL.

265. Even before the government's announcement of the Double Reduction policies on July 23, 2021, Defendants made changes to TAL's product offerings evidencing their advanced knowledge. For instance, the July 26, 2021 *Caixin Global* article further reported, "On July 8, TAL announced a new adult education brand focusing on postgraduate entrance exams, language training and overseas study. The disclosure came less than a week after the company launched a separate science program and two weeks after it announced changes to flagship English learning service."

[10] https://www.caixinglobal.com/2021-07-26/education-companies-knew-sweeping-rules-were-in-the-pipeline-101745681.html.

### 2. TAL Insiders Realized Approximately $458 Million in Net Profits from Their Class Period Stock Sales

266. Throughout the Class Period, the Individual Defendants were motivated to issue false statements to give themselves the opportunity to sell their common stock at artificially inflated prices before the full truth emerged. Thus, while Defendants engaged in their scheme to defraud investors during the Class Period by falsely assuring investors that the Company was in compliance with China's heightened laws and regulations governing the tutoring industry, Individual Defendants Zhang and Luo, along with other Company insiders, sold significant amounts of TAL shares at artificially inflated prices. As the Individual Defendants misled investors about the Company's regulatory compliance, with advance knowledge of the forthcoming Double Reduction policies which they knew would decimate TAL's core business, they and other Company insiders unloaded hundreds of millions of dollars of their personally held shares. The Individual Defendants and TAL senior executives were motivated to hide the Company's repeated regulatory violations and forthcoming Double Reduction policies to benefit from sales of their personally held shares at artificially inflated prices. Because TAL is a foreign private issuer, it is exempt from Section 16 of the Securities Exchange Act of 1934. As a result, unlike insiders of United-States domiciled issuers, corporate insiders of TAL are not required to publicly disclose sales of TAL ADSs on Form 4. As a result, pre-discovery, Lead Plaintiff has no practical ability to identify sales of all registered TAL shares by the Individual Defendants or senior executives during the Class Period, as the Individual Defendants were not required to report all sales of registered shares with the SEC.

267. In total, TAL insiders are known to have dumped over ***9.5 million shares of stock*** during the Class Period for approximate ***net profits of over $450 million.*** However, for the aforementioned reasons, pre-discovery, Lead Plaintiff cannot determine the full extent of insider sales by the Individual Defendants and senior executives during the Class Period. TAL executives

planning to sell unregistered shares of Company stock were required to file a Form 144 with the SEC which provides notice of a proposed sale of securities.

268. As reflected in Forms 144 filed with the SEC[11] and as set forth below, during the Class Period, the Individual Defendants and senior executives of TAL sold at least $458 million of their personally held shares, as summarized in the following chart:

**TAL Education (TAL)** **4/26/18 - 7/22/21** **Insider Sales Summary**

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Liu Yachao** | 4/30/2018 | $35.89 | 100,000 | $3,589,000 |
| Chief Operating | 11/18/2019 | $44.40 | 100,000 | $4,440,000 |
| | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/30/2020 | $49.70 | 100,000 | $4,970,000 |
| | 8/11/2020 | $74.00 | 240,000 | $17,760,000 |
| | 11/9/2020 | $71.23 | 20,000 | $1,424,600 |
| | 11/10/2020 | $71.32 | 20,000 | $1,426,400 |
| | 11/11/2020 | $70.06 | 20,000 | $1,401,200 |
| | 11/16/2020 | $74.59 | 10,000 | $745,900 |
| | 11/17/2020 | $75.18 | 10,000 | $751,800 |
| | 11/18/2020 | $74.01 | 10,000 | $740,100 |
| | 11/19/2020 | $73.73 | 10,000 | $737,300 |
| | 11/20/2020 | $74.75 | 10,000 | $747,500 |
| | 11/23/2020 | $74.44 | 10,000 | $744,400 |
| | 1/28/2021 | $78.38 | 35,649 | $2,794,168 |
| | 2/1/2021 | $76.88 | 10,000 | $768,800 |
| | 2/2/2021 | $76.60 | 60,000 | $4,596,000 |
| | 2/3/2021 | $81.17 | 45,170 | $3,666,448 |
| | | | **846,509** | **$52,996,392** |
| | | | | |
| **Rong Luo** | 5/9/2018 | $36.23 | 19,988 | $724,125 |
| Chief Financial | 10/29/2018 | $27.90 | 5,001 | $139,527 |
| | 2/22/2019 | $32.88 | 90,000 | $2,959,200 |
| | 2/22/2019 | $33.97 | 9,000 | $305,730 |

[11] The net profit calculation is an approximation because the PRC has opaque reporting requirements for insiders. Additionally, unlike the domestic SEC Form 4 which is filed electronically within two business days of the trade and provides extensive information on each insider transaction, the SEC Form 144 used by foreigners' insiders is not required to be filed either speedily or electronically and does not always contain the same extensive information to calculate a net profit for each trade.

