**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SUN,**

**Plaintiffs,**

**-against-**

**TAL EDUCATION GROUP ET AL.,**

**Defendants.**

**22-cv-01015 (ALC)**

**OPINION & ORDER**

**ANDREW L. CARTER, United States District Judge:**

Co-Lead Plaintiffs New Mexico State Investment Council ("NMSIC") and Public Employees' Retirement System of Mississippi ("MSPERS," and together with NMSIC, "Plaintiffs") bring this securities class action against Defendants TAL Education Group ("TAL" or "the Company"), along with Bangxin Zhang ("Zhang"), Rong Luo ("Luo") and Linda He (collectively "Individual Defendants" and together with TAL, "Defendants"), alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (Count I), and Section 20(a) of the Exchange Act (Count II), individually and on behalf of a class of all persons or entities who purchased TAL American Depository Shares ("ADSs") between April 26, 2018 and July 22, 2021, both dates inclusive (the "Class Period")

Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' Third Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' Motion is **GRANTED.**

## BACKGROUND

### I. Procedural Background

Roushui Sun first brought this securities action against TAL and the Individual Defendants on February 4, 2022. ECF No. 1. On April 5, 2022, NMSIC filed a motion seeking appointment

as Lead Plaintiff. ECF No. 20. That same day MSPERS filed a motion seeking appointment as Lead Plaintiff. ECF No. 17. Several other individuals also filed motions seeking appointment as lead plaintiff and appointment of lead counsel. On October 6, 2022, the Court referred these motions to Magistrate Judge Katharine Parker. ECF No. 42. On October 12, 2022, Judge Parker issued an Opinion and Order appointing NMSIC and MSPERS as Lead Plaintiffs and approving their selection of co-lead counsel. ECF No. 44.

The Lead Plaintiffs filed the Amended Complaint on October 19, 2022. Amended Compl. ("AC"), ECF No. 46. On September 29, 2023, the Court issued an Opinion granting Defendants' Motion to Dismiss the Amended Complaint and granted leave for Plaintiffs to file a Second Amended Complaint. ECF No. 78. On November 20, 2023, Plaintiffs filed their Second Amended Complaint. ECF No. 82. The Parties briefed a Motion to Dismiss the Second Amended Complaint and on July 15, 2025, the Court held oral arguments. Following the oral arguments, the Court dismissed the Second Amended Complaint and permitted the Plaintiffs to file a Third Amended Complaint. ECF No. 97. On July 29, 2025, the Plaintiffs filed a Third Amended Complaint. ECF No. 100. On September 18, 2025, Defendants filed a motion to dismiss the Third Amended Complaint. ECF No. 104. Plaintiffs filed their Opposition on October 20, 2025. ECF No. 107. Defendants filed their Reply on November 10, 2025. ECF No. 109. The motion is deemed fully briefed. After careful consideration, Defendants' motion to dismiss is **GRANTED**.

## II. Factual Background

The Court accepts as true for purposes of this motion the well-pled allegations of the Third Amended Complaint as supplemented by the documents incorporated by reference. [1]

[1] The Court also considers facts drawn from news releases, financial reports, and transcripts of earnings calls which Plaintiffs quote from extensively in the TAC and are thus incorporated into the TAC by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### A. The Relevant Parties[2]

Lead Plaintiff NMSIC and MSPERS purchased TAL American Depository Shares ("ADSs") during the Class Period, and purportedly suffered damages as a result of Defendants' violations of the federal securities laws. TAC ¶ 29.

NMSIC is a sovereign wealth fund that manages the investments for New Mexico's four permanent funds: (i) the Land Grant Permanent Fund; (ii) the Severance Tax Permanent Fund; (iii) the Tobacco Settlement Permanent Fund; and (iv) the Water Trust Fund. *Id.* ¶ 30. As of 2021, NMSIC manages assets valued at $34 billion including the investment of 23 New Mexico government related clients which, at present, have a combined value of approximately $1.5 billion. *Id*. According to NMSIC's website, it is "focused on optimizing the earnings of New Mexico's permanent funds – funds that contribute to the state's overall operating budget – while preserving and growing the real value of the funds for future generations of New Mexicans." *Id*.

MSPERS was established in 1952 as the retirement system for Mississippi state agencies, as well as counties, cities, and other participating political subdivisions. *Id*. ¶ 31. It provides retirement benefits for employees of the state of Mississippi who work in government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services. *Id*.

Defendant TAL is a Cayman Islands corporation headquartered in Beijing, China. TAL provides private educational and tutoring services to students in China. *Id*. ¶ 32. TAL ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "TAL." *Id*. Each ADS represents one third of one share of TAL common stock. *Id*.

---

[2] Defendants Zhang, Luo, and He have yet to appear.

Defendant Bangxin Zhang ("Zhang") co-founded TAL, was the Chief Executive Officer ("CEO") and a director of TAL during the Class Period, and, until January 2020, the Chairman of the Board of Directors. *Id.* ¶ 33. Defendant Zhang is also the controlling shareholder of the Company. *Id.* Zhang is also the sole shareholder and sole director of Bright Unison Limited, a company incorporated in the British Virgin Islands. *Id.* During the Class Period, Defendant Zhang sold 5,509,553 shares of TAL stock through his company Bright Unison Ltd., realizing proceeds of approximately $215.2 million. *Id.* Defendant Rong Luo ("Luo") was TAL's Chief Financial Officer ("CFO") during the Class Period; he resigned from the Company effective October 29, 2021. *Id.* ¶ 34. During the Class Period, Defendant Luo sold 457,380 shares of TAL stock at artificially inflated prices, realizing approximately $24.7 million in proceeds. *Id.* Defendant Linda He[3] ("He") was TAL's Vice President of Finance during the Class Period, beginning at least by January 2019. *Id.* ¶ 35.

Plaintiffs include a history of TAL, including its rise and eventual demise as one of China's largest tutoring companies. The Court recounts this history as alleged in the TAC.

**B. History and Structure of TAL**

TAL was founded in the People's Republic of China ("China" or the "PRC") in 2003 by Defendant Zhang while he was completing his PhD program at Peking University. TAC ¶ 48. When Zhang originally launched TAL, the Company primarily offered mathematics tutoring courses, but later expanded to other subject areas. *Id.* During the Class Period, TAL provided K-12 after-school tutoring services in China, mainly covering core academic subjects, including mathematics, physics, chemistry, biology, history, geography, political science, English and Chinese. *Id.* Tutoring services were primarily offered through small classes, personalized premium

[3] According to Plaintiffs, Defendant Linda He's name is often spelled "Linda Huo" on public filings. TAC ¶ 35, n.2.

services and online course offerings. *Id*. On January 10, 2008, TAL became incorporated in the Cayman Islands as the "holding company for a group of companies engaged in the provision of high quality after-school tutoring programs." *Id*. ¶ 50. Although headquartered in Beijing, China, the Company is organized as an offshore holding company domiciled in the Cayman Islands and maintains contractual relationships with Chinese-domiciled variable interest entities ("VIEs"), including Beijing Xueersi Education. *Id*.