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | 2/25/2019 | $33.97 | 30,000 | $1,019,100 |
| | 10/29/2019 | $41.85 | 120,000 | $5,022,000 |
| | 1/28/2020 | $47.43 | 5,779 | $274,097 |
| | 7/29/2020 | $78.69 | 23,612 | $1,858,028 |
| | 8/4/2020 | $80.97 | 100,000 | $8,097,000 |
| | 1/27/2021 | $78.80 | 54,000 | $4,255,200 |
| | | | **457,380** | **$24,654,007** |
| | | | | |
| **Yan Huang** | 2/22/2019 | $32.88 | 120,000 | $3,945,600 |
| Chief | 10/31/2019 | $42.81 | 5,952 | $254,805 |
| | 11/4/2019 | $42.75 | 180,000 | $7,695,000 |
| | 11/14/2019 | $44.15 | 100,000 | $4,415,000 |
| | 1/28/2020 | $47.43 | 34,714 | $1,646,485 |
| | | | **440,666** | **$17,956,890** |
| | | | | |
| **Zhang Kaifu** | 10/28/2019 | $43.10 | 5,264 | $226,878 |
| Director | 10/28/2020 | $66.56 | 4,807 | $319,953 |
| | 2/25/2021 | $81.34 | 24,141 | $1,963,628 |
| | | | **34,212** | **$2,510,459** |
| | | | | |
| **Yunfeng Bai** | 11/19/2019 | $44.34 | 106,742 | $4,732,940 |
| President | 1/28/2020 | $47.43 | 35,690 | $1,692,776 |
| | 1/28/2021[12] | $78.38 | 144,000 | $11,286,720 |
| | | | **286,432** | **$17,712,436** |
| | | | | |
| **Bright Unison Ltd**[13] | 5/30/2019 | $34.32 | 955,000 | $32,779,611 |
| Shareholder | 5/31/2019 | $34.09 | 1,054,553 | $35,944,966 |
| | 10/29/2019 | $41.85 | 3,500,000 | $146,475,000 |
| | | | **5,509,553** | **$215,199,577** |
| | | | | |
| **Chen Weiru** | 10/28/2019 | $43.10 | 5,264 | $226,878 |

[12] Bai Yunfeng also became Chairman of the Board before making this sale.

[13] Bright Unison Ltd. is a corporation incorporated in the British Virgin Islands. https://find-and-update.company-information.service.gov.uk/company/OE012545. During the Class Period, Bright Unison Ltd owned more than 5% of TAL Education's shares. According to TAL Education's June 30, 2020 SEC Form 20-F, Bright Unison Limited is "Mr. Bangxin Zhang's personal holding company." https://www.sec.gov/Archives/edgar/data/1499620/000110465920078996/tal-20200229x20f.htm. Zhang is also publicly identified as the sole shareholder and sole director of Bright Unison

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| Director | | | | |
| | | | | |
| **Excellent New Limited**[14] | 4/29/2019 | $38.67 | 3,280,500 | $126,856,935 |
| | | | | |
| **Grand Total** | | | **9,556,627** | **$458,113,574** |

269. Further, to the extent that TAL insiders acquired any shares during the Class Period – such shares were acquired on a zero-cost basis. Thus, the proceeds netted by these insiders are virtually the same as their profits.