In or around October 2010, TAL listed its ADSs on the NYSE under the ticker "XRS." In the subsequent years after its initial public offering ("IPO"), the price of TAL ADSs grew by approximately 200%. *Id*. From 2015 to 2019, TAL ranked in the Top 100 Most Valuable Chinese Brands for five consecutive years. *Id*. By February 2021, TAL was valued at $55 billion and Defendant Zhang's wealth grew to over $15 billion. *Id*.

According to Plaintiffs, TAL's primary sources of revenue were (1) small class tutoring services that focus on offline education; and (2) online education services provided through www.xueersi.com. *Id*. ¶ 51. For the fiscal year ending February 28, 2021, TAL's online educational offerings accounted for 28.4% of TAL's total net revenue, up from 13.3% and 18.9% for the years ending February 28, 2019 and February 29, 2020, respectively. *Id*. Plaintiffs allege that throughout the Class Period, TAL's gross profits increased exponentially as it experienced robust growth due to "its deceptive pricing and advertising strategies." *Id*. TAL's fiscal year 2019 gross profits were $1.4 million; fiscal year 2020 profits were $1.8 million; and fiscal year 2021 profits were $2.4 million. *Id*. As of February 28, 2021, TAL's network consisted of "more than 1,000 learning centers and 990 service centers in over 100 cities throughout China and one in the United States, as well as online courses and an online education platform." *Id*. ¶ 53. According to TAL's Form 20-F for its fiscal year end February 29, 2020, the net revenue obtained from TAL's

VIEs and subsidiaries and schools accounted for 93.4% of TAL's total net revenue. *Id*. During the Class Period TAL had 10 subsidiaries and consolidated affiliated entities.[4] *Id*. ¶ 54.

In addition to TAL's 10 subsidiaries and consolidated affiliated entities, TAL has an additional operating entity called Shenzhen Xueersi Training Center ("Shenzhen School"), which was incorporated in November 2013 in Shenzhen, China. *Id*. ¶ 57. According to the 20-F forms filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL owned a 100% legal ownership interest in several entities. *Id*. ¶ 58.[5] For fiscal year end February 28, 2022 ("FY 2022"), TAL's 100% legal ownership over other entities dropped significantly, and TAL reported in its Form 20-F for FY 2022 that the "Company decided in November 2021 to cease offering services relating to academic subjects from kindergarten through grade nine in the mainland of China by the end of December 2021" and further, that "[t]he Company also has taken actions to restructure its business

[4] TAL's subsidiaries are: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. TAC ¶ 54. TAL's VIEs are: (1) Beijing Xueersi Education Technology Co., Ltd. ("Beijing Xueersi Education"); (2) Beijing Xueersi Network Technology Co., Ltd. ("Beijing Xueersi Network"); (3) Xinxin Xiangrong Education Technology (Beijing) Co., Ltd. ("Xinxin Xiangrong"). *Id.* ¶ 55. TAL's Affiliated Entities ("AEs") are: (1) Shidai TAL Education Technology (Beijing) Co., Ltd.; (2) TAL Education Technology (Jiangsu) Co., Ltd.; and (3) TAL Training School (Shanghai) Co., Ltd. *Id.* ¶ 56.

[5] According to Forms 20-F filed with the SEC, for fiscal years 2019, 2020, and 2021, TAL owned a 100% legal ownership interest in the following entities: (1) TAL Holding Limited ("TAL Hong Kong"), an intermediate holding company; (2) Beijing Century TAL Education Technology Co., Ltd. ("TAL Beijing"), a software sales and consulting service; (3) Beijing Huanqiu Zhikang Shidai Education Consulting Co., Ltd. ("Huanqiu Zhikang"), an education and management consulting service; (4) Yidu Huida Education Technology (Beijing) Co., Ltd. ("Yidu Huida"), a software sales and consulting service; (5) Beijing Xintang Sichuang Education Technology Co., Ltd. ("Beijing Xintang Sichuang"), a software and network development, sales, and consulting service; (6) Zhixuesi Education Consulting (Beijing) Co., Ltd. ("Zhixuesi Beijing"), a software and network development, sales, and consulting service; (7) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. ("Pengxin TAL"), an investment management and consulting service; (8), Firstleap Education ("Firstleap"), an intermediate holding company; (9) Firstleap Education (HK) Limited ("Firstleap Hong Kong"), an intermediate holding company; (10) Beijing Lebai Information Consulting Co., Ltd. ("Lebai Information"), an education and management consulting service; and (11) Beijing Yizhen Xuesi Education Technology Co., Ltd. ("Yizhen Xuesi"), a software and network development, sales, and consulting service. TAC ¶ 58.

and operations . . . ." *Id.* ¶ 59.[6] As of the date of the filing of Plaintiffs' TAC, TAL operates four major tutoring brands including: (1) Xueersi, which is further divided into Xueersi Peiyou, which provides small-class learning services, and Xueersi.com, which provides online education services; (2) Zhikang, which provides after-school one-on-one learning services; (3) First Leap, which provides English education; and (4) Mobby, its science, technology, engineering, arts and math ("STEAM") education brand. *Id.* ¶ 60. Xueersi Online School is TAL's leading brand; it provides online live lessons to students ages 3–16 and is the longest-running online education brand under TAL. *Id.* ¶ 61.

### C. Private Tutoring Industry in China

From the time children in China are toddlers in preschool, social pressure to excel academically weighs heavily on Chinese parents with daunting exams such as the Gaokao—China's very difficult college entrance exam. TAC ¶ 1. Parents, concerned that other children will outperform their own, began enrolling their children in expensive tutoring courses to supplement their already intense public-school education. *Id.* ¶ 2. Supplemental tutoring became the norm with Chinese parents spending between 25% and 50% of their annual income on after-school tutoring. *Id.*

TAL became one of the top five tutoring companies in China, and by February 2021, it was valued at over $55 billion, up 323% from its $13 billion valuation in October 2018. *Id.* ¶ 3. Leading up to and during the Class Period, the Chinese government began to implement a series of regulations and laws intended to govern the for-profit tutoring industry. *Id* ¶ 4.

---

[6] As of February 28, 2022, TAL only had a 100% legal interest in: (1) TAL Holding Limited; (2) Beijing Century TAL Education Technology Co., Ltd.; (3) Beijing Xintang Sichuang Education Technology Co., Ltd.; and (4) Pengxin TAL Industrial Investment (Shanghai) Co., Ltd. TAC ¶ 59.

TAL, as one of China's largest tutoring companies, faced significant risks if it failed to comply with China's new and increasing regulation of the industry. *Id*. ¶ 4. Plaintiffs allege that in the midst of exponential year-over-year growth, TAL had no intention of limiting its operations, and that rather than constrain its growth and concomitant profits by complying with the applicable rules, regulations and proscriptions, TAL persistently flouted the Chinese government's new regulations and laws by, among other things: (i) releasing deceptive advertisements and promoting fake product pricing in order to induce student enrollment; (ii) creating fake course reviews; (iii) forcing students to pay advances and take on recurring debt; and (iv) offering students courses that gave them unfair advantages in contravention of Chinese policies. *Id* ¶ 87.