270. The insider sales were unusual compared to the prior trading history for Yunfeng Bai, Bright Unison Ltd., Rong Luo, and Yan Huang, departed from their prior trading patterns and far exceeded the proceeds they received from sales of TAL shares over the same period prior to the Class Period. The following chart shows these same individuals' insider sales in the two years prior to the Class Period:

**TAL Education (TAL)** **4/26/16 – 4/25/18** **Insider Sales Summary**

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Yunfeng Bai** | 2/6/2018 | $31.67 | 131,767 | $4,173,060 |
| | 2/8/2017 | $83.76 | 21,833 | $1,828,732 |
| | | | **153,600** | **$6,001,792** |
| | | | | |
| **Bright Unison Ltd** | 8/24/2017 | $30.91 | 2,700,000 | $83,457,000 |
| | | | | |
| **Rong Luo** | 5/4/2016 | $56.88 | 13,634 | $775,501 |

[14] According to TAL Education's June 30, 2020 SEC Form 20-F, Excellent New Limited is also a British Virgin Islands company over which "Yunfeng Bai has the power to direct the retention or disposal of, and the exercise of any voting rights attached to, the foregoing shares through a trust structure." https://www.sec.gov/Archives/edgar/data/1499620/000110465920078996/tal-20200229x20f.htm.

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | | | | |
| **Yan Huang** | 2/28/2018 | $36.70 | 120,000 | $4,404,000 |
| | | | | |
| **Grand Total** | | | **2,987,234** | **$94,638,293** |

271. The graph below also illustrates the large discrepancy between the amount of insiders' stock sales before and during the class period:




272. During the two years prior to the Class Period, these same Company insiders sold only 2,987,234 shares of their TAL stock, for proceeds of only $94.6 million. Notably, Defendant Luo sold only 13,634 shares for $775,501 in proceeds in the prior two years – compared to his Class Period sales of 457,380 shares for approximate net profits of nearly $25 million. Moreover, there were no reported sales for four of the eight Company insiders (Chen Weiru, Excellent New Limited,

Liu Yachao, Zhang Kaifu) during this time period. The significantly smaller number of pre-Class Period sales by such a broad swath of Company insiders highlights the suspicious nature of their Class Period insider sales.

273. During the Class Period, Defendant Zhang sold 3.7% of his stockholdings and Defendant Luo sold 19.11% of his stockholdings.

274. Because TAL insiders were gifted with substantial equity in the Company shortly after TAL's formation in 2003, the percentage of stockholdings sold by TAL insiders appears lower; however, this does not negate an inference of scienter.

275. The insider sales were also suspicious in timing. As alleged above, the Individual Defendants and senior TAL executives were aware of forthcoming regulations in early 2021 *before* the Double Reduction policies were announced (or even rumored) and those changes were a frequent topic of discussion among senior TAL executives at TAL's headquarters. As demonstrated above, the sales were predominantly made *before* March 2021, when China held its annual "Two Sessions" parliamentary meetings, where it was announced that there would be "stricter regulations" to rein in the online education industry. Many of the sales were also made at times when the stock was trading at over $70 per share as Defendants were materially inflating the Company's revenues by falsely assuring investors that the Company's practices were in compliance with China's strict laws and regulations governing the for-profit tutoring industry and knew, unlike the investing public, that stricter regulations were forthcoming. Indeed, Defendant Luo sold over 170,000 shares (for over $12 million in proceeds) at prices at and near a 52-week trading high for TAL stock. The suspiciousness of the insider stock sales raises a strong inference that these insiders were aware of TAL's inability to comply with the Chinese government's increasingly restrictive regulations and the unsustainability of TAL's deceptive marketing tactics and illicit business practices when they sold

their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from the TAL's massive stock price decline.

276. CW1 confirmed that some "core members" of TAL's senior management team divested their TAL shares during the 2021 Spring Festival which took place in January-February 2021 at which time TAL's stock price was trading between USD $70 to USD $80.

**3. The Individual Defendants' Bonuses**

277. The Individual Defendants' motive to issue false statements throughout the Class Period is further evidenced by their desire to optimize their bonuses and other available incentives under TAL's lucrative compensation system for its executives.

278. According to TAL's Forms 20-F for fiscal years 2019, 2020, 2021, and 2022, TAL issues cash compensation and share-based compensation to its executives.

279. In particular, according to TAL's Form 20-F for fiscal year end February 28, 2019, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. Further, for the same fiscal year, TAL granted 354,301 non-vested restricted Class A common shares to its executive officers and non-executive directors as well as a total share-based compensation expense of $5.2 million for its executive officers and non-executive directors.

280. According to TAL's Form 20-F for FY 2020, the aggregate cash compensation paid to its executive officers for that fiscal year was $1.9 million. For the same fiscal year, TAL granted 51,520 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.4 million for its executive officers and non-executive directors.