The National People's Congress is China's highest legislative body, while the State Council is the highest authority of the executive branch of the PRC central government.[7] *Id*. ¶ 62. In 2018, the Chinese government began enacting a series of rules and regulations referred to as "Circulars" and "State Council Opinions" under the regime of the "Law on the Promotion of Private Education of China." *Id*. ¶ 66. For instance, in February 2018, the Chinese government promulgated the "Circular on Special Enforcement Campaign Concerning After-school Training Institutions to Alleviate Extracurricular Burden on Students of Elementary Schools and Middle School," or Circular 3, which was aimed at reining in excessive tutoring fees and limiting the perceived societal harm resulting from the for-profit tutoring programs in China. *Id*. Among other restrictions, the regulations prohibited after-school tutoring institutions from providing courses more advanced than the government-approved syllabus and curricula applicable to the respective primary and secondary school students; providing courses designed to enhance exam-taking skills;

[7] There are several ministries and agencies under the authority of the State Council including the Ministry of Education, the General Administration of Press and Publication, the MIIT, the SAIC, and the Ministry of Civil Affairs. TAC ¶ 62.

and linking school enrollment with tutoring results. *Id*. As stated in TAL's Form 20-F for fiscal year 2018 ("FY 2018"), under Circular 3, Chinese "government authorities will carry out a special enforcement campaign to alleviate extracurricular burden on students of elementary schools and middle schools and regulate operations of after-school training institutions." *Id*.

On February 13, 2018, the Ministry of Education ("MOE"), the Ministry of Civil Affairs, the Ministry of Human Resources and Social Security and the State Administration for Market Regulation ("SAMR") jointly issued a Circular on "Alleviating After-school Burden on Primary and Secondary School Students and Implementing Inspections on After-school Training Institutions," under which government authorities would carry out a series of inspections on after-school training institutions. *Id*. ¶ 66. On August 22, 2018, the Chinese State Council issued an opinion on "Supervising After-School Tutoring Institutions," known as "Circular 80," or "State Council Opinions 80," which provided additional regulations targeting after-school tutoring institutions. *Id*. ¶ 68. In addition to imposing certification requirements for after-school tutoring institutions, Circular 80 limited curriculum content, banned homework, set early class stopping times, and forbade tutoring companies from collecting more than three months' worth of fees. *Id*. Circular 80 also set forth requirements pertaining to the Permit for Operating a Private School, including: the size of the classroom; the teacher's qualifications, insurance, fire safety, environmental protection, as well as health and food safety. *Id*.[8]

[8] That same month, the State Counsel issued the "Opinion on regulating the Tutoring Industry" which set forth the following: (1) course information must be filed with the local education authorities and made publicly available; (2) contents of tutorial courses should not surpass the national guideline (i.e., students should not be placed in courses that match their grade levels); (3) course schedule should not conflict with regular school time; (4) tutorial centers should not offer tutoring courses past 8:30 pm and instructors should not assign homework for students; (5) no examination, competition, or any related rankings can be conducted for courses of primary school and secondary school subjects; (6) tutorial centers cannot receive students' tuition payments for more than 3 months in advance; (7) instructors who teach Chinese, math, foreign language, physics, and chemistry, among others, in the compulsory education system must obtain teaching qualifications; (8) the average floor space per student during one tutoring session cannot be less

On August 31, 2018, the General Office of the MOE promulgated the Circular called "Implementation of Special Measures and Rectification Work on the Private Education Institutions," which pronounced specific requirements for local education departments to enforce State Council Opinions 80. *Id.* ¶ 70. On November 20, 2018, the General Office of the MOE along with the General Office of the SAMR of the PRC and the General Office of the Ministry of Emergency Management of the PRC jointly issued the "Notice on Improving the Specific Governance and Rectification Mechanisms of After-School Tutoring Institutions," better known as "Circular 10." Circular 10 provides express requirements for local governments regarding the implementation of State Council Opinions 80, which was issued earlier that year in February. *Id.* ¶ 71.

On March 5, 2019, during China's "Two Sessions" of the 13th CPPCC National Committee (annual political meeting of China's top political advisory body held in Beijing), a notice entitled, "The Urgency of Regulating Out-of-School Tutoring market" was published on the Ministry of Education website by LI Hongpin, the Deputy to the National People's Congress ("NPC"). *Id.* ¶ 72. On July 8, 2019, the Central Committee of the Communist Party of China and the State Council issued the "Opinions on Deepening the Reform of Education and Teaching to Improve the Quality of Compulsory Education" marking China's first document centered on reforming education and teaching in compulsory education. *Id.* ¶ 73. Parallel to the July 8, 2019 regulation were the Implementation Opinions on Regulating Online After-school Training ("Online After-School Training Opinions"), promulgated by the MOE and other PRC government bodies such as the Cyberspace Administration of China, on July 12, 2019. *Id* ¶ 74. According to Plaintiffs, these

than three square meters; and (9) public school teachers cannot be employed by after-school tutoring institutions. TAC ¶ 69.

Opinions were intended to regulate academic after-school training that involved internet technology and specifically initiated the supervision of online and offline after-school training. *Id*.

Plaintiffs allege that because TAL operated in a highly regulated industry, the impact of new laws and regulations governing Chinese tutoring industry and the Company's compliance with the Chinese regulatory framework and government prerogatives were of material importance to investors, and that TAL acknowledged the material importance of strict compliance with Chinese laws, regulations, and government prerogatives governing the tutoring industry. *Id*. ¶ 76. For example, in TAL's annual financial reports filed on Form 20-F during the Class Period, TAL stated that any compliance failures could "materially and adversely affect [TAL's] business and results of operations." *Id*.

On April 7, 2021, China's State Council promulgated the "Amended Regulations on the Implementation of the Law for Promoting Private Education of the PRC," or the "Amended Implementation Regulations of Private Education Law," which became effective on September 1, 2021. *Id*. ¶ 77. The Amended Implementation Regulations of Private Education Law together with State Council Circular 80 "require the learning centers of after-school tutoring institutions to make filings with the relevant education authorities," as reported in TAL's Form 20-F for fiscal year 2022.

**D. China Outlaws the Private Academic Tutoring Industry**

On July 23, 2021, China effectively outlawed the entire private academic tutoring industry. *Id*. ¶ 78. In particular, the General Office of the Central Committee of China's Communist Party and the General Office of the State Council jointly released the "Opinions on Further Reducing the Burden of Homework and Off-Campus Training for Compulsory Education Statements" (the "Opinions") which contain a reference to a "Double Reduction" – that is, a reduction in the total amount of time and commitment consumed by school homework as well as a reduction in the

burden presented by after-school training or off-campus programs. *Id*. This drastic measure effectively ended any potential growth in the for-profit tutoring sector in China. *Id*. A Reuters report titled "China bars for-profit tutoring in core school subjects" stated that the "move threatens to decimate China's $120 billion private tutoring industry and triggered a heavy selloff in shares of tutoring firms traded in Hong Kong and New York," including TAL. *Id*. The July 23 rules require, among other things, that all education companies register as nonprofits; and further state that "no new licenses will be issued to tutoring agencies catering to elementary and middle school students." *Id*. Plaintiffs cite to several new articles that reported the government's decision to "further regulate and standardize off-campus training." *Id*. ¶¶ 79–80. Plaintiffs allege that Defendants knew about the Double Reduction policies months prior to their implementation. *Id.* ¶ 39. TAL's senior executives and others in the Company engaged in discussions, meetings, and emails during the first half of 2021 regarding the forthcoming regulations. *Id*. On May 7, 2021, the same day that TAL filed its Form 20-F annual report, TAL executives attended a meeting with high-ranking government officials in China to discuss the Double Reduction policies. *Id.* ¶ 206. In anticipation of the new regulations, Plaintiffs allege TAL made changes to its product offerings *before* the Double Reduction regulations were formally enacted, evidencing TAL's advance knowledge of the regulations. ¶265.