281. According to TAL's Form 20-F for FY 2021, the aggregate cash compensation paid to its executive officers for that fiscal year was $2.0 million. For the same fiscal year, TAL granted 28,500 non-vested restricted Class A common shares and 24,000 share options to purchase 24,000

Class A common shares to its executive officers and non-executive directors and TAL recognized a total share-based compensation expense of $6.1 million for its executive officers and non-executive directors.

282. Finally, for TAL's fiscal year end February 28, 2022, the aggregate cash compensation paid to its executive officers and non-executive directors as a group was about $2.4 million. For that same fiscal year, TAL granted 250,700 non-vested restricted Class A common shares to its executive officers and non-executive directors and TAL recognized a share-based compensation expense of $9.2 million for its executive officers and non-executive directors.

283. Thus, for fiscal years 2019 through 2022, TAL's executives took home a combined $8.3 million in cash compensation bonuses and $26.82 million in share-based compensation payments.

284. The cash-compensation paid out to executives and non-executive directors during the Class Period was substantial. These payments further demonstrate that the Individual Defendants had the motive and opportunity to maximize their bonuses.

### 4. The Individual Defendants' High-Level Positions and Experience

#### a. Defendant Zhang

285. Defendant Zhang held the highest-level position at TAL. As CEO, Defendant Zhang controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the tutoring industry. Because of his high-level position, Defendant Zhang was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Zhang knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and

were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's most senior-level executive, Defendant Zhang was responsible for the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

286. According to CW1, Defendant Zhang had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "***at least six months in advance***." CW1 stated that the executives – including Defendant Zhang – "knew that a new regulation was forthcoming" and what the main direction of the regulations would be. Defendant Zhang had an understanding that the pending July 2021 Double Reduction regulation would affect TAL's scale of operations, forbid TAL from further expansion, and materially reduce the number of the Company's campuses.

**b. Defendant Luo**

287. As Chief Financial Officer, Defendant Luo held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, non-public information concerning the fact that TAL education was not incompliance with Chinese regulations and laws governing the after-school tutoring industry, and more generally, its education sector. By virtue of his high-level position, Defendant Luo was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information about TAL, Defendant Luo knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's second senior-most

executive, Defendant Luo was responsible for ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

288. According to CW1, Defendant Luo had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "***at least six months in advance***." CW1 stated that the executives – including Defendant Luo – "knew that a new regulation was forthcoming" and what the main direction of the regulations would be. Defendant Luo had an understanding that the pending July 2021 Double Reduction regulation would affect TAL's scale of operations, forbid TAL from further expansion, and materially reduce the number of the Company's campuses.

289. Defendant Luo also has extensive management experience. As reported in several of TAL's Form 20-F filings, Defendant Luo was previously the chief financial officer of eLong Inc. from 2013 to 2014. Prior to that, Defendant Luo was the finance senior manager for the Lenovo Group in China. Furthermore, before joining Lenovo, Defendant Luo worked at Microsoft Corporation in Beijing and Seattle where he worked in various finance positions including as an analyst, manager, and senior manager. Defendant Luo also has a double major bachelor's degree in economics and information management and systems from Peking University in addition to a master's degree in management science and engineering from Tsinghua University.

**c. Defendant He**

290. As the Company's Vice President of Finance, Defendant He also held one of the highest-level positions at TAL, controlled the contents of TAL's public statements, and had access to material, adverse, nonpublic information regarding TAL's non-compliance with Chinese laws and regulations governing the after-school for-profit tutoring industry. Because of her high-level position, Defendant He was provided, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent

their issuance or cause them to be corrected. Because of her position and access to material non-public information about TAL, Defendant He knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors of TAL's ADSs were materially false, misleading, and/or incomplete. As the Company's Vice President of Finance, Defendant He was responsible for ensuring the accuracy of TAL's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

291. According to CW1, Defendant He had access to material, adverse, nonpublic information about the July 2021 regulations and their effect on TAL's ability to operate and grow its tutoring "***at least six months in advance***." CW1 stated that the executives – including Defendant He – "knew that a new regulation was forthcoming" and what the main direction of the regulations would be. Defendant He had an understanding that the pending July 2021 Double Reduction regulation would affect TAL's scale of operations, forbid TAL from further expansion, and materially reduce the number of the Company's campuses.