Plaintiffs allege that as the Chinese government enacted these laws, TAL turned a blind eye to the new laws and regulations and instead elected to evade and violate the regulatory framework while assuring investors that it was in compliance or actively seeking to comply. *Id*. ¶ 83. Despite Defendants' acknowledgment that it was of material importance to investors that TAL comply with the rules, regulations, and proscriptions of the Chinese government, during the Class Period, the Plaintiffs allege that the Company regularly violated those same rules, regulations and

proscriptions, but lied to investors, claiming Tal was in compliance, to artificially inflate the Company's financial results. *Id*. ¶ 84. Plaintiffs allege that these violations were caught by Chinese regulators, who imposed fines ranging from the equivalent of a few hundred to a few thousand dollars. *Id*.

Lead Plaintiffs' investigation uncovered at least 60 infractions; however, Plaintiffs allege that TAL engaged in many additional violations which led the Chinese government to finally, effectively, shut down the Company's operations. *Id* ¶ 85. At a governmental conference announcing the industry-wide fines, officials stated that the crackdown on the for-profit tutoring industry had grown out of the Two Sessions parliamentary meetings held earlier in the year and followed a deluge of complaints against bad industry actors, including 155,000 complaints and reports for education and training services received by authorities in 2020 alone and over 47,000 similar complaints and reports received by authorities in the first quarter of 2021. *Id*. Plaintiffs assert that "[g]iven the concentration in the industry among TAL and a handful of its competitors, it stands to reason that TAL engaged in many more regulatory infractions which are either unavailable or inaccessible to the public than the 60 referenced above." *Id*.

Plaintiffs also allege that as part of the Chinese government's announcement of the Double Reduction policies, it also announced that various tutoring companies were engaged in serious violations of the rules, regulations and proscriptions governing the tutoring industry. *Id*. ¶ 16. These announcements were made on June 1, 2021. *Id*. ¶ 141. In May 2021, SAMR fined 15 TAL after-school tutoring institutions with financial penalties amounting to CNY 36.50 million ($5.13 million). *Id*. ¶ 86. In particular, an affiliate of TAL's leading brand Xueersi, Hangzhou Yidu Training School Co. Ltd., was fined CNY 2.5 million ($351,321 USD) for engaging in false advertising and price fraud. *Id*. Senecaesg.com reported that the tutoring companies were accused

of "false publicity, such as fabricating teacher qualifications, exaggerating tutoring effects, fabricating user reviews, and so on." *Id*. According to Plaintiffs, TAL's previously undisclosed misconduct was reported to have also included widespread practices of: (1) forcing students to pay large advances and take on recurring debt payments in violation of Chinese law; (2) offering courses that gave students unfair advantages in contravention of Chinese government policies; (3) engaging in illegal bait-and-switch tactics; (4) misrepresenting teacher qualifications and course qualities; (5) mishandling user data; (6) fabricating favorable course reviews, including by purported consumers who did not in fact exist; (7) engaging in deceptive advertising and promoting fake product pricing, designed to induce student enrollment and (8) rigging promotional events to defraud consumers. *Id*. ¶ 142.

Plaintiffs allege that TAL was an unrepentant serial violator of the Chinese government's rules, regulations and proscriptions engaged in a continuing game of cat and mouse with regulators. *Id*. ¶ 88.

Plaintiffs' Complaint focuses on several alleged violations committed by TAL. First, Plaintiffs allege that TAL flouted Circular 80, which forbade tutoring companies from charging tuition for a period greater than three months. *Id*. ¶ 100. Second, TAL repeatedly engaged in illegal tutoring practices by, among other things, offering course programs that violated state regulations, tutoring beyond the scope of the syllabus, and operating a school without approval. *Id*. ¶ 89. Third, TAL ignored or skirted China's stringent regulations concerning teachers' qualifications. *Id*. ¶ 96.[9]

[9] For example, Plaintiffs allege that many Xueersi.com teachers lacked the requisite teaching qualifications; and according to one report dated May 2, 2020, only 27 out of 58 teachers that taught Chinese, Math, and English in Grade 1 via Xueersi.com provided their teaching certificate numbers. TAC ¶ 96. Of those that did purport to provide their teachers' qualifications, such "qualifications" did not comply with prevailing regulations. *Id*. Another report dated April 25, 2021 reported that some teachers on Xueersi.com taught students in grades that were more advanced than their teaching qualifications permitted. *Id*. ¶ 97. On May 19, 2021, Beijing Xueersi Education was fined for enlisting Jiangxi Changsheng Network Technology Co. Ltd., on December 29, 2020, to produce and publish a video advertisement wherein an actor falsely claiming

Fourth, Plaintiffs allege that TAL's subsidiaries also flagrantly disregarded Chinese law governing pricing by engaging in unlawful pricing practices and price fraud. *Id*. ¶¶ 100-107. Fifth, Plaintiffs contend that TAL repeatedly disseminated unauthorized or illegal publications to promote its tutoring business in defiance of Chinese regulations pertaining to publications. *Id*. ¶¶ 109-117. For example, during the Class Period, Beijing Xueersi Education Technology Co., Ltd., was fined on June 21, 2022 for publishing and disseminating an online publication between December 12, 2016 and April 6, 2022 that contained illicit content. *Id*. ¶ 109. Sixth, Plaintiffs allege that TAL regularly engaged in false advertising of its services in violation of applicable regulations. *Id*. ¶¶ 112–125.[10]

**E. TAL's ADSs Price Plummets**

Plaintiffs allege that on May 12, 2021, news reports revealed that the impending government crackdown on for-profit tutoring companies in China would be much more drastic and far reaching than previously publicly known. *Id*. ¶¶ 12, 139. Sources stated that anticipated rules would include measures such as banning on-campus tutoring classes, the provision of tutoring services during weekend hours, and the imposition of industry-wide fee limitations. *Id*. Plaintiffs allege that as a result of this news, the price of TAL ADSs dropped from $53.14 when the market closed on May 11, 2021, to $46.25 when the market closed on May 13, 2021, a 13% decline over the two-day period. *Id.* ¶ 140. On June 1, 2021, Chinese regulators announced they had fined 15 off-campus training institutions, including TAL, for illegal activities such as false advertising and fraud. *Id*. ¶ 141. As a result of this news, the price of TAL ADSs dropped from $40.51 when the

to be a high school teacher with six years of teaching experience recommended Xueersi.com online courses. *Id*. ¶ 98.