**B. The Alleged Fraud Concerns the Core Operation of TAL's Business**

292. The alleged fraud concerns the most important part of TAL's business and the government regulations and compliance violations concealed from investors were topics that the Individual Defendants claimed to know about during investor conference calls held throughout the Class Period. Given the fundamental importance of after-school tutoring to TAL's existence as a business, the Company's compliance with the regulations governing after-school tutoring, as well as the insight of TAL's senior executives into regulatory developments, was a subject of intense market scrutiny and concern, and a topic on which the Defendants made numerous public statements during the Class Period. The Individual Defendants, who were the Company's highest-ranking executives, made numerous statements about these subjects in response to analyst questions, and were aware that

the market was relying on the veracity of those statements. The Individual Defendants were intimately familiar with the Company's noncompliance with the regulations they professed to monitor (or were reckless touting their oversight and commitment to compliance) and knew about the government's policy shift at the time they made their misstatements, which strongly supports an inference of scienter.

293. The Individual Defendants were aware of the chronic fines and penalties due to their direct impact on the Company's net loss position. TAL incurred net losses of $127 million and $143 million in 2020 and 2021, respectively. Given those net loss positions, and the resulting need to carefully monitor the Company's expenses to limit losses, the Individual Defendants were aware of the fines and penalties that materially reduced TAL's net income.

294. TAL Education is fundamentally a private, for-profit, after-school tutoring company. In its website copyrighted 2017, it describes itself as "a smart learning solutions provider in China." It states that "TAL Education Group offers comprehensive learning services to students from all ages through diversified class formats," and that its "learning services mainly cover enrichment programs and some academic subjects in and out of China." TAL does not have any source of revenue or profit other than private tutoring. To state that the regulations the PRC was enacting would affect TAL's "core operations" is an understatement. Given that for-profit after-school tutoring was TAL's entire business, the Company's compliance with the regulations governing after-school tutoring, as well as the insight of TAL's senior executives into regulatory developments, was a subject of intense market scrutiny and concern, and a topic on which the Defendants made numerous public statements during the Class Period.

295. That private tutoring was TAL's overwhelming core operation – in fact, its sole operation – is also reflected in reports issued by analysts who were aware that new regulations might be coming out, and were hyper-focused on the effect they might have on TAL's profitability. For

example, a May 24, 2021 Credit Suisse report considering what the effect of the PRC's new regulations might be states, "We expect the new policy to pilot post-class services (mainly extra-curricular activities) of public schools on weekends in key cities but allow students to choose AST. And we expect most students of TAL to stick to its services as TAL focuses more on the high-end demand of parents and students who are willing to invest more time and resources in academic study."

296. A JP Morgan analyst report dated April 23, 2021, had this to say about the anticipated changes to the regulations:

> Management remains confident on successfully navigating policy uncertainty, though it refrained from providing any color on regulation itself. The company believes (and we agree) that TAL's core competitiveness lies in its products – high quality curriculums and teachers – as well as unparalleled brand equity & operational execution. Therefore, TAL's competitive positioning would actually outshine in a scenario where the government severely restricts tutoring advertisement (note: the company declined to speculate on the possibility of this happening), allowing it to mitigate potential negative impact with share gains.

Thus, while JP Morgan believed TAL's false narrative surrounding the impending government regulations (i.e., that they would not shutter the business entirely, but rather might be beneficial to TAL), what is certain is that JP Morgan recognized that any changes in Chinese regulations to the private tutoring business would have an enormous impact on TAL.

297. UBS wrote in a report dated July 6, 2021, just before the Double Reduction policy was officially released:

> We are still waiting for the final release of the Opinion to Further Reduce the Homework and Afterschool Tutoring (AST) Burden on Students of Compulsory Education (the Opinion, aka. The "Double Reduction" regulation), which was approved on 21 May . . . We are seeing local governments already moving towards the direction outlined by the Opinion: 1) increase the supply of tutoring/childcare services from the public system and 2) strict regulation enforcements on the AST sector . . . Re 1), we view more services provided by the public system could cannibalise [sic] low-end AST providers that provide quasi-childcare services and do not see material threat to the better quality providers such as TAL.

Similar to JP Morgan, the UBS analyst was fooled by TAL's false statements that the new regulations would positively impact its business. But what is clear is that, like TAL, UBS understood that these regulations would affect TAL's core operations.