[10] According to Plaintiffs, before, during, and after the Class Period, TAL and many of its subsidiaries flagrantly disregarded the PRC's advertising rules and regulations thereby incurring repeated sanctions. TAC ¶ 119.

market closed on June 1, 2021, to $33.27 when the market closed on June 3, 2021, nearly an 18% decline over the two-day period. *Id.* ¶ 145. Plaintiffs allege that once the market learned of TAL's previously undisclosed repeated violations and that its core business became effectively outlawed by the July 2021 regulations, the price of TAL ADSs again plummeted from $20.52 when the market closed on July 22, 2021, to just $4.40 by market close on July 26, 2021, a nearly 79% decline. *Id.* ¶ 147. This represented a greater than 95% decline in just five months from the February 19, 2021 Class Period high of $90.15 for TAL ADSs. *Id.*

### F. Defendants' Alleged Misstatements During the Class Period

Plaintiffs allege that throughout the Class Period, Defendants issued materially false and misleading statements and omissions, including those regarding: (a) TAL's adherence to Chinese regulations governing the after-school tutoring industry; (b) the ability of TAL to comply with Chinese regulations; and (c) the forthcoming Double Reduction regulations. TAC ¶ 148.

According to the TAC, the first set of alleged misstatements are related to "TAL's compliance with Chinese regulations governing the after-school tutoring industry." *See* TAC ¶ 149–189.

- The 2018 Form 20-F[11]

  In March 2018, two of our training institutions providing K-12 tutoring services received notice under Circular 3 from the local government authority and ***we are taking corrective measures in accordance with Circular 3.*** For example, ***we have reduced our course hours and schedule for certain of our offline tutoring courses to end before 8:30 pm and reduced the coursework assigned to our students***, etc. However, ***we cannot assure you that we will fully comply with the above mentioned regulations timely or at all, and will not be fined or otherwise penalized by government authorities for offering such classes, in which case our business and operations could be materially and adversely affected . . . .***

  ***if we fail to comply with the applicable legal requirements*** concerning obtaining and maintaining applicable licenses and permits and fulfilling applicable registration and filing requirements to operate our after-school tutoring business, including any failure to cure non compliances in a timely manner, we may be

[11] All italicized and bolded texts are as filed in the Third Amended Complaint.

subject to fines, confiscation of the gains derived from our noncompliant operations or the suspension of our noncompliant operations, which may materially and adversely affect our business and results of operations. TAC ¶ 153.

- <u>July 28, 2018 Earnings Call</u>
  Defendant Luo stated: TAL is "***fully cooperating with the government directions***, and ***where needed, [will] make adjustments to our business operations accordingly."*** Defendant Luo also stated that ***"we proactively follow the government regulations and do the adjustments ourselves."*** Defendant Luo further stated: "[W]e, as a company, also we are operating our own business in a very disciplined way." *Id*. ¶ 155.

- <u>January 24, 2019 Earnings Call</u>
  During the call, Defendant Luo again claimed that TAL was following Chinese law regarding the tutoring industry and adjusting its business practices accordingly:

  As you know, the education industry, including after-school tutoring market is currently in the midst of ongoing education reforms, standardizations and regulations. All these policies are aimed at further improving overall standards and the ecosystem of the entire industry. ***We are following government directions***, ***and where needed, we will continue to make adjustments into our business operations accordingly***.

- <u>January 24, 2019 Earnings Call</u>
  Defendant Luo added during the January 24 earnings call that "***we welcome all the regulations, policies in online environments***." Defendant Luo further reassured investors that "***[i]f any new policy [comes] out, we definitely will become the first compan[y] who will go and implement all the policies in place***." During the same call, Defendant He stated: "***we are pacing our off-line capacity growth as we continue to invest in new technology and online business to ensure we are following the new standards and regulations that are currently being implemented."*** Finally, Defendant Luo stated: "And we will continue to follow all of government policies and regulations to make sure the new learning centers we enter is compliant with the government requirements." *Id*. ¶ 158.

- <u>April 25, 2019 Earnings Call</u>
  During the call, in regard to the education regulations, defendant Luo stated that ***"we continue to invest in new technology and online business to keep improving our overall operational efficiency and ensure we are following the new standards and regulations that are currently being implemented***" and "***[w]e have followed the government directions***, ***and where needed, we'll continue to adjust our business operations accordingly."*** *Id*. ¶ 160.

- <u>October 24, 2019 Earnings Call</u>

[D]uring an earnings call, in regard to the government policies and regulations, Defendant Luo acknowledged that the regulations put in place in July 2018 have "definitely [impacted] our operations in the past, maybe 6 quarters," which has made ***"[t]he pressure of being compliant . . . bigger than before."*** Yet, Defendant Luo asserted that "***the policies were a good timing for us to review our business models and be more cautious***," so TAL "***can be more compliant than before***." With respect to off-line centers, he stated: "***we will still be very cautious with the approval policy as first priority to make sure all off-line centers can be more compliant."*** *Id.* ¶ 162.

- June 30, 2020 Form F-20
  In the Form 20-F, Defendants Zhang and Luo certified pursuant to the SOX that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* ¶ 164.

- June 30, 2020 Form F-20
  The 2020 Form 20-F included the Company's annual financial results, and described TAL's purportedly effective marketing and recruitment strategies, stating that the Company's "reputation and brand have also greatly facilitated our student recruitment" and that TAL ***"adapted our operations" to comply with existing governmental regulations and "been making efforts to ensure compliance with these regulations and implementation rules."*** TAL also explained how on February 13. 2018, the MOE and three other government authorities made changes to academic competitions which may impact the demand for their after-school tutoring business and personalized premium service and stated: "***We have adapted our operations which may be construed as competitions or ranking activities to these regulations."*** *Id.* ¶ 166.

- January 1, 2021 Earnings Call
  During the call, defendant Luo asserted that TAL ***"[a]s always, . . . will conduct [its] business in line with all relevant government policies and regulations, including those that regard national public health."*** Defendant Luo further committed to ***"investing in technology, teachers and marketing and make every effort to build all-around online services with top-quality content and customer experiences.***" He further stated: "we will consistently pursue our long-term strategy regardless of what kind of the ***short-term challenges we are facing***. *Id.* ¶ 172.

- April 22, 2021 Earnings Call
  D.S. Kim, an analyst with JP Morgan Chase & Co. asked Defendants about TAL's compliance with marketing regulations. Defendant Luo claimed, "***very clearly, we comply with the guidelines***. ***We made necessary adjustments."*** *Id.* ¶ 174.

The second set of statements relate to TAL's compliance with pricing regulations.

- April 28, 2020 Earnings Call
  Defendant Luo stated: "So the pricing strategy of online will serve our purpose to getting more market share, to serve more people and to make people more satisfy." Defendant Luo further stated: "I think on one side, we tailored price a little bit up, but on the other side, we also give promotions in the coupons and kind of an incentive for the parents and students if they can finish the work." *Id*. ¶ 178.

The third set of statements relate to TAL's compliance with tuition payment regulations.

- October 25, 2018 Earnings Call
  Mark Li, an analyst with Citigroup Inc., Research Division, asked Defendant Luo about the advanced tuition payment regulation, stating: "I want to know about the regulation of no more than 3 months of getting the fees." Defendant Luo replied:

  I think we as the top players in this industry, ***we are definitely to comply with the government policies. We're in the process to implement the 3-month policies across our business units.*** For example, the Xueersi Peiyou small class. Their retention period will start from late October, maybe this week and next week, to early December. So we will change our system to fit in the 3-months policy, with no doubt. We will follow the government policy to do this.