298. The Individual Defendants certainly followed developments of the PRC's new regulatory regime. CW1, who was a deputy head and deputy general manager, responsible for TAL's relations with the PRC, disclosed that the Individual Defendants knew about the new regulations at least as early as January 2021. The Individual Defendants, who were the Company's highest-ranking executives, made numerous statements about regulatory issues and compliance in response to analyst questions, and were aware that the market was relying on the veracity of those statements. The Individual Defendants were intimately familiar with the Company's noncompliance with the regulations they professed to monitor (or were reckless in touting their oversight and commitment to compliance) and knew about the government's policy shift at the time they made their misstatements, which strongly supports an inference of scienter.

299. Because TAL's educational network consisted of more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and only *one* in the United States during the Class Period, the few dozen publicly reported infractions relating to its tutoring business obscured the actual magnitude of TAL's unreported violations and its egregious non-compliance, as announced by the Chinese government at the end of the Class Period.

**C. The Sarbanes-Oxley Certifications**

300. The Individual Defendants' scienter is further demonstrated by their Sarbanes-Oxley ("SOX") certifications wherein they certified that certain SEC filings represented, accurately, the financial condition of TAL.

301. In particular, Defendants Zhang and Luo, as CEO and CFO of the Company, certified pursuant to SOX that TAL's Forms 20-F filed throughout the Class Period, which contain materially

false and misleading statements as set forth above, were compliant with the federal securities laws, and further that "the information contained in [each] report fairly presents, in all material respects, the financial condition and result of operations of the company."

### D. The SEC Threatened to Delist TAL ADSs for Non-Compliance with U.S. Accounting Regulations

302. TAL's auditor – Deloitte Touche Tohmatsu Certified Public Accountants LLP – operates in Beijing, PRC. In December 2021, the PCAOB reported that it is "unable to inspect or investigate completely registered public accounting firms headquartered in Mainland China and Hong Kong." TAL's auditor, Deloitte, was identified as one such auditor.

303. China has stringent privacy laws that hamper the PCAOB's ability to monitor accounting firms in China.

304. Enacted in December 2020, the Holding Foreign Companies Accountable Act ("HFCAA") is a law that requires the SEC to "identify public companies that have retained a registered public accounting firm to issue an audit report where the firm has a branch or office that: (1) is located in a foreign jurisdiction, and (2) the Public Company Accounting Oversight Board ('PCAOB') has determined that it is unable to inspect or investigate completely because of a position taken by an authority in the foreign jurisdiction. If the issuer remains a "Commission-Identified Issuer" for three consecutive years – that is, the PCAOB is unable to inspect the issuer's auditor for three consecutive years – the SEC will prohibit the issuer from trading its securities on U.S. stock exchanges. For instance: "[a]fter a company has been a Commission-identified issuer for three consecutive years, the SEC will issue an order prohibiting trading of the company's securities on any national securities exchange or in the over-the-counter market in the United States."

305. On June 24, 2022, TAL was provisionally identified as a "Commission-Identified Issuer" – i.e., a company subject to the HFCAA and on July 19, 2022, the SEC conclusively identified

TAL Education as an issuer under the HFCAA. TAL disclosed this in its Form 20-F filed with the SEC on June 14, 2022.

306. On June 14, 2022, TAL filed its annual report on Form 20-F for fiscal year end February 28, 2022. The annual report stated, in relevant part:

> Our ADSs will be delisted and our ADSs and shares will be prohibited from trading in the over-the-counter market in 2024 under the Holding Foreign Companies Accountable Act, or the HFCAA, if the PCAOB is unable to inspect or fully investigate auditors located in China, or in 2023 if proposed changes to the law are enacted. ***The PCAOB has been unable, and is currently unable, to inspect our auditor in relation to their audit work performed for our financial statements.*** On December 16, 2021, the PCAOB issued a report to notify the SEC of its determination that the PCAOB is unable to inspect or investigate completely registered public accounting firms headquartered in Mainland China and Hong Kong**.** ***The PCAOB identified our auditor, Deloitte Touche Tohmatsu Certified Public Accountants LLP, as one of the registered public accounting firms that the PCAOB is unable to inspect or investigate completely.*** Under the current law, delisting and prohibition from over-the-counter trading in the United States could take place in 2024. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. In addition, the proposed changes to the law would decrease the number of non-inspection years from three years to two, thus reducing the time period before our ADSs may be prohibited from over-the-counter trading or delisted. If the proposed provision is enacted, ***our ADS could be delisted from the exchange and prohibited from over-the-counter trading in the United States in 2023.***

307. On June 28, 2022, TAL filed a Form 6-K with the SEC disclosing that it was updating its status under the HFCAA to "Commission-Identified Issuer." TAL further disclosed that the SEC identified TAL as a "Commission-Identified Issuer" because "the Company used an auditor [Deloitte] whose working paper cannot be inspected or investigated" by the PCAOB to issue the audit opinion for its financial statements for the fiscal year end February 28, 2022.