  And for the Xueersi one-on-on – for Zhikang one-one-one [sic], ***yes we will also adopt this one-on-one policy – this 3-month policies.*** But because for the one-on-one, actually, most of their students, actually, coming up from our small class. ***So we don't foresee a material impact on maybe difference or change to my business due to the change of the 3-month policy. We don't see any material impact on them . . . .***

  But again, I think the 3-month policy is very good policy because it gives more right back to the parents. . . .

  ***So we are also quite confident to this 3-month policy to give more rights back to the parents. And we believe that's the right way and that's the right policy to help improve the quality of the whole industry.*** *Id*. ¶ 180.

- January 24, 2019 Earnings Call
  During the call, Yuzhong Gao, an analyst with CICC asked Defendants: "how much of your deferred revenue has been impacted by the new tuition collection policy?" Defendant He replied:

  And for your question, yes, according to the regulations issued last year in August, parents cannot be billed for more than 3 months. It does have impact on our deferred revenue and cash flow. ***Since the policy has been issued, we have followed the***

> ***government's requirement to make necessary adjustment of our tuition fee charging policies if needed.*** This particular policy actually gives a right of choice back to the parents, ***which we believe is a right and good practice to protect the parents' rights and interest*** and, as I just mentioned, helps to improve the overall industry environment. . . .
>
> And in terms of the pro forma, we charge tuition fee based on the spring, summer, autumn and winter semesters. *Id*. ¶ 182.

- <u>October 25, 2018 Earnings Call</u>
  During the call, Yue Wu, an analyst with China International Capital Corporation Limited, asked Defendant Luo about teachers' licenses and in particular, whether the teacher licensing exam affects TAL's next quarter guidance and expansion. Defendant Luo replied:

  I think because ***we have put the teacher license as a very high priority in the past few years, so in this industry***, the percentage of our teachers who have license is higher than the industry average. And based on the government's policy, this year, most of – almost all, but most of our teachers who don't have license, they have registered exams in November, which will happen after 1 or 2 weeks. ***So we will continue to follow company's – government's policy to make sure all of our teachers can be compliant.*** And we don't see a material impact from teaching license in the short term, especially for the next quarter. *Id*. ¶ 184.

- <u>January 24, 2019 Earnings Call</u>
  During the call, Thomas Chong, an analyst with Credit Suisse AG's research division, asked Defendant Luo for an update regarding teachers' passing rates on exams. Defendant Luo responded: "[W]e will continue to encourage our teachers, who don't have license, to go and apply for the new teacher exams and try to get teacher license by the end of the exams. We continue to encourage all of them to do so." *Id*. ¶ 186.

The Third Amended Complaint alleged Defendants made materially false and misleading statements and omissions regarding the PRC's impending Double Reduction policies.

- <u>May 7, 2021 Form 20-F</u>
  TAL reported that under PRC advertising, pricing and anti-unfair competition laws and regulations, "we are obligated to monitor our advertising and promotional content to ensure that such content is true and accurate and in full compliance with applicable laws and regulations." . . . TAL stated: ***"We have adapted our operations which may be construed as competitions or ranking activities to these regulations. We cannot assure you whether relevant governmental authorities will find our operations in violation of such regulations.***" TAL also referenced the State Council Opinion 80 and Circular 10 that provide a series of requirements in the operation of after-school tutoring business and that they "***have been making efforts to ensure compliance with these regulations and implementation rules."*** *Id*. ¶ 197.

- May 7, 2021 Form 20-F
  TAL specifically mentioned how the "market price for [its] ADSs is likely to be highly volatile and subject to wide fluctuations in response to factors such as…" and then listed several factors, **none of which** included information on TAL's longstanding history of regulatory violations, including for releasing misleading advertisements.

  TAL claimed as part of its filing that "[it] [was] not aware of any trends, uncertainties, demands, commitments or events for the fiscal year end February 28, 2021 that are reasonably likely to have a material adverse effect on [its] net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions." *Id.* ¶¶ 198-204.

The Third Amended Complaint alleges Defendants made materially false and misleading statements and omissions about Sarbanes-Oxley Certifications.

- June 26, 2018 Form 20-F
  Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* ¶ 208.

- May 16, 2019 Form 20-F
  In the 2019 Form 20-F, Defendants Zhang and Luo certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Both Defendants also certified pursuant to Section 906 of SOX: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* ¶ 210.

### G. Post Class Period Developments

On July 30, 2021, TAL announced that it would be cancelling its scheduled earnings release and earnings call in light of the regulatory developments. TAC ¶ 250. In October 2021, staff at Xueersi stated that the Company would cease admitting new students and that their online payment channels were closed. *Id.* ¶ 251. On October 13, 2021, the Sixth Tone released an article

stating "the payments freeze ensures that the once-vast for-profit tutoring industry will be largely dissolved by the end of the year." *Id*. ¶ 252. On November 12, 2021, TAL filed a press release announcing plans to cease offering academic subjects to students from kindergarten through grade nine in mainland China by the end of December 2021. *Id*. ¶ 253. TAL further stated that the cessation of these activities would have "a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods" and that the revenues derived from offering those services for fiscal year end February 28, 2021, "accounted for a substantial majority of the Company's total revenues in the year." *Id*.

## LEGAL STANDARD

### I. Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557.The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007).

**II. Motions to Dismiss under Fed. R. Civ. P. 9(b) and the PSLRA**

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading

[and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal,* make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also Francisco v. Abengoa, S.A.*, No. 15 CIV. 6279 (ER), 2026 WL 2547006, at *17 (S.D.N.Y. Aug. 28, 2026).

## III. Section 10(b) of the Exchange Act and Rule 10b-5

Plaintiff brings claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, against all Defendants, as well as claims for violations of Section 20(a) against Defendants Zhang, Luo, and He.

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Under Rule 10b-5, promulgated thereunder, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to

> make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. SEC Rule 10b–5 b "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 204 (S.D.N.Y. 2020) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

To state a private civil claim under Section 10(b) and Rule 10b-5, Plaintiff must prove the following six elements: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase or sale of securities; (4) Plaintiff's reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

**IV. Section 20(a)**

Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates Section 10. *See* 15 U.S.C. § 78t(a). To establish a Section 20(a) claim, Plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns.*, 493 F.3d at 108.

## DISCUSSION

Defendants argue that (1) Plaintiffs fail to plead scienter; (2) Plaintiffs fail to plead that any statements were false when made and (3) Plaintiffs' allegation of a breach of Item 5(D), 105, or 303 fails because Plaintiffs have not alleged actual knowledge of the purported trends.

**I. Scienter**

To plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *see* 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)). Recklessness may also suffice to plead scienter for securities fraud in the Second Circuit. *See ECA*, 553 F.3d at 198.

As mentioned above, to create a strong inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. In determining whether this inference exists, courts consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (citing *ECA*, 553 F.3d at 198). "Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA*, 553 F.3d at 198. "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco*, 559 F. Supp. 3d at 317 (S.D.N.Y. 2021) (quoting *ECA*, 553 F.3d at 198).