308. TAL had until July 18, 2022, to submit evidence disputing the SEC's identification of it as a "Commission-Identified Issuer" under the HFCAA.

309. On July 19, 2022, TAL was conclusively identified as an issuer under the HFCAA.

310. On December 29, 2022, President Biden signed the Consolidated Appropriations Act, 2023, which, according to sec.gov, "amended the HFCAA to reduce the number of consecutive years an issuer can be identified as a Commission-Identified Issuer before the Commission must impose an initial trading prohibition on the issuer's securities from three years to two years."

311. Accordingly, TAL was at risk of having its ADSs delisted for non-compliance with the PCAOB as early as July 19, 2024. This is because its auditor, Deloitte Touche, operated in Beijing and therefore the PCAOB was unable to inspect TAL's auditor, because it was based in China.

312. That TAL's financial filings with the SEC had not properly been investigated by the PCAOB in recent years and that the Company was at risk of having its ADSs delisted from the NYSE further evidences that TAL and the Individual Defendants acted with scienter.

**E. Executive Resignations**

313. Finally, the resignation of Defendant Long and departure of Defendant He contribute to an inference of scienter.

314. On September 24, 2021, TAL issued a press release announcing that Defendant Luo "decided to resign from the position of Chief Financial Officer to pursue another opportunity, effective from October 29, 2021." Defendant Luo served as TAL's CFO for seven years. Shortly after the announcement, on November 1, 2021, Defendant Luo was reported to have joined TAL's competitor Baidu, Inc., as CFO. The timing of Luo's resignation was suspicious because it was announced just two months after the government's July 23, 2021 disclosures of both the Double Reduction policy and TAL's violations of various rules and regulations governing the tutoring industry.

315. Defendant He left TAL after the April 22, 2021 earnings conference call. The timing of He's departure was suspicious because it took place shortly before implementation of the Double

Reduction regulations, at a time when Defendants were omitting the forthcoming regulations and the adverse impact they were likely to have on the Company's operations.

316. In sum, viewed collectively, the Individual Defendants' stock sales resulting in ***net profits of approximately $458 million*** combined with their motivation to maximize their cash compensation, the accounts of nine former TAL employees who detailed Defendants' flagrant and persistent violations of PRC laws, the Individual Defendants' high-level positions and access to information concerning regulatory fines and the forthcoming Double Reduction regulations, the departures of Defendants Long and He, and other facts alleged herein raise a compelling inference of scienter.

## IX. LOSS CAUSATION

317. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

318. During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at artificially inflated prices and were damaged thereby. The price of TAL's ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thus causing investors' losses. As alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TAL's ADSs and operated as a fraud or deceit on purchasers of TAL ADSs. When the truth about Defendants' misconduct was revealed, the value of TAL's ADSs declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of TAL's ADSs were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

319. The timing and magnitude of the ADS price declines negate any inference that the losses suffered by Lead Plaintiff and members of the Class were caused by changed market

conditions, macroeconomic or industry factors, or non-TAL specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following charts comparing TAL's ADS price performance to relevant peers/competitors and comparable indices. The first chart shows the entire Class Period and the second chart shows the end of the Class Period:







320. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff and the Class purchased TAL ADSs at artificially inflated prices and were damaged thereby. The price

of TAL ADSs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

321. The economic loss, i.e., damages, suffered by Lead Plaintiff and members of the Class, was a direct result of Defendants' material misrepresentations and omissions to artificially inflate the prices of TAL's ADSs, as well as the subsequent significant decline in the value of TAL's ADSs when Defendants' prior misrepresentations and omissions were revealed.