A "strong inference of fraudulent intent can be established by alleging with sufficient particularity (i) 'that defendants had the motive and opportunity to commit fraud' or (ii) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Hawaii Structural*

*Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 848 (S.D.N.Y. 2019) (quoting *ECA*, 553 F.3d at 198).

**A. Motive and Opportunity**

"A strong inference of scienter through 'motive and opportunity' will only be raised where plaintiffs allege that defendants 'benefitted in some concrete and personal way from the purported fraud.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (quoting *ECA.*, 553 F.3d at 198). "The desire for the corporation to maintain the appearance of profitability, keep stock prices high to increase officer compensation, and sustain the success of an investment does not suffice to establish a motive." *In re Plug Power, Inc. Sec. Litig.*, No. 21 CIV. 2004 (ER), 2022 WL 4631892, at *11 (S.D.N.Y. Sept. 29, 2022) (citing *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020) and *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013). Instead, "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.* (citing *Novak*, 216 F.3d at 308).

**1. The articles are insufficient to show scienter.**

In the TAC, Plaintiffs make new allegations to support scienter: that based on articles, Defendants had advanced warning of the Double Reduction regulations. Plaintiffs cite to a *Beijing Daily*[12] article dated May 8, 2021, to support their claim that TAL, among other private tutoring companies, "attended a meeting with high-ranking government officials in China to discuss the Double Reduction policies[]" just before TAL filed its "2021 Form 20-F." TAC ¶¶ 206-07. Defendants argue that the *Beijing Daily* article mentions only broad efforts to reduce the burdens

[12] The native Chinese version of the article is available at https://www.beijing.gov.cn/gongkai/ldhd/202105/t20210508_2383569.html. A certified English translation is available at *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, No. 22-cv-07966 (E.D.N.Y.), ECF No. 41-6.

of homework and after-school tutoring, which had already been adopted by previous Chinese regulations. Defendants' Motion to Dismiss Third Amended Complaint ("Deft. MTD") at 7. Defendants contend the article does not mention the actual Double Reduction regulations announced on July 23, 2021 that impacted the market --- that all education companies register as nonprofits and that no new licenses would be issued to tutoring agencies catering to elementary and middle school students. TAC ¶ 79. In response, Plaintiffs argue that it "is of no consequence" that "the article did not specify whether the government revealed the precise content of the Double Reduction regulations to attendees." Plaintiffs' Opposition to Defendants' Motion to Dismiss the Third Amended Complaint ("Pl. Opp.") at 18. The Court finds the article's lack of specificity, regarding what, if anything, Defendants knew about the impending regulations, very consequential, as this goes directly to whether Defendants had scienter. It is unclear from the article, which is not a primary source, what the Chinese government told Defendants about the upcoming Double Reduction regulations, if anything. The Court *In re UiPath, Inc. Sec. Litig.* examined whether the defendants had access to real-time information that contradicted their allegedly misleading statements, to meet the burden of strong circumstantial evidence, which is what Plaintiffs here claim to have, No. 24 CIV. 4702 (JPC), 2025 WL 2065093 (S.D.N.Y. July 23, 2025). Judge Cronan held, like other courts, that plaintiffs needed to identify specific reports or statements. *See also Shemian v. Rsch. In Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014). Plaintiffs here do not have that level of detail, especially not from this article. Therefore, Plaintiffs' introduction of the *Beijing Daily* article in the TAC is not sufficient to demonstrate Defendants' advanced knowledge of the Double Reduction policy announced on July 23, 20221.

Plaintiffs also introduce another article from *Caixin Global* dated July 26, 2021 to support the requisite element of scienter. The *Caixin Global* article reported that "Chinese officials held multiple rounds of talks with top private education firms," including TAL, "to discuss the industry's future before announcing sweeping new regulations last week that are set to transform the sector." TAC ¶ 263. Importantly, as Defendants note, this article does not indicate when these discussions occurred, so there is no way of knowing if they took place before Defendants' made the alleged misstatements. Plaintiffs ask the Court to infer that the multiple rounds of talks occurred before May 7, 2021 (the last day of alleged misstatements) but have not pleaded sufficient facts for the Court to draw such an inference. Mere participation in discussions, without specific evidence as to how information discussed contradicts the statements made by defendants, does not allow for the Court to find a strong inference of scienter. *See In re AppHarvest Sec. Litig*., 684 F. Supp. 3d 201, 242 (S.D.N.Y. 2023). Therefore, the Court cannot credit the *Caixin Global* article as evidence of a strong inference of scienter.

**2. The evidence from confidential witnesses is insufficient to show scienter.**

Like in the SAC, Plaintiffs rely on Confidential Witness 1 ("CW1") to impute scienter, but the TAC does not plead with specificity what CW1's specific duties or responsibilities were or how CW1 had insight into Defendants' state of mind. Plaintiffs are allowed to use confidential sources to support their circumstantial evidence of scienter. *See Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011). "Courts…will credit confidential source allegations, generally, in two situations. The first is when those sources' positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations…. Second, when independent adequately plead factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened."

*Id*. (internal citations omitted). However, confidential sources cannot just "parrot [ ] ... conclusory allegations contained in the complaint." *In re Sierra Wireless, Inc. Sec. Litig*., 482 F.Supp.2d 365, 376 (S.D.N.Y.2007). In the TAC, Plaintiffs allege that senior executives" had "internal discussions, meetings, and emails . . . regarding the forthcoming regulations" and "TAL employees talked about the potential new regulations almost daily and knew that changes were forthcoming," AC ¶ 39. Yet, Plaintiffs do not provide details about the contents of any of these discussions, meetings, or emails or explain how CW1 knew defendants had advanced knowledge of the Double Reduction regulations. Besides CW1, no other CW had contact with any Defendant (only CW3 and CW5 even allegedly worked in Beijing, *see* TAC ¶¶ 41, 43). "In the absence of direct personal contact between the confidential witnesses and the Individual Defendants, Plaintiffs must demonstrate scienter by other means." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *see also Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 880 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) ("Furthermore, the confidential witness does not describe any communications with the Defendants or provide grounds to believe they were aware of the alleged scheme."); *cf. In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019).[13]

**3. Defendants' equity sales do not support scienter.**

---

[13] In *In re Avon Sec. Litig.*, the Court held that "[t]he notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law" and ultimately credited the seven confidential witnesses cited in the complaint. *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21. However, in this case, the Plaintiffs' complaint included detailed descriptions of the CWs' job responsibilities, which indicated their specific duties, the programming for which they provided oversight, who they oversaw and managed, and who they reported to. *Id.* at *2. Plaintiffs, here, did not include such particular allegations in the TAC.

The Court remains unconvinced that Defendants' equity sales support scienter because they were not inherently suspicious. "Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual*." City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (internal citations omitted). "A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information." *Id.* (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)). To determine whether trading is unusual or suspicious, a court examines the following factors:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*Sun v. TAL Educ. Grp*., No. 22-CV-01015 (ALC), 2023 WL 6394413, at *29 (S.D.N.Y. Sept. 29, 2023).

One of the main issues with Plaintiffs' claims this Court identified in its prior opinion was Plaintiffs' failure to allege that Defendants made net profits from selling stock. *Id*. at *30. Plaintiffs replace "proceeds" with "net profits" in their TAC without providing evidence of a change in the numbers. Therefore, the Court does not find that Plaintiffs demonstrated suspicious profits.