322. At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose that TAL's revenue and operational growth was the result of deceptive marketing tactics and illicit business practices that knowingly violated Chinese laws, regulations and policies, and exposed TAL to an extreme risk that more draconian measures would be imposed on the Company, as alleged herein. Before and during the time of Lead Plaintiff's and Class members' purchases of TAL's ADSs, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of TAL's ADSs to be artificially inflated.

323. Lead Plaintiff and members of the Class purchased TAL's ADSs at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. As a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period. However, TAL ADSs continued to trade at artificially inflated prices because investors and the market still did

not know the full truth about TAL's illicit business practices or the severity of the impending regulatory crackdown arising from these practices.

324. On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. Among the violations by the 15 offenders were reportedly fabricating teacher qualifications, exaggerating the effects of training, and fabricating user reviews. In addition, TAL was reportedly found to have: (i) forced students to pay hefty advances and take on recurring debt payments in violation of Chinese law; (ii) offered courses that gave students unfair advantages in contravention of Chinese government policies; (iii) engaged in illegal bait-and-switch tactics; (iv) misrepresented teacher qualifications and course qualities; (v) mishandled user data; and (vi) rigged promotional events to defraud consumers. As a result of this news, the price of TAL ADSs dropped from $40.51 when the market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period.

325. On July 23, 2021, China unveiled a sweeping overhaul of its education sector, banning companies that teach the school curriculum from making profits, raising capital or going public, effectively ending any potential growth in the for-profit tutoring sector in China. As a result of this news, the price of TAL ADSs plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs.

## X. CLASS ACTION ALLEGATIONS

326. Lead Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased TAL ADSs during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, and

members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

327. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TAL ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TAL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

328. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

329. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

330. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' statements or omissions during the Class Period were materially false and misleading;

(b) whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

331. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. NO SAFE HARBOR

332. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made.

333. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of TAL who knew that those statements were false when made.

## XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

334. At all relevant times, the market for TAL ADSs was an efficient market for the following reasons, among others:

(a) TAL ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b) as a regulated issuer, TAL filed periodic public reports with the SEC;

(c) TAL regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) TAL was followed by securities analysts employed by major brokerage firms such as: Credit Suisse AG; Morgan Stanley; China International Capital Corporation Limited; Deutsche Bank AG; JP Morgan Chase & Co.; Citigroup Inc.; CICC; Goldman Sachs; and China Renaissance Securities (US) Inc., who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

335. As a result of the foregoing, the market for TAL ADSs promptly digested current information regarding TAL from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of TAL ADSs during the Class Period suffered similar injury through their purchases of TAL ADSs at artificially inflated prices and a presumption of reliance applies.

336. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. CLAIMS FOR RELIEF

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

337. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

338. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

339. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of TAL ADSs during the Class Period.

340. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TAL ADSs. Lead Plaintiff and the Class would not have purchased TAL ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

341. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of TAL ADSs during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

342. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

343. The Individual Defendants acted as controlling persons of TAL within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of TAL shares, the Individual Defendants had the power and authority to cause TAL to engage in the wrongful conduct complained of herein. TAL controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XV. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: July 29, 2025

/s/ Michael Dell'Angelo
BERGER MONTAGUE PC
Michael Dell'Angelo
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net

*Lead Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi and Proposed Lead Counsel for the Class*

Tricia Beale, MSB# 99113
Laken H. Ryals, MSB# 106300
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-3680 / (601) 359-2003
Email: Tricia.beale@ago.ms.gov
Laken.ryals@ago.ms.gov

George W. Neville
Neville Law, LLC
403 Garden Park Cove
Brandon, Mississippi 39047
Telephone: (601) 940-8815
Email: george.w.neville@gmail.net

*Additional Counsel for Lead Plaintiff The Public Employees' Retirement System of Mississippi*

Caitlin M. Moyna
Mica A. Cocco
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Tel.: (646) 722-8501
Email: cmoyna@gelaw.com
Email: mcocco@gelaw.com

*Lead Counsel for New Mexico State Investment Council and Proposed Lead Council for the Class*

OFFICE OF THE NEW MEXICO ATTORNEY GENERAL
RAUL TORREZ, Attorney General
Post Office Drawer 1508
Santa Fe, NM 87504-1508
Telephone: 505/490-4052

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Additional Counsel for Lead Plaintiff New Mexico State Investment Council*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2025, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF system, which will automatically provide email notification to all counsel of record.

/s/ Michael Dell'Angelo
Michael Dell'Angelo
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net