In the TAC, Plaintiffs also allege that Defendants Zhang and Luo retained more than 96% and more than 80% of their equity, respectively, ¶ 273. It would not make sense for these defendants to retain this much of their equity if they were engaged in insider trading. In response, Plaintiffs argue that they were "working with incomplete data." Plaintiffs' Opposition at 27. The Court finds that this undermines Plaintiffs' position that the trading was suspicious and finds that the Plaintiffs have failed to plead a strong inference of scienter.

Plaintiffs have failed to put forward well-pleaded allegations that any of the Individual Defendants acted with scienter. "In the absence of scienter, Plaintiffs cannot state a claim under Section 10(b) or Rule 10b-5" and therefore these claims "must be dismissed." *Maloney*, 518 F. Supp. 3d at 782.

**II. Plaintiffs failed to plead the statements were false.**

Even if Plaintiffs pleaded scienter, which they have not, Plaintiffs' TAC must be dismissed because they have not pleaded sufficient facts to demonstrate that the statements at issue were false. Plaintiffs allege that TAL made 1) misleading statements regarding compliance with Chinese regulations and 2) made half-truths about the Double Reduction policies.

To plead a claim of securities fraud, Plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

**1. Statements Regarding Compliance with Chinese Regulations**

Plaintiffs allege that Defendants' following statements were false: TAL is "fully cooperating with the government directions" and "we proactively follow the government regulations" (TAC ¶155); "we are following government directions" and "will continue to make adjustments into our business operations accordingly" (*Id.* ¶157); "we are following the new standards and regulations that are currently being implemented" and "will continue to follow all [the] government policies and regulations" (*Id.* ¶158); we are following government directions" and "will continue to make adjustments into our business operations accordingly"(*Id.* ¶157); "we are following the new standards and regulations that are currently being implemented" and "will continue to follow all [the] government policies and regulations" (*Id.* ¶158);[7]"[w]e have followed the government directions" (*Id.* ¶160) ;and "very clearly, we comply with the guidelines. We

made necessary adjustments" (*Id*. ¶174). However, other than "penalty decisions" and testimony from CWs, which the Court has already discounted because these CWs did not have direct contact with Defendants, Plaintiffs do not offer the particularized facts required for falsity. Moreover, the penalty decisions do not necessarily indicate widespread non-compliance with government regulations. As this Court has already noted in the July 2025 hearing, and Plaintiffs agreed, "complying" does not need to mean 100 percent compliance. Hrg. Tr. at 19:24-20. Therefore, the Court does not find that these statements were materially misleading.

**2. Statements about the Double Reduction Policies**

Plaintiffs also allege that two months before the Double Reduction policies went into effect, Defendants only made boilerplate risk warnings about the new regulations. To support their claim, Plaintiffs point to Defendants' 2021 Form 20-F statements that "[U]ncertainties . . . exist as the competent authorities may set more specific and stringent operation requirements for after-school tutoring institutions on various aspects including the means and timing of fee collection, pricing, advertisements and promotion content, prepaid funds under supervision, teachers' qualification licenses, refunds, course time and content, homework arrangement, and student enrollment, among others." TAC ¶199. Plaintiffs argue that Defendants' choice of the word "may" was misleading because Defendants definitively knew that China's Double Reduction regulations were not only imminent but also highly likely to materially impact TAL's business. In support of this argument, Plaintiffs cite to *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.,* where the Court found a risk disclosure to be misleading, No. 22-CV-7966 (PKC) (CLP), 2025 WL 416872 (E.D.N.Y. Feb. 6, 2025). One of the statements at issue in *Gaotu* was in a 2020 Form 20-F, "[u]ncertainties exist in relation to new legislation" and that "[f]ailure to renew requested licenses or permits in a timely manner or obtain newly required ones due to adverse

changes in regulations or policies could have a material adverse impact on our business." In *Gaotu*, the plaintiffs alleged that the defendants had "sold a significant quantity of Gaotu shares through Irefresh" on March 9, 2021… and they further cite to the Financial Times article on the Irefresh sales, which states that, 'one person close to [Gaotu] said its leaders were aware at the time of the trade that Beijing was considering stricter regulations on the industry.'" (quotation altered and internal citation omitted). *Id.,* at * 8. The Plaintiffs here do not allege that TAL and others were suspiciously selling shares or that TAL definitively knew about the existence of Double Reduction. As already discussed, the singular *Beijing Daily* article that Plaintiffs cite, to argue that Defendants knew about the Double Reduction policies, does not specify the policies sufficiently. Therefore, Plaintiffs have not alleged that Defendants' statements here were a generic risk disclosure constituting a securities violation. Plaintiffs have not alleged that Defendants actually knew more than they disclosed.

Because Plaintiffs have failed to plead both scienter and falsity, the Court gives no opinion as to the Parties' arguments concerning loss causation.

**III. Item 5(D) of Form 20-F, Item 105, Item 303**

Plaintiffs allege that Defendants violated their affirmative duties pursuant to Item 5(D) of Form 20-F and Item 105 of Regulation S-K to disclose the impacts of the known uncertainties and risks concerning TAL's flagrant and repeated violations of governmental rules and regulations. TAC ¶ 213-29. Resting on its prior analysis, the Court finds that, once again, Plaintiffs' allegations essentially mirror the Plaintiffs' allegations related to their Section 10b claims. Therefore, the claims under these regulations must fail.

What's new in the TAC is Plaintiffs' Item 303 claim. Item 303 of Regulation S–K requires filers to disclose "known trends or uncertainties that the registrant reasonably expects will have a

material unfavorable impact on revenues or income from continuing operations.*"* *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citing 17 C.F.R. § 229.303(a)(3)(ii)). Filers must also disclose the "manner in which [the trend] might reasonably be expected to materially impact a company's overall financial position." *Id.* at 105. Plaintiffs argue that TAL was required to "disclose the forthcoming Double Reduction policies and their anticipated impact on TAL's business," TAC ¶ 219. However, as discussed in regard to scienter, Plaintiffs have not put forth evidence that TAL knew about the Double Reduction policy in advance. Thus, Plaintiffs have not pleaded an omission under Item 303.

## IV. Section 20(a) Claim

As Plaintiffs have failed to adequately allege their § 10(b) claim, Plaintiffs' claim under § 20(a) fails as a matter of law. See *S.E.C. v. First Jersey Sec., Inc*., 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) ("plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant"); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Therefore, Count II is dismissed.

## V. Leave to Amend

Defendants request that the Court deny Plaintiff's Amended Complaint with prejudice. Plaintiff requests leave to amend to cure any pleading deficiencies. The Court doubts that Plaintiffs can cure any pleading deficiencies, and they have amended three times. While the Court does not grant leave to amend at this time, the Court will allow Plaintiffs to file a motion to amend. **The motion should include a copy of the proposed complaint and must be filed by October 22, 2026. Defendants may oppose by November 5, 2026 and any reply by November 12, 2026.**

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. The Clerk of the Court is respectfully directed to terminate ECF Nos. 103 and 104.

**SO ORDERED.**

**Dated: September 29, 2026**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